<span style="color:red">FILED
CLERK</span>

1/15/2016 3:57 pm

<span style="color:red">U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE</span>

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**
---------------------------------------------------------X

UNITED STATES OF AMERICA,

              -against-

EDWARD M. WALSH, JR.,

                   Defendant.

---------------------------------------------------------X

**ORDER**
15-cr-91 (ADS)

**APPEARANCES:**

**United States Attorney's Office, Eastern District of New York**
610 Federal Plaza
Central Islip, NY 11722
        By: Catherine Mary Marabile, Assistant U.S. Attorney
            Raymond A. Tierney, Assistant U.S. Attorney

**Leonard Lato, Esq.**
*Attorney for the Defendant*
200 Motor Parkway, Suite C-17
Hauppauge, NY 11788

**William D. Wexler, Esq.**
*Attorney for the Defendant*
816 Deer Park Avenue
North Babylon, NY 11703

**SPATT, District Judge.**

On March 6, 2015, a grand jury returned an Indictment (the "Indictment") against the Defendant Edward M. Walsh, Jr. (the "Defendant"), an employee of the Suffolk County Sheriff's Office ("SCSO"). The Indictment alleges that from January 2011 to April 2014, the Defendant made false representations to the SCSO as to the amount of overtime and regular hours that he worked, and as a result, SCSO paid him for hours that he did not actually work.

The Indictment charges the Defendant with one count of theft of funds, 18 U.S.C. § 666(a)(1)(A), and one count of wire fraud, 18 U.S.C. § 1343.  In addition, the Indictment gives the Defendant notice that in the event he is convicted of either count, the Government will seek forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) of any property derived from proceeds traceable to the crimes charged.

Presently before the Court is the Defendant's motion to dismiss count one of the Indictment and to compel the Government to serve a bill of particulars.

The parties appeared before the Court for oral argument on January 15, 2016.

For the reasons set forth below, the Defendant's motion is denied.

## I. BACKGROUND

The SCSO is a local government agency in Suffolk County, New York, which operated correctional facilities in Yaphank and Riverhead, New York.  (Indictment ¶ 1.)  Specifically, the SCSO provided "Suffolk County courthouse security and enforcement of all decrees, orders and mandates of the civil courts within the county"; "patrolled and investigated crimes committed on county-owned property"; and "oversaw all security matters within the correctional facilities it operated."  (Id.)

From 2010 to 2014, the SCSO "received in excess of $10,000 each calendar year under a federal program involving asset forfeiture monies and other forms of federal assistance."  (Id. at ¶ 2.)

The Defendant began his employment with the SCSO in December 1990.  (Id. at ¶ 1.)  On September 11, 2006, the Defendant was promoted to the position of SCSO Correction Officer III Investigator and "was assigned to work at the SCSO correctional facility in Riverhead as an aide to the Sheriff."  (Id. at ¶ 3.)  During the period of his employment, the Defendant "was paid

a portion of his wages from SCSO via direct deposit," and "[a]ll such payment to [the Defendant]'s bank account in Suffolk County, New York were electronically transmitted through the State of Massachusetts." (Id. at ¶ 4.)

In addition, since at least 2006 to the present, the Defendant was the Chairman of the Suffolk County Conservative Party ("SCCP"). (Id. at ¶ 7.)

On January 7, 2015, the Defendant was arrested pursuant to a complaint charging him with theft of funds in violation of 18 U.S.C. § 666(a)(1)(A). The complaint alleged that from January 2011 to April 2014:

> in order to obtain compensation from the SCSO, the [D]efendant Edward M. Walsh, Jr. falsely represented to the SCSO that he had worked certain regular and overtime hours when, in fact, he did not work those hours. Contrary to his representations to the SCSO that he was working regular and overtime hours for the SCSO on numerous dates, [the Defendant] was, among other things, playing golf or performing work on behalf of the SCCP. In reliance on those false representations, the SCSO paid [the Defendant] wages for hours he did not work.

(Compl. at ¶ 8.)

To support this allegation, the complaint provides examples of regular and overtime hours that the Defendant allegedly represented to the SCSO that he had worked and was paid for. (See Compl. at ¶¶ 9–34.) It then alleged that records from the Defendant's cell phone, the Hampton Hills Golf & Country Club, Astoria Bank, the Suffolk County Federal Credit Union, TD Ameritrade, State Farm Insurance, and Foxwoods Casino, demonstrate that the Defendant was not at the SCSO Riverhead facility during the hours that he claimed to be working but was instead, among other things, playing golf, playing poker, and attending SCCP fundraising events. (See id.)

As previously noted, on March 6, 2015, a grand jury returned an Indictment charging the Defendant with one count of theft of funds and one count of wire fraud. Similar to the

complaint, the Indictment alleges that from January 2011 to April 2014, the Defendant "falsely represented to the SCSO that he had worked certain regular and overtime hours, when in fact, he did not work those hours." (Indictment at ¶ 6.)

On March 25, 2015, April 2, 2015, July 16, 2015, October 7, 2015, and October 16, 2015, consistent with its disclosure obligations set forth under Federal Rule of Criminal Procedure ("Fed. R. Crim. P.") 16(a), the Government produced to the Defendant the following categories of documents: (i) SCSO attendance records; (ii) SCSO Internal Affairs records pertaining to the Defendant; (iii) a SCSO computer audit; (iv) SCSO timesheets; (v) the Defendant's golf records; (vi) the Defendant's telephone records; (vii) SCCP records; (viii) records from the Mohegan Sun casino; and (ix) the Defendant's bank records.

The Court will now address (i) the Defendant's motion to dismiss the theft of funds count; and (ii) the Defendant's motion for a bill of particulars.

## II. DISCUSSION

### A. As to the Defendant's Motion to Dismiss Count One of the Indictment

As noted, the Indictment charges the Defendant with one count of Theft of Funds, 18 U.S.C. § 666 ("Section 666"), which statute states:

(a) Whoever, if the circumstance described in subsection (b) of this section exists-
(1) being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof—

(A) embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property that-- (i) is valued at $5,000 or more, and (ii) is owned by, or is under the care, custody, or control of such organization, government, or agency; or

(B) corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency

involving any thing of value of $5,000 or more; or

(2) corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent of an organization or of a State, local or Indian tribal government, or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more;

shall be fined under this title, imprisoned not more than 10 years, or both.

18 U.S.C. § 666(a).

In addition to the requirements in subsection (a) of Section 666, subsection (b) requires the Government to show "that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance."

Finally, subsection (c) states, "This section does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business." This provision is referred to by the parties as the "safe-harbor" provision.

The Defendant asserts that his conduct falls under the safe-harbor provision because "[h]e was a legitimate SCSO employee" and "had a legitimate salary." (The Def.'s Mem. of Law at 15–16.) In support of this contention, the Defendant points to what it contends is the ordinary meaning, legislative history, and the relevant case law surrounding the safe-harbor provision. (See id. at 6–20.)

On the other hand, the Government contends that the question of whether the Defendant's conduct falls under the safe-harbor provision is a jury question and therefore, cannot be the subject of a pre-trial motion to dismiss the indictment. (See the Gov't Opp'n Mem. of Law at 9) Further, even if the Defendant's motion was procedurally proper, the Government asserts that the plain language, legislative history, and case law demonstrates that the safe-harbor

provision may not be applied where, as here, a defendant received compensation on the basis of fraudulent overtime timesheets.  (See id. at 10–18).

**1. As to Whether the Defendant's Motion is Procedurally Proper**

It is not entirely clear which Federal Rule of Criminal Procedure the Defendant is moving under.  The Defendant's papers in support of this motion to dismiss do not provide the applicable rules or legal standards which entitles him to relief.

The Defendant has filed a legal memorandum asserting that the theft of funds count fails to state an offense because Section 666(c) applies to bar prosecution of the conduct alleged in this case.  (See the Def.'s Reply Mem. of Law at 25.)

Fed. R. Crim. P. 12(b)(3)(B)(v) provides that a defendant can raise a defect in the indictment for "failure to state an offense" prior to trial "if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits."

The Defendants' motion appears to be making such an argument, and therefore, the Court will construe the Defendant's motion as one made under Fed. R. Crim. P. 12(b)(3)(B)(v).

For purposes of Rule 12(b)(3)(B)(v), the Second Circuit has stated, "An indictment is sufficient if it 'first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" United States v. Stringer, 730 F.3d 120, 124 (2d Cir. 2013) (quoting Hamling v. United States, 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974)).

This is not a difficult standard to meet:  the indictment need "'do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.'"  United States v. Pirro, 212 F.3d 86, 92 (2d Cir. 2000); see also United States v.

De La Pava, 268 F.3d 157, 162 (2d Cir. 2001) ("An indictment, however, need not be perfect, and common sense and reason are more important than technicalities."); United States v. Goodwin, 141 F.3d 394, 401 (2d Cir. 1997) ("'The precision and detail formerly demanded are no longer required, imperfections of form that are not prejudicial are disregarded, and common sense and reason prevail over technicalities.'") (quoting Charles Alan Wright, Federal Practice and Procedure: Criminal 2d § 123, at 347 (1982) (alteration omitted)).

To establish a theft of funds count under Section 666(a)(1)(a), the Government must prove that (i) the Defendant is "an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof"; (ii) the Defendant "embezzle[d], st[ole], obtain[ed] by fraud, or otherwise without authority knowingly convert[ed] to the use of any person other than the rightful owner or intentionally misapplie[d] property"; (iii) the property is "valued at $5,000 or more"; (iv) the property is "owned by, or is under the care, custody, or control of such organization, government, or agency"; and (v) the organization, government, or agency "receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance."

Here, the Indictment specifically tracks these elements:  it alleges that (i) the Defendant is an employee and agent of the SCSO, which is a local government agency in Suffolk County; (ii) the Defendant "did knowingly and intentionally embezzle, steal, obtain by fraud, misapply and otherwise without authority knowingly convert to the use of a person other than the rightful owner, property of the SCSO"; (iii) the property was "valued at $5,000 or more"; (iv) the property was "owned by, and under the care, custody and control of the SCSO, to wit: wages for regular and overtime hours"; and (v) the SCSO "received benefits in excess of $10,000 under

one or more Federal programs involving grants, contracts, subsidies, loans guarantee, insurance and other forms of Federal assistant in or more one-year periods."  (Indictment at ¶ 8.)

Further, the Indictment alleges that from January 2011 to April 2014, the Defendant "falsely represented to the SCSO that he had worked certain regular and overtime hours when, in fact, he did not work those hours," and was instead "playing golf or working on behalf of the SCCP."  (Id. at ¶ 6.)  In addition, the Government provided the Defendant with the criminal complaint, which outlined his alleged crimes in detail and provides examples of specific instances of misconduct and records that the Government intends to rely on to prove its case.

Based on the Indictment and the disclosures provided by the Government, there is no question that the Defendant has been sufficiently informed of "the time and place (in approximate terms) of the alleged crime."  See Stringer, 730 F.3d at 124–25 ("The government had provided him with the criminal complaint, which outlined his crimes in detail, as well as disclosures that included the victims' names, well in advance of trial. Taking these disclosures into account, it is beyond question that Stringer was sufficiently informed to defend against the charges and to be protected against the risk of double jeopardy.").

As the Indictment tracks the statutory language of § 666(a)(1)(A) and the Defendant has been informed of "the time and place (in approximate terms) of the alleged crime," the Court finds that the Indictment is sufficiently pled.  See United States v. Alfonso, 143 F.3d 772, 776 (2d Cir. 1998) ("We have no doubt that Count One of the indictment in the instant case meets these basic pleading requirements by accurately stating the elements of the offense charged and the approximate time and place of the robbery that defendants allegedly conspired to commit, thereby providing sufficient detail to allow defendants to prepare a defense and to invoke the protection of the Double Jeopardy Clause of the Fifth Amendment against any subsequent

prosecution for the same offense."); United States v. Silver, No. 15-CR-93 (VEC), 2015 WL 4496295, at *7 (S.D.N.Y. July 24, 2015) ("The Superseding Indictment provides Silver with more than enough information to know 'the charge against which he must defend' and would 'enable[ ] him to plead an acquittal or conviction in bar of future prosecutions for the same offense.' . . . . Accordingly, Silver's Motion to Dismiss on this basis is denied.") (quoting Alfonso, 143 F.3d at 776).

Nevertheless, the Defendant asserts that the theft of funds count fails a matter of law because the Defendant's conduct falls under the safe-harbor provision set forth in Section 666(c), which, as noted, provides, "This section does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business." (See the Def.'s Reply Mem. of Law at 25.)

On the other hand, the Government submits that "the application of § 666(c) and whether wages are bona fide and earned in the usual course of business is a question of fact for the jury to decide." (The Gov't Opp'n Mem. of Law at 9–10) (internal quotation marks omitted).

Fed. R. Crim. P. 12(b) provides that "[a]ny defense, objection, or request which is capable of determination without the trial of the general issue may be raised before trial by motion." The Second Circuit has stated that, "'[t]he general issue in a criminal trial is, of course, whether the defendant is guilty of the offense charged.'" United States v. Alfonso, 143 F.3d 772, 777 (2d Cir. 1998) (quoting United States v. Doe, 63 F.3d 121, 125 (2d Cir. 1995) (alteration in original)).

Thus, where a question raised by the Defendant on a pre-trial motion to dismiss is "intermeshed with questions going to the merits, the issue should be determined at trial." Id. (denying a pre-trial motion to dismiss an indictment, in part, because "[i]n the case of a Hobbs

Act prosecution, the requirement of an effect on interstate commerce is itself an element of the offense charged, and the determination of whether the jurisdictional element has been satisfied is part and parcel of the inquiry into the 'general issue' of whether the statute has been violated"); see also United States v. Perez, 575 F.3d 164, 166 (2d Cir. 2009) ("The Defendants, however, had no basis to challenge the sufficiency of the indictment before trial because it met the basic pleading requirements and was valid on its face. The defect of which the Defendants complain is the sufficiency of the Government's proof of the elements of the offense it chose to charge in the indictment."); Doe, 63 F.3d at 125 ("A defendant is not entitled to raise in a pretrial motion the question whether the government breached an agreement with him if the agreement provides a defense to liability for the crimes charged in the indictment; resolution of that question requires trial of the general issue and is not properly decided in a pretrial motion.").

Apparently, the Second Circuit has not yet considered whether a defense predicated on Section 666(c) is an issue that should be determined by the jury at trial, as the Government contends, or whether the question can be determined by the Court prior to trial if there is no need to look beyond the facts alleged in the indictment to decide the question, as the Defendant contends.

Further, there is a split in authority outside of the Second Circuit on this issue. Compare United States v. Mann, 172 F.3d 50 (6th Cir. 1999) (affirming a district court's decision to grant a pre-trial motion to dismiss a theft of funds count because it found that the defendant's alleged conduct fell under the safe-harbor provision set forth in 18 U.S.C. § 666(c)); with United States v. Williams, 507 F.3d 905, 909 (5th Cir. 2007) ("Whether wages are bona fide and earned in the usual course of business is a question of fact for the jury to decide"); United States v. Dwyer,

238 F. App'x 631, 647 (1st Cir. 2007) ("Whether wages were bona fide is a question of fact for the jury.").

Here, the Defendant relies on facts — namely, that the Defendant was employed by the SCSO and received regular and overtime wages from the SCSO — which are alleged in the Indictment and are not disputed by the Government. Thus, the question of whether Section 666(c) applies does not rest on disputed facts but rather, the parties' legal interpretations of Section 666(c).

Under these circumstances, the Court, in an abundance of caution, declines to deny Defendant's motion to dismiss the theft of funds count as procedurally improper. See United States v. Bryant, 556 F. Supp. 2d 378, 426-27 (D.N.J. 2008) ("Although there is authority suggesting that the § 666(c) exception is a question of fact for the jury, . . . Defendants rely on cases where, before trial, the court has dismissed § 666 counts as a matter of law based on the 'safe harbor' provision of § 666(c). Thus, for purposes of this motion, the Court will accept that there may be situations where it is appropriate to dismiss an Indictment pursuant to § 666(c).").

The Court will now turn to the merits of the parties' positions with respect to the ordinary meaning of Section 666(c), its legislative history, and the relevant case law

**2. As to the Ordinary Meaning of 18 U.S.C. § 666(c)**

As noted, Section 666(a)(1)(A) makes it illegal to for an agent of a state or local agency to "embezzle[], steal[], obtain[] by fraud, or otherwise without authority knowingly convert[] to the use of any person other than the rightful owner or intentionally misapplies, property that . . . (i) is valued at $5,000 or more, and (ii) is owned by, or is under the care, custody, or control of such organization, government, or agency."

However, Section 666(c), the safe-harbor provision, provides, "This section does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business."

The Defendant asserts that he was a "legitimate and bona fide" employee of the SCSO who received a salary and overtime wages for his work, and thus, the plain language of the safe-harbor provision applies to bar prosecution of his alleged conduct.  (Id. at 18–19.)

In response, the Government asserts that the Defendant obtained his salary and regular wages through the submission of fraudulent overtime sheets.  Therefore, it contends that his salary and wages were not "bona fide, legitimate wages, paid in the ordinary course of business," and the safe-harbor provision is not applicable to this case.  (Id. at 13.)

"When evaluating the scope of a federal criminal statute, [the court] must look closely to its language, legislative history, and purpose."  United States v. Rooney, 37 F.3d 847, 851 (2d Cir. 1994).  In that regard, "[s]tatutory analysis begins with the plain meaning of a statute.  The plain meaning can be extrapolated by giving words their ordinary sense."  Nat. Res. Def. Council, Inc. v. Muszynski, 268 F.3d 91, 98 (2d Cir. 2001); see also United States v. Aleynikov, 676 F.3d 71, 76 (2d Cir. 2012) ("Statutory construction 'must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose.'") (quoting United States v. Albertini, 472 U.S. 675, 680, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985)).

When a term is not defined by statute, courts can consult dictionaries to determine its ordinary meaning.  Cont'l Terminals, Inc. v. Waterfront Comm'n of New York Harbor, 782 F.3d 102, 109 (2d Cir. 2015) (parenthetically quoting Taniguchi v. Kan Pac. Saipan, Ltd., ––– U.S. –– ––, 132 S.Ct. 1997, 2002, 182 L.Ed.2d 903 (2012) (alteration omitted)); see also United States v.

Rybicki, 354 F.3d 124, 153 (2d Cir. 2003) (discerning the ordinary meaning of the term,
"intangible right to honest services," as used in 18 U.S.C. § 1346, by reference to dictionaries).
However, "where a word is defined multiple ways, dictionary definitions are less helpful and
often a court may not discern the meaning of the statute based on the dictionary definition
alone." Espinoza v. Zenk, No. 10-CV-427 (MKB) 2013 WL 1232208, at *4 (E.D.N.Y. Mar. 27,
2013) (citing United States v. Costello, 666 F.3d 1040, 1043–44 (7th Cir. 2012)).

In addition, "'[t]he plainness or ambiguity of statutory language is determined [not only]
by reference to the language itself, [but as well by] the specific context in which that language is
used, and the broader context of the statute as a whole.'" Yates v. United States, 135 S. Ct. 1074,
1081-82, 191 L. Ed. 2d 64 (2015) (quoting Robinson v. Shell Oil Co., 519 U.S. 337, 341, 117
S.Ct. 843, 136 L.Ed.2d 808 (1997) (alterations in original)).

"If the statutory terms are unambiguous, [the courts] review generally ends and the
statute is construed according to the plain meaning of its words." Greenery Rehab. Grp., Inc. v.
Hammon, 150 F.3d 226, 231 (2d Cir. 1998); see also United States v. Coyne, 4 F.3d 100, 108 (2d
Cir. 1993) ("'Courts . . . applying criminal laws generally must follow the plain and
unambiguous meaning of the statutory language. '[O]nly the most extraordinary showing of
contrary intentions' in the legislative history will justify a departure from that language.'")
(quoting United States v. Albertini, 472 U.S. 675, 680, 105 S.Ct. 2897, 2902, 86 L.Ed.2d 536
(1985) (some alterations omitted)).

However, "[i]f the statutory language is ambiguous , . . . [the court] will 'resort first to
canons of statutory construction, and, if the [statutory] meaning remains ambiguous, to
legislative history[.]'" Cohen v. JP Morgan Chase & Co., 498 F.3d 111, 116 (2d Cir. 2007)
(quoting Daniel v. Am. Bd. of Emergency Med., 428 F.3d 408, 422 (2d Cir. 2005)).

As noted, Section 666(c) provides, "This section does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business."

The statute does not define the terms, "bona fide salary," "wages," or "in the usual course of business." Accordingly, the Court will first consult dictionaries to discern the ordinary meanings of these terms.

The Government urges the Court to adopt the dictionary definition of the term, "bona fide," which it contends is defined as "made, done, etc. in good faith; without deception or fraud." (The Gov't Opp'n Mem. of Law at 8.) As the Government alleges that from January 2011 to April 2014, the Defendant obtained some of his salary and wages through submitting false timesheets to the SCSO, it asserts that the compensation he earned during this period cannot be considered "bona fide salary" or "wages . . . in the usual course of business" within the ordinary meanings of those terms. (Id.)

Although somewhat hard to discern, it appears that the Defendant does not dispute the Government's proffered definition of "bona fide." Rather, he asserts that "bona fide" must be construed in accordance with the other terms of Section 666(c) — "salary," "wages," and the "usual course of business." (The Def.'s Reply Mem. of Law at 11–13.) As the Defendant was an employee of SCSO, he contends that he received a "bona fide salary" and "wages" in the "usual course of business" regardless of whether he allegedly obtained some of his salary and wages by submitting false time sheets. (See id. at 18–20.)

The dictionaries in use in 1986, when Congress amended Section 666 to add the safe-harbor provision, as well those in use after 1986, uniformly define "bona fide" with some variation of "made in good faith without fraud or deceit." Webster's The Ninth New Collegiate

Dictionary 166 (1985); see also Black's Law Dictionary (10th ed. 2014) ("1. Made in good faith; without fraud or deceit. 2. Sincere; genuine."); Law Dictionary (2002) ("[I]n good faith (q.v.); honestly; without fraud or unfair dealing"); Webster's College Dictionary (1991) ("[M]ade done, etc. in good faith; without deception or fraud"); William Statsky, the Legal Thesaurus Dictionary 98 (1985) ("In good faith (bona fide effort. Sincere, true, genuine, without fraud, without deceit, honest, aboveboard, open, actual innocent, real, not feigned, candid, trustworthy, ingenuous, legitimate"); The American Heritage Dictionary 195 (1982) ( "1. Done or made in good faith; sincere . . . 2. Authentic; genuine"); accord P. Stolz Family P'ship L.P. v. Daum, 355 F.3d 92, 100 (2d Cir. 2004) ("Bona Fide: 1. Made in good faith; without fraud or deceit. 2. Sincere; genuine.") (quoting parenthetically Blacks Law Dictionary (7th ed. 1999)); Bradford v. Moench, 809 F. Supp. 1473, 1487 (D. Utah 1992) ("[T]his court should give the term 'bona fide' its common, ordinary meaning of 'in good faith,' without fraud or deception.").

Dictionaries generally define "salary" as "[a]n agreed compensation for services . . . [usually] paid at regular intervals on a yearly basis, as distinguished from an hourly basis." Black's Law Dictionary (10th ed. 2014); accord Webster's Third New Int'l Dictionary 2002 (1993) ("[F]ixed compensation paid regularly (as by the year, the quarter, month or week) for services" or "remuneration for services given"); William Statsky, the Legal Thesaurus Dictionary 674 (1985) ("A fixed periodical compensation paid for services rendered."); American Heritage Dictionary 1085 (1982) ( "A fixed compensation for services, paid to a person on a regular basis.").

"Wages" is generally defined as "[p]ayment for labor or services . . . based on time worked or quantity produced." Black's Law Dictionary (10th ed. 2014); accord The Law Dictionary (2002) ("[T]he agreed compensation paid by an employer to an employee for work

done"); <u>Webster's Third New International Dictionary</u> 2568–69 (1993) ("1 a: a pledge or payment of usu[ally] monetary remuneration by an employer esp. for labor or services usu. According to contract and on an hourly, daily, or piecework basis[.] . . . 2: recompense, requital, reward"); William Statsky, the <u>Legal Thesaurus Dictionary</u> 795 (1985) ("[P]ayment made to a hired person for his or her services"); <u>The American Heritage Dictionary</u> 1359 (1982) ("[P]ayment for services to a worker").

Finally, "usual course of business" is defined by legal dictionaries as "[t]he normal routine in managing a trade or business." <u>Black's Law Dictionary</u> (10th ed. 2014); <u>see also</u> <u>Ballantine's Law Dictionary</u> ("According to the usages and customs of commercial transactions"); William Statsky, the <u>Legal Thesaurus Dictionary</u> 544 (1985) ("That which transpires as a matter of daily custom in business; the transaction of business according to usages and customs of the commercial world generally, of a particular community, or of a particular individual.").

Based on these dictionary definitions, the Court finds that the ordinary meaning of the phrase, "bona fide salary . . . in the ordinary course of business," is fixed compensation for services obtained without fraud or deceit and in the normal routine of a business. Further, the ordinary meaning of the phrase, "wages . . . in the ordinary course of business," is payment received by employees based on the amount of time they worked or quantity of goods they produced in the normal routine of a business.

Here, according to the criminal complaint, Defendant received a salary from the SCSO for his "regular shift hours," which were eight hours a day, five days a week, for a total of forty hours per week. (<u>See</u> Compl. at ¶ 9 n. 3.) If he worked in excess of his "regular shift hours," the Defendant was required to submit time sheets representing both his regular shift hours and

overtime hours.  (Id.)  Based on these time sheets, the Defendant would receive compensation for any regular and overtime hours he claimed to have worked.  (See id.)

According to the Indictment, from January 2011 to April 2014, the Defendant submitted false time sheets to the SCSO representing that he worked regular and overtime hours that he did not in fact work.  Based on these allegedly false time sheets, the Defendant received regular and overtime wages for hours that he did not work.  (See Indictment at ¶ 6.)

Construing these allegations as true, the Court finds that a reasonable jury could conclude that the Defendants' compensation from January 2011 to April 2014 was not "bona fide salary . . . in the usual course of business" because he allegedly obtained overtime compensation through fraud and deceit by intentionally submitting false time sheets.  A reasonable jury could also conclude that the Defendant's overtime compensation during the relevant period was not "wages in the ordinary course of business" because the term, "wages," implies that he was compensated based on the hours that he worked, and according to the Indictment, the Defendant was paid overtime for hours that he did not actually work.  Thus, a reasonable jury could find that the Defendants' conduct does not fall under the plain language of the safe-harbor provision and does constitute an intentional misapplication of funds in violation of Section 666(a)(1)(A).

However, the Court must not rely solely on dictionary definitions in isolation and instead, must construe the safe-harbor provision according to the broader context of Section 666 as a whole and the specific context in which it is used.  See Yates, 135 S. Ct. at 1081-82; see also Deal v. United States, 508 U.S. 129, 132, 113 S. Ct. 1993, 1996, 124 L. Ed. 2d 44 (1993) ("[It is a] fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used.").

In that regard, "[i]t is 'one of the most basic interpretive canons[ ] that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.'" Hedges v. Obama, 724 F.3d 170, 189 (2d Cir. 2013) (Corley v. United States, 556 U.S. 303, 314, 129 S.Ct. 1558, 173 L.Ed.2d 443 (2009) (alterations in original).

The Defendant asserts that the canon against surplusage prevents the Court from interpreting Section 666(c) to only provide safe-harbor to employees who receive legitimate salaries and wages. (See the Def.'s Mem. of Law at 13-14.) That is because employees who receive their wages legitimately would not be subject to liability under Section 666(a)(1)(A) and therefore, according to the Defendant, Congress would have no need to provide those employees with a separate safe-harbor provision under Section 666(c). (See id. at 14.) Accordingly, the Defendant contends that adopting the Government's interpretation of Section 666(c) — namely, that the provision only provides safe-harbor for employees who earn their "bona fide salary" and "wages" legitimately — would render the provision superfluous. (See id.) The Court disagrees for three reasons.

First, "[t]he canon against surplusage is not an absolute rule." Marx v. Gen. Revenue Corp., 133 S. Ct. 1166, 1177, 185 L. Ed. 2d 242 (2013). Of importance, "the canon against surplusage 'assists only where a competing interpretation gives effect to every clause and word of a statute.'" Id. (quoting Microsoft Corp. v. i4i Ltd. Partnership, 564 U.S. ——, ——, 131 S.Ct. 2238, 2248, 180 L.Ed.2d 131 (2011)). In other words, the canon of surplusage is not applicable where both parties offer interpretations which leave portions of a statute meaningless or duplicitous. See Lamie v. U.S. Tr., 540 U.S. 526, 536, 124 S. Ct. 1023, 1031, 157 L. Ed. 2d

1024 (2004) ("Where there are two ways to read the text . . . applying the rule against surplusage is, absent other indications, inappropriate.").

As noted earlier, 18 U.S.C. § 666(a)(1)(A) makes an agent of state and local government who receives federal benefits in excess of $10,000 criminally liable if he or she "embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property that — (i) is valued at $5,000 or more, and (ii) is owned by, or is under the care, custody, or control of such organization, government, or agency."

The terms, "embezzle[], steal, obtains by fraud, . . . knowingly convert[] . . . , [and] intentionally misapply[]," all require an intent to apply federal money for one's own purposes. See United States v. Urlacher, 979 F.2d 935, 938 (2d Cir. 1992) ("Section 666(a)(1)(A) prohibits embezzling, stealing, obtaining by fraud, converting, or intentionally misapplying funds. The first four prohibitions cover any possible taking of money for one's own use or benefit. Intentional misapplication, in order to avoid redundancy, must mean intentional misapplication for otherwise legitimate purposes[.]").

Thus, the Defendant is correct that an employee who received legitimate compensation would not be covered by Section 666(a)(1)(A) because he would lack the requisite specific intent. Therefore, reading Section 666(c) to only cover employees who received legitimate compensation does render the provision superfluous with respect to employees who receive their compensation through legitimate channels.

However, the Defendant's interpretation of the safe-harbor provision also renders provisions of Section 666 superfluous. Specifically, if, as the Defendant contends, Section 666(c) provides refuge for any defendant who receives salary or wages regardless of whether his

salary or wages were obtained through fraudulent means, then Congress would have no need to specify that the statute did not cover "*bona fide* salary," which as noted above, implies that an employee's salary was obtained without fraud or deceit. Hence, the fact that Congress did include the term "bona fide" suggests that Congress intended to provide safe-harbor only for those receiving legitimate compensation for their work.

Second, interpreting Section 666(c) as broadly as the Defendant proposes would potentially permit local and state government agents to steal or misappropriate federal money so long as it had the indicia of wages and salary. That result is absurd and plainly contrary to the intent of Congress, discussed in more detail below, which enacted Section 666 in 1984 "to protect the integrity of the vast sums of money distributed through Federal programs from theft, fraud, and undue influence by bribery." United States v. Rooney, 37 F.3d 847, 851 (2d Cir. 1994) (quoting S. Rep. No. 225, 98th Cong., 2d Sess. 369 (1984), reprinted in 1984 U.S.C.C.A.N. 3182, 3510.).

Third, even if, as the Defendant contends, the canon against surplusage produces an ambiguity with regard to Congress's intent, the legislative history of Section 666(c) discussed below makes clear that Congress intended the provision to only provide safe-harbor to legitimate business practices and not to fraudulent schemes, such as the one at issue in this case.

Accordingly, the Court is not persuaded by the Defendant's contention that the canon of surplusage dictates that the Court find that Section 666(c) provides him safe-harbor. See King v. Burwell, 135 S. Ct. 2480, 2492, 192 L. Ed. 2d 483 (2015) ("But our preference for avoiding surplusage constructions is not absolute . . . . And specifically with respect to this Act, rigorous application of the canon does not seem a particularly useful guide to a fair construction of the statute.") (internal quotation marks and citations omitted); Microsoft Corp., 564 U.S. 91, 131 S.

Ct. at 2248 (declining to apply the canon against superfluity because "no interpretation of § 282

— including the two alternatives advanced by Microsoft — avoids excess language.").

Therefore, the Court finds that the plain language, structure of Section 666, and cannons

of statutory interpretation support a finding that the Defendant's alleged conduct does not fall

within the safe-harbor provision of Section 666(c).

### 3. The Legislative History

As noted above, the legislative history of Section 666 also supports a finding that the

Defendant's alleged conduct does not fall under the safe-harbor provision.

In <u>United States v. Rooney</u>, *supra*, the Second Circuit described the context in which

Section 666 was originally enacted in 1984:

> Section 666 was originally enacted in 1984 in response to several federal
> appellate decisions that held that state and local government officials and
> members of private organizations that distribute federal monies did not fall within
> the definition of a 'public official' subject to the provisions of the federal bribery
> statute, 18 U.S.C. § 201.  See S. Rep. No. 225, 98th Cong., 2d Sess. 369 (1984),
> reprinted in 1984 U.S.C.C.A.N. 3182, 3510 . . . . The provision, modeled after the
> bribery statute, 18 U.S.C. § 201, expanded the class of individuals subject to
> federal penalties for prohibited conduct to virtually anyone who either receives
> federal funds or participates in a federal program that meets the jurisdictional
> threshold. Congress intended the terms of the statute to be 'construed broadly,
> consistent with the purpose of this section to protect the integrity of the vast sums
> of money distributed through Federal programs from theft, fraud, and undue
> influence by bribery.' <u>Id.</u> at 3511. Thus, as is evident from the circumstances
> surrounding its adoption, § 666's manifest purpose is to safeguard finite federal
> resources from corruption and to police those with control of federal funds.

37 F.3d at 85.

Subsection (a) of the original 1984 version of Section 666 made it illegal for an agent of a

state or local entity that received more than $10,000 in federal funds to "solicit[], demand[],

accept[], or agree[] to accept anything of value from a person or organization other than his

employer or principal for or because of the recipient's conduct in any transaction or matter or a

series of transactions or matters involving $5,000 or more." PL 98–473 (H J Res 648), PL 98–473, October 12, 1984, 98 Stat 1837.

Subsection (c) of the 1984 version of Section 666 also made it illegal for agents of state and local entities to "offer[], give[], or agree[] to give to an agent of an organization or of a State or local government agency, described in subsection (a), anything of value for or because of the recipient's conduct in any transaction or matter or any series of transactions or matters involving $5,000 or more concerning the affairs of such organization or State or local government agency[.]" Id.

In 1984, Congress also amended 18 U.S.C. § 215 ("Section 215"), a bribery statute that applies to employees of financial institutions, to include similar language:

> Whoever, being an officer, director, employee, agent, or attorney of any financial institution, bank holding company, or savings and loan holding company, except as provided by law, directly or indirectly, asks, demands, exacts, solicits, seeks, accepts, receives or agrees to receive anything of value, for himself or for any other person or entity, other than such financial institution, from any person or entity for or in connection with any transaction or business of such financial institution.

PL 98–473 (H.J. Res 648), PL 98–473, October 12, 1984, 98 Stat 1837.

However, unlike Section 666, Section 215 provided an exemption in subsection (d), which stated, "This section shall not apply to the payment by a financial institution of the usual salary or director's fee paid to an officer, director, employee, agent, or attorney thereof, or to a reasonable fee paid by such financial institution to such officer, director, employee, agent, or attorney for services rendered to such financial institution." Id.

On August 4, 1986, Congress amended Section 215 by adding an intent requirement — namely, Section 215, as amended, prohibited employees of financial institutions from "corruptly give[ing], offer[ing], or promise[ing] anything of value to any person, with intent to influence or

reward an officer, director, employee, agent, or attorney of a financial institution in connection with any business or transaction of such institution.  See PL 99–370 (HR 3511), PL 99–370, August 4, 1986, 100 Stat 779 (emphasis added).

In addition, Congress amended the exemption in Section 215 to provide, "This section shall not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business."  PL 99–370 (HR 3511), PL 99–370, August 4, 1986, 100 Stat 779.  Thus, Congress added the word "bona fide" to the exemption and also broadened it to include "wages," "expenses," and "other compensation paid."  See id.

The House Report accompanying the 1986 amendment to Section 215 states:

New subsection (c) exempts from the coverage of section 215 the payment of bona fide salary, wages, fees, or other compensation and the payment or reimbursement of bona fide expenses.  The exemption provision of present section 215 has been broadened.  The present exemption applies only to salaries paid to officials of a financial institution by the financial institution itself.  However, many employees of credit unions receive their salaries directly from the company with which the credit union is connected. This is a normal business practice and ought not be criminal.  Moreover, the present exemption would not seem to exclude from criminal punishment a bonus paid an employee or the payment or reimbursement of business expenses incurred by the employee.  The Committee's exemption provision cures these defects in the present exemption provision.

H.R. REP. 99-335, 2, 1986 U.S.C.C.A.N. 1782, 1788 (emphasis added).

Accordingly, the legislative history of the 1986 amendment to Section 215 indicates that Congress broadened the exemption to make clear that the statute did not proscribe legitimate business practices, such as "employees of credit unions receive[ing] their salaries directly from the company with which the credit union is connected," "a bonus paid an employee," or "the reimbursement of business expenses incurred by the employee."  See id.

Subsequently, on November 10, 1986, Congress made similar changes to Section 666.  In particular, it also added the word "corruptly" to the original subsections (a) and (c).  Importantly,

it also added a safe-harbor provision identical to the amended exemption in Section 215 —

namely, "[t]his section does not apply to bona fide salary, wages, fees, or other compensation

paid, or expenses paid or reimbursed, in the usual course of business." <u>See</u> PL 99–370 (HR

3511), PL 99–370, August 4, 1986, 100 Stat 779; PL 99–646 (S 1236), PL 99–646, November

10, 1986, 100 Stat 3592l.

The House Report accompanying the November 10, 1986 amendments to Section 666

makes clear that Congress intended its amendments to Section 666 to parallel those made to

Section 215:

> <u>18 U.S.C. 666 prohibits bribery of certain public officials, but does not seek to constrain lawful commercial business transactions</u>. Thus, 18 U.S.C. 666 prohibits corruptly giving or receiving anything of value for the purpose of influencing or being influenced in connection with any business, transaction, or series of transactions. <u>The provision parallels the bank bribery provision (18 U.S.C. 215)</u>. See Pub. L. No. 99–370, 99 Stat. —— (1986). See also H.R. REP. NO. 335, 99th Cong., 1st Sess. (1985); 131 CONG. REC. H–9275 (daily ed. Oct. 29, 1985) (remarks of Rep. Conyers.)

H.R. REP. 99-797, 34, 1986 U.S.C.C.A.N. 6138 (emphasis added).

In addition, the House Report states, "section 42 amends 18 U.S.C. 666 to avoid its

possible application to acceptable commercial and business practices." <u>Id.</u> at 30 (emphasis

added).

Therefore, read together, the legislative history to the 1986 amendments to both Section

215 and Section 666 indicate that by adding an intent requirement and an explicit exemption for

"bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed,"

Congress intended to make clear that the statute did not apply to employees who received

legitimate compensation, nor employers who gave such compensation to its employees.

The Government alleges that the Defendant obtained substantial overtime compensation

from January 2011 to April 2014 based on the submission of false time sheets. Therefore,

construing the allegations in this case as true, it would be contrary to the intent of Congress, as expressed in the legislative history, to find that the Defendant qualified for the safe-harbor provision because he allegedly did not obtain his compensation legitimately and by false pretenses.

The Defendant asserts that adopting such an interpretation of Section 666(c) would be contrary to the intent of Congress because it could "ensnare thousands of State and local government employees" who are "slackers" and work less than the forty-hours that they are compensated for.  (See the Def.'s Mem. of Law at 19–20.)  Again, the Court disagrees.

As noted above, Section 666(a)(1)(A) only proscribes intentional conduct — to be liable, the Government must show that the individual "embezzle[d], st[ole], obtain[ed] by fraud, . . . . knowingly convert[ed], . . . or intentionally misappli[ed]" federal funds.  A hypothetical "slacker" would likely not have the specific intent required to show that he intended to misapply federal funds by working fewer hours than he was supposed to work.  Thus, an appropriate application of the intent requirement of Section 666(a)(1)(A) would prevent the statute from reaching innocuous conduct, such as employees working fewer hours than they are required to under their employment agreements.

The Defendant also asserts that the rule of lenity dictates interpreting Section 666(c) to find that the Defendant's challenged compensation constituted a "bona fide salary" or "wages . . . in the usual course of business."  (The Def.'s Reply Mem. of Law at 23–24.)  Here again, the Court disagrees.

The rule of lenity provides, "'[W]here there is ambiguity in a criminal statute, doubts are resolved in favor of the defendant.'" United States v. Simpson, 319 F.3d 81, 86 (2d Cir. 2002) (quoting United States v. Bass, 404 U.S. 336, 348, 92 S. Ct. 515, 30 L.Ed.2d 488 (1971)

(alteration omitted). However, the application of this rule has "'always [been] reserved . . . for those situations in which a reasonable doubt persists about a statute's intended scope even after resort to the language and structure, legislative history, and motivating policies of the statute." United States v. Gonzalez, 407 F.3d 118, 124 (2d Cir. 2005) (quoting Moskal v. United States, 498 U.S. 103, 108, 111 S.Ct. 461, 112 L.Ed.2d 449 (1990) (emphasis added)).

Here, the Defendant has failed to show that there is an ambiguity in Section 666(c) requiring the application of the rule of lenity. To the contrary, as discussed above, the plain language of Section 666(c), its context, and its legislative history make clear that Congress did not intend for Section 666(c) to apply to the type of fraudulent conduct alleged in the Indictment. Accordingly, the Court declines to apply the rule of lenity to this case. See id. ("[T]he rule of lenity is not a catch-all maxim that resolves all disputes in the defendant's favor-a sort of juristical 'tie goes to the runner.' Rather, the rule is cabined to resolve ambiguous questions of law.").

### 4. The Relevant Case Law

The Court also finds that its interpretation of Section 666(c) is fortified by the relevant case law.

The Second Circuit has yet to directly address whether Section 666(c) provides safe-harbor to employees who submit fraudulent time sheets. However, in United States v. Urlacher, 979 F.2d 935 (2d Cir. 1992), it suggested that Section 666(c) does not apply to fraudulent conduct proscribed by Section 666(a)(1)(A). There, the defendant, the chief of a city police department, was convicted of three counts of misapplying and embezzling federal funds pursuant to Section 666(a)(1)(A). See id. at 936. At trial, he testified in his defense that the funds that he allegedly diverted were actually spent for "legitimate police purposes," though he admitted that

26

the "funds were not spent for the purposes allocated." Id. at 937. Based on this testimony, he requested the Court instruct the jury on Section 666(c), a request which was denied by the trial court. Id. at 936–37.

On appeal, the Second Circuit found that Section 666(a)(1)(A) proscribed the Defendant's conduct regardless of whether he diverted funds for otherwise legitimate purposes. See id. at 938. As such, the court found that construing Section 666(c) to provide safe-harbor for "willful misappropriation of funds if used for legitimate purposes" would be "inconsistent with [Section] 666(a)(1)(A)'s prohibition against the intentional misapplication of funds." Id. at 938. Accordingly, the court found that the trial court properly refused to give a jury instruction premised on Section 666(c). See id. at 939.

Here, the Government alleges that from January 2011 to April 2014, the Defendant regularly submitted false time sheets which contained overtime hours that he did not work. Given the length of the scheme and the fact that records allegedly show that the Defendant was, among other things, playing golf, playing poker at a casino, and attending SCCP fundraisers when he claimed to be working, the Court finds that a reasonable jury could conclude that his conduct, if true, evidenced an "intentional misappropriation of funds" in violation of Section 666(a)(1)(A). Thus, to find that Section 666(c) provides safe-harbor to the Defendant "would be inconsistent with § 666(a)(1)(A)'s prohibition against the intentional misapplication of funds." Urlacher, 939 F.2d at 938.

The Defendant argues that this case is more analogous to United States v. Harloff, 815 F. Supp. 618, 618 (W.D.N.Y. 1993). (See the Def.'s Mem. of Law at 7-12.) There, the Government charged the defendants with two counts of violating Section 666(a)(1)(A) for "falsifying payroll

records by claiming to have worked 40–hour weeks when in fact they worked 'substantially fewer hours.'" Harloff, 815 F. Supp. at 618.

The court in Harloff *sua sponte* dismissed the two Section 666(a)(1)(A) counts because it found that Section 666(c) applied to give the defendants safe-harbor from prosecution. Id. at 619. The court reasoned that the plain language of Section 666(c) "prohibits a prosecution under § 666 based on an employee's accepting wages for more hours than s/he actually worked." Id. at 619. It also noted the legislative history of the safe-harbor provision indicating that Congress intended the provision only to apply to "acceptable commercial and business practices." Id. However, the court found that "[a]bsent a clearer mandate from Congress, either in its statutory language or in the history of its deliberations, I cannot be persuaded that it intended to criminalize an employee's early departure from work, or even a group of employees' agreement to depart work early." Id. at 619.

The court in Harloff also rejected the Government's attempt to analogize its case to United States v. Stout, No. CRIM. 89-317-1-2-3, 1990 WL 136341, at *1 (E.D. Pa. Sept. 18, 1990). In Stout, a jury convicted the defendant, the former president of a union, of six counts of embezzlement, four of which charged the defendant with violating Section 666(a)(1)(A) for "paying supporters to be his 'consultants' at the hospital when, in reality, these individuals performed no services for the hospital." Id. at *5. The court denied the defendant's motion for an acquittal on the Section 666(a)(1)(A) counts, finding that there was more than sufficient evidence for a reasonable jury to conclude that he had an intent to misapply federal fund funds because the testimony showed that the defendant "rewarded his supporters — in particular, his influential supporters — with no-show jobs at the hospital and that he knew that this practice was beyond the scope of his authority as acting executive director of the hospital." Id. at *6.

The court in Harloff found Stout inapposite because in Harloff the defendants were employees who worked fewer hours than they was supposed to work, and in Stout, the defendant invented "'ghost employees,' that is, persons listed on an official payroll who performed no actual work." Harloff, 815 F. Supp. at 619. According to the court, while Section 666(c) could apply in a case involving "ghost employees," "its plain language would prevent making a federal crime out of an employee's working fewer hours than he or she is supposed to work." Id. Thus, the court found Stout inapposite and ruled that Section 666(c) applied to bar prosecution of the Section 666(a)(1)(a) counts. See id.

By contrast, in this case, the Defendant allegedly obtained compensation that was not part of his regular salary but rather, was overtime compensation he received in addition to his salary. Thus, the overtime compensation he received in this case was not part of his "bona fide" salary, as was the case for the employees in Harloff. Furthermore, the defendants in Harloff merely left work early on certain occasions. The allegations against the Defendant in this case — namely, that for a three-year period, he regularly submitted false time sheets for time that he spent playing golf and attending SCCP functions — evidence a different and a far greater level of intent to defraud the Government of significant funds. As such, the Court finds that the alleged conduct in this case presents far more evidence of fraud than the conduct at issue in Harloff.

Accordingly, the court does not find Harloff to be applicable to this case. See United States v. George, No. CRIM.A. 14-10237-DJC, 2015 WL 1523163, at *5 (D. Mass. Apr. 2, 2015) ("'Harloff stands merely for the proposition that § 666(c) is applicable to allegations that an employee worked fewer hour than that for which she was obligated,' . . . not whether the salaries and wages of the employee was misappropriated by a defendant, as alleged here." (quoting United States v. Bryant, 556 F. Supp. 2d 378, 427 (D.N.J. 2008)); United States v.

Abney, No. CRIM. 3-97-CR-260-R, 1998 WL 246636, at *2 (N.D. Tex. Jan. 5, 1998)

(distinguishing Harloff because "while it is legitimate to arrive to work late or leave work early,

it is definitely not acceptable business practice for employees to alter their time sheets after being

approved by a supervisor. In fact, it is ordinary for a full-time employee to sometimes be paid for

the full forty-hour week when that employee has taken half a day off and worked only thirty-six

hours, whereas it is not acceptable to be paid for overtime hours that were never worked.").

Moreover, as the Government correctly points out, courts in other Circuits have declined

to apply Section 666(c) in circumstances analogous to this case. Thus, the rule in Harloff will

not be applied in this case. See United States v. Ransom, No. 09-20057 (JWL), 2009 WL

3756977, at *7 (D. Kan. Nov. 9, 2009) ("To the extent that the rationale of that case is

inconsistent with the analysis above, the Court declines to be guided by Harloff."). The

precedent supports this conclusion.

For example, in United States v. Baldridge, 559 F.3d 1126, 1134 (10th Cir. 2009), the

defendant, a county commissioner, was convicted on several theft of funds counts for his role in

submitting inflated and false claims to the county for work done by certain vendors. On appeal,

the Tenth Circuit rejected the defendant's argument that Section 666(c) applied to bar

prosecution of his conduct, reasoning that one of the contractors was paid for doing work that

was outside of the scope of the work authorized by the county and the other contractor was paid

"for doing no work, not fewer hours of work, so his payment likewise could not have been bona

fide." Id. at 1139.

In United States v. Williams, 507 F.3d 905, 906 (5th Cir. 2007), the Fifth Circuit

affirmed the conviction of a city clerk for embezzlement in violation of Section 666(a)(1)(A)

based on evidence that she prepared several extra pay checks for herself. On appeal, she argued

that her checks were part of a "bona fide salary in the usual course of the City's business" and therefore, fell under the safe harbor provision. Id. at 908. The Fifth Circuit found that the defendant's argument "misse[d] the mark" because "[p]revious decisions from other circuits demonstrate that a salary is not bona fide or earned in the usual course of business under § 666(c) if the employee is not entitled to the money." Id. In that case, the court found that "[a] reasonable jury could conclude that Williams's 'advance' paychecks were actually extra payments for work she had not performed and therefore were not part of her bona fide salary." Id.

Also, in United States v. Dwyer, 238 F. App'x 631, 635, 642–43 (1st Cir. 2007), the defendant, an administrative assistant at a city public development institute, was convicted of conspiracy to commit fraud under Section 666(a)(1)(A) for helping to prepare fraudulent time sheets for several employee as a way to pay off a debt that she owed to one of the employees. On appeal, the First Circuit dismissed her argument that the safe-harbor provision applied because it found that the evidence showed that one of the employees was "paid repeatedly for weeks he did not work," "was paid on days when he was out due to injury," and "he continued to be paid after he stopped working." Id. at 647–48. Therefore, the court found that "[a] reasonable jury could find that the payments to [the employee] were not made in the usual course of business and thus were not bona fide." Id.

Similarly, here, the Indictment alleges that for a three-year period, the Defendant was paid overtime based on his submission of false timesheets certifying that he worked hours that he did not in fact work. If these allegations are true, the Court, like the majority of courts discussed above, finds that a reasonable juror could conclude that the overtime compensation received

during this period was not part of his "bona fide salary," or received in the "usual course of business."

Therefore, based on the plain language of the statute, the legislative history, and the relevant case law, the Court finds that a reasonable juror could conclude that Section 666(c) does not provide a safe-harbor for the Defendant's conduct in this case. See United States v. Robinson, 903 F. Supp. 2d 766, 775 (E.D. Mo. 2012) aff'd, 781 F.3d 453 (8th Cir. 2015) (denying a pre-trial motion to dismiss a Section 666(a)(1)(A) count on the basis of Section 666(c) because "one who submits weekly time sheets falsely certifying time worked to obtain a salary payment, when in fact no work is performed, is not receiving a 'bona fide salary, wages or fee' and is not being paid in the 'usual course of business' within the meaning of 18 U.S.C. § 666(c)."); Ransom, 2009 WL 3756977 at *4 ("Thus, if he submitted false time reports with the requisite intent, a jury could properly find that [the defendant] 'stole' from the United States a 'thing of value' within the meaning of that statute [§ 666(c)].").

Accordingly, the Defendant's motion to dismiss count one of the Indictment is denied.

**B. As to the Defendant's Request for a Bill of Particulars**

The Defendant also moves for a bill of particulars. Federal Rule of Criminal Procedure 7(c)(1) states that an indictment must be "a plain, concise and definite written statement of the essential facts constituting the offense charged."

"Federal Rule of Criminal Procedure 7(f) allows a defendant to seek a bill of particulars in order to (1) 'identify with sufficient particularity the nature of the charge pending against him, thereby enabling defendant to prepare for trial'; (2) 'to prevent surprise'; and (3) 'to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense.'" United

States v. Badoolah, No. 12-CR-774 (KAM), 2014 WL 4793787, at *13 (E.D.N.Y. Sept. 25, 2014) (quoting United States v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987)).

However, "'[a] bill of particulars is required 'only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused.'" United States v. Chen, 378 F.3d 151, 163 (2d Cir. 2004) (quoting United States v. Walsh, 194 F.3d 37, 47 (2d Cir. 1999)).  In addition, "a bill of particulars is not necessary where the government has made sufficient disclosures concerning its evidence and witnesses by other means."  Id. (quoting Walsh, 194 F.3d at 47); see also United States v. Ahmed, No. 12-CR-661 (SLT) S-2, 2015 WL 1321612, at *28 (E.D.N.Y. Mar. 24, 2015) (same).  Also, "a bill of particulars is not to be used 'as a discovery device to seek and compel disclosure of the Government's evidence prior to trial.'" United States v. Walters, 963 F. Supp. 2d 125, 134 (E.D.N.Y. 2013) (quoting United States v. Larracuente, 740 F. Supp. 160, 163 (E.D.N.Y.1990)).

As noted, the Indictment charges the Defendant with one count of violating Section 666(a)(1)(A), previously discussed, and one count of wire fraud pursuant to 18 U.S.C. § 1343, which requires the Government to show "(1) a scheme to defraud, (2) money or property [as the object of the scheme], and (3) use of the mails [or wires] to further the scheme."  Fountain v. United States, 357 F.3d 250, 255 (2d Cir. 2004) (quoting United States v. Dinome, 86 F.3d 277, 283 (2d Cir. 1996) (alterations in original))

The primary basis for both of these counts is the allegation that from January 2011 to April 2014, the Defendant engaged in a scheme to defraud the SCSO of federal funds by "falsely represente[ing] to the SCCO that he had worked certain regular and overtime hours, when in fact, he did not work those hours."  (Indictment at ¶ 6.).  In addition, to satisfy the "mail or wire" element of the wire fraud count, the Indictment alleges that the Defendant was "paid a portion of

his wages from the SCSO via direct deposit" and that "[a]ll such payments to Walsh's bank account in Suffolk County, New York were electronically transmitted through the State of Massachusetts." (Id. at ¶ 4.)

The Defendant alleges that he is entitled to a bill of particulars because "[t]he indictment does not specify how often during this 39-month period that the wire transfers occurred, or when they occurred. And neither the indictment nor the discovery identifies which wire transfers contained stolen funds." (The Def.'s Mem. of Law at 17.)

Accordingly, he seeks a bill of particulars specifying: (i) "[t]he specific wire transmissions, and the approximate dates of those transmissions, that, according to the Government, consist in whole or in part of unlawfully earned wages"; (ii) "[t]he specific SCSO time sheets that the Government alleges contain entries for 'regular and overtime hours when, in fact, [Walsh] did not work those hours'; and (iii) "[t]he specific dates within the aforementioned time sheets that the Government alleges contain entries for 'regular and overtime hours when, in fact, [Walsh] did not work those hours.'" (The Def.'s Mem. of Law at 20) (alterations in original).

In response, the Government asserts that the Defendant is not entitled to a bill of particulars because (i) the Indictment "cites to and tracks the language of the relevant statutes; it specifically identifies the elements of the offense charged, the time period, location and nature of the crimes the defendant is alleged to have committed, and the allegations against the defendant"; and (ii) the Government has already disclosed to the Defendant (a) the complaint, which contains specific examples of when the Defendant submitted false time sheets to the SCSO, and (b) a set of records containing the specific time sheets and electronic transfers it contends are fraudulent. (The Gov't Opp'n Mem. of Law at 21–23.) The Court agrees.

34

As already discussed, the Indictment (i) describes the Defendant's fraudulent scheme — namely, falsifying overtime sheets —, <u>see</u> Indictment at ¶ 6; (ii) specifies January 2011 to April 2014 as the time period of the scheme, <u>see id.</u>; (iii) describes the manner in which the allegedly stolen wages were wired and transferred to the Defendant's bank account, <u>see id.</u> at ¶ 6; and (iv) specifically tracks the language of the two statutes at issue, <u>see id.</u> at ¶¶ 7–10.

Thus, the Indictment describes the nature of the charges and provides the time frame and location in which the crimes were alleged to have taken place.

In addition, the Government has produced to the Defendant the time sheets and the bank records evidencing the payment of his wages from January 2011 to April 2014. Further, in its legal memorandum, it represents that it intends to show at trial that all of the time sheets that the Defendant submitted to the SCSO during the relevant period were false with the exception of those time sheets submitted in August 2011, late July/early August 2012, February 2013, late July/early August 2013, and the three weeks following Hurricane Sandy in 2012. (The Gov't Opp'n Mem. of Law at 21–23.).

Based on these disclosures, the Defendant can reasonably locate the relevant time sheets and wire transfers that the Government intends to introduce at trial from the discovery it has already received. While a list of the specific wire transfers and time sheets that the Government alleges are fraudulent may be helpful to his defense, the Defendant has failed to show that it is necessary to his defense in light of the information in the complaint, the Indictment, and the Government's extensive disclosures and document productions to the Defendant. <u>See</u> <u>United States v. Chen</u>, 378 F.3d 151, 163 (2d Cir. 2004) ("The district court therefore did not abuse its discretion in denying Chen a bill of particulars specifying the exact time and place of each alleged act associated with each offense identified in the indictment."); <u>United States v. Feng</u>

Ling Liu, No. 12 CR. 934 (RA), 2014 WL 101672, at *14 (S.D.N.Y. Jan. 10, 2014) ("Although it may indeed aid Liu's trial preparation if the government were to identify the specific falsehoods in fifty asylum applications, the government is correct that this would amount to a 'preview ... of the Government's case at trial' (Gov.Mem.19) and is not necessary for her defense[.]").

The cases relied on by the Defendant are not to the contrary. In United States v. Bortnovsky, 820 F.2d 572, 573 (2d Cir. 1987), the defendants were convicted of wire fraud and violating the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 et seq. (1982), in connection with a scheme to submit false insurance claims for burglary losses. The Second Circuit found the district court abused its discretion in denying the defendant's pre-trial motion for a bill of particulars because the indictment omitted "crucial information: the dates of the fake burglaries and the identity of the three fraudulent documents." Id. at 574–75. Further, the Government provided "mountains of documents" to the defendants, many of which were not relevant to the charges, and the defendants' counsel only had four days before trial to sift through them — "[t]he Government did not fulfill its obligation merely by providing mountains of documents to defense counsel who were left unguided as to which documents would be proven falsified or which of some fifteen burglaries would be demonstrated to be staged." Id. at 575.

By contrast, in this case, the Indictment alleges the relevant time period of the conspiracy, January 2011 to April 2014, and the complaint provides specific examples of the Defendant's alleged conduct. Further, while the Government may have produced "10,000 pages of discovery," it has also telegraphed in its legal memorandum which time sheets and wire transfers it intends to use at trial to prove its fraud and theft of fund charges. This is simply not a

case where the "relevance of key events are shrouded in mystery." See Bortnovsky, 820 F.2d at 575. Accordingly, the Court does not find Bortnovsky controlling.

In United States v. Scully, 108 F. Supp. 3d 59 (E.D.N.Y. 2015), this court granted a motion for a bill of particulars because the case involved a complex conspiracy to sell misbranded drugs and the seventy-three count indictment did not allege the specific statements the Government contended were fraudulent. Similarly, in United States v. Solnin, 81 F. Supp. 3d 193, 208 (E.D.N.Y. 2015), this Court granted a motion for a bill of particulars specifying the identities of the "John Doe" victims of the fraud scheme alleged in the indictment.

By contrast, this case involves a straight forward two-count Indictment, not a prolonged and complex 73-count indictment which was at issue in Scully. Further, as noted above, the complaint, the Indictment, and the Government's disclosures all apprise the Defendant of the relevant time period as well as the time sheets and the wire transfers that form the basis of the theft of funds and wire fraud counts. Unlike in Solnin, there is no mystery surrounding the central basis of the fraudulent scheme in this case. For these reasons, the Court also does not find Scully or Solnin to be analogous to this case.

In sum, the Court finds that the charging instruments and the additional discovery provided to the Defendant should enable him to adequately prepare for trial. Accordingly, the Court, in its discretion, denies the Defendant's request for a bill of particulars.

### III. CONCLUSION

For the foregoing reasons, the Defendant's motion to dismiss count one of the Indictment and for a bill of particulars is denied in its entirety. The Clerk of the Court is directed to terminate docket entries 29 and 35.

**SO ORDERED.**

Dated: Central Islip, New York
January 15, 2016

___*Arthur D. Spatt*___
ARTHUR D. SPATT
United States District Judge