

U.S. Department of Justice

United States Attorney
Eastern District of New York

JJD:RAT
F. #2014R01331

610 Federal Plaza
Central Islip, New York 11722

November 1, 2016

By Hand and ECF

The Honorable Arthur D. Spatt
United States District Judge
United States District Court
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

   Re: United States v. Edward M. Walsh, Jr.
      Criminal Docket No. 15-091 (ADS)

Dear Judge Spatt:

   The government respectfully moves to quash a subpoena (the "Subpoena") made pursuant Federal Rules of Criminal Procedure ("FRCP 17" and "Rule 17") and issued on behalf of defendant Edward M. Walsh, Jr., to the Suffolk County Sheriff's Office ("SCSO") for "all documents relied on by [the SCSO] to substantiate the claim that Mr. Walsh has not completed twenty-five (25) years of creditable service to Suffolk County (pursuant to Retirement and Social Security law Section 89-F), and is ineligible to receive his pension as of his retirement date."  A copy of the Subpoena, which the defendant once again failed to provide to the government, is attached as Exhibit A.  Personnel with the SCSO has requested that the government move to quash the Subpoena on their behalf.  For the reasons that follow, the Subpoena should be quashed in its entirety.

FACTS

I. The Charges

   The defendant was arrested on January 7, 2015, pursuant to a complaint charging him with theft of funds, in violation of 18 U.S.C. § 666(a)(1)(A).  On March 6, 2015, a grand jury returned the Indictment (the "Indictment" or "Ind.").  The Indictment charged the defendant in two counts:  Count One charged the defendant with theft of funds, in violation of 18 U.S.C. § 666(a)(1)(A); Count Two charged the defendant with wire fraud, in violation of 18 U.S.C. § 1343.  The Indictment charged, inter alia, that from January 2011 to April 2014, the defendant, who was employed as a Correction Officer III Investigator by

the SCSO, engaged in a fraudulent scheme whereby he "falsely represented to the SCSO that he had worked certain regular and overtime hours, when, in fact, he did not work those hours," and was instead, among other things, "playing golf or performing work on behalf of the [Suffolk County Conservative Party ("SCCP")]. (See Ind. ¶¶ 3, 6). The Indictment further alleged that "[i]n reliance on those false representations, the SCSO paid [the defendant] wages for hours he did not work." (Id. at ¶ 6). The Indictment identified the funds stolen by the defendant as "wages for regular and overtime hours" (id. at ¶ 8), and identified the interstate wire communications as "wages which were electronically transmitted." (Id. at 10).

II.     The Trial

The trial commenced on March 15, 2016. On March 31, 2016, the jury rendered its verdict, convicting the defendant on all counts. Post-trial motions have been submitted to the Court and the matter is currently scheduled for sentencing on November 18, 2016. There are no evidentiary hearings scheduled on the case.

III.    The Evidence

    A.     The Defendant and the SCSO

        1.     The SCSO

The SCSO is a local government agency, which, among other things, operates correctional facilities in Riverhead and Yaphank, New York. (See Trial Transcript ("T") at 488-92; see T. 1317). There are two main functions of the SCSO: the enforcement side, which employs Deputy Sheriffs; and the correction side, which employs Correction Officers. The duties and responsibilities of the Correction Officers include, among other things, overseeing all security matters within the correctional facilities and the care and custody of inmates remanded to the SCSO. (T. 67-68, 491-93).

        2.     The Defendant and The Defendant's Duties and Responsibilities

Throughout the charged period, the defendant was employed by the SCSO as a Correction Officer (T. 69-70). From 2006 through 2014, the defendant was assigned to work at the Riverhead facility, where he had an office. (T. 525, 791; GXs 51B, 51E, 51J, 51O; see T. 526-38, 1319, 1393-94).

Specifically, during the charged period (January 2011 through April 2014), the defendant was a Correction Officer Lieutenant Investigator; the civil service designation for his position was Correction Officer III (III denotes the title Lieutenant) and the departmental designation was that of Investigator. (T. 70, 513-14; see GXs 3, 8). Throughout the defendant's career at the SCSO, he had additional designations, such as Aide to the Sheriff, Liaison to Outside Agencies and Internal Security Gang Intelligence Unit. (T. 503-14; GXs 2, 4, 5, 6; see T. 790-91).

2

Effective August 14, 2006, the defendant was promoted to Correction Officer III, i.e. Correction Officer Lieutenant Investigator. (T. 513-14). The defendant's duties and responsibilities did not change as a result of his change in title; however, the promotion came with a greater expectation of trust. (T. 514-15; see T. 633-34, 796).

Sheriff Vincent DeMarco testified that the defendant was aware of his duties and responsibilities because he was told what they were. (T. 792). DeMarco expected the defendant to come to work when scheduled and to work a full day when he came to work (T. 559), and DeMarco never gave the defendant permission to work from home. (T. 559-60).

The defendant's duties and responsibilities did not include attending funerals or wakes of SCSO employees or family members on behalf of the SCSO, nor did it include visiting sick or injured SCSO employees at the hospital. (T. 517-18, 706-13, 787-90; see also T. 1519-21, 1744-45 (witnesses did not know if the defendant was at wake/funeral in his personal or official capacity)). The defendant was not tasked with assisting in SCSO academy training nor was he a certified instructor. (T. 518-19; see T. 874-76). The defendant was not tasked with assisting in settling union grievances. (T. 519; see T. 713-15). He was also not asked to attend SCSO graduations on behalf of the SCSO. (T. 519-523, 718-19; GX 85-A – 85-E (SCSO graduation guest lists for 2011 through 2014); see also T. 1788-90 (witness did not know if the defendant was present at graduations in his capacity as a correction officer or as SCCP Chairman)). And the defendant was not tasked with community relations responsibilities. (See T. 873-79, 884-91, 897-903, 917-20, 929-33, 940-42).

None of the defendant's duties permitted him to play golf, go to Foxwoods, or participate in political party functions when he was scheduled to work regular or overtime hours. (T. 560; see also T. 1791). Indeed, as the jury heard, a Suffolk County employee cannot engage in political activity while working, as such conduct is against the law. (T. 560-61).

Even the defendant's own witnesses failed to establish that the defendant had any duties or responsibilities that would take him outside the SCSO facilities. (See T. 1744-45 (defense witnesses did not know if the defendant was at wake/funeral in his personal or official capacity); T. 1788-90 (defense witness did not know if the defendant was present at graduations in his capacity as SCCP Chairman)).

Defense witness Vito D'Agnello, President of the Suffolk County Correction Officers Union, testified that "as far as [he] knew, [the defendant] worked for the sheriff and he dealt with Internal Affairs *and stuff that was in the building*." (T. 1500 (emphasis added)). D'Agnello further testified that SCSO Correction Officers are not to be paid for golfing on County time (id. at 1504), for gambling on County time (id. at 1505), for sitting at home when they are scheduled to work (id.), or for attending political functions on County time (id.). D'Agnello further testified that he did not know if the defendant was at the

3

Suffolk County Legislature in his SCSO capacity or in his capacity as the SCCP Chairman. (T. 1514-15).

Defense witness Dan Papele – a retired SCSO warden who was friends with the defendant and even had the defendant as a member of his wedding party – testified that he was "unaware of the defendant's specific day-to-day responsibilities," and he did not know what the defendant's assignments were. (T. 1766-67).

Defense witness Michael Murnane, a retired SCSO captain investigator, admitted that when he spoke with agents as part of the underlying investigation into the defendant stealing time from the SCSO, he told investigators that he did not know what the defendant did as an aide to the sheriff. (T. 1612-15). Murnane also testified that he was aware that the defendant golfed during his scheduled work hours, and that he would have a problem with someone he supervised golfing when scheduled to work. (T. 1600-01, 1617-18).

B. The Collective Bargaining Agreement

As established at the trial, a collective bargaining agreement (the "CBA") is akin to a contract and the relevant CBA in this case involves the agreement between the SCSO, the Suffolk County Correction Officers Association, and Suffolk County. (T. 62, 68, 84-85, 1502-03; GX 44). The Suffolk County Correction Officers Association is the bargaining unit that represents the union members on the Correction side of the SCSO, and anyone with the title of Correction Officer is covered by the CBA. (T. 68, 74-75, 556-57). Changes to a collective bargaining agreement occur, in writing, through a memorandum of agreement that is signed by all parties to the original agreement. One side in the bargaining agreement cannot unilaterally change the agreement. (T. 64-65, 558-59, 797).

The government elicited evidence from several witnesses regarding the CBA, including SCSO Employee Relations Director Robert Draffin and defense witness D'Agnello. (T. 60-104, 1495-1516). Draffin testified that he participated in the negotiations and ratification of the CBA in effect during the relevant time period. (T. 73). D'Agnello testified that his duties and responsibilities included, among other things, negotiating union contracts such as collective bargaining agreements. (T. 1496-97).

The relevant CBA contains certain provisions regarding requirements for the work day, work week and overtime work. (T. 68, 75-78). According to Section 8.1 of the CBA, a Correction Officer – regardless of his or her level – is required to work a seven-and-a-half hour work day and a 37-and-a-half hour work week. (T. 68, 75, 1503; see T. 117, 557). With respect to overtime, Section 6.1 of the CBA provides that overtime is hours worked in excess of those two thresholds – seven-and-a-half hour work day or the 37-and-a-half hour work week. (T. 68-69, 75-76, see T. 118). Correction Officers are paid on a biweekly period, which is 75 hours every two weeks (37.5 times 2). (T. 68-69, 75-76).

4

Section 6.4 of the CBA addresses circumstances in which an officer is called in from outside the facility to work overtime; that is, when an officer is actually called into work on either his or her regular day off or during a period of time not continuous to the officer's normal work week. In these circumstances, an officer would get paid a minimum of four hours plus a half-hour travel to/from work for a total of five hours. (T. 76-77, 98-99; see T. 557). Draffin explained that, in such circumstances, an officer would have to work the actual four hours, unless he or she was dismissed by a supervisor. (T. 76-77, 99). Draffin further stated that in order to be paid for the travel time (half hour to/from work for a total of one hour travel), the officer would actually have to travel to work. (T. 77).

The CBA further takes into consideration the interaction between sick, personal, vacation time and regular hours. Pursuant to the CBA, approved time off is considered time worked in order to meet the daily and weekly work hour thresholds. (T. 77). Thus, with respect to the seven-and-a-half hour work day and the 37-and-a-half hour work week, a Correction Officer is actually required to work those hours or otherwise account for those hours with sick, personal or vacation time. (T. 69, 77, 1504). A Correction Officer is, likewise, required to work the overtime hours he or she claimed to work. (T. 69, 118-19, 1504).

The jury also heard testimony from former SCSO employee Anthony Dolan, who held the position of Aide to the Sheriff during the same period of time that the defendant was an Aide to the Sheriff, a Liaison and a CO III Investigator. (T. 1132-62). Dolan testified that, as an aide, he was required to comply with the CBA and work a seven-and-a-half hour workday, and a 37-and-a-half hour workweek. (T. 1139). Dolan also testified that he could not get overtime if he did not work those hours or otherwise account for them for vacation or sick time. (T. 793).

Both Draffin and D'Agnello, as well as many other witnesses, testified about the work week and overtime requirements of the CBA. Indeed, nearly every SCSO Correction Officer who testified at trial – including the defendant's own witnesses – acknowledged the work week and overtime requirements and each testified that he or she complied with these requirements. (T. 879-80, 891, 903-04, 920-22, 928, 933-34, 1521-22, 1601, 1618, 1763-64, 1741-44, 1790).

    C.    <u>The Defendant's SCSO Time Sheets and Direct Deposit of Wages</u>

        1.    <u>The SCSO Time Sheets</u>

The government also presented evidence related to the completion of SCSO time and attendance sheets and payroll records, and the maintenance of these records. (T. 104-26, 943-55). It is the responsibility of the SCSO payroll department to keep and maintain records reflecting the hours worked and the wages earned by all members of the SCSO, including Correction Officers. (T. 108, 944-46). The SCSO's time and attendance and payroll records for the defendant from December 2010 through April 2014 were

5

introduced into evidence. (T. 108-10, 120; GXs 11A, 11B, 11C, 11D, 12A, 12B, 12C, 12D, 13A,13B, 13C, 13D, 14A, 14B, 14C, 15).

With respect to the defendant's overtime slips, these records contained the defendant's name and shield number, as well as his signature. (T. 108; GXs 11A – 11D). The overtime slips further contained the date of the overtime, the defendant's regular shift that he worked, and the overtime shift he worked with the amount of hours for the overtime, and a brief description of why the defendant worked the overtime. (T. 110-13; GXs 11A – 11D; see T. 947, 953-54). The descriptions provided by the defendant to justify his overtime included "Outside Agency," meaning he was working with an outside law enforcement agency, "Int. Sec.," meaning he was addressing an issue that effected the internal security of the SCSO; and "gangs," meaning the defendant claimed to be addressing an issue that arose as a result of the activities of the various gang members incarcerated by the SCSO. (GXs11A – 11D). As the SCSO payroll department supervisor testified, travel time would only be filled if the employee was called in to work overtime when he or she was otherwise not scheduled to work. (T. 112). Each overtime slip contained the defendant's signature. (T. 113).

The government presented evidence concerning how to read and interpret the SCSO overtime slips. (T. 947-49; GXs 11A – 11D). Michelle Mahler, a payroll supervisor with the SCSO payroll department, testified that the defendant worked a rotating shift, Monday to Friday, 8 a.m. to 4 pm and 2 p.m. to 10 p.m. (T. 947). Mahler testified that if a day on the overtime sheet is left blank, payroll would assume that the defendant worked the same shift as the other days that week. (T. 948). Referring to the page Bates stamped 476 of GX 11A as an example, Mahler testified that the defendant's shift that week was 8 am to 4 pm and that he indicated that he had worked overtime Monday through Thursday. The shift for Friday that page was left blank. Mahler testified that the payroll department would assume – and pay the defendant – for working the 8 am to 4 pm regular shift. If the defendant had worked overtime, or had otherwise used vacation or sick leave, such information would have been noted. (T. 948). That is, absent any other direction or memoranda, the payroll department would assume that the defendant worked the shift consistent with the other days noted on the overtime sheet. (T. 948-49).

The government also presented evidence about the defendant's time and accrual records for 2011 through 2014. (T. 114-15; GXs 12A – 12D). These documents track the defendant's days worked, as well as the defendant's vacation and/or sick time, or any other time off. (Id.).

The government presented evidence regarding the defendant's applications for leave from 2011 through 2014. (T. 115-17; GXs 13A – 13D). The SCSO payroll supervisor testified that an employee – like the defendant – would fill out an application for leave and submit the document for approval or denial. (T. 115). If an employee wanted to take leave, whether for vacation or personal time, he or she would have to submit a leave slip. (T. 115-16). The types of leave available for SCSO Correction Officers included vacation, personal or sick leave, or bereavement days. (T. 117).

6

Marlene Madorran, a clerk who worked in the SCSO payroll department, testified – consistent with the testimony from numerous other witnesses – that SCSO Correction Officers must work 75 hours for a bi-weekly pay period (37.5 hours per week). She further explained to the jury that regular work hours are counted through the time and attendance sheets kept by the payroll department, and if there are no slips submitted asking for time off, then the employee will show up on the attendance roster maintained by the division as working. (T. 117).

Madorran further testified – again, consistent with the testimony of numerous other witnesses – that overtime hours are hours worked outside their regular shift. (T. 118). Madorran explained that there is a difference in pay between regular and overtime hours; specifically, employees are paid for overtime hours at a rate of time-and-a-half plus hourly longevities. (T. 118).

SCSO employees are required to honestly account for their time on their time sheets, as they are required to state the actual hours that they worked, both regular and overtime hours. (T. 955). Madorran testified that employees, including the defendant, are given the opportunity to review their time sheets both prior to and after submission, and an employee has the opportunity to bring up any discrepancies or errors they find in the computation of the regular or overtime hours. (T. 119).

### D. Evidence the Defendant Was Not At Work When He Claimed To Have Worked Both Regular and Overtime Hours

The government presented an overwhelming amount of evidence illustrating that the defendant was not at work when he stated on his time sheets to have worked both regular and overtime hours for the SCSO.

#### 1. Evidence of the Defendant's Golfing Activities

The trial included evidence from several witnesses that the defendant was playing golf at times when he stated on his SCSO time sheets that he was working both regular and overtime hours. Indeed, the jury saw and heard evidence regarding the dates and time of defendant's various golf-related activities from: (1) the Hampton Hills Golf and Country Club ("Hampton Hills"), where the defendant was a member (see T. 126-32, 139-99, 1456-87; GXs 20, 21, 22, 23, 24, 25); (2) the Metropolitan Golf Association, which provides a Golf Handicap Information Network ("GHIN") service used by the defendant to record the dates and times of various golf play (see T. 200-213; GX 29); (3) the Sebonack Golf Club, where the defendant golfed on at least four occasions (see T. 214-29; GX 26; see also T. 230-49); and (4) the Timber Point Golf Course, where the defendant purchased a single cart rental for 18 holes of golf on September 2, 2013, using his Amex card (T. 251-58; GX 27).

#### 2. Evidence of the Defendant's Gambling Activities

Evidence was presented from witnesses that the defendant was traveling to/from Connecticut and/or gambling at Foxwoods Casino at times when he stated on his

7

SCSO time sheets that he was working both regular and overtime hours. Specifically, the jury saw and heard evidence regarding the dates and time of defendant's gambling activities from: (1) the Cross Sound Ferry Services, on which the defendant purchased ferry tickets to travel to/from Orient Point, New York and New London, Connecticut, including transportation to the Mohegan Sun Casino (T. 259-72; GX 43); and (2) the Foxwoods Resort Casino in Mashantucket, Connecticut (T. 426-54; GXs 48, 49, 86).

### 3. Evidence of the Defendant's Banking and Credit Card Activities

The trial included evidence from witnesses regarding the defendant's banking and credit card activities – activities that occurred at times when he stated on his SCSO time sheets that he was working both regular and overtime hours. Specifically, the jury saw and heard evidence regarding the defendant's banking and credit card activity from: (1) Astoria Bank (T. 272-91; GXs 30B, 30C, 30D, 30E, 31A, 31B, 31C, 32A, 32B, 33A, 33B, 33C, 34A, 34B, 34C, 35A, 35B, 35C, 36); (2) Suffolk Federal Credit Union (T. 316-28; GXs 37, 38); (3) American Express (T. 328-35; GX 40A); (4) Neiman Marcus (T. 335-42; GX 45); and (5) Reebok, a subsidiary of Adidas (T. 343-50; GX 55).

### 4. Evidence of the Defendant's SCCP Activities

The trial also included evidence regarding the defendant's activities on behalf of the SCCP during periods of time when the defendant stated on his SCSO time sheets that he was working both regular and overtime hours. Regina Duffy, the Treasurer of the Suffolk County Conservative Club, testified that she maintains the books and records for the SCCP, of which the defendant was the Chairman. She stated that she would see the defendant on a weekly basis, and that the defendant would submit bills and receipts for reimbursement for activities that he undertook on behalf of the SCCP. These records were introduced into evidence and several dates and purchases were highlighted during Duffy's testimony. (T. 292-311; GX 41; see also GX 33B).

### 5. Testimonial Evidence Regarding the Defendant's Conduct

The government also presented testimony from several witnesses who stated that, while the defendant was engaging in these activities, he was not conducting SCSO business. Gerald Wolkoff, a real estate developer on Long Island, testified that he golfed with the defendant at the Sebonack Golf Club and he had no business whatsoever with the SCSO. (T. 238-40, 248-49; see generally T. 230-49). Anthony Senft, a trial judge in the Suffolk County District Court and former Town Councilman for the Town of Islip, testified that he attended numerous SCCP events where the defendant was present and that none of those events involved the business of the SCSO (T. 381; see generally T. 351-64, 371-87). U.S. Congressman Lee Zeldin testified that he attended meetings with the defendant as well as numerous fundraisers and SCCP events where the defendant was present and that none of those meetings or events did the Congressman recall discussing the business of the SCSO (T. 406-09; see generally T. 388-423). Indeed, Congressman Zeldin stated that his discussions with the defendant were generally about family and politics, and not about SCSO

business. (T. 410). Richard Schaffer, Supervisor for the Town of Babylon and Chairman of the Suffolk County Democratic Committee, also testified that he attended meetings with the defendant as well as numerous fundraisers and SCCP events where the defendant was present, and that none of those meetings or events involved the business of the SCSO. (T. 850-51; see generally T. 836-58). (See also T. 858-71 (Testimony of Frank Tinari) and 956-64 (Testimony of Frank Profeta)).

The trial also included testimony from John Ruocco. (T. 311-15). Ruocco, the then-President and Chief Executive Officer of Interceptor Ignition Interlocks, testified that, on February 21, 2014, he attended a shareholder meeting in Shirley, New York; the meeting began at 11:00 a.m. and lasted approximately two hours. (T. 313-15). Ruocco testified that the defendant was not a shareholder or employee of the company, however, the defendant was present for the entire shareholder meeting. Ruocco further testified that the meeting had nothing to do with the SCSO. (T. 313-15).

6. Surveillance of the Defendant

The government also presented evidence of the defendant's attempts to disguise his conduct, in that he would leave work early and exit the SCSO Riverhead facility via a dirt road, as opposed to exiting through the front gates. SCSO Deputy Sheriff Scott Nolin testified that, in March 2014, he had been assigned to conduct surveillance of the defendant. Nolin described how he waited in the Riverhead facility parking lot to observe when the defendant left the building, and that the defendant exited the facility via a dirt access road. Nolin described the defendant's actions, not as an employee going through the front gates like everyone else, but, rather, sneaking out around back so as to go unnoticed or detected. (T. 804-34; GXs 87A, 87B, 87C, 87D).

The government also presented testimony from several other SCSO employees, who all testified that they had never entered nor exited the SCSO Riverhead facility via the dirt road. (T. 880-82, 891-92, 904-05, 922-23, 934-36; GX 87A).

7. Cell Phone Evidence

The government presented extensive evidence regarding the defendant's cell phone use. A representative from Verizon Wireless explained a variety of cell phone records, including records for cell phone number (631) 748-2151 for the indictment period. (T. 455-73; GX 70A, 70B, 70C, 71A, 71B, 71C, 71D, 71E, 71F, 72, 73A, 73B, 74, 75, 76). This cell phone number (ending in 2151) is the defendant's cell phone number and the same number that he provided as his contact number to Hampton Hills (T. 139-41; GX 20), to Astoria Bank (T. 281-88; GX 30E, 31C, 33B, 33C, 33D, 35C), to the Suffolk Federal Credit Union (T. 321; GX 38), and to Foxwoods Resort Casino (T. 434; GX 48). (See also T. 1794 (defense counsel identifies the defendant's cell phone number as 631-748-2151)). Duffy further testified that, as part of her duties as the treasurer for the SCCP, she reimburses the defendant, on behalf of the SCCP, for his Verizon cell phone bill for the cell phone number (631) 748-2151. (T. 294-95; GX 41).

Among the cell phone records introduced into evidence were billing and call detail records for the defendant's cell phone as well as Verizon Wireless tower information for the New York metro area. (Id.). The Verizon Wireless representative testified that both the billing records and the call detail records are created at the time calls are placed or received, as information is transmitted from a switching station that is then communicated to Verizon Wireless's billing system. (T. 465).

Eduardo Orellana, an expert in the field of radio frequency engineering, wireless engineering and cellular call data analysis (including location data), testified at trial. (T. 995-1127). Orellana explained to the jury how cell phone technology works. Orellana explained that a cell phone looks for the tower, with the best signal strength and quality, which is normally the tower closest to the cell phone when the call is either being placed or received. Every cell phone tower connects back to a switch (i.e., the switching station referenced by the Verizon Wireless representative). Orellana further explained that the switch processes and records information, including the time and date of a call. (T. 1003-04). Orellana testified that, among other documents, he reviewed call detail records for the defendant's cell phone and, based on his review of the records and cell tower information, he could determine the exact tower that was used for a particular phone call. (T. 1005). Orellana further stated that, while he is unable to pinpoint a particular phone location using the cell site data, he can determine that a phone is in the general area around the tower. (T. 1005-06). With respect to billing records, Orellana explained that the information provides a general reference to an area (like a town), as opposed to a specific tower. (T. 1006-07).

Using this information, Orellana indicated the geographical location near the tower which indicated where the defendant's phone was located at the time he made or received phone calls. (T. 995-1127). Orellana highlighted the location of the defendant's cell phone over the course of a number of days. (Id.). Orellana's examples involved periods of time when the defendant stated on his SCSO time sheets that he was working both regular and overtime hours and the cell phone data analysis demonstrated otherwise. (See T. 1012-65; GXs 11A – 14C, 77, 78, 79, 80, 81A, 82A, 82B, 83, 84, 90, 91, 92, 93, 94, 95A, 95B).

### 8. Testimony of FBI Special Agent Ken Hosey

The government also presented testimony from FBI Special Agent Ken Hosey. (T. 1166-1383). Agent Hosey testified that, as part of his investigation, he obtained and reviewed over 10,000 pages of records, including, but not limited to, telephone records, SCSO records, golf records, bank records, casino records, hotel records, Amex records, gas records, Conservative Party records, LIRR records, and photographs. Documents reviewed by Agent Hosey were admitted into evidence. (T. 1168-70, 1197, 1316; see government exhibits admitted into evidence throughout the trial). In addition, Special Agent Hosey interviewed various people. (T. 1168; see T. 1309-16, 1328-29, 1334-35, 1373-75). Agent Hosey testified that he examined each of these records in connection with one another, and did not review them in vacuum. (T. 1170).

Agent Hosey identified specific documents, including the defendant's time sheets and other relevant records for specific days throughout the indictment period. (T. 1197-1303). For example, Agent Hosey testified about May 12, 2011, when, according to the defendant's time sheet (GX 11A, Bates stamped 496), the defendant's scheduled shift for that day was 8:00 a.m. to 4:00 p.m. (T. 1209). Agent Hosey further testified that the defendant's cell phone records (GX 71B, Bates stamped 7475-76) indicated that on May 12, 2011, the defendant's first cell phone call in the Riverhead area (where the defendant was scheduled to work) was 9:48 a.m. and the last phone call in the area was at 3:26 p.m. Agent Hosey further stated that the defendant had calls later in the day that indicated he was in an area other than Riverhead. (T. 1209-10). Agent Hosey further highlighted records from Hampton Hills golf course (GX 23, Bates stamped 3473-74; GX 24, Bates stamped 3307), which indicated that the defendant was present at the golf course at 2:55 p.m. and purchased a golf cart for nine holes of golf. (T. 1208-10). Agent Hosey also highlighted Astoria Bank records (GX 30B, Bates stamped 5096 and 5255; GX 36, Bates stamped 23746), which indicated that the defendant made a withdrawal from the bank at the East Islip branch at 8:53 a.m. (T. 1210-11). Thus, although the defendant's scheduled shift for the day was 8:00 a.m. to 4:00 p.m.; the records indicated that the defendant was at an Astoria Bank branch in East Islip at 8:53 a.m. and was golfing at the Hampton Hills golf course before the end of his shift. (T. 1211).

Agent Hosey testified about similar examples of the defendant's conduct – based on the records introduced into evidence – throughout the charged period. (T. 1197-1303; see, e.g., T. 1225 and GX 41 (Conservative Party records); T. 1247 and GX 48 (Foxwoods records); T. 1258 and GX 40-A (Amex records); T. 1263 and GX 42-A (LIRR records); T. 1287 and GX 45 (Neiman Marcus records); T. 1288 and GX 65 (Reebok records); T. 1288-89 and GX 46 (Marriot hotel records); T. 1298 and GX 27 (Timber Point Golf Records); T. 1298 and GX 29 (GHIN records)).

Agent Hosey testified that he reviewed all the defendant's time sheets, including his overtime slips that indicated the defendant's scheduled shifts – documents which were introduced into evidence and shown to the jury – and that he also reviewed the other records in evidence and, based on his review of the time sheets and other records in evidence, there were no overtime slips that indicated the defendant worked his scheduled hours in the entirety; that is, the records reflected that the defendant worked some hours, but not all the hours indicated on his time sheets. (T. 1304-05; see T. 1379-80). Indeed, Agent Hosey testified that every single time sheet he reviewed indicated that he worked hours (regular and/or overtime) that he did not, in fact, work. (T. 1305).

Agent Hosey further testified that, based on his review of the records in evidence – including both the defendant's time sheets and the records from Hampton Hills – the defendant made some kind of purchase at Hampton Hills over 160 times during the indictment period during hours that he claimed on the time sheets to be his work hours. (T. 1306).

The jury also heard evidence of the loss amount suffered by the SCSO as a result of the defendant's fraudulent conduct. (T. 1308-09). Specifically, Agent Hosey

11

testified that, based on his review of the documents in evidence, the defendant did not work an excess of 1,500 regular hours and in excess of 1,000 overtime hours that he indicated he had worked on his time sheets, which resulted in over $200,000 in loss to the SCSO. (T. 1308-09). As noted above, evidence of the defendant's hourly wage ($60.78) and overtime rate ($92.99), with which to calculate the loss to the SCSO, had been previously introduced into evidence by a supervisor from the SCSO payroll department. (T. 949). Thus, Agent Hosey was able to calculate the amount of loss suffered by the SCSO based on a review of all the evidence in the record and before the jury.

IV. The Jury Verdict and Post-Verdict Activity

As previously indicated, on March 31, 2016, the defendant was convicted on both counts of the indictment. In or about the early part of April 2016 the office of the New York State Comptroller contacted the United States Attorney's Office for the Eastern District of New York ("USAO-EDNY") and the FBI seeking information pertaining to the defendant's conviction and his underlying failure to accurately account for the hours that he claimed on his time sheets. Both the USAO-EDNY and the FBI provided the New York State Comptroller's office with information pertinent to their request and also provided them with a point of contact in the SCSO. Any and all information provided to the New York State Comptroller's office by the USAO-EDNY, FBI and SCSO was included in the documents that were previously provided to the defense as discovery and 3500 materials prior to the trial.

On May 16, 2016, Newsday reported that the New York State Comptroller's office determined that the defendant failed to qualify for an immediate state pension based upon the fraudulent time sheet activity that was uncovered during the defendant's trial. See Newsday, May 16, 2016, "Edward Walsh fails to qualify for immediate pension." In the article, a representative from the New York State Comptroller's office indicated that "Federal Authorities provided the retirement system with documentation indicating Walsh's fraudulent service." Id. The defendant's criminal counsel, William Wexler strongly disagreed with the ruling of the New York State Comptroller's office and indicated that he would "contest it in a hearing." Id.

On September 21, 2016, the defendant wrote a letter ("Walsh FOIL Letter") to the SCSO pursuant to the New York State Freedom of Information Law ("FOIL") requesting the following documents:

> all documents relied on by your office to substantiate the claim that I have not completed twenty-five (25) year of creditable service to the county (pursuant to Retirement and Social Security Law Section 89-F0, and am ineligible to receive my pension as of my retirement date[; and]

12

> all documents that were provided by your office to the New York State local retirement system concerning my total service credit or lack thereof.

A copy of Walsh's FOIL Letter is annexed as Exhibit B. It is the government's understanding that the SCSO provided a response to the Walsh FOIL Letter and any response from the SCSO would be duplicative of their response to the Walsh Foil Letter.

On October 27, 2016, the defendant served the SCSO with the Subpoena, which is virtually identical to the Walsh FOIL Letter and seeks "all documents relied on by your office to substantiate the claim that I have not completed twenty-five (25) year of creditable service to the county (pursuant to Retirement and Social Security Law Section 89-F0, and am ineligible to receive my pension as of my retirement date."

## DISCUSSION

I.  Applicable Law

The use of subpoenas in criminal cases is governed by FRCP 17, which states:

> A subpoena may order the witness to produce any books, papers, documents, data, or other objects the subpoena designates. The court may direct the witness to produce the designated items in court **before trial** or before they are to be offered in evidence. When the items arrive, the court may permit the parties and their attorneys to inspect all or part of them.

FRCP 17(c)(1) (emphasis added).

Here, there has already been a trial, the defendant has already received thousands of documents that encompass the items called for in the subpoena, and the SCSO has already responded to the request as part of their FOIL response. Further, the Subpoena specifically refers to an ancillary civil and/or administrative matter that is unrelated to the criminal case under which counsel seeks to have the documents produced. The criminal trial has concluded, there are no evidentiary hearings currently scheduled, the government has already complied with its discovery obligations and the Subpoena itself pertains to an unrelated civil and/or administrative matter. Accordingly, the Subpoena should be quashed in its entirety.

The issuance of Rule 17 subpoenas in criminal cases is governed by the Supreme Court's decision in United States v. Nixon, 418 U.S. 683 (1974). The Nixon Court dealt with subpoenas issued in advance of trial and principally recognized that the Rule 17 subpoena "was not intended to provide a means of discovery for criminal cases." Nixon, 418

U.S. at 698. It therefore held that, in order to require production of materials prior to trial, the moving party must show:

> (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general "fishing expedition."

Id. at 699-700 (citing Bowman Dairy Co. v. United States, 341 U.S. 214, 220 (1951)). The Court specified that, "[a]gainst this background," the subpoena proponent must "clear three hurdles: (1) relevancy; (2) admissibility; [and] (3) specificity." Id. at 700 (emphasis added).

Applying those principles, including the requirement of establishing admissibility, the Nixon Court held that Rule 17 subpoenas could generally not be used to obtain impeachment materials. See id. at 701 ("Generally, the need for evidence to impeach witnesses is insufficient to require its production in advance of trial."). Obviously, because the trial has already occurred and no hearings are scheduled, even if proper, the need for impeachment material is non-existent in this case.

II. Application

In the instant case, discovery has been concluded, numerous witness have testified and thousands of pages in discovery, 3500 material and witness testimony have been provided to the defendant. The defendant's trial subpoena, dated October 25, 2016, seeks "all documents relied on by [the SCSO] to substantiate the claim that Mr. Walsh has not completed twenty-five (25) years of creditable service to Suffolk County (pursuant to Retirement and Social Security law Section 89-F), and is ineligible to receive his pension as of his retirement date." The subpoena should be quashed because it plainly fails to meet the Nixon requirements for a Rule 17 subpoena, is duplicative and pertains to subject matter that has nothing to do with the criminal matter before this Court.

First, the subpoena is subject to quashing under the Nixon requirements because it does not seek "evidentiary" materials, or "admissible" evidence, nor can it, because the trial has concluded and there are no evidentiary hearings scheduled. In fact, based on the language used on its face, it is clear that the subpoena is being used for discovery in the unrelated pension matter. The subpoena demands that the SCSO produce all documents "relied upon" to substantiate the claim that defendant has not completed twenty-five years of creditable service to Suffolk County pursuant to the Retirement and Social Security Law. However, the defendant misapprehends the facts, the SCSO did not make the determination that the defendant is ineligible for certain pension benefits, the New York State Comptroller's office did. If the defendant disagrees with that decision, he needs to take that issue up with the comptroller's office in the proper forum.

Notably, pursuant to its obligations under Rule 16 of the Federal Rules of Criminal Procedure, Brady v. Maryland, 373 U.S. 83 (1963), and otherwise, the government has disclosed thousands of pages of complete copies of documents provided to it by the SCSO, all of which pertain to the government's case against the defendant Walsh, including, among other things, overtime records; time and accrual records; time off records; standby authorization records; overpayment memoranda; a complete copy of materials found in the defendant's office; and SCSO Internal Affairs records pertaining to Walsh; a SCSO computer audit; Walsh's golf records; telephone records; documents from SCSO timesheet charges files and footage taken from SCSO security cameras, as well as testimony from numerous witnesses that establish that the defendant defrauded Suffolk County.  Once again, if Walsh wants to know if all or a portion of this literal mountain of evidence was used by the comptroller's office to deny him pension benefits, he needs to take that up with the comptroller's office as this issue has nothing to do with the crime for which he stands convicted.  Accordingly, as the defendant has not set forth any basis to conclude that any materials contained within the requested personnel files of the defendant and Sheriff DeMarco sought by his subpoena would be relevant to his criminal case, the subpoena should be quashed.  See Nixon, 418 U.S. at 699-701.  Additionally, the defendant can and has obtained the material requested through other means as evinced through the SCSO's response to the Walsh Foil Letter.

Second, even putting aside the general rule that subpoenas may be quashed unless they seek admissible evidence, the subpoena should also be quashed pursuant to Nixon's relevance and specificity requirements and its prohibition on "fishing expedition[s]." The defendant has not set forth any specificity regarding why the requested files would be relevant for any reason.  In short, the subpoena is nothing other than a fishing expedition. Insofar as Nixon stands for the proposition that Rule 17 should not be used to provide a means of discovery for criminal cases, it certainly cannot be used as a means for discovery in unrelated civil matters.  The defendant's subpoena specifically calls for materials "pursuant to Retirement and Social Security Law Section 89-F," which may be relevant to the defendant's civil and/or administrative matter but has nothing to do with his criminal conviction.  Defense counsel has already stated that he seeks to contest the denial of some of the defendant's pension benefits by a state agency that had nothing to do with the criminal prosecution of Walsh.  If that is counsel's intention, then counsel should move in the proper court to do so and should not use the criminal matter to obtain discovery for this unrelated civil/administrative matter.  If the defendant seeks to learn the basis under which the New York State Comptroller's office denied certain of his pension benefits, then he should take that inquiry up with the New York State Comptroller's office in the proper forum.

The Subpoena is duplicative insofar as it necessarily calls for the production of materials that have already been provided to him throughout the underlying criminal matter. Lastly, the SCSO previously provided a response to the defendant for the specific information requested in the Subpoena through their response to the Walsh Foil Letter.

15

CONCLUSION

        For the foregoing reasons, the government respectfully submits that the Subpoena should be quashed in its entirety.

                                Respectfully submitted,

                                ROBERT L. CAPERS
                                Acting United States Attorney

By:    /s/
                                Raymond A. Tierney
                                Catherine M. Mirabile
                                Assistant U.S. Attorneys
                                (631) 715-7849/50

cc:    Clerk of the Court (by ECF)
        William Wexler, Esq. (by email and ECF)