**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X

UNITED STATES OF AMERICA

          -against-

EDWARD M. WALSH, JR.,

                Defendant.

--------------------------------------------------------X

**MEMORANDUM OF
DECISION & ORDER
15-CR-91 (ADS)**

**APPEARANCES:**

**United States Attorney's Office, Eastern District of New York**
610 Federal Plaza
Central Islip, NY 11722
      By: Catherine Mary Mirabile, Assistant U.S. Attorney
          Raymond A. Tierney, Assistant U.S. Attorney

**Leonard Lato, Esq.**
*Attorney for the Defendant*
200 Motor Parkway, Suite C-17
Hauppauge, NY 11788

**William D. Wexler, Esq.**
*Attorney for the Defendant*
816 Deer Park Avenue
North Babylon, NY 11703

**SPATT, District Judge**.

On March 31, 2016, after a jury trial, the Defendant Edward M. Walsh, Jr. (the "Defendant") was convicted of two felony counts, the same counts for which he had been indicted by a grand jury on March 6, 2015. The Defendant now moves under Federal Rule of Criminal Procedure ("FED. R. CRIM. P." or the "Rule(s)") 29 for a judgment of acquittal on both counts, and under Rule 33 for a new trial in the interest of justice. For the reasons that follow, both of the Defendant's motions are denied.

# I. PROCEDURAL HISTORY

On January 7, 2015, the Defendant was arrested pursuant to a complaint that charged him with theft of funds, in violation of 18 U.S.C. § 666(a)(1)(A). On March 6, 2015, the Defendant was indicted by a grand jury of the Eastern District of New York. The indictment charged the Defendant with theft of funds, in violation of 18 U.S.C. § 666(a)(1)(A) and wire fraud, in violation of 18 U.S.C. § 1343.

On March 16, 2016, the jury trial commenced. The trial lasted approximately two weeks. The Court charged the jury on March 31, 2016 as to both counts, and the jury returned a unanimous verdict of guilty as to both counts the same day.

## II. DISCUSSION

For purposes of these motions, familiarity with the underlying trial record, which spans more than two thousand (2,000) transcribed pages, is presumed. The Court's discussion of the evidence adduced at the trial will be limited to the specific challenges presently raised by the Defendant. In this regard, references to the trial transcript are denoted as "Tr."

## A. As to the Defendant's Rule 29 Motion for a Judgment of Acquittal After Jury Verdict

### 1. Applicable Law

Under Rule 29, a district court will grant a motion to enter a judgment of acquittal on grounds of insufficient evidence if it concludes that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *See* FED. R. CRIM. P. 29(a), (c); *see also United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003); *United States v. Reyes,* 302 F.3d 48, 52 (2d Cir. 2002).

"A defendant bears a heavy burden in seeking to overturn a conviction on grounds that the evidence was insufficient." *United States v. Cruz*, 363 F.3d 187, 197 (2d Cir. 2004); *see also*

*United States v. Si Lu Tian*, 339 F.3d 143, 150 (2d Cir. 2003) (quoting *United States v. McCarthy*, 271 F.3d 387, 394 (2d Cir. 2001)). In particular, "a conviction will be affirmed if '*any* rational trier of fact could have found the essential elements of the crime[s] beyond a reasonable doubt.' " *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979)) (emphasis in original).

The evidence must "be viewed in the light most favorable to the Government and all permissible inferences drawn in the Government's favor," *United States v. Guadagna,* 183 F.3d 122, 129 (2d Cir. 1999), and a court may only grant a judgment of acquittal under rule 29 "if the evidence that the defendant committed the crime alleged was nonexistent or . . . meager." *Id.* at 130 (internal quotations omitted).

In assessing the evidence, the Court is constrained to bear in mind that Rule 29 "does not provide [it] with an opportunity to substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *United States v. Temple*, 447 F.3d 130, 136 (2d Cir. 2006) (quoting *Guadagna*, 183 F.3d at 129). Rather, "[w]here a jury has rendered a verdict of guilty, the duty of a court passing on a Rule 29 motion is to 'review all of the evidence presented at trial in the light most favorable to the government, crediting every inference that the jury might have drawn in favor of the government.' " *Id.* (quoting *United States v. Walker*, 191 F.3d 326, 333 (2d Cir. 1999)).

### 2. As to the Jury's Guilty Verdict as to Count One

The Defendant contends that he cannot be guilty of count one because is protected by 18 U.S.C. § 666(c)'s safe harbor provision because he was a legitimate sheriff's office employee; because there is no evidence that the Defendant was familiar with the collective bargaining agreement (the "CBA"); and because he believed he was fulfilling the duties delegated to him by

Sheriff DeMarco.  The Court disagrees with all of the Defendant's points, and finds that there was sufficient evidence for the jury to find the Defendant guilty of count one.

### a.  The Language of Section 666

Section 666 states that a person is guilty of theft or bribery of programs receiving federal funds if that person is "an agent . . . of a State, local, or Indian tribal government, or any agency thereof [and] embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property that is valued at $5,000 or more, and is owned by, or is under the care, custody, or control of such organization, government, or agency."  18 U.S.C. § 666(a)(1)(A).

Section (c) states that the above "does not apply to bona fide salary, wages, fees or other compensation paid, or expenses paid or reimbursed, in the usual course of business." 18 U.S.C. § 666(c).  Section (c) is known as the "safe harbor provision."

### b.  As to Whether the Safe Harbor Provision Should Have Applied to the Defendant

The Court previously ruled on whether or not the Defendant fell within the safe harbor provision of 18 U.S.C. § 666(c).  *See United States v. Walsh*, 156 F. Supp. 3d 374 (E.D.N.Y. 2016). The Court considered the legislative history of the statute, the definitions of various words in the statute, as well as the relevant case law.  *Id.* at 382–93.  After a lengthy discussion, the Court found that a reasonable juror could conclude that the safe harbor provision did not apply to the Defendant. *Id.* at 393.

The law of the case doctrine—regarding issues not on remand from an appellate court— states "that when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case."  *United States v. Carr*, 557 F.3d 93, 102 (2d Cir

2009); *United States v. Uccio*, 940 F.2d 753, 758 (2d Cir. 1991) (quoting *Arizona v. California,* 460 U.S. 605, 618, 103 S. Ct. 1382, 1391, 75 L. Ed. 2d 318 (1983) (internal quotation marks omitted)); (*United States v. Basciano*, No. 03–CR–929, 2010 WL 3325409, at *6 (E.D.N.Y. Aug. 19, 2010), *aff'd* 465 Fed. App'x 9 (2d Cir 2012). A court may be justified in reconsidering its own earlier decision in "compelling circumstances, consisting principally of an intervening change in controlling law, new evidence, or the need to correct a clear error of law or to prevent manifest injustice. *Carr*, 557 F.3d at 93; *Uccio*, 940 F.2d at 758; *United States v. Shellef*, 756 F. Supp. 2d 280, 288 (E.D.N.Y. 2011) (quoting *United States v. Tenzer*, 213 F.3d 34, 39 (2d Cir. 2000)); *see also Vitrano v. United States*, No. 06–CV–6518, 2009 WL 1011582 at *9 (E.D.N.Y. April 14, 2009) ("Though the doctrine is discretionary, it generally motivates courts to refuse to reopen what has been decided") (internal citations and quotations omitted).

The Court is mindful that the "doctrine of law of the case is not an inviolate rule, and the decision whether or not to apply law-of-the-case is, in turn, informed principally by the concern that disregard of an earlier ruling should not be allowed to prejudice the party seeking the benefit of the doctrine." *Uccio,* 940 F.2d at 758 (internal quotation and citations omitted). "In this context prejudice . . . refers to a lack of sufficiency of notice or a lack of sufficient opportunity to prepare armed with the knowledge [the prior ruling is not deemed controlling]." *Id.* (quoting *United States v. Birney,* 686 F.2d 102, 107 (2d Cir. 1982) (internal quotation marks omitted).

Here, the Defendant does not put forward any new arguments or any new evidence concerning why the safe harbor provision should apply to him. The Court has reviewed its previous decision; reviewed the state of the law; considered the evidence presented at trial; and does not find any cogent or compelling reasons to deviate from its prior ruling. The Court still holds that any reasonable juror could find that the Safe Harbor Rule does not apply to the

Defendant, and that is what the jury found. The specific evidence adduced at trial will be discussed below. The Court finds that there was sufficient evidence for any rational trier to fact to determine that the Defendant did not fall within the safe harbor provision, and that portion of the Defendant's motion for a verdict of not guilty notwithstanding the jury's verdict is therefore denied.

### c. As to Whether the Defendant Knew about the CBA and Believed He Was Fulfilling His Duties

The Defendant argues that he cannot be found guilty of a scheme to defraud because he believed he was fulfilling his duties, and because there was no evidence that he knew about the requirements of the CBA. The Defendant states that because he did not know he was not supposed to engage in the activities of which he was convicted, he did not possess the requisite intent to defraud the SCSO. The Court disagrees.

The CBA between the Suffolk County Sheriff's Office (the "SCSO") and Suffolk County requires that a correction officer work a seven-and-a-half-hour work day and a thirty-seven-and-a-half-hour work week. (Tr. at 68, 75, 1503). Officers are paid overtime when they work in excess of either of those thresholds. (Tr. at 68–69, 75–76). During the relevant period, the Defendant was a correction officer with the SCSO. (Tr. at 69–70).

Whether acting as a correction officer, aide to the sheriff, or liaison, the Defendant was not exempt from the CBA. (Tr. at 69–71; 1139; 1504). The Defendant worked for the SCSO for almost twenty years. He filled out time sheets and overtime sheets, which appeared to show a working knowledge of the CBA. (See Gov't Exs. 11A–D, 12A–D, 13A–D, 14A–C, 15). Nearly every SCSO employee who testified, whether for the Government or for the Defendant, acknowledged that they knew about the CBA and its attendant hourly requirements. (Tr. at 879–80, 891, 903–04, 920–22, 928, 933–34, 1421–22, 1601, 1618, 1763–64, 1741-44; Gov't Ex. 44).

The Defendant's witness Vito D'Agnello testified that the Defendant called him for guidance on issues that members of the union faced who were subject to the CBA. (Tr. at 1501). Any rational trier of fact could have found that the Defendant knew about the CBA. Furthermore, any rational trier of fact could have found that the Defendant knew he was defrauding Suffolk County by playing golf or going to the casino instead of being at work, irrespective of whether he knew about the CBA. This is illustrated by the fact that the Defendant filled out his time sheets when he was playing golf, gambling or at political functions with "Outside Agency," "Int. Sec." and "Gangs." Each of these notations suggested that the Defendant was working rather than playing golf or going to the casino. It is further illustrated by the fact that the Defendant would enter and leave the SCSO Riverhead facility through the dirt road that was so rarely used by any other SCSO employees. (Tr. at 804–34, 880–82, 891–92, 922–23, 934–36). All of this evidence showed that the Defendant was attempting to cover up his activities.

There was no evidence that any of the Defendant's responsibilities required him leave the SCSO facilities during the times when it was shown that the Defendant was not present at those facilities, (see Tr. at 70, 503–517, 525, 745–747), and there certainly was no evidence that his professional responsibilities brought him to the golf course or the casino. Sheriff DeMarco, who was the Defendant's supervisor, testified that the Defendant did not have responsibilities that would have required him to be outside of the Riverhead or Yaphank facilities. (Tr. at 515, 517, 596–98).

The jury found the Defendant guilty of both counts. As the Court said in its charge for count two, "because an essential element of the crime is intent to defraud, it follows that good faith on the part of the defendant is a complete defense." (Tr. at 2040). Each juror believed beyond a reasonable doubt that the Defendant intended to defraud the SCSO, and that he therefore either

knew about the CBA or knew that he was not performing his job as it was assigned to him.  There was sufficient evidence for the jury to find either or both such facts.

### d.  As to the Sufficiency of the Evidence of Count One

Throughout the trial, the jury learned what the Defendant's responsibilities were at the SCSO; what he did when he claimed to be at the SCSO facilities but he was not; how the Defendant committed the fraud; and evidence of the Defendant's state of mind.  The cumulative effect of all of the evidence was sufficient to sustain the conviction on the first count.

The Defendant's actual duties and responsibilities throughout the relevant period included: acting as a correction officer at the Riverhead facility (Tr. at 69–70, 525, 791; Gov't Ex. 51B, 51E, 51J, 51O); serving as a point of contact for outside law enforcement agencies (Tr. at 510–512; 745–47); conducting tours for judges (Tr. at 511); keeping in contact with the Internal Security Unit and Gang Intelligence Unit (Tr. at 512–13, 666–69, 722–23) and reporting on the circumstances surrounding any inmate deaths (Tr. at 513).  As mentioned above, there was no evidence that the Defendant had responsibilities that took him outside of the SCSO facilities.

Further, even the Defendant's witnesses did not testify that the Defendant had reason to be outside of the SCSO facilities in his official capacity.  (Tr. at 1500–05, 1600–18, 1744–45, 1766–67, 1788–90).  At best, the witnesses for the Defendant testified that they did not know what his daily responsibilities were, (Tr. at 1766–67), and at worst they said that his responsibilities did not take him outside of the SCSO facilities.  (Tr. at 1500).

The evidence of what the Defendant did when he was claimed to be working was substantial.  The jury learned that when his time sheets indicated he was working for the SCSO, the Defendant played more than one hundred and sixty total rounds of golf at Hampton Hills Golf and Country Club (Tr. at 126–32, 139–99, 1456–87, 1990; Gov't Ex. 20–25); that he also golfed

at the Sebonack Golf Club and Timber Point Golf Course (Tr. at 214–29, 251–58; Gov't Ex. 26–27); that he gambled at Foxwoods on several dates (Tr. at 259–72, 426–54; Gov't Ex. 43, 48, 49, 86); that he went to the bank and shopped (Tr. at 272–91, 316–50; Gov't Ex. 30B–E, 31A–C, 32A–B, 33A–C, 34A–C, 35A–C, 36-38, 40A, 45, 55); and that he worked on behalf of the Suffolk County Conservative Party (the "SCCP"). (Tr. at 292–311, 388–423; Govt Ex. 33B).

The jury learned of all of this through attendance and payroll records, time sheets, overtime slips, receipts, cell phone records, credit card records, bank records, business records, photographs, and direct testimony.

Specifically, as to the Defendant's time sheets and overtime slips, the jury learned that the Defendant claimed to have worked more time than he actually did on every time sheet and overtime slip. (Tr. at 1304–05). When the amount of hours where the Defendant was paid but did not work were added up, and multiplied by his hourly wage, the jury learned that the Defendant defrauded the SCSO of $200,000. (Tr. at 1308–09).

As to further evidence of the Defendant's state of mind, the jury learned that the Defendant often exited the SCSO Riverhead facility by the dirt road instead of leaving through the front gates as other employees did. (Tr. at 804–34). Several of the SCSO employees testified that they had never used the SCSO Riverhead dirt road. (Tr. at 880–882, 891–92, 904–05, 922–23, 934–36). This evidenced an intent to hide his activities, further supporting a finding of an intent to defraud.

Viewing the evidence in the light most favorable to the Government, and drawing every possible inference in the Government's favor, the Government proved, and a jury of the Defendant's peers found beyond a reasonable doubt: that the Defendant worked for a local government agency; that he defrauded the SCSO by claiming to work hours that he did not; that

the money he took by fraud belonged to the SCSO; that he defrauded the SCSO of more than $5000; and that the SCSO receives more than $10,000 a year from the United States government.

Accordingly, the Court cannot find that the evidence presented to the jury on Count One of the Indictment was meager or nonexistent. Rather, there was more than sufficient evidence for the jury to find the Defendant guilty of Count One, and the Defendant's motion for a not guilty verdict on that count is denied.

### 3. As to the Jury's Guilty Verdict as to Count Two

The Defendant similarly argues that he cannot be guilty of wire fraud because there was no evidence that the Defendant knew about the CBA, and that he believed he was fulfilling his obligations to the SCSO. The Defendant states that since he did not know that he was not doing his job, there was insufficient evidence to support a finding of an intent to defraud. The Court disagrees, and finds that there was sufficient evidence for any rational trier of fact to find the Defendant guilty as to this count.

### a. As to What Constitutes a violation of 18 U.S.C. § 1343

The wire fraud statute makes it a crime to use wires in furtherance of a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1343. "The essential elements of a mail [or wire] fraud violation are (1) a scheme to defraud, (2) money or property [as the object of the scheme], and (3) use of the mails [or wires] to further the scheme." *United States v. Dinome,* 86 F.3d 277, 283 (2d Cir. 1996) (quoting *United States v. Miller,* 997 F.2d 1010, 1017 (2d Cir. 1993)) (quotation marks omitted, all alterations in *Dinome* and some alterations in *Miller*).

### b. As to the Sufficiency of Evidence of Count Two

As discussed above, the Court finds that there was sufficient evidence before the jury for any rational trier of fact to find that the Defendant knew about the CBA; that he did not believe that he was fulfilling his obligations; and that the Defendant engaged in a scheme to defraud the SCSO of money. Therefore, the only remaining issue for the Court to address regarding the sufficiency of the evidence for Count Two is the Defendant's use of the mails or wires.

The jury learned that the Defendant received his paychecks via direct deposit into his Suffolk Federal Credit Union bank account, and that they traveled there through interstate wires before being deposited into the Defendant's bank account. (Tr. at 474–83; Gov't Ex. 53).

Viewing the evidence in the light most favorable to the Government, and drawing all possible inferences in its favor, the Court finds that there was sufficient evidence for any rational trier of fact to find that the Defendant engaged in a scheme to defraud the SCSO of money, and that he used interstate wires in furtherance of that scheme. Accordingly, the Defendant's motion for a not guilty verdict as to the second count is denied.

### B. As to the Defendant's Rule 33 Motion for a New Trial

The Defendant also moves for a new trial in the interest of justice because he claims that he was deprived of a fair trial in that 1) Sheriff DeMarco perjured himself; 2) the Government failed to disclose promises of leniency to Sheriff DeMarco in violation of *Brady* and *Giglio*; 3) the Defendant should have been provided with a bill of particulars; and 4) Agent Hosey impermissibly gave opinion testimony. The Court disagrees, and denies the Defendant's motion for the reasons that follow.

### 1. Applicable Law

Under FED. R. CRIM. P. 33(a), "the court may vacate any judgment and grant a new trial if the interest of justice so requires." This rule, "by its terms gives the trial court 'broad discretion . . . to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice.' " *United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir. 2001) (quoting *United States v. Sanchez,* 969 F.2d 1409, 1413 (2d Cir. 1992)); *see also United States v. Landau*, 155 F.3d 93, 104 (2d Cir. 1998) ("A district court should grant a new trial if it is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice" (internal quotation marks and citation omitted)).

In passing on a Rule 33 motion, the Court's role is to "strike a balance between weighing the evidence and credibility of witnesses and not 'wholly usurp[ing]' the role of the jury." *United States v. Ashburn*, No. 11–CR–303, 2015 WL 5098607, at *22 (E.D.N.Y. Aug. 31, 2015) (quoting *Ferguson*, 246 F.3d at 133). In this regard, "[i]t is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment." *Sanchez*, 969 F.2d at 1414. For example, "[w]here testimony is patently incredible or defies physical realities, it may be rejected by the court, despite the jury's evaluation." *Id.*

Thus, in order to warrant Rule 33 relief, "[t]here must be a real concern that an innocent person may have been convicted," *id.*, and that "letting [the] guilty verdict stand would be a manifest injustice," *Ferguson*, 246 F.3d at 134. By comparison, Rule 33 relief is not warranted where the Court is "satisfied that 'competent, satisfactory and sufficient evidence' in the record supports the guilty verdict." *Id.* (quoting *Sanchez*, 969 F.2d at 1414).

### 2. As to Sheriff DeMarco's Alleged Perjury

The Defendant claims that he should be granted a new trial because Sheriff DeMarco perjured himself on the witness stand when he testified that a) he didn't instruct Baisley to tell prospective witnesses for the Defendant that they would not be paid and b) he didn't know that the Defendant had visited former correction officer Mele ("Mele") in the hospital. (Def.'s Mem. at 26–27). The Court disagrees, and declines to find that Sheriff DeMarco committed perjury.

"Even where courts in this Circuit have clearly identified perjured testimony, they have refused to grant a new trial unless the court could find that the jury "probably would have acquitted in the absence of the false testimony." *United States v. McCourty*, 562 F.3d 458, 476 (2d Cir. 2009) (quoting *Sanchez*, 969 F.2d at 1413–15) (refusing to grant a new trial under Rule 33 on the basis of perjured testimony because it "could not be said that the jury probably would have acquitted in the absence of the false testimony"). In short, where the resolution of the Rule 33 motion "depend[s] on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial." *Metromedia Co. v. Fugazy,* 983 F.2d 350, 363 (2d Cir. 1992).

"It is only in the rare instance where it can be shown that the prosecution knowingly used false testimony that the courts apply a less stringent test and permit the granting of new trial where the jury might have acquitted absent the perjury." *United States v. Sanchez*, 969 F.2d 1409, 1413–14 (2d Cir. 1992); *see also Sanders v. Sullivan,* 863 F.2d 218, 225–26 (2d Cir. 1988).

"It long has been our rule that trial courts 'must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses.' " *United States v. LeRoy,* 687 F.2d 610, 616 (2d Cir. 1982), *cert. denied,* 459 U.S. 1174, 103 S. Ct. 823, 74 L. Ed. 2d 1019 (1983) (internal citations omitted). It is only where exceptional circumstances can be demonstrated that the trial

judge may intrude upon the jury function of credibility assessment. *See United States v. Kuzniar,* 881 F.2d 466, 470 (7th Cir. 1989). Where testimony is patently incredible or defies physical realities, it may be rejected by the court, despite the jury's evaluation. *See*, *e.g.*, *Holland v. Allied Structural Steel Co.,* 539 F.2d 476, 483 (5th Cir. 1976), *cert. denied,* 429 U.S. 1105, 97 S. Ct. 1136, 51 L. Ed. 2d 557 (1977); *Zollman v. Symington Wayne Corp.,* 438 F.2d 28, 31–32 (7th Cir. 1971), *cert. denied,* 404 U.S. 827, 92 S. Ct. 59, 30 L. Ed. 2d 55 (1971). However, the trial judge's rejection of all or part of the testimony of a witness or witnesses does not automatically entitle a defendant to a new trial. *See United States v. Indelicato,* 611 F.2d 376, 387 (1st Cir. 1979). The test is whether "it would be a manifest injustice to let the guilty verdict stand." *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992).

Here, the Court declines to find that Sheriff DeMarco committed perjury. The conversation with Lieutenant Baisley concerns an issue of credibility, and the Court must defer to the jury on issues of credibility. Furthermore, the Defendant has misconstrued the evidence presented against him at trial. Sheriff DeMarco testified that he had a conversation with Lieutenant Baisley about defense subpoenas and that no witnesses for the government or defense would be paid until they had an opinion from the Suffolk County Attorney as to whether the CBA permitted it. (Tr. at 565-66). The Defendant points to testimony from Lieutenant Baisley as evidence of Sheriff DeMarco's alleged perjury, where Lieutenant Baisley testified that Sheriff DeMarco said "that anyone who was coming to testify, not for the government, would not be paid because we don't pay people to testify for criminal defendants." (Def.'s Mem. at 11–12 (quoting (Tr. at1401)). However, as the Defendant's own memorandum points out, the Lieutenant continually said that it was partially true that the directive that witnesses for the defense would not be paid came directly from Sheriff DeMarco. (Def. Mem. of Law at 12). Lieutenant Baisley clarified his testimony in redirect,

lending credence to what Sheriff DeMarco said: "We hadn't gotten clarification of the [CBA]. When I had that conversation with them, the union president was in my office where we were trying to straighten the situation out. And Director of Labor Relations . . . said it was his belief that we're not allowed to pay them, according to the contract. He told the sheriff that; the sheriff directed me 'We're not going to pay them.' " (Tr. at 1412–13).

Even if the Court were to find that Sheriff DeMarco perjured himself in that manner, the Court cannot find that the jury probably would have acquitted in the absence of the allegedly false testimony. First, the question of whether or not the defense witnesses would have been paid is a collateral issue that has no direct bearing on the Defendant's guilt. Second, the witnesses who were subpoenaed *did* testify for the defense, and they *were* paid by the SCSO, so the issue was moot at the trial. As noted above, if the Court were to believe that the testimony was false, it must ask itself whether the jury would have probably acquitted in the absence of that testimony. The result would have been the same because the evidence would have been the same–the witnesses were paid. With reasonable certainty, the jury would not have probably acquitted in the absence of the alleged false testimony.

As to whether or not Sheriff DeMarco knew that the Defendant went to visit Mele, it does not appear from the record that Sheriff DeMarco was ever asked that direct question. The question that the attorney for the Defendant asked was "[a]re you aware . . . that [the Defendant] went to hospitals and says 'I'm here on behalf of the sheriff, is there anything we can do for you' . . . were you aware of that?" (Tr. at 711). The Sheriff replied that he was not aware. The question was asked whether Sheriff DeMarco knew that 1) the Defendant went to hospitals and 2) identified himself as being there as an agent of the Sheriff, which is not the same as asking whether Sheriff DeMarco knew that the Defendant went to visit Mele. In any event, it is an issue of credibility on

which the Court should defer to the jury. The testimony is not patently false, and it does not deny the realities of physics. *See Holland,* 539 F.2d at 483. Nonetheless, in the Court's view, this is another collateral issue which would not have affected the jury's decision.

The Court declines to find that Sheriff DeMarco testified falsely in either instance, and further declines to find that the jury would have likely acquitted in the absence of the allegedly false testimony. Both instances bore on Sheriff DeMarco's credibility. The jury was instructed to consider credibility in its deliberations, and the Defendant argued vehemently in its summations that Sheriff DeMarco was not credible.

Accordingly, the Court declines to find that Sheriff DeMarco perjured himself, and denies the Defendant's motion for a new trial on that specific basis.

### 3. As to the Alleged Brady/Giglio violation

The Defendant argues that the Government may have committed a *Brady*/*Giglio* violation because the Defendant speculates that the Government may have promised prosecutorial leniency to Sheriff DeMarco. The Court disagrees because the Defendant is unable to present any evidence to support that theory.

*Brady* requires the Government to disclose material evidence which is favorable to a criminal defendant. *United States v. Rivas,* 377 F.3d 195, 199 (2d Cir. 2004). Evidence is favorable if it is either exculpatory or impeaching, *Strickler v. Greene,* 527 U.S. 263, 281–82, 119 S. Ct. 1936, 1948, 144 L. Ed. 2d 286 (1999), and it is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Youngblood v. West Virginia,* 547 U.S. 867, 870, 126 S. Ct. 2188, 2190, 165 L. Ed. 2d 269 (2006) (quotation marks omitted). This includes prosecutorial promises of leniency made to

a cooperating witness. *Giglio v. United States*, 405 U.S. 150, 154–55, 92 S. Ct. 763, 766, 31 L. Ed. 2d 104 (1972).

Here, the Defendant speculates that the Government made promises of leniency to a witness. There is no evidence that the Government made such promises. The only "evidence" presented by the Defendant is that Agent Hosey did not memorialize any of his conversations with Sheriff DeMarco, and that the Government asked for a jury charge of "witnesses equally available." The Government in its memoranda submits that no such promise was ever made. (Gov't Mem. at 41). Further, the Second Circuit has explicitly held that *Brady* does not require the government to take notes of all interviews of potential witnesses. *United States v. Rodriguez*, 496 F.3d 221, 225 (2d Cir. 2007). The Defendant had the opportunity to cross-examine Agent Hosey, who, the Defendant speculates, made such promises. The Defendant also had the opportunity to cross-examine Sheriff DeMarco. Although the Defendant crossed Agent Hosey about his failure to memorialize his conversations with Sheriff DeMarco, the Defendant did not ask either witness about this supposed promise. The Defendant failed to put forward any evidence that the Government made any promises to Sheriff DeMarco. The Defendant does not present evidence, only speculation.

Speculation that the Government did not fulfill its *Brady* obligations, or mere speculation that there was a promise of leniency, is not enough for a court to find a violation. *See*, *e.g.*, *United States v. Tairod Nathan Webster Pugh*, No. 1:15–CR–00116, 2015 WL 9450598, at *30 n. 22 (E.D.N.Y. Dec. 21, 2015) (stating that the defendant "has not put forward any evidence suggesting that the Government has wrongfully withheld" *Brady* material); *Miles v. Conway*, 739 F. Supp. 2d 324, 340 (W.D.N.Y. 2010) ("[Defendant's] Brady claim must fail because he provides no evidence to support his allegations.") (internal quotation marks and citation

omitted); *Chandras v. McGinnis*, No. 01–CV–2519, 2002 WL 31946711, at *5 (E.D.N.Y. Nov. 13, 2002) ("[T]here must be some evidence of an agreement or understanding between [the prosecutor] and [the witness] for a *Giglio* violation to have occurred. In the absence of credible evidence contradicting the [prosecutor's] denials, [the defendant's] claims of prosecutorial misconduct are meritless."); *United States v. Upton*, 856 F. Supp. 727, 746 (E.D.N.Y. 1994) ("As a matter of law, mere speculation by a defendant that the government has not fulfilled its obligations under Brady, is not enough to establish that the government has, in fact, failed to honor its discovery obligations.") (internal citation omitted).

As there is no evidence here of a *Brady*/*Giglio* violation, the Defendant's motion for a new trial on that basis is denied.

### 4. As to the Bill of particulars

The Defendant argues that the Court erred when it denied his request for a bill of particulars because it burdened him with the task of retracing his steps everyday over a forty-month period. (Def.'s Mem. at 28). The Court disagrees.

"Federal Rule of Criminal Procedure 7(f) allows a defendant to seek a bill of particulars in order to (1) 'identify with sufficient particularity the nature of the charge pending against him, thereby enabling defendant to prepare for trial'; (2) 'to prevent surprise'; and (3) 'to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense.' " *United States v. Badoolah*, No. 12–CR–774, 2014 WL 4793787, at *13 (E.D.N.Y. Sept. 25, 2014) (quoting *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987)).

"A bill of particulars is required 'only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused.' " *United States v. Chen,* 378 F.3d 151, 163 (2d Cir. 2004) (quoting *United States v. Walsh,* 194 F.3d 37, 47 (2d

Cir. 1999)).  In addition, "a bill of particulars is not necessary where the government has made sufficient disclosures concerning its evidence and witnesses by other means." *Id.* (quoting *Walsh,* 194 F.3d at 47); *see also United States v. Ahmed,* No. 12–CR–661, 2015 WL 1321612, at *28 (E.D.N.Y. Mar. 24, 2015) (same).  Also, "a bill of particulars is not to be used 'as a discovery device to seek and compel disclosure of the Government's evidence prior to trial.' " *United States v. Walters,* 963 F. Supp.2d 125, 134 (E.D.N.Y. 2013) (quoting *United States v. Larracuente,* 740 F. Supp. 160, 163 (E.D.N.Y. 1990)).

This case is similar to *United States v Chen*, 378 F.3d 151 (2d Cir. 2004) where the Second Circuit held that:

> the indictment in this case included the nature of the charges and provided a time frame and location in which the crimes were alleged to have taken place.  Moreover, extensive discovery furnished defendants with significant insight into the government's case: counsel for defendants were given various FBI reports of interviews; grand jury testimony of witnesses; and the recordings and transcripts from the taped conversations that were eventually presented as evidence at trial. Finally, the government distilled its case even further in the course of the prolonged oral argument with respect to Chen's motion for a bill of particulars and again during a colloquy preceding Chen's cross-examination of Hsu.

*Id.* at 161.

Both the Complaint and the Indictment described the fraudulent scheme with which the defendant was charged (falsifying time sheets (Compl. at ¶ 8; Ind. at ¶ 6)), and specified the time period as being between January 2011 and April 2014.  (Compl. at ¶ 8; Ind. at ¶ 6).  In the Complaint the Government laid out four specific examples of dates when the Defendant committed the charged crimes.  (Compl. at ¶¶ 9–34).  Furthermore, the Government stated that it intended to prove that "the [D]efendant falsified every time sheet he submitted to the SCSO."  (Gov't Mem. of Law at 22, ECF No. 39).  The Defendant was provided with all of these time sheets in discovery. At the trial, Agent Hosey testified that every single time sheet that he reviewed indicated that the

Defendant claimed to have worked hours that he did not work. (Tr. at 1305). The Government provided the Defendant with the time sheets that he signed as well as his bank records, which evidenced the falsification and wire transfers.

The Defendant relies on the same case that he presented to the Court in his motions in limine, *United States v. Bortnovsky*, 820 F.2d 572 (2d Cir. 1987), in which the defendants were convicted in district court of several crimes in connection with a scheme to submit false insurance claims for burglary losses. As this Court previously stated, the Second Circuit held that the district court abused its discretion because the indictment omitted such crucial information as the dates of the fake burglaries and the identity of the fraudulent documents, and because the Government buried the defendants with irrelevant documents that their attorneys had to sift through in four days. *United States v. Walsh*, 156 F. Supp. 3d 374, 395-6 (E.D.N.Y. 2016).

As the Court said in its earlier decision denying the request for a bill of particulars,

[b]y contrast, in this case, the Indictment alleges the relevant time period of the conspiracy, January 2011 to April 2014, and the complaint provides specific examples of the Defendant's alleged conduct. Further, while the Government may have produced '10,000 pages of discovery,' it has also telegraphed in its legal memorandum which time sheets and wire transfers it intends to use at trial to prove its fraud and theft of fund charges. This is simply not a case where the 'relevance of key events are shrouded in mystery.'

*United States v. Walsh*, 156 F. Supp. 3d 374, 396 (E.D.N.Y. 2016) (quoting *Bortnovsky*, 820 F.2d at 575).

In this case, the Defendant was able to identify with particularity all of the charges against him. There was no surprise in this case. This was a trial of a two count indictment where the conduct alleged spanned approximately three years and was clearly alleged in advance. Finally, there is no risk of double jeopardy because the acts and times were clearly proscribed.

Accordingly, the Court finds that the Defendant was not prejudiced by the Court's denial of his motion for a bill of particulars, and the Defendant's motion for a new trial on that basis is denied.

**5. As to Agent Hosey's Testimony**

Finally, the Defendant claims that the Court erred when it permitted Agent Hosey to testify as to the losses that the SCSO suffered when the Defendant did not work because it was opinion testimony from a lay witness and constituted a legal conclusion. Again, the Court disagrees. Agent Hosey's testimony was not opinion testimony.

Rule 701 of the Federal Rules of Evidence prohibits lay testimony based on scientific, technical or other specialized knowledge. FED. R. EVID. 701. Rule 704 states that "an opinion is not objectionable just because it embraces an ultimate issue." FED. R. EVID. 704.

Agent Hosey's testimony did not require any specialized knowledge—it merely required time, addition and multiplication. Agent Hosey added up the amount of time the Defendant was not at work, and multiplied those hours by his hourly wage. (Tr. at 1308). That is how he arrived at the amount of two hundred thousand dollars ($200,000.00). Of importance, the evidence as to when the Defendant was not at work was already before the jury (Tr. at 1166–1383); and they also learned about his regular and overtime hourly wages. (Tr. at 949). Tying this clearly admissible testimony together is certainly within the purview of a lay person. This was not an opinion, but merely a simple calculation. Even assuming that it was an opinion, it was not one that required specialized knowledge. *See United States v. Rigas*, 490 F.3d 208, 224 (2d Cir. 2007) (stating that lay testimony may be received if it results "from a process of reasoning familiar in everyday life") (citations omitted).

The testimony to which the Defendant objects concerns the losses that SCSO suffered. Agent Hosey did not offer his opinion about whether the Defendant committed fraud, and did not say that these losses were caused by fraud. In short, he did not give offer an opinion on a legal conclusion. A witness offers an opinion on a legal conclusion when he or she attempts to define the defendant's conduct as illegal or compare the defendant's conduct to statutory language. *See United States v. Groysman*, 766 F.3d 147, 162 (2d Cir. 2014) (holding that government agent gave impermissible opinion testimony when he testified as to the defendant's role in the fraud scheme and ultimate culpability); *United States v. Garcia*, 413 F.3d 201, 210 (2d Cir. 2005) (finding that it was harmless error for the district court to allow the government's witness to testify as to the defendant's role in a drug ring when the witness had to glean the information from analysis of wiretapped phone calls, surveillance, cooperator debriefings, and a review of law enforcement databases); *United States v. Scop*, 846 F.2d 135, 140 (2d Cir.), *on reh'g*, 856 F.2d 5 (2d Cir. 1988) (holding that an expert witness, who testified that the defendants engaged in a "manipulative and fraudulent scheme" to manipulate stocks and whose testimony tracked the language of the statute, was an impermissible legal opinion); *United States v. Hoffecker*, 530 F.3d 137, 170 (3d Cir. 2008) (holding that a proper foundation was laid for a lay witness to testify that the defendant's company was a scam). Therefore, Agent Hosey's testimony was not a legal conclusion.

The case cited by the Defendant in support of his position, *United States v. Frantz*, No. 02–CR–01267, 2004 WL 5642909 (C.D. Cal. Apr. 23, 2004), addresses both lay and expert opinions. The court did not allow two IRS auditors, who the Government proffered as lay witnesses, to explain how the Defendant "intended to mislead the IRS agents" by going through their audits. *Id.* at *1, 12. Sifting through voluminous tax records and explaining how certain filings are intended to mislead is not something as to which a lay person could testify. In contrast, a lay person is able

to add and multiply. In *Frantz*, the Court did allow the Government's proffered expert witness to testify that "payments made from Defendant Braswell's domestic corporation to [his other corporation] Deleon must, as a matter of law, be treated as personal income to [defendant] Braswell." This was over the defendant's objection that this testimony would be a legal conclusion because it would assume that Deleon was a sham corporation into which defendant Braswell was funneling money to avoid taxes. *Id.* at *17–18. The Court allowed the expert's testimony because "the trier of fact must still determine that [the defendant] committed an affirmative act to evade taxes and that he did so willfully, [the IRS special agent's] testimony . . . would not usurp the trier of fact's role in determining ultimate guilt or innocence. As a result, the testimony does not constitute an impermissible legal conclusion." *Id.* at *19.

The Defendant's citation to this case is inappropriate because the incomplete quotation presented by the Defendant is not reflective of the *Frantz* court's holding. (*See* Def. Mem. of Law at 28 (stating that the *Frantz* court "observ[ed] that IRS special agent could not 'state a legal conclusion, but only his expert opinion as to whether transactions were taxable' ") (quoting *Frantz*, 2004 WL 5642909 at *18)). The full sentence to which the Defendant cites reads "[p]ermitting Sterling to testify to the proper tax treatment of certain payments or transfers does not allow him to state a legal conclusion, but only his expert opinion as to whether the transfers were taxable." *Id.* at *18. However, the *Frantz* case is not relevant here because Agent Hosey neither testified as an expert nor did he testify to a legal conclusion. The case would have been analogous if Agent Hosey had testified that the Defendant's wire transfers were fraudulent, or that the Defendant's actions constituted fraud. However, Agent Hosey did not so testify.

In sum, Agent Hosey did not testify to the ultimate issue of fraud when he calculated SCSO's losses; he merely calculated the losses using simple arithmetic. The jury had already

heard where the Defendant was supposed to be while working; when he was supposed to be working; his hourly wages for regular time and overtime; where the Defendant visited when he was supposed to be working; and when he visited those places. Agent Hosey merely summarized what he was able to perceive from direct comparisons of documents such as time sheets and receipts.

Accordingly, the Court does not find that Agent Hosey's testimony was improper opinion testimony and the Defendant's motion for a new trial on that basis is denied.

### III. CONCLUSION

Based on the foregoing, the Defendant's motion pursuant to FED. R. CRIM. P. 29 for a judgment of acquittal on both counts is denied, and his motion pursuant to FED. R. CRIM. P. 33 for a new trial is also denied.


It is **SO ORDERED:**

Dated: Central Islip, New York
         November 7, 2016


_____/s/ Arthur D. Spatt_____
              ARTHUR D. SPATT
         United States District Judge