UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

   - against -                                          15-CR-91 (ADS)

EDWARD M. WALSH JR.,

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


EDWARD M. WALSH JR.'S OBJECTION TO THE LOSS FIGURE
CONTAINED IN THE PRESENTENCE REPORT AND TO THE
GOVERNMENT'S LETTER "NOT[ING] . . . CLARIFICATIONS
AND OBJECTIONS TO THE [PRESENTENCE REPORT]"


Leonard Lato, Esq.
200 Motor Parkway, Suite C-17
Hauppauge, NY 11788
Telephone:  (631) 655-5008
Fax:  (631) 300-4380
Email:  leonardlato@yahoo.com

William D. Wexler, Esq.
816 Deer Park Avenue
North Babylon, NY 11703
Telephone:  (631) 422-2900
Fax:  (631) 422-0987
Email:  wexlaw@optonline.net

## PRELIMINARY STATEMENT

Edward M. Walsh Jr. objects to the loss figure contained in the presentence report and to the relief that the government seeks in its December 22, 2016, letter to the probation department.

## DISCUSSION

**Loss—The Court Must Hold a *Fatico* Hearing**

According to the probation department, "The defendant is accountable for a total loss of $202,225, related to Counts 1 and 2 [of the indictment,] for the time period January 1, 2011[,] through April 30, 2014. (PSR ¶ 9). "However," the probation department continues, "agents report that a review of the defendant's overtime sheets for 2007 through 2010 indicated that the defendant committed additional fraud [of $240,000] over the aforementioned time period. . . . Therefore, . . . the defendant is accountable for a total loss of $442,225." (PSR ¶ 9.)

At trial, the government's case agent testified:

> Q. Did you calculate a loss amount . . . ?
>
> . . . .
>
> A. Yes.
>
> . . . .
>
> Q. How did you do that?
>
> A. I added up the number of hours, both regular time and overtime, that . . . he was not at work.

> Q. And what was that amount? The total amount.
>
> A. . . . [R]egular hours were over 1500 hours.
>
> And the overtime hours were in excess of 1,000 hours during the three-year period of the indictment.
>
> Q. And how much money?
>
> . . . .
>
> A. Just over 200,000 [dollars].

(Trial Tr. 1308:2-25, Mar. 24, 2016.)

The PSR's loss amount of $442,225 calls for a 12-level enhancement. (PSR ¶ 17.) But a loss of $202,225 results in only a 10-level enhancement. *See* U.S.S.G. § 2B1.1(b)(1)(F). The difference is a material one that triggers the need for a *Fatico* hearing. *See United States v. Drayer*, 364 F. App'x 716, 720-21 (2d Cir. 2010) (vacating sentence that this Court had imposed after declining to hold a presentencing *Fatico* hearing when, at a later restitution hearing, this Court concluded that the loss figure that it had adopted at sentencing resulted in an unwarranted two-level enhancement).

**The Government's "Clarifications and Objections Letter"**

According to the government, "[T]he defendant engaged in obstructive conduct, on several occasions, during the underlying investigation and at trial." (Letter of AUSAs Catherine M. Mirabile and Raymond A. Tierney to Probation

2

Officer Holly Kaplan of Dec. 22, 2016, at 1-2.)  The government also complains, "[T]he [PSR's] recitation of the defendant's prior criminal conduct omits the defendant's arrest and conviction in Maryland."  Lastly, the government grumbles, "¶ 52 of the PSR indicates that the defendant submitted copies of character reference letters to Probation and the Court. . . . [T]he government has not been provided a copy of this submission."  (Letter at 4.)

*"Obstructive Conduct"*

According to the government, "[T]he defendant attempted to intimidate, or at the very least, persuade, at least three witnesses—Charles Vallillo, Charles Ewald, Vito D'Agnello—to make statements in the defendant's favor when questioned by federal agents or at trial."  (Letter at 1-2.)  With respect to Vallillo, the government contends:

> Charles Vallillo was a Suffolk County Sheriff's Office ("SCSO") Correction Officer . . . .  The government sought to question Vallillo about the defendant and the occasions they golfed together during work hours.
>
> Vallillo reported that, in the Spring of 2014, while the investigation of the defendant was ongoing, the defendant stopped by to see Vallillo at the SCSO Yaphank facility.  During the conversation, the defendant stated, in substance, "You see what's going on in the news [regarding the investigation of the defendant]."  The defendant further told Vallillo that someone may stop by the Yaphank facility to ask Vallillo if the defendant has [sic] stopped by the Yaphank facility in the past.  Vallillo reported that he felt uncomfortable about

3

> the defendant's comments because the defendant rarely stopped at the Yaphank facility.
>
> Further, on August 23, 2014, Newsday published an article about the federal investigation into the defendant and identified Vallillo as an individual questioned by federal agents. . . . [A]fter Vallillo's name appeared in the newspaper, the defendant showed up—uninvited—at Vallillo's house. Vallillo noticed a car blocking his driveway and observed the defendant walking away from Vallillo's house. The two then spoke outside of Vallillo's house. According to Vallillo, the defendant made the following statements: "Now you know what I'm going through;" and "Did you ever think there's more going on here, more than just golf." The defendant further stated that he had not spoken to anyone and had never mentioned Vallillo's name. At one point, the defendant stated "You look like you want to hit me." In addition, the defendant stated, in substance, "Thank goodness I remember seeing you at a golf course." Vallillo stated that he thought the defendant was trying to communicate to him to keep his mouth shut.

(Letter at 2) (first alteration in original).

With respect to Ewald, the government asserts:

> Charles Ewald was the SCSO Warden and responsible for the Corrections Division of the SCSO. Among other things, Ewald was responsible for signing the defendant's time sheets and relied on the defendant regarding their accuracy. As a result of issues with his time sheets, the defendant was suspended from the SCSO in or around August 2014.
>
> During the suspension or immediately thereafter, the defendant showed up at Ewald's house unexpectedly. Ewald stated that the defendant had never stopped by his house unannounced before. While at Ewald's house, the defendant stated, in substance, "You know I was there,"

4

making reference to the defendant being at work. The defendant's statements are an attempt to influence Ewald's recount of the defendant's work performance.

  Ewald further reported that . . . approximately two to three weeks before the government interviewed Ewald[], the defendant called Ewald and asked him to meet the defendant at a diner, which Ewald agreed to do. During that meeting, the defendant stated that the case against him was about him playing golf. The defendant again called Ewald and asked to meet him the same week of the government's interview of Ewald. Again, the defendant met Ewald at a diner. Ewald admitted that the defendant knew, at the time of this meeting, that Ewald was scheduled to speak with the government. During that meeting, the defendant stated, in substance: "You know what I did," "You know that I was at work;" "I worked for the Sheriff. I did Project Lifesaver and Project Great;" the defendant also allegedly told Ewald to tell the truth. While Ewald stated that it had not occurred to him that the defendant was trying to manipulate Ewald into making statements, Ewald admitted that he was not aware of the defendant having worked on any of those projects on behalf of the SCSO. In addition, approximately an hour and a half before Ewald's interview with federal authorities, the defendant again showed up at Ewald's house unannounced. The defendant claimed that he had heard Ewald had been picked up by the FBI and expressed relief that Ewald had not been arrested. The defendant told Ewald to call him after meeting with the government.

  While Ewald stated that he considered the defendant's statements as trying to convince himself (Walsh) that he had worked on these projects, the government submits that the defendant's unannounced appearance at Ewald's residence and statements in support of work allegedly performed by the defendant were, rather, attempts to intimidate Ewald or, at least,

5

> persuade him to make statements in the defendant's favor when questioned.

(Letter at 2-3.)

Finally, with respect to D'Agnello, the government claims:

> Vito D'Agnello was the President of the Suffolk County Correction Officers Union. At trial, D'Agnello testified that, prior to trial, he met with the defendant and defendant's attorneys at which time he felt that the defendant attempted to influence his testimony. D'Agnello testified as follows:
>
> > Q. And, the defendant, he actually spoke at that meeting?
> >
> > A. Yes.
> >
> > Q. And he tried to tell you what to say at trial, didn't he?
> >
> > A. Whether it was—yes.
> >
> > Q. You felt that he was trying to influence your testimony here in court?
> >
> > A. You could say that.

(Letter at 3) (quoting Trial Tr. 1506:2-10, Mar. 28, 2016.)

The government's contentions are meritless.

"The Sentencing Guidelines provide for a two-level enhancement '[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the

6

instant offense.'" *United States v. Hernandez*, 83 F.3d 582, 585 (2d Cir. 1996) (quoting U.S.S.G. § 3C1.1) (alteration in original). The Second Circuit observed in *Hernandez*:

> For an obstruction of justice to be found, a court must establish that the defendant had the specific intent to obstruct justice. In other words, there must be a finding that the defendant "consciously act[ed] with the *purpose* of obstructing justice." And Application Note 1 to U.S.S.G. § 3C1.1 requires a sentencing court, in determining whether an obstruction of justice occurred, to read "statements by the defendant . . . in a light most favorable to the defendant." In general, the question of whether an obstruction of justice took place is one to be decided by a preponderance of the evidence, but we have suggested that as to statements governed by Application Note 1 to U.S.S.G. § 3C1.1, the standard "sounds to us indistinguishable from a clear-and-convincing" one.

*Id.* at 585. (alteration and ellipses in original) (citations omitted).

In *Hernandez*, the Circuit vacated the district court's enhancement for obstruction of justice, *id.* at 587, stating:

> 1. Before trial, Hernandez called [witness] Frey "the devil" and stated that she would "stare" Frey "down" at trial. But, as the government virtually conceded at oral argument, these utterances hardly amount to a threat. Even if this conversation "intimidated" Frey and made her "scared," there is no evidence that Hernandez made the statements with the requisite *intent* to obstruct justice. Taking the statements to Frey in the light most favorable to Hernandez, what Hernandez said was not an obstruction of justice.
>
> 2. Hernandez sought to communicate with Frey on the first day of trial. Without some showing of

7

> evil intent as to that attempted contact, however, this fact cannot constitute any evidence at all of obstruction.
>
> . . . .
>
> 4.   Like the defendant's shouts at Frey, her "screaming and hollering" at [witness] Michael Thomas when she first learned that Thomas had testified against her shows no more than fury. Fury may be exceedingly unpleasant, but alone, it bespeaks no intent to obstruct justice.
>
> . . . .
>
> 6.   The only evidence regarding the defendant that might come close to showing intimidation or attempted intimidation on her part is her post-trial statement to Michael Thomas . . . , "die, die, die." But once this statement is taken in the light most favorable to Hernandez—as it must be under Application Note 1 of the Guidelines—it becomes impossible to conclude that the words were stated with an intent to obstruct justice. It may very well be that Hernandez wished Thomas dead, and the sooner the better. But that is a very long way from showing that she made the statement in order to get him to change his testimony at the sentencing hearing.

*Id.* at 586.

Even if the government's allegations about Walsh were true, the complained-of conduct does not come close to evincing a "conscious[] . . . *purpose* of obstructing justice." Moreover, with respect to the alleged obstruction involving D'Agnello, the government's allegation is knowingly false. Immediately after the government elicited, on its direct examination of D'Agnello, what it contends is evidence of attempted obstruction of justice, defense counsel William Wexler

8

began his cross-examination of D'Agnello with the following:

> Q. Mr. D'Agnello . . . . You came to my office, correct?
>
> A. Correct.
>
> . . . .
>
> Q. And [defense counsel] Leonard Lato was there?
>
> A. Correct.
>
> Q. And [a] retired FBI agent was there?
>
> A. Correct.
>
> Q. And Eddie [Walsh] was there?
>
> A. Correct.
>
> . . . .
>
> Q. And how long were you at my office for?
>
> A. Half hour.
>
> . . . .
>
> Q. And of the half hour, 30 minutes, how many of those 30 minutes was I talking to you, trying to learn about what you do?
>
> A. The majority of it.
>
> Q. And the discussions or the discussions or the conversations that you had with Ed, was that in conjunction so that I and Len Lato—Mr. Lato could learn what goes on in the Sheriff's office?

9

>    A.   You can say that.
>
>    Q.   Well, when you left, did you feel that anybody was trying to influence your testimony?
>
>    A.   No.

(Trial Tr. 1506:15-1507:21, Mar. 28, 2016.)

If an attempt to obstruct justice occurred in this case, it came from two government witnesses—Sheriff Vincent DeMarco and one of his internal affairs investigators, Brian Baisley. The following are excerpts from Baisley's testimony during cross-examination:

>    Q.   Did you instruct . . . [John Santac]roce and [Richard] Clark, that if they testified for the defense, they would not be paid for the day?
>
>    A.   Yes.
>
>    Q.   Did you tell them that this directive was coming directly from Vincent DeMarco?
>
>    A.   I may have.
>
>    Q.   Well—
>
>    A.   I'm going to correct that. I'm going to say yes.
>
>    Q.   "Yes," as to what, sir?
>
>    A.   Yes, the directive came from Sheriff DeMarco.
>
>    Q.   So is it a fair statement that Sheriff DeMarco told you that anyone who testifies on Ed Walsh's behalf will not be paid for the day?

10

> A. I was told that—
>
> Q. "Yes" or "no," sir, or "I can't answer it yes or no." Those are the choices.
>
> A. I can't answer it yes or no.
>
> Q. Did you speak to Sheriff DeMarco about defense subpoenas?
>
> A. Yes.
>
> Q. Did he tell you to tell anything to people who have been subpoenaed by the defense?
>
> A. He told me that anyone who was coming to testify, not for the government, would not be paid because we don't pay people to testify for criminal defendants.

(Trial Tr. 1399:18-1400:21, Mar. 28, 2016.)

Baisley's dance routine was stymied after he listened to a recording of one of his conversations with Santacroce and Clark:

> Q. . . . [I]s it a fair statement that you told [Santacroce and Clark] several times during that conversation in substance . . . , "If you testify for any criminal defendant, including Eddie Walsh, you're not getting paid"?
>
> A. Yes.
>
> Q. And is it a fair statement that you said that was coming directly from the sheriff?
>
> A. That's partially true, yes.
>
> Q. No, my question is, did you tell them that it was

11

> coming directly from the sheriff?
>
> A. That was part of the statement I made, yes.
>
> Q. And did you say that several times?
>
> A. Yes.
>
> . . . .
>
> Q . . . . [I]s it a fair statement that you also stated, in contrast, that if the government had called Mr. Santacroce or Mr. Clark as a witness, they would be paid?
>
> A. Yes.

(Trial Tr. 1403:8-1404:2, Mar. 28, 2016.)

Now *that* sounds more like an attempt to obstruct justice.

*The Government's Version of Walsh's Prior Criminal Record*

The government complains:

> With respect to the defendant's criminal history, while it does not affect the defendant's criminal history category, the recitation of the defendant's prior criminal conduct omits the defendant's arrest and conviction in Maryland. In December 1984, the defendant was arrested by the University of Maryland Police Department in College Park and charged with a sexual offense in the fourth degree; the defendant pleaded guilty and was sentenced to 12 months' probation.

(Letter at 4.)

In its letter, the government provides no support for its contention that the aforementioned criminal conduct occurred. And the government conceals that this

12

matter has come up before. (*See* Def.'s Response to Government's Motion in Limine, Mar. 12, 2016, at 8-9, ECF No. 63.) In its motion in limine, the government wrote:

> [N]ews agencies reported that the defendant had provided false and inaccurate information on his application for employment with the Sheriff's Office. Specifically, the defendant was arrested in December 1984 by the University of Maryland Police Department in College Park and charged with a sexual offense in the fourth degree; the defendant pleaded guilty and was sentenced to 12 months' probation.

(Government's Motion in Limine, Mar. 8, 2016, at 4, ECF No. 60.)

In response to the government's motion, Walsh wrote, "It is actually hard to believe that the Government is serious." "In any event," Walsh responded, "Walsh's 1984 Maryland matter did not end in either 'a sexual offense' conviction or in a sentence of '12 months' probation.' After a presentence probationary period of 12 months, the case was dismissed." (*See* Def.'s Response to Government's Motion in Limine 9.)

If the case was sealed, as it probably was given the probation department's failure to find it, the Court cannot consider it. *See, e.g.*, *United States v. Beaulieau*, 959 F.2d 375, 381 (2d Cir. 1982) (vacating sentence because the district court "improperly considered a prior 1980 conviction which had been sealed pursuant to state law"). Accounts that "news agencies have reported" do not trump what the Second Circuit has held.

13

*Walsh's Character-Reference Letters*

    Walsh has not furnished any character-reference letters to the Court. His only post-trial submissions, other than his requests to continue sentencing, were made to the probation department. Walsh consents to the probation department's providing to the government copies of any letters that Walsh gave to the probation department.

Dated:    Hauppauge, New York
           April 22, 2017

                                            Respectfully,

                                            *Leonard Lato*
                                            Leonard Lato

                                            *William D. Wexler*
                                            William D. Wexler

ec:    AUSAs Catherine M. Mirabile & AUSA Raymond A. Tierney

       U.S. Probation Department (officer to be assigned)