

U.S. Department of Justice

United States Attorney
Eastern District of New York

RAT/CMM
F. #2015R00415

610 Federal Plaza
Central Islip, New York 11722

June 8, 2017

By Hand and ECF

The Honorable Arthur D. Spatt
United States District Judge
United States District Court
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

      Re:   United States v. Edward M. Walsh, Jr.
             Docket No. 15-CR-91 (ADS)

Dear Judge Spatt:

      The defendant Edward M. Walsh, Jr. was convicted on March 31, 2016, after a jury trial, of theft of funds, in violation of 18 U.S.C. § 666(a)(1)(A), and wire fraud, in violation of 18 U.S.C. § 1343.  On June 1, 2017, the Court held a Fatico hearing to address (1) the loss amount suffered by the Suffolk County Sheriff's Office ("SCSO") as a result of the defendant's conduct, and (2) the government's request for a two level obstruction of justice enhancement related the defendant's conduct in attempting to intimidate or, at the very least, persuade three witnesses to make statements in the defendants favor when questioned by federal investigators or at trial.  The government respectfully submits this letter in connection with the defendant's sentencing and in further support of the government's position that the loss amount at issue, including relevant conduct, exceeds $250,000.  The defendant is scheduled to be sentenced on June 20, 2017.

I.      Factual Background

      The SCSO is a government agency in Suffolk County, New York, which operates facilities in Riverhead and Yaphank, New York.  The SCSO also provides courthouse security, patrols and investigates crimes committed on county-owned property and oversees all security matters within the county correctional facilities.  Between 2010 and 2014, the SCSO received in excess of $10,000 per year under federal programs involving asset forfeiture monies and other federal assistance.  See Presentence Investigation Report ("PSR"), ¶ 5.

Between 1990 and 2016, the defendant was employed by the SCSO. From September 2006 until the date of his retirement, the defendant worked as a Correction Officer III Investigator at the Riverhead correctional facility. In this capacity, he worked as an aide to the Suffolk County Sheriff. He was also appointed by the Sheriff as a liaison to outside agencies and to oversee internal security and gang investigations. Neither the aide nor liaison position required him to leave the Riverhead correctional facility on a regular basis. PSR ¶ 6. The defendant was paid a portion of his wages from the SCSO via direct deposit and the wages were electronically transferred to his personal bank account in Suffolk County. Id.

In addition, since at least 2006 to the date of the jury's verdict, the defendant was the Chairman of the Suffolk County Conservative Party ("SCCP"), an elected and salaried position. Id. Since at least April 2010, the defendant was a member of the Hampton Hills Golf & Country Club, located in Westhampton Beach, New York ("Hampton Hills").

As proven at trial, from January 2011 to April 2014, the defendant engaged in a fraudulent scheme whereby he falsely represented to the SCSO that he worked certain regular and overtime hours when, in fact, he did not work those hours, and was instead, among other things, playing golf, gambling or performing work on behalf of the SCCP. In reliance of those false representations, the SCSO paid the defendant wages for hours he did not work. PSR ¶¶ 7-8. Between January 1, 2011 and April 30, 2014, based upon his false representations, the defendant was paid $202,225 in regular and overtime wages for which he was not entitled. PSR ¶ 8. As of this date, no portion of these funds have been repaid. See id.

As established at the Fatico hearing, the defendant's fraudulent conduct began years before the indictment period. From 2007 through 2010, the defendant, likewise, represented to the SCSO that he worked certain regular and overtime hours when, in fact, he did not work those hours. See Transcript of Fatico hearing, held on June 1, 2017 ("FT"). The government submits that the defendant earned approximately $240,000 (approximately $5,000 per month) in additional regular and overtime pay that he was not entitled to. The conduct that resulted in these losses is considered relevant pursuant to United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") § 1B1.3. See PSR ¶ 10. As set forth in detail below, for the purpose of the Guideline calculations, the government submits that the defendant is accountable for a total $442,224 ($202,224 + $240,000) loss associated with the instant offense and relevant conduct.

II.     The PSR and Guidelines Calculation

    A.     Guidelines Calculation

On September 29, 2016, the United States Probation Department for the Eastern District of New York ("Probation") issued the PSR. Probation incorporated the defendant's relevant conduct and additional loss amount in calculating the defendant's total offense level. Probation calculated the defendant's total offense level as follows:

2

Count 1 (Theft of Funds):

| | |
|---|---:|
| Base Offense Level (§ 2B1.1(a)(2)) | 6 |
| Plus:  Loss Amount Greater than $250,000 (§ 2B1.1(b)(1)(G) | +12 |
| Total Offense Level: | 18 |

Count 2 (Wire Fraud):

| | |
|---|---:|
| Base Offense Level (§ 2B1.1(a)(1)) | 7 |
| Plus:  Loss Amount Greater than $250,000 (§ 2B1.1(b)(1)(G) | +12 |
| Total Offense Level: | 19 |

Taking into consideration the multiple count adjustment, Probation calculated the defendant's total offense level as level 19.  See PSR ¶¶ 16-35.  Probation also determined the defendant's Criminal History Category to be I, based on a criminal history score of zero.  See PSR ¶ 38.

Based upon an offense level of 19 and a Criminal History Category of I, the defendant is subject to an advisory Guidelines sentencing range of 30-37 months.  See PSR ¶ 76.

      B.      The Parties Objections to the PSR

           1.      The Government's Objections

On December 22, 2016, the government submitted its objections to the PSR. Specifically, the government requested a two-level enhancement for obstruction of justice, pursuant to U.S.S.G. § 3C1.1.  As noted in the government's submission and at the Fatico hearing, the defendant attempted to intimidate or, at the very least, persuade at least three witnesses to make statements in the defendant's favor when questioned by federal investigators or at trial.  At the Fatico hearing this Court ruled that the government did not establish, by a preponderance of the evidence, the obstruction of justice enhancement. However, as discussed below, the defendant's conduct is relevant for the purposes of evaluating Section 3553(a) factors.

The government did not object to Probation's calculation of the loss amount and submits that Probation accurately calculated the loss amount and the defendant's resulting Guidelines range.

3

2. <u>The Defendant's Objections</u>

On April 22, 2017, the defendant submitted his objections to the loss figure contained in the PSR and his response to the government's December 22, 2016 correspondence. The defendant requested a <u>Fatico</u> hearing.

C. <u>The June 1, 2017 *Fatico* Hearing</u>

The Court held a <u>Fatico</u> hearing on June 1, 2017 to address, among other issues, the loss amount suffered by the SCSO as a result of the defendant's conduct. At the hearing, the Court accepted the following exhibits into evidence (many of which were also exhibits admitted at the trial of this matter):

| **GX #** | **Bates #s** | **Description** |
|---|---|---|
| 11E | 83-133 | SCSO 2007 Walsh Overtime Records |
| 11F | 148-195 | SCSO 2008 Walsh Overtime Records |
| 11G | 212-262 | SCSO 2009 Walsh Overtime Records |
| 11H | 335-386 | SCSO 2010 Walsh Overtime Records |
| 12E | 134-137 | SCSO 2007 Walsh Time and Accrual Records |
| 12F | 196-199 | SCSO 2008 Walsh Time and Accrual Records |
| 12G | 263-267 | SCSO 2009 Walsh Time and Accrual Records |
| 12H | 387-391 | SCSO 2010 Walsh Time and Accrual Records |
| 13E | 138-147 | SCSO 2007 Walsh Time Off Records |
| 13F | 200-211 | SCSO 2008 Walsh Time Off Records |
| 13G | 268-297 | SCSO 2009 Walsh Time Off Records |
| 13H | 392-422 | SCSO 2010 Walsh Time Off Records |
| 23 | 3399-10999 | Hampton Hills Golf & Country Club Walsh Invoices 2010-2014 |
| 24 | 3284-3366 | Hampton Hills Golf & Country Club Late Day Sheets |
| 41 | 2326-3072 | Suffolk County Conservative Party Receipts |
| 71G | 5877-6231 | Verizon Phone Records for Edward Walsh for January 1, 2014 through December 31, 2007 |
| 71H | 6232-6652 | Verizon Phone Records for Edward Walsh for January 1, 2014 through December 31, 2008 |
| 71I | 6653-7021 | Verizon Phone Records for Edward Walsh for January 1, 2014 through December 31, 2009 |
| 71J | 7022-7367 | Verizon Phone Records for Edward Walsh for January 1, 2014 through December 31, 2010 |
| 99 | | Walsh Loss Calculation Spreadsheet (Trial) |
| 99A | | Walsh Loss Calculation Spreadsheet (Sentencing) |

<u>See</u> FT at 6-14, 28, 44. The records admitted at the <u>Fatico</u> hearing evidence the defendant's fraudulent conduct during the period of time from 2007 through 2010.

4

FBI Special Agent Ken Hosey testified at the Fatico hearing. Special Agent Hosey testified that he prepared a summary chart that summarized the day-to-day activity of the defendant from January 2011 through April 2014, the period of the indictment. See FT at 15-19, 25-28. Special Agent Hosey testified that the information contained in GX 99 was based upon evidence, both documentary and testimonial, that was introduced at trial. Agent Hosey further testified that the exhibit accurately summarized the records examined in this case, including but not limited to the voluminous phone records, bank records, SCCP receipts, and golf records. Id. at 17-18. As Special Agent Hosey explained, GX 99 summarized the defendant's activities for each and every day of the week from January 2011 through April 2014. Id. at 15-19, 25-28.

With respect to the period of time relevant to the Fatico hearing (i.e., 2007-2010), Special Agent Hosey testified that he, likewise, prepared a chart similar to GX 99; this chart was identified at the Fatico hearing as GX 99-A. Id. at 31-35. Special Agent Hosey testified that GX 99-A was, essentially, the same as GX 99, except that it used a sampling – an extrapolation – of the defendant's daily activities for two months out of each year, as opposed to GX 99, which chronicled the defendant's daily activities over a three year four month period. Id. Special Agent Hosey testified that, while he randomly selected two months for each year, he did a daily calculation for each month he examined. Id. at 33-34. Specifically, Special Agent Hosey did a daily loss calculation for the following months: March and April 2007, August and September 2008, May and June 2009, and July and August 2010. Id. at 33. Like GX 99, Special Agent Hosey testified that GX 99-A was based on evidence that was introduced at the hearing, including the defendant's SCSO records, Verizon Wireless billing records, SCCP receipts and golf records, and that it was prepared in the same manner as GX 99. Id. at 34-35. At the hearing the Court initially stated that it had an issue with GX 99-A because Special Agent Hosey had not chronicled the defendant's daily activities for the entire time period at issue but, rather, examined only a sampling of the defendant's conduct during the period at issue. Id. at 35-38. Ultimately, the Court admitted GX 99-A into evidence for purposes of establishing the loss amount for the two months per year. Id. at 44. In any event, as discussed below, the Second Circuit has held that it is reasonable to rely on a sampling or an extrapolation – such as the sampling done in this case – for purposes of establishing a loss amount. See infra II. D ("The Court Should Find that the Loss Amount Exceeds $250,000"), pp. 7-9.

During the hearing, Special Agent Hosey testified as to examples of the defendant's fraudulent conduct during the relevant period of time. Id. at 38-59. Special Agent Hosey further testified that, where records were inconclusive as to whether or not the defendant was present at the Riverhead facility, Special Agent Hosey gave the defendant credit for being at work. Id. at 119. Special Agent Hosey stated that he "would have given [the defendant] credit for any time that he was in Riverhead or any indication that he was working." Id.

Special Agent Hosey testified that the approximate total calculated loss for the indictment period was $202,000 and that the average loss in any particular month was around $5,000 per month. See FT at 35, 59-60, 63. Special Agent Hosey further testified that, when

5

"requested to determine whether there was additional loss during the period that preceded the indictment, [he] did a limited calculation only using the two months per year as an example to determine if the same pattern had existed [in 2007, 2008, 2009 and 2010, as had existed in 2011 through 2014]. . . . [His sample calculations were] to determine whether the roughly $5,000 per month loss amount from the indictment period [were] consistent with the prior period." Id. at 35-36. Moreover, regardless of the agent having only done daily calculations for two months for each year for purposes of the summary chart, the underlying records for the entire period of time at issue were introduced as evidence at the Fatico hearing, including the defendant's SCSO records, cell phone records, golf records and SCCP receipts. Id. at 36-38, 64.

With respect to the sample months that Special Agent Hosey examined for the period of time 2007 through 2010, those months also averaged out to approximately $5,000 in loss per month. Id. at 60 ("They're actually a little higher, but over $5,000 per month."). As established during the hearing, Special Agent Hosey calculated the following loss amounts for the sample months examined:

| | | |
|---|---|---|
| March 2007: | $4,861.54 | (Id. at 60-61) |
| April 2007: | $4,469.34 | (Id. at 61) |
| August 2008: | $7,473.68 | (Id. at 61) |
| September 2008: | $7,227.69 | (Id. at 61-62) |
| May 2009: | $5,152.84 | (Id. at 62) |
| June 2009: | $5,145.84 | (Id. at 62) |
| July 2010: | $5,220.90 | (Id. at 62) |
| August 2010: | $4,034.64 | (Id. at 62) |

Those calculations were outlined in GX 99-A (the "Walsh Loss Calculation Spreadsheet (Sentencing)" for 2007 through 2010). Special Agent Hosey further testified that the calculations for these sample months were consistent with what he expected to see after his analysis of the indictment time period because "the average loss per month [during the indictment period] was approximately $5,000, so the individual two month periods for each in the time frame 2007 through 2010, was much the same average, a little higher, but in excess of $5,000 a month." Id. at 63.

At the conclusion of the Fatico hearing, the Court found that the government had proven by a preponderance of the evidence that there was an additional loss not covered in the indictment or at trial. Id. at 134. The Court found that the government had established the following additional losses for the months of March 2007, September 2008, June 2009, July 2010 and August 2010. The Court did not identify additional losses for the months of April 2007, August 2008 and May 2009. The government submits, however, that, as set forth above, Special Agent Hosey testified about the specific loss amounts for these months

6

and his testimony was unrebutted at the hearing. Thus, the government established, by a preponderance of the evidence, the specific loss amount for the months of April 2007, August 2008 and May 2009.

At the conclusion of the hearing, the government requested the opportunity to submit a supplemental memorandum addressing the loss amount issue. This letter is, in part, in response to that request.

> D. The Court Should Find that the Loss Amount Exceeds $250,000

Under U.S.S.G. § 2B1.1(b)(1), a defendant receives an upward adjustment in offense level based upon the amount of loss. The commentary to U.S.S.G. § 2B1.1 provides in relevant part that "[t]he court need only make a reasonable estimate of the loss." See U.S.S.G. § 2B1.1(b)(1), Application Note 3(C). The commentary further provides that

> The estimate of the loss shall be based on available information, taking into account, as appropriate and practicable under the circumstances, factors such as the following: . . .(iv) the approximate number of victims multiplied by the average loss to each victim[; and] . . . (vi) more general factors, such as the scope and duration of the offense and revenues generated by similar operations.

Id.; see also United States v. Uddin, 551 F.3d 176, 180 (2d Cir. 2009) (district court "need not establish the loss with precision but rather need only make a reasonable estimate of the loss, given the available information").

Determining loss is not a merely arithmetical task of adding together the loss from individual transactions; the court can and should look to the overall pattern of criminal conduct established by the evidence. See United States v. Wilson, 11 F.3d 346, 356 (2d Cir. 1993) ("Even if the specific transactions identified in the record do not total five kilograms, they are merely examples of a course of conduct that continued unabated for an entire year . . . ."). The Second Circuit has held that "it is permissible for the sentencing court, in calculating a defendant's offense level, to estimate the loss resulting from his offense by extrapolating the average amount of loss from known data and applying that average to transactions where the exact amount of loss is unknown." United States v. Bryant, 128 F.3d 74, 76 (2d Cir. 1997) (in tax return fraud case, calculating loss regarding unaudited returns based upon average loss in returns that were audited); see also United States v. Coppola, 671 F.3d 220, 249-50 (2d Cir. 2012) (upheld loss determination of over $2.5 million by dividing that amount by the length of the criminal enterprise (more than 30 years) and then reasoning that the resulting $84,000 per year in loss was a conservative estimate of the evidence, even if the exact amount of loss was not proven precisely); United States v. Abiodun, 536 F.3d 162 (2d Cir. 2008) (in case involving stolen credit information, district court did not err in using aggregate figures to estimate average loss per credit report or in estimating the number of victims affected by the defendant's conduct); United States v. Bruno, 234 F.3d 1263, 2000

7

WL 1715254 (2d Cir. 2000) (courts can extrapolate from audited figures to determine an appropriate total loss figure for purposes of determining a Guidelines offense level).

In <u>United States v. Burke</u>, 445 Fed. Appx. 395 (2d Cir. 2011), the Second Circuit affirmed a district court's estimated loss determination.  The <u>Burke</u> defendants were convicted after a trial of conspiracy to commit mail fraud and mail fraud in connection with two fraudulent schemes: (1) a mortgage broker scheme ("MBS") that sold bogus lists of potential customers, and (2) a homeowner scheme ("HS") that defrauded homeowners seeking to refinance their mortgages.  In calculating an estimated loss, the district court considered transactions that were not specifically addressed at trial.  As the <u>Burke</u> Court noted

> The district court concluded based on the trial testimony that there were no legitimate lead lists sold to any mortgage broker.  Similarly, [the defendant' did not dispute the Government's identification of 54 homeowners who had spent approximately $1.275 million in transaction costs as a result of having executed refinancings brokered by [the defendant's] company, and the district court reasonably concluded based on the trial testimony that every individual who refinanced his or her home through [the defendant's] company was defrauded.

<u>Burke</u>, 445 Fed. Appx. at 398.  In affirming the district court's estimated loss calculation, the Second Circuit held that "a district court may reasonably rely upon the trial evidence concerning the nature and scope of a defendant's fraudulent scheme to conclude that specific transactions not specifically addressed at trial were part of the same fraudulent scheme proven at trial and thus should be included in the loss calculation." <u>Id</u>. (citing <u>United States v. Sutton</u>, 13 F.3d 595, 599 (2d Cir. 1994)).

Similarly, in <u>United States v. Davis</u> 41 Fed Appx. 493 (2d Cir. 2002), the Second Circuit affirmed a district court's loss determination based on sampling of the evidence; that is, the loss was properly estimated based on the losses for a representative time period, and the government's substantial concessions ensured that the loss calculation was reasonable.  In <u>Davis</u>, the defendants were convicted of offenses related to their receipt and possession of stolen property and the district court calculated the loss amount based on an extrapolation.  The <u>Davis</u> Court noted that "this Circuit has affirmed loss determinations extrapolated from an average loss amount based on known data in cases where the instances of theft, embezzlement or fraud are numerous."  <u>Davis</u>, 41 Fed. Appx. at 496 (citing <u>Bryant</u>, 128 F.3d at 76).  In affirming the district court's determination, the Court held that "two years of losses is a sufficiently large sample size to serve as a proxy for [the defendant's] participation in the conspiracy over nine and one-half years. (approving of a 20 % sample for extrapolation purposes)."  <u>Id</u>. (citations omitted).

The Second Circuit has further acknowledged that, although determining a loss amount "is no easy task[,] . . . some estimate must be made for Guidelines' [calculation]

8

purposes, or perpetrators of fraud would get a windfall." United States v. Ebbers, 458 F.3d 110, 127 (2d Cir. 2006). Thus, extrapolating a loss figure on the basis of known data is proper.

Here, the government established, by a preponderance of the evidence, that the total loss amount exceeds $250,000 and that this Court should apply U.S.S.G. § 2B1.1(b)(1)(G). Consistent with Second Circuit precedent, this Court should accept the government's evidence of the loss amount for the period of 2007 through 2010 based on the extrapolation performed by Special Agent Hosey.

As Special Agent Hosey testified, the approximate total calculated loss for the indictment period was $202,000 and the average loss in any particular month was around $5,000 per month. See FT at 35, 59-60, 63. Consistent with Second Circuit precedent, Special Agent Hosey then did an extrapolation to determine the loss amount at issue in the Fatico hearing, i.e. 2007 through 2010. The loss amounts for the eight months for which Special Agent Hosey examined the defendant's daily activities were consistent with the monthly loss amounts for the three years and four-month indictment period. Indeed, with respect to the sample months that Special Agent Hosey examined for the period of time 2007 through 2010, those months also averaged out to approximately $5,000 in loss per month. See FT at Id. at 60 ("They're actually a little higher, but over $5,000 per month.").

Moreover, as a further example of the sound conclusions made by the government with respect to monthly loss amounts caused by the defendant's ongoing criminal conduct, following the Fatico hearing, Special Agent Hosey chronicled the daily activities of the defendant for two additional months during the time period at issue: May and June 2010. See GX 99-B attached here to as Exhibit A. The underlying documents used to create the GX 99-B summary chart were introduced into evidence at the Fatico hearing and are evidence before this Court. See GX 11H (SCSO Overtime Records 2010, Bates Stamped EMW 354-363); GX 12H (SCSO Time and Accrual Records 2010, Bates Stamped EMW 387-391); GX 13H (SCSO Time Off records 2010, Bates Stamped EMW 398-404); GX 23 (Hampton Hills Invoices, Bates Stamped EMW 3405-3431); GX 24 (Hampton Hills Late Day Sheets, Bates Stamped EMW 3285-3292); GX 71J (Verizon Wireless Records 2010; Bates Stamped EMW 7129-7192). As indicated on GX 99-B, the defendant's day-to-day activities reveal a loss amount of $4,760.50 for May 2010 and $4,579.07 for June 2010. These figures are consistent with the monthly loss amounts for the indictment period as well as the previous eight months extrapolated by Special Agent Hosey.

The government submits that it has proven, beyond a preponderance of the evidence, that the defendant is accountable for a total $442,224 ($202,224 + $240,000) loss associated with the instant offense and relevant conduct. The loss calculation propounded by the government is extrapolated from assumptions taken from the evidence, including a time span of relevant conduct from 2007 through 2010 and an average of $5,000 per month in loss. These assumptions are based on the evidence proven beyond a reasonable doubt at trial and upon the sample calculations over the relevant time period. Accordingly, this Court should apply U.S.S.G. § 2B1.1 (b)(1)(G) in determining the defendant's Guidelines calculation.

III.    <u>Section 3553(a) Factors</u>

    A.    <u>The Factors a Court Must Consider at Sentencing</u>

Title 18, United States Code, Section 3553(a) requires a court to consider a number of factors in imposing a sentencing, including (among others) the nature and circumstances of the offense and the history and characteristics of the defendant (§ 3553(a)(1)); the need for the sentence to reflect the seriousness of the violation, to promote respect for the law, and to provide a just punishment for the violation (§ 3553(a)(2)(A)); and the need for the sentence to afford adequate deterrence to criminal conduct (§ 3553(a)(2)(B)), and to protect the public from further crime or violations of the defendant (§ 3553(a)(2)(C)).

    B.    <u>A Sentence of 30 to 37 Months' Imprisonment is Appropriate</u>

The government submits that a sentence of 30 to 37 months' imprisonment is sufficient but not greater than necessary to achieve the goals of sentencing. <u>See</u> U.S.S.G. § 3553(a)(2).

As an initial matter, there can be little doubt that, through at least the last 10 years of his employment at the SCSO, the defendant engaged in a scheme to defraud Suffolk County and its taxpayers. The defendant did not engage in some arbitrary, aberrant behavior. Rather, the defendant took deliberate and willful steps to defraud the SCSO and to profit from that conduct. As established at trial, from January 2011 through April 2014 – with the exception of scheduled vacations – the defendant falsified every time sheet he submitted to the SCSO. Moreover, until the instant federal prosecution, it was the defendant's belief that his position as the politically influential leader of SCCP shielded him from prosecution for having actively and persistently defrauded the taxpayers through his steadfast refusal to actually work the hours contained on his time sheets, thereby fulfilling the job requirements expected of every SCSO employee covered under the collective bargaining agreement entered into between the Count of Suffolk, the SCSO and the union. The defendant's conduct over several years was not a momentary aberration or lapse of reason. The defendant's criminal activity extended over several years and he actively and repeatedly defrauded the SCSO. The defendant believed that his political influence insulated him from responsibility for his actions. Fortunately, as evidence by the jury's verdict in this case, the defendant was wrong.

A significant term of imprisonment is warranted in these circumstances. Far from a one-time mistake, as noted above, the defendant's fraud continued for years, stopping only when he was arrested. Fraudulent schemes committed by public officials, such as the defendant, undermine the trust that is essential to the proper functioning of our government. Further, the defendant's actions forced other SCSO officials to carry an extra burden in order to accomplish the daily work of the SCSO.

Moreover, the need for deterrence in this case similarly warrants a strong sentence. A sentence of 30 to 37 months' imprisonment would meet the § 3553(a) factors

for the need to afford adequate deterrence. First, the kind of conduct at issue here cries out for a significant sentence to create general deterrence under § 3553(a)(2)(B). Victims of these schemes suffer significant, unrecoverable losses – as did Suffolk County here – before such schemes are stopped. It is critical to deter them in the first place.

Further, a sentence of 30 to 37 months' imprisonment would meet the § 3553(a) factors for the need to afford adequate deterrence and to protect the public from future crimes of the defendant. Here, the defendant has failed to take responsibility for his conduct. Indeed, as noted in the government's previous submissions, the defendant engaged in conduct, on several occasions during the federal investigation and trial, in which he attempted to intimidate or, at the very least, persuade, at least three witnesses. The defendant repeatedly claimed to these witnesses to have done work for the SCSO that he knew full well he had not done. There is reason to hope that a sentence within the government's proposed Guidelines range would provide the defendant with years to reflect upon his crimes and experience the consequences of his criminal conduct and that such imprisonment will effectively deter the defendant from repeated his offenses. Consequently, specific deterrence of this defendant is important to keep him from doing it again (§ 3553(a)(2)(B)) and to protect the public from further crimes of the defendant (§ 3553(a)(2)(C)).

Significantly, a sentence within the Guidelines range of 30 to 37 months would best reflect the seriousness of the defendant's criminal conduct, promote respect for the law and provide just punishment. Far from an isolated incident, the defendant's scheme defrauded the SCSO over an extended period of time.

Finally, an order of restitution in this case is warranted. See 18 U.S.C. § 3663, 3663A. Pursuant to U.S.S.G. § 5E1.1, restitution to the SCSO in the amount of $202,225 for the loss amount relative to the indictment period is mandatory. The government further asks the Court to impose restitution for the related conduct, resulting a total amount of restitution of $470,785.

IV. Forfeiture

In accordance with Rule 32.2, the government previously provided notice to the defendant of its intent to seek forfeiture in the event of his conviction. Fed. R. 32.2(a); Indictment, Dkt. 10, ¶¶ 11-12; see also Dkt. 112 (Government's January 17, 2017 letter regarding forfeiture). In this regard, the applicable statutory provision mandates the forfeiture of all property constituting or derived from proceeds traceable to the crimes of conviction. 18 U.S.C. § 981(a)(1)(C). Moreover, under established Second Circuit precedent, the forfeiture may take the form of a money judgment. See United States v. Awad, 598 F.3d 76, 79 (2d Cir. 2010).

As set forth in the government's January 17, 2017 letter, it is respectfully submitted that the defendant is liable for a forfeiture money judgment. See Proposed Order of Forfeiture attached as Exhibit D to the Government's January 17, 2017 letter.

V.	Conclusion

        For the foregoing reasons, and based on a balancing of the § 3553(a) factors, the government respectfully requests that the Court impose a sentence of imprisonment within 30 to 37 months, together with restitution, and a forfeiture money judgment.

        Respectfully submitted,

        BRIDGET M. ROHDE
        Acting United States Attorney

By:   /s/
        Catherine M. Mirabile
        Raymond A. Tierney
        Assistant U.S. Attorneys
        (631) 715-7850/7849