UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X
UNITED STATES OF AMERICA      :  15-CR-91

      -against-                  US District Court
                                 Central Islip, NY
EDWARD WALSH, JR.,
                 Defendant. :  March 22, 2016
- - - - - - - - - - - - - - X   9:30 am

          TRANSCRIPT OF TRIAL
          BEFORE THE HONORABLE ARTHUR D. SPATT
          UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:
                         ROBERT L. CAPERS
                         United States Attorney
                         271 Cadman Plaza East
                         Brooklyn, New York 11201
                         By:  CATHERINE MIRABILE, ESQ.
                              RAYMOND TIERNEY, ESQ.
                         Assistant US Attorney

For the Defense:         LEONARD LATO, ESQ.
                         WILLIAM WEXLER, ESQ.

Court Reporter:          Dominick M. Tursi, CM, CSR
                         US District Courthouse
                         1180 Federal Plaza
                         Central Islip, New York 11722
                         (631) 712-6108  Fax:  712-6124
                         DomTursi@email.com

          Proceedings recorded by mechanical stenography.
              Transcript produced by CAT.

1          (The following ensued in the presence of the

2    jury.)

3          THE COURT:  Good morning, members of the jury.

4          THE Jury:  Good morning.

5          THE COURT:  Please be seated.

6          Please accept my compliments.  You are a

7    dedicated, efficient, hard working and conscientious jury.

8    18 jurors all here ahead of time.  Thanks very much.

9          You may proceed.  Where is the witness?

10         MR. WEXLER:  Sheriff.  Oh.

11

12   **VINCENT DEMARCO**

13         called by the Government, having been

14         duly sworn/affirmed, continued testifying as

15         follows:

16         THE COURT:  You may proceed.

17         MR. WEXLER:  Thank you judge.

18

19   CROSS-EXAMINATION (Continued)

20   BY MR. WEXLER:

21   Q.   Good morning, Mr. DeMarco.  Sheriff DeMarco.  I

22   apologize.

23   A.   Good morning.

24   Q.   We left off yesterday talking about the years '06 and

25   '07, and I believe I left off asking you questions

1  concerning the fact about the various times you pulled up

2  to the office and whether or not you saw Ed Walsh's car

3  and then the times that you walked into the office.

4        I think you testified on direct that you would

5  walk in in the morning, when you gave us the day in the

6  life of a sheriff, and you would tell us that you would

7  meet with undersheriffs, Undersheriff Meyerricks and

8  perhaps Caracappa.

9        Is that correct?

10  A.   Undersheriff Meyerricks.  Undersheriff Caracappa

11  wasn't there in that year, 2006.  But yes.

12  Q.   So that would be your you custom and practice, to

13  meet with Undersheriff Meyerricks.  Correct?

14  A.   Yes.

15  Q.   And you would want to know what was happening that

16  day, what happened the night before.  Yes?

17  A.   Yes.

18  Q.   And would you say hello to the other people in the

19  immediate front office, the one that you and I

20  collectively drew on the paper easel, you would say hello

21  to the chief of staff Ed Walsh all the way next door to

22  the sheriff.

23        Would you say hello to them in the morning?

24  A.   If I saw people, I would say hello.

25        As I would come into the office, I would usually

1    walk straight to the warden's office to get a cup of

2    coffee -- that's where the fresh coffee was -- and anyone

3    I encountered, of course I would say hello and good

4    morning to.

5    Q.    To get your cup of coffee, you would necessarily have

6    to walk right past Ed's door.

7    A.    Yes.

8    Q.    I mean, it wouldn't be uncommon for you to poke your

9    head in and say: *Hey, Ed*?

10   A.    If the door was open and I saw Ed and Dolan and the

11   undersheriffs I would say good morning, hello.

12   Q.    Did you normally see him when you came in in the

13   morning?

14   A.    I saw him, yes.

15   Q.    And did you regularly see him?

16   A.    Yes.

17   Q.    Okay.  So his absence was a nonevent to you at least

18   in '06 and 07.  Correct?  He was there when you went in

19   the morning.

20   A.    I saw him, yes.

21   Q.    You saw him with your own eyes.

22   A.    Yes.

23   Q.    And also in '06 and '07 Undersheriff Meyerricks and

24   all the brass in your front office, nobody ever told you

25   he wasn't there.  Correct?  Or he was leaving.  Or he

1   wasn't doing his job.  Correct?

2   A.   It's not necessarily something -- if he wasn't doing

3   his job, that would be reported to me, but if someone was

4   on vacation or on a sick day or personal day, they

5   wouldn't say, oh.  I don't get reports like that, no.

6   Q.   I understand, sheriff.  I understand that one of the

7   brass would not tell you that it was somebody's day off

8   and he wasn't here today.

9          That would be rather obvious, wouldn't it?  That

10  is not what I'm talking about.  What I'm talking about:  A

11  UA.  Don't they call them that in the military:

12  unauthorized absence?

13  A.   If you say so.

14  Q.   Okay.  Did anybody say in '06 and 07 he's

15  unauthorized, or AWOL?  He's not here?

16  A.   No.

17  Q.   Okay.  And I mean, if they didn't say it -- and by

18  they I mean all the undersheriffs, the two undersheriffs,

19  chief of staff, deputy chief of staff, the warden, the

20  deputy warden -- you assumed that he was doing what he was

21  supposed to be doing.  Correct?

22  A.   Correct.

23  Q.   And did you have any opinion in '06 and '07 that all

24  of your front office were a bunch of slackers, weren't

25  doing their jobs?

1    A.    No.

2    Q.    By the way, in '06 and '07 who signed his time

3    sheets?

4    A.    I don't know.

5    Q.    Well, you didn't sign them.  Right?

6    A.    I didn't sign them.

7    Q.    Okay.  And you know a CO didn't sign them.  Correct?

8    A.    Correct.

9    Q.    And a sergeant didn't sign them.

10   A.    Most likely no.

11   Q.    A sergeant couldn't sign a lieutenant's time sheets

12   and another lieutenant of coordinate rank wouldn't sign

13   them.  It would only be a captain, a deputy warden, a

14   warden, or an undersheriff.  Correct?

15   A.    Correct.

16   Q.    So you do know who would sign them:  One of those

17   four positions.

18   A.    I thought you were asking me to be specific.  I

19   apologize.

20   Q.    Okay.  Well, let's talk generally.

21   A.    Okay.

22   Q.    You know that the undersheriffs could sign them.

23   A.    Yes.

24   Q.    And in fact they did sign them.  Correct?  You knew

25   that.

1   A.   I don't know that.

2   Q.   Well, wait a while.  Wait a while.  You are sitting

3   here now.  It is March 21 of 2016.  Did you ever ask

4   Undersheriff Meyerricks as you sit there today -- what his

5   first name?  John?

6   A.   John.

7   Q.   John:  What did you sign his time sheets for eight

8   years for if he wasn't doing his job?

9            Did you ever ask him that?

10  A.   No.

11  Q.   This case has been pending now for a year and a half.

12  According to you, you went to the District Attorney.  You

13  went to the United States Attorney.  You never thought to

14  ask -- does John Meyerricks still hold an office next to

15  yours?

16  A.   Yes.

17  Q.   Is he still --

18  A.   I'm not -- well, yes, but not my main office.  Yes.

19  There is an office.

20  Q.   Do you still speak to him every day?

21  A.   I do.

22  Q.   Do you still trust him?

23  A.   Yes.

24  Q.   Did you ever say:  John, I know it's going back ten

25  years, but why didn't you ever tell me?

1  A.  Well, I did have conversations with him.

2  Q.  Oh.  Now you did.

3  A.  Now I understand what you are saying.  Yes.

4  Q.  Okay.

5  A.  I --

6  Q.  So you did --

7  A.  -- had a -- have a conversation --

8      THE COURT:  Wait a minute.  Don't everybody talk

9  at the same time.  Slow down, will you, Mr. Wexler?

10     MR. WEXLER:  Certainly, judge.

11 BY MR. WEXLER:

12 Q.  Let me ask it again then.

13 A.  Sure.

14 Q.  Maybe I was confusing.

15     Did you ever have a conversation with John

16 Meyerricks as to why he signed his time sheets all those

17 years?

18 A.  I asked John Meyerricks --

19 Q.  No, I didn't ask you what you asked him.

20 A.  I --

21 Q.  No, no.  Did you --

22     THE COURT:  Excuse me --

23 A.  I did.

24     THE COURT:  -- sheriff.  Listen to the

25 questions.

1    On cross-examination the attorney is permitted

2  to ask questions that call for a yes or no answer.

3    THE WITNESS:  Okay.

4    THE COURT:  If he asks a question that calls for

5  a yes-or-no answer, please try to answer yes or no.

6    THE WITNESS:  I will.

7    THE COURT:  And if you can't, say so.

8    THE WITNESS:  Okay.

9    THE COURT:  But don't make an explanation if the

10  question doesn't call for it.

11    Do you understand our procedure?

12    THE WITNESS:  I do, your Honor.

13    THE COURT:  Okay.

14    MR. WEXLER:  Thank you, Judge.  And sheriff.

15  BY MR. WEXLER:

16  Q.   My question was, yes or no, did you ever have a

17  conversation, in all these years, with John Meyerricks as

18  to why he signed his time sheets?  You did or you didn't.

19  A.   Yes.

20  Q.   Okay.  Now you did.  Okay.

21    And when did you have that conversation?  Was it

22  yesterday?  Last week?  A month ago?  A year ago?  Three

23  years ago?  Five years ago?

24    Think hard.

25  A.   In 2014.

1  Q.   In 2014.  Okay.  So you waited eight years before you

2  had that conversation.  Correct?

3            MS. MIRABILE:  Objection.

4            THE COURT:  Pardon?

5            MS. MIRABILE:  I had objected.

6            THE COURT:  Overruled.

7  BY MR. WEXLER:

8  Q.   And when you had that conversation, was that before

9  the government arrested Ed Walsh or after?

10 A.   Before.

11 Q.   Okay.  And what prompted you in 2014 to have such a

12 conversation?

13 A.   I compared Ed Walsh's time sheets to golf records and

14 other records that I had received on subpoenas.

15 Q.   Okay.

16 A.   And they showed that he wasn't at work when he

17 claimed to be at work.

18 Q.   And what did John Meyerricks say?

19            Did you ask him:  Why were you derelict in your

20 duty, Undersheriff Meyerricks?

21 A.   No, that is not what I asked him.

22 Q.   Okay.  Well, what did you ask him?

23 A.   I asked him why you and the warden signed the sheets

24 if he wasn't there.

25 Q.   And what did he say to you?

1  A.   He said they didn't know if he was there or not.

2  Q.   Wait a while?  Wait a while.  Wait a while.

3       The undersheriff whose office is next --

4  A.   Well --

5  Q.   Wait.  The undersheriff whose office is next door to

6  Eddy Walsh's, or across the hallway -- we did that

7  distance, about 13, 14 feet -- for eight years, told you

8  he didn't know if he was there or not?

9       Wait.  Is that what he said?  Just yes or no.

10      Is that what he said?

11 A.   I don't know what years you are talking us about now,

12 counselor.  Are we talking about 2006-2007?  Or 2011 to

13 2014?  I'm not quite sure.

14 Q.   Let's talk about all of the years.  All right?  Let's

15 go talk about eight years.  He told you, quote, he wasn't

16 sure whether or not he was at work or not?

17 A.   No.

18 Q.   That's what he told you?

19      Why don't you tell me, again please?

20 A.   For the period of 2011 to 2014 I asked him about Ed

21 Walsh's time sheets.  He said every time if he needed to

22 find Ed he saw him there.

23 Q.   That is not what you said just five minutes ago.  You

24 just changed your answer to what he said.

25 A.   I don't believe -- I didn't know what period of time

1 you were you talking about before, sir.

2 Q.   Okay?

3 A.   You are talking about an eight-year period, a

4 four-year period.  You are talking about the period that

5 is not in the indictment, so I'm not quite clear here.

6 Q.   What do you care about what period is in the

7 indictment?

8          MS. MIRABILE:  Objection.

9          THE COURT:  Sustained.

10 BY MR. WEXLER:

11 Q.   Okay.  Let's talk about '11 to '14.

12 A.   Okay.

13 Q.   Okay.  Is it '11 to '14 he said every time he looked

14 for him, he was there?

15 A.   If he needed to find Ed Walsh to give him something

16 to do, he found Ed Walsh.

17 Q.   Okay.  So he gave you no pause -- he, meaning

18 undersheriff, gave you no cause to believe that Ed was not

19 doing his job and was not present and was doing what he

20 was supposed to be doing.  Correct?

21 A.   Yes.

22 Q.   Okay.  And what Ed Walsh was supposed to be doing

23 between '11 and '14 is what you determined he should be

24 doing based on that memo, Liaison to Outside Agencies.

25 Correct?

1  A.    And internal security.  Yes.

2  Q.    Yes.

3  A.    Yes.

4  Q.    So your undersheriff, I think you referred to him as

5  your go-to guy.

6  A.    Yes.

7  Q.    So your go-to guy, who you have known for 20 years,

8  you trust him implicitly.  Correct?

9  A.    Correct.

10  Q.    Told you that between 2011 and 2014 Ed Walsh was

11  doing what he was supposed to be doing, and whenever he

12  needed him, he can get in touch with him.  Yes?

13  A.    That is not what he said.

14  Q.    Well, tell me again what he said.

15  A.    He said if he needed Ed Walsh to give him something

16  to do, he found him and gave it to him.

17  Q.    Okay.  But he, at no time did he ever intimate to you

18  that he was not available or was not doing his job.

19  Correct?

20  A.    He said that if he did not see Ed Walsh, he assumed

21  he was inside the jail and would talk to him later or he

22  was off.

23  Q.    Let me ask you the question again.

24       At no time did he ever intimate to you that Ed

25  was never doing his job as Undersheriff Meyerricks

1  believed his job to be.

2  A.   That's correct.

3  Q.   And he is not shy guy.  Right?  He would tell you if

4  he was goofing off or not.

5  A.   That's correct.

6  Q.   If fact he was one of the people in the sheriffs

7  office who was the disciplinarian if people were not

8  working.  Correct?

9  A.   Correct.

10 Q.   And he is not a light-hearted, easy-going, aw-shucks,

11 all-right-take-the-week-off guy.  Correct?

12      John Meyerricks.  He does a job and he's tough?

13 A.   Yes.

14 Q.   Is he the toughest person in your front office?

15 A.   No.

16 Q.   Who's tougher than him?

17 A.   Me.

18 Q.   Okay.  And would he be number two as far as

19 toughness?

20 A.   I don't know.

21 Q.   Okay.  So now we have covered '11 to '14, the period

22 in the indictment.  Let's talk about 2006 to 2011.

23 A.   Okay.

24 Q.   Now, in that five year period did you ever discuss

25 with John Meyerricks -- I don't know.  Do you address him

1 as John?

2 A. Yes.

3 Q. Did you go: Hey, John. What was he Eddy doing

4 between '06 and '11? Was he doing his job?

5 Did you ever have that sort of conversation?

6 A. No.

7 Q. Well, not even after he's arrested by the government

8 you never thought you should have a conversation with your

9 undersheriff to find out what was going on in your office?

10 A. Well, no. What I did I asked him if there was any

11 work problem for ed Walsh for the time he was working for

12 us and he gave it to me.

13 Q. Okay. So essentially, based on what you just told

14 us, between '06 and '11, your go-to guy Undersheriff

15 Meyerricks never gave you any indication that Ed was not

16 doing the job as he, the undersheriff, understood his job

17 to be. Correct?

18 A. That's correct.

19 Q. Okay. Let's talk about Undersheriff Caracappa.

20 Would he be kind of number three in the chain of

21 command?

22 A. He had very specific duties that didn't have to do

23 with the corrections or police division. He oversaw the

24 operations division.

25 Q. So I understand it, you were the CO, the commanding

1  officer, and Meyerricks was the XO, the executive officer?

2  A.  That's correct.

3  Q.  Okay.  And in the pecking order, though, would

4  Undersheriff Meyerricks be number three as an

5  undersheriff?

6  A.  Undersheriff Caracappa?

7  Q.  What did I say?

8  A.  Meyerricks.  Yes.

9  Q.  I'm sorry.

10  A.  I know what you mean.  Yes.

11      Actually, he would be the number three person in

12  charge if I was absent and John Meyerricks was absent.

13  Q.  Okay.  And Undersheriff Caracappa's office was -- we

14  used to have that diagram -- was right next door or across

15  the hall from Ed Walsh's.  Correct?

16  A.  From 2006 to 2008.

17  Q.  Yes.

18  A.  Correct.

19  Q.  Yes.  And any time during that time period did your

20  Undersheriff Caracappa advise you that:  Oh, Ed is not

21  doing his job, you'd better take a look at this?

22  A.  Actually, Mr. Wexler, I have to correct myself.

23      Undersheriff Caracappa was not there in that

24  time period.

25  Q.  When did Undersheriff Caracappa get appointed?

1    A.    I believe may in 2009.  2008, 2009.  But we are

2    saying 2006 to 2007.  I just want to be correct.

3    Q.    Let's go to 2008.  We will start from there.

4            From 2008 to 2011.  Did Undersheriff Caracappa

5    ever tell you that he's not going his job?

6    A.    No, he didn't.

7    Q.    And he had no reason to.  Correct?  He understood

8    what Ed's responsibility was.

9    A.    I think he did.  Yes.

10   Q.    And you understood what Ed's responsibility was.

11   A.    Yes.

12   Q.    Presumably Ed understood.

13   A.    Yes.

14   Q.    Okay.  What about from 2011 to 2014?  Did

15   Undersheriff Caracappa ever tell you that Ed is not doing

16   his job as he understood it to be?

17   A.    No.

18   Q.    And again, is that something -- I mean you appoint

19   the undersheriffs.  Correct?  They are all your direct

20   appointments.

21   A.    They are.

22   Q.    And you can appoint them.  You can remove them.  That

23   is your call.

24   A.    Yes, I can.

25   Q.    Does Undersheriff Caracappa ever tell you anything

1    about employees or their work product or lack thereof or

2    their not doing their job?

3    A.    No.

4    Q.    What about Undersheriff Meyerricks?  Did he ever tell

5    thank you about deficient work product by any of your

6    employees?

7    A.    Yes.

8    Q.    Okay.  Now, I understand that -- and incidentally, as

9    you sit here today, you met with the government a number

10    of times.  Did they ever ask you if you ever had any

11    conversations with your two undersheriffs about Ed Walsh's

12    work product or lack thereof?

13          Did they ever ask you those questions?

14    A.    I believe they did.

15    Q.    You believe.

16    A.    Yes.

17          I'm trying to remember.  I think we had a

18    conversation about Ed Walsh or work product and who he

19    worked for.

20    Q.    So presumably you told them, as you just testified

21    here, that neither of my undersheriffs Caracappa or

22    Meyerricks ever complained, ever, about a deficiency.

23    Correct?

24          You told them that.

25    A.    Correct.

1  Q.  And were they taking notes?

2  A.  I assume think were.  I don't remember.

3  Q.  You are a trained investigator.

4  A.  I would think they were taking notes.  I don't recall

5  watching them writing things down but I would assume they

6  were writing down what I was saying.

7  Q.  When you told them that:  well, no.  Both my

8  undersheriffs in an eight-year period told me that they

9  had no complaints about his work product and what he did

10  and fulfilling his roles, did they ask you follow-up

11  questions on that?

12  A.  I had no complaints about his work product but we did

13  receive complaints about what he did.

14  Q.  Well, that was in 2014.  I'm going back eight years.

15  A.  No.  I'm talking about 2007, 2009, 2010.

16  Q.  All right.  So there were -- they asked you those

17  questions and you told them there was no complaint.

18  Correct?

19  A.  No, there were complaints.  Not about his work

20  product.

21  Q.  I'm asking you about his work product.

22  A.  You are saying what he did.

23  Q.  Well, he's here under indictment for not showing up

24  and not dong his job.  Correct?

25  A.  But we are talking about 2007, 2009, 2010, which are

1    not part of the indictment, sir.

2    Q.    Okay.  Well, I'm asking you, in eight, seven, six,

3    ten, eleven, did you tell them that; that he did his job?

4    A.    I said I didn't have complaints about the job he did.

5    Q.    Did they follow up with that?

6    A.    Yes.  It wasn't a question.  But the complaint was

7    not about the job he was doing; it was about whether or

8    not he was he at his job.

9    Q.    Well, did you tell them that my undersheriffs, nobody

10   ever told me that he wasn't -- you had no knowledge

11   that he wasn't at his -- you saw him every day.

12            What did they say to you when you told them

13   that?

14   A.    I saw him every day from 2006 to 2008.

15   Q.    What did -- all right.  What did the FBI tell you

16   when you told them that?

17            Let me put it this way.  You don't have to

18   answer that.

19   A.    All right.

20   Q.    When you told them that you never had any complaints

21   and the undersheriffs told you, reported to you that he is

22   doing his job, he showed up whenever they needed him, did

23   they scratch their head and ask you further questions?

24   A.    Yes.

25   Q.    Now let's the talk about your chief, Michael Sharkey.

1    He was chief of staff.  Right?

2  A.   Yes.

3  Q.   You are the chief.  The undersheriffs.  The deputy

4  chiefs.  And he is like the number three man.  Correct?

5  A.   No.

6  Q.   All right.  Where would the chief be?

7  A.   The chief is in charge of the operations division.

8  Q.   Okay.  And he would see Ed on a daily basis, wouldn't

9  he?

10 A.   You would have to ask him that.

11 Q.   You don't know?

12 A.   I don't know.

13 Q.   Well, did you ever have a conversation with him?

14 A.   No.

15 Q.   You are my chief of staff.  I appointed you, Sharkey.

16 Is Ed working or not?

17          Did you ever have a conversation?

18 A.   No.  He had nothing to do with Ed Walsh.

19 Q.   Okay.  But if he thought Ed Walsh wasn't showing up

20 when he was supposed to be there, he would have told you,

21 wouldn't he have?

22 A.   I think he would.  But he wasn't watching Ed Walsh.

23 Q.   I'm not asking about watching.

24          Listen.  Somebody has a workmate next door that

25 doesn't show up for four, five days.  People know about

1  it.

2         Did he tell you?  That is all I want to know?

3  A.   No.  And if Ed Walsh wasn't there for four days, I'm

4  sure people thought he was on vacation.  That's all.

5  Q.   So he was on vacation for eight years?

6  A.   You said four days, not eight years.

7  Q.   Next is Deputy Chief Kneitel.

8  A.   Chief Deputy Sheriff.  That's correct.

9  Q.   He worked in close contact, proximity with Ed Walsh.

10 Correct?

11 A.   His office was across the hall.

12 Q.   Can't get much closer.

13 A.   Correct, but --

14 Q.   Okay.  And so we don't get confused on various years,

15 let's say from '06 to today and whenever he started, you

16 can correct me if I'm wrong, did deputy chief Kneitel ever

17 inform you Ed was not showing up was not doing his job?

18 Did he do that?

19 A.   Chief Kneitel's job had nothing to do with Ed Walsh.

20 Q.   Okay.

21 A.   So he would not even be paying attention to whether

22 Ed Walsh was there or not.

23 Q.   So he wouldn't have mentioned it.

24 A.   No.

25 Q.   And what about the warden and deputy warden?

1  A.    The warden would know.

2  Q.    He would know.  Of course he would know.

3        And how many memos did the warden give you that

4  Ed wasn't showing up, leaving early, or wasn't doing his

5  job as he understood Ed's job?

6  A.    None.

7  Q.    No?

8  A.    None.

9  Q.    No what?

10  A.    None.

11  Q.    Oh.  None.

12        Well, what about the deputy warden?  What is his

13  name?

14  A.    There are four of them.  But I didn't get any memos

15  from them, either.

16  Q.    None of the four gave you?  And they would be Ed

17  Walsh's direct boss, wouldn't they?

18  A.    They would have something to do with him, yes.  There

19  was the chain of command.

20  Q.    So have you ever spoken to any of those four deputy

21  wardens?

22  A.    No.

23  Q.    And say:  I'm just learning now.  My God, the federal

24  government's arresting Ed Walsh.  You never told me he

25  wasn't showing up.

1    Did you ever have that conversation?

2  A.   No.

3         There was one deputy warden who would have been

4  in his chain of command, and I did not have a discussion

5  with him because he was part of a broader investigation.

6  Q.   Well, have any of these people been disciplined by

7  you?  Just yes or no.

8  A.   There are --

9  Q.   Has this undersheriff Meyerricks been disciplined?

10 A.   It's an ongoing investigation.  But undersheriff

11 Meyerricks is not part of it, no.

12 Q.   So if I went to Undersheriff Meyerrick's personnel

13 file there would be no notations, no memos:  Dude, you

14 dropped the ball.  There would be none of that.  Correct?

15 A.   That's correct.

16 Q.   And what about Undersheriff Caracappa?  Was he

17 disciplined for anything?

18 A.   No.

19 Q.   What about the Chief of Staff Sharkey?

20 A.   There is no reason he would be disciplined for

21 anything.

22 Q.   Okay.  What about the deputy chief of staff, whatever

23 his title is.

24 A.   Chief Deputy Sheriff.  No.

25 Q.   And what about the warden?  Was he disciplined?

1  A.    No.

2  Q.    What about the underwarden or wardens?

3  A.    No.

4  Q.    Let me show you what has previously been marked as

5  Exhibit G for identification, sheriff.  It actually was

6  produced from your office by subpoena.

7          I'm going to ask you if you recognize what that

8  is.

9  A.    Personnel file.

10  Q.    Yes.  The personnel file of whom?

11  A.    Edward Walsh.

12  Q.    And you have seen personnel files before?

13  A.    Yes, sir.

14  Q.    You have probably had one as a deputy.

15          I don't know.  Do you have one as the sheriff?

16  A.    No.

17  Q.    Take a look at Ed Walsh's personnel file.  That

18  covers 25 years of his life in the sheriff's office.

19          Take a look and tell me how many memos or

20  letters are in there from, let's say, the day he started

21  until, how about March of 2014, that he ever was

22  disciplined.

23  A.    Quick glance, I don't see any.

24  Q.    Okay.  You don't have to take a quick glance.

25  A.    No, except for, he was suspended a result of this

1   investigation.  But other than that, before that, no.

2   Q.    And you kind of knew that even before you looked at

3   it, didn't you?

4   A.    No.

5   Q.    So are you surprised to learn that after 25 years he

6   was never --

7   A.    I'm not surprised.

8   Q.    Why weren't you surprised?

9   A.    Because I have never heard it.

10  Q.    You have never heard of any sort of disciplinary

11  action against him.

12  A.    Right.

13  Q.    What about if it wasn't a full-blown disciplinary

14  action?  What about any sort of letters, memos, emails?

15  What do they call those things?

16  A.    Letters of reprimand?

17  Q.    Stickies, yellow things.  Anything in there that

18  anybody ever filed that Ed didn't do his job?

19  A.    I don't see one.

20  Q.    Okay.  What about he didn't do a job professionally?

21  A.    No.

22  Q.    Or he was leaving early?

23  A.    No.

24  Q.    Coming in late?

25  A.    No.

1    Q.   Now, have you ever had a discussion with anybody on

2    your staff as to how one of your employees as you now

3    claim was out doing things that you had no idea his

4    personnel file would be that of a perfect employee?

5            Did you ever have any discussion with anybody

6    like that?

7    A.   Can you just shorten the question?  Rephrase the

8    question?

9    Q.   Sure.  Sure.  Have you ever discussed Ed's personnel

10   file with anybody?

11   A.   This personnel file?

12   Q.   Yes.

13   A.   No.

14   Q.   And the lack of any sort of letter, demerit, memo?

15   Anything.

16   A.   No.

17   Q.   Well, did you discuss that with the FBI?

18           Did you bring or did they show you his personnel

19   file and say:  Sheriff, help us out here.  There's nothing

20   ever in it and he's doing, between '06 and '14, what you

21   directed him to do?

22           Did the FBI ever ask you that?

23   A.   No.  I won't have brought this -- I did not bring

24   this file to the FBI.

25   Q.   Did the FBI have his personnel file?

1    A.    I don't know.

2    Q.    Did they ever reference it?

3    A.    No.

4    Q.    Now, you testified that in 2008 to 2010 you moved --

5    thank you, Mr. Lato.

6          Sheriff, those personnel files are kept in the

7    regular course of business of the sheriff's office, isn't

8    that correct?

9    A.    Yes.  They are.

10          MR. WEXLER:  Your Honor, at this time the

11    defense would offer Exhibit G into evidence.

12          THE COURT:  Any objection?

13          MS. MIRABILE:  Yes, your Honor.

14          THE COURT:  What ground?

15          MS. MIRABILE:  Can we approach?

16          THE COURT:  All right.

17          (Continued on the following page.)

18

19

20

21

22

23

24

25

1          (Discussion at sidebar ensued as follows.)

2          MS. MIRABILE:  Judge, it is not complete to the

3    extent it doesn't include the complaint that the sheriff

4    received with respect to the defendant's politicking.

5          THE COURT:  Well I don't know whether it is

6    complete or not.  He testified it is the personnel file.

7    Why shouldn't it be admissible?

8          MR. WEXLER:  I will also make the record that

9    that is the personnel file that was subpoenaed, that the

10   United States Attorneys office handed over to me.

11         MR. TIERNEY:  I would just say that is, fine

12   Judge, but on redirect we should be able to discuss the

13   complaints with regard to defendant's professionalism

14   because he has been crossed and there is no issues with

15   regard to the defendant's professionalism, and there is.

16         THE COURT:  You can discuss anything you want to

17   discuss.

18         MS. MIRABILE:  Okay.

19         THE COURT:  That is redirect.

20         MR. TIERNEY:  That is fine.

21         THE COURT:  I'm allowing this in evidence.

22         MS. MIRABILE:  Okay.

23         MR. TIERNEY:  That's fine, your Honor.

24         (Discussion at sidebar was concluded.)

25         (Continued on the following page.)

1          (The following ensued in open court.)

2          THE COURT:  Defendant's Exhibit G is in

3     evidence.

4          (Defense Exhibit G in evidence.)

5     BY MR. WEXLER:

6     Q.   Sheriff, between 2008 and 2010, you moved your office

7     to Central Islip.

8     A.   That's correct.

9     Q.   And you were in Central Islip how many days a week?

10    A.   I probably stop there five days a week.  But I did

11    stop out in Riverhead for part of the day once or twice a

12    week.

13    Q.   Okay.  But remaining in Riverhead were your two

14    undersheriffs.  Correct?

15    A.   Correct.

16    Q.   Your chief of staff.

17    A.   Yes, sir.

18    Q.   Your deputy chief of staff.

19    A.   Yes.

20    Q.   The warden and the underwardens.  Correct?

21              And all the --

22    A.   Chief deputy sheriff and deputy wardens.

23    Q.   Yes.

24    A.   Yes.

25    Q.   And all the inmates were in Riverhead.

1  A.    And Yaphank.

2  Q.    And Yaphank.  But you now were going to Central

3  Islip.

4  A.    Right, where I had employees who worked there, too.

5  Q.    Okay.  And what do you have, about 15 employees in

6  the Central Islip?

7  A.    In Central Islip we have, we run a detention center

8  in Central Islip on one side of the building, and on the

9  other side of the building we have about 20 investigators.

10        In the detention center, we probably have 60

11  people assigned there but probably 30 working at any one

12  time.

13  Q.    And those are handling the prisoners.  Right?  You

14  didn't have daily contact with the COs moving prisoners to

15  Courtroom 14 versus Courtroom 20.

16  A.    I walk down there.

17  Q.    But you didn't have much daily contact.

18  A.    I walk down and say hello.

19  Q.    That was about the extent of it.  You didn't have

20  extensive conversations with COs transporting prisoners.

21  Correct?

22  A.    They were deputy sheriffs.  But no, I did not.

23  Q.    So but you still reported to your office in Riverhead

24  every day.

25  A.    No.

1  Q.   Every other day?

2  A.   No.

3  Q.   Once a month?

4  A.   Make once or twice a week in the morning.

5  Q.   Okay.  And so you are, as you claim, in CI, and once

6  again as we established nobody ever tells you about any

7  deficiencies of Ed Walsh.  Correct?

8  A.   That's correct.

9  Q.   All right.  Now, the times that you testified that

10  you didn't see Ed Walsh, you walked into your office, you

11  went to get a cup of coffee where the fresh coffee was by

12  the chief's office, did you ever have to call him on his

13  cell phone?

14  A.   I have talked to him on his cell phone but usually --

15  Q.   That wasn't my question, sheriff.

16  A.   Rephrase again.  I'm sorry.  Or say it again.

17  Q.   Yes, sir.  Did you ever have to call him on his cell

18  phone?

19  A.   Yes.

20  Q.   Okay.  And you called him on his cell phone why?

21  A.   If I needed an answer to a question or wanted him to

22  produce something for me or look into something.

23  Q.   Why didn't you call him at his desk phone?  He had an

24  office phone on his desk in Riverhead and Yaphank.

25  A.   Maybe he didn't answer.

1    Q.    I'm sorry?

2    A.    Maybe he didn't answer.  I may have tried.

3    Q.    So you my have first called him on his desk phone, he

4    didn't answer and then you called him on his cell phone.

5    A.    Yes.

6    Q.    I mean we do that all the time.  Good.

7          Did you have say to him:  Ed, Ed, I only gave

8    you two times in eight years permission to leave.  You

9    testified to those two times.

10   A.    Yes.

11   Q.    Two times.  *How come you are not at your desk?*

12         Did you ever have that conversation with him?

13   A.    He wasn't expected to be at his desk.

14   Q.    Okay.  Well:  *How come I had to call you on your cell*

15   *phone?*

16         Did you ever have that conversation?

17   A.    Maybe he was at the jail.

18   Q.    I didn't ask you where he was.  Did you ever have the

19   conversation?

20   A.    Why he wasn't at his -- desk.

21   Q.    Yes.

22   A.    No.

23   Q.    Did you ask him where he was?  In eight years:  *Ed,*

24   *where are you?*

25         Did you ever ask him on his cell phone?

1    A.    I didn't call him on a daily basis.

2    Q.    Okay.  Well, you spoke to him quite often, didn't

3    you?

4    A.    On the phone?

5    Q.    No.  Smoke signals.

6          Of course on the phone.

7          MS. MIRABILE:  Objection.

8    A.    I thought in person.

9          Now you are being sarcastic, I mean.

10          MS. MIRABILE:  Objection.

11          THE COURT:  Sustained.

12    A.    I'm trying to find out what you mean.

13    BY MR. WEXLER:

14    Q.    On the cell phone you spoke with him quite often,

15    didn't you?

16    A.    I talked to him on his -- spoke to him on the phone.

17    I don't know quite often, what the definition of that is.

18    Q.    Well, since I was not there why don't you tell me

19    between 2006 and 2014 approximately how many cell phone

20    calls you had with Ed Walsh.

21    A.    I have no idea.

22    Q.    Well, was it more than five?

23    A.    Yes.  I'm sure it was.

24    Q.    Was it more than ten?

25    A.    I'm sure it's more than ten.

1   Q.   More than 50?

2   A.   I don't know.

3   Q.   More than 100?

4   A.   I don't know.  Mr. Wexler.

5   Q.   If I told you you had 1,163 phone calls, would that

6   refresh your recollection?

7   A.   No.

8   Q.   No?  Cold it be?

9   A.   I don't know, Mr. Wexler.

10  Q.   Well, listen, sheriff.

11  A.   I don't know if I had a thousand calls.

12  Q.   I understand.  There are some people, like I have an

13  aunt in Toledo that I speak to one a year.  And I

14  understand.  You can ask me.  I speak to my aunt once a

15  year.  And then my wife or my parents I speak to every.

16  Day.  So we have an idea of roughly who we call a lot and

17  who we don't call.

18          I'll try it again.  Did you speak to sheriff or

19  Ed Walsh on at least 1,000 occasions?

20  A.   I don't know.

21  Q.   Do you have that recollection?

22  A.   I don't know.

23          MS. MIRABILE:  I'm going to object to the

24  colloquy.

25          THE COURT:  Sustained.

1    BY MR. WEXLER:

2    Q.    So you have no idea.  It cold be between 100 and

3    1,163.  Is that correct?

4    A.    I don't know, Mr. Wexler.

5    Q.    You don't know whether even that is a range?

6    A.    I can see somewhere 100.

7    Q.    You can give me 100.  No more than that.

8    A.    No.  I'm not saying that, Mr. Wexler.  I don't know.

9    Q.    What were Undersheriff Meyerrick's jobs at the jail?

10   What were his duties?

11   A.    At the sheriff's office?

12   Q.    Yes.

13   A.    What his duties were?  He was the number two in

14   charge and he oversaw the Internal Affairs Bureau.  For a

15   time period until the present, internal security.  The

16   medical evaluation unit reported directly to him.

17         And he oversaw the corrections division and the

18   police division of the sheriff's office.

19   Q.    Okay.  He showed up and he did his job?

20   A.    He did.

21   Q.    Okay.  Undersheriff Caracappa:  What were his duties,

22   his job?

23   A.    He oversaw the operations division and Project Life

24   Safer project or program.

25   Q.    Does he show up?

1  A.  Yes.

2  Q.  What about Chief Sharkey?  What were his

3  responsibilities?

4  A.  He oversaw the operations bureau.

5  Q.  And did he show up?

6  A.  Yes.

7  Q.  Do his job?

8  A.  Yes.

9  Q.  How about deputy chief Kneitel?  What are his job

10  duties?

11  A.  Yes.

12  Q.  I said, what were you they?

13  A.  What were they?  He oversaw the police division.  I'm

14  sorry.

15  Q.  Did he show up?  Do his job?

16  A.  Yes.

17  Q.  What about Warden Ewald?

18  A.  The corrections division.

19  Q.  Yes.  And did he show up and do his job?

20  A.  He did.

21  Q.  And the deputy warden or wardens.

22       What were their names?  Just so we have them for

23  the record.

24  A.  Tom Hennesee.  Michael Franchi.

25       What time period are you talking about?

1    Q.    Let's go from '06 to '14.

2    A.    They changed a lot.

3    Q.    Okay.  Then you know what?  We will talk about '11 to

4    '14.  Okay.

5    A.    To the best of my recollection it was Michael

6    Franchi.  Thomas Hennessee.  Robert Hervan.  And for a

7    period of that, Daniel Papele.

8    Q.    And had they not, they meaning the names that you

9    just given, had they not done their jobs, you would have

10   learned about it pretty quickly, wouldn't you have?

11   A.    I think the warden would have told me.

12   Q.    Somebody.  I mean would they go five days and not do

13   their job before you would learn about it, before it would

14   become obvious?

15   A.    You would have to ask the warden.

16          I mean, I would think if they weren't doing

17   their job and he was concerned, he would bring it to the

18   attention of the undersheriff or myself.

19   Q.    Now, additionally, the other 1,300 or so employees,

20   while you may not know exactly what they were doing at any

21   moment you have a pretty good idea of what people were

22   assigned to be doing and whether they were doing it or

23   not.  Correct?

24   A.    Correct.

25          It was a presumption that they were doing their

1    job.  They are sworn law enforcement officers.

2    Q.   And if they weren't, you would learn about it through

3    either a memo or a report, a direct conversation, a

4    telephone call.  You would know about it.  Yes?

5    A.   I don't know.  It depends on through the chain of

6    command.

7            If it was a CO-1 working on a tier, I'm sure it

8    would go to a sergeant or lieutenant or captain, and they

9    might just deal with it at that level.  If it was a boss

10   that wasn't doing their job, it would probably work its

11   way up towards the administration eventually.  Yes.

12   Q.   But if it was a systemic or prolonged period of time,

13   you would know about it.  Correct?

14   A.   I would like to think so.

15   Q.   Okay.  Your cell phone number:  516-987-9127.

16   Correct?

17   A.   That is my personal cell phone.

18   Q.   And your work phone is 631-335-1813.  Correct?

19   A.   Yes.

20   Q.   And your home is 631-367-0167.  Correct?

21   A.   Correct.

22   Q.   Okay.  Now, I want to ask you, we have talked about

23   telephone calls before.

24   A.   Okay.

25   Q.   And I want to ask you if you are aware that in 2013

1  and into the first couple of months of '14, are you aware

2  there were 236 phone calls you had with Ed Walsh?

3  A.  I'm not aware but it wouldn't surprise me because

4  that was a period I was going through a reelection.

5       And most of those phone calls are probably on my

6  personal cell phone and they were probably political, not

7  work related.

8  Q.  So even during the day you were taking political

9  phone calls?

10  A.  I don't know.

11  Q.  Pardon me?

12  A.  I don't know that, sir.  Probably not during the day.

13  Q.  Oh.  So if those 236 phone calls all happened at

14  night or --

15  A.  I don't know, sir.

16  Q.  Okay.  Am I to assume that if the phone calls were

17  made during the day it was work related, and if at night

18  it was politics?

19  A.  Probably.

20  Q.  Okay.  Let's talk about the day phone calls.

21       What sorts of things would you call Ed about?  I

22  mean, there were 236 in 2013, and 101 were after hours so

23  that leaves another 125 phone calls you had between you

24  and Ed Walsh.  On your cell phone.  Home phone.  During

25  the day.

1    What sorts of things would you discuss with Ed

2    during the day?

3    A.    Were they on weekends or week days?

4    Q.    Well, I can tell you.

5    A.    Okay.

6    Q.    Almost 120 of those were Monday through Friday.

7    A.    Okay.

8    Q.    During the workday.  So what sorts of things would

9    you discuss with Ed Walsh?

10    A.    Was I calling him or was he calling me?

11    Q.    There's both.

12    A.    Okay.

13    Q.    He seemed to call you a little more than you called

14    him.

15    A.    Okay.

16    Q.    Does that sound -- okay.  What sorts of things would

17    you discuss Monday through Friday 9 to 5 or 8 to 4?

18    A.    Probably things going on in security, internal

19    security.

20          If a judge came for a tour and he said:  Judge

21    So and So said hello.

22    Q.    Okay.  So he would talk to you about work-related

23    things and you would talk to him about work-related

24    things.

25    A.    Yes.  And he might have talked to me about some

1  political things too.

2  Q.    Okay.  And at any time during those 120-ish phone

3  calls did he ever discuss with you things that were going

4  on outside the jail?

5  A.    Politically, yes.

6  Q.    No, those are the night calls.

7  A.    I said there could be some during the day too.  If we

8  were talking about something, I'm sure we talked about,

9  politics led into it if we were on the phone.

10  Q.    But didn't you say that would be illegal, that would

11  be -- I think that is what the government brought up.

12  A.    If we were in the office talking about it, it was in

13  the office, yes.

14  Q.    But on the phone you talked to him about politics.

15  A.    If we weren't in the office and if he was off, if I

16  was off, we should not have been talking abut politics.

17  Q.    What do you mean if I was off and if he was off?

18  What are you talking about?  It was Monday through Friday.

19  A.    People take days off, Mr. Wexler.

20  Q.    So you are assuming every time you spoke to him about

21  politics, he must have been off?

22  A.    No.  If we had a conversation about work, I'm sure

23  politics might have led in:  *Hey, I saw so and so and this*

24  *is happening*, something like that.

25  Q.    Okay.  So politics would bleed into the job.

1  Correct?

2  A.    No.  That is not what I said.

3  Q.    Would bleed into the conversation?

4  A.    Would bleed into a telephone conversation, a

5  five-minute telephone conversation.  Politics can bleed

6  into it.

7  Q.    What would you care about politics?

8  A.    I'm an elected official.

9  Q.    So?

10  A.    And I was running for reelection in that time frame

11  that you were talking about.

12  Q.    So you ran in 2013 and this is 2014.

13  A.    You said 2013 into 2014.

14  Q.    Okay.  You are right.  So if you are running for

15  reelection, then it would justify you discussing politics

16  during the day.

17  A.    I'm not saying it would justify it, but throughout

18  the course of my tenure as sheriff, people would call me

19  up and said:  Hey, I heard this or I heard that.

20  Q.    I'm not talking about people in general.  I'm only

21  talking about one person, you and he, meaning, Ed Walsh.

22  A.    One of those people.

23  Q.    Okay.  So you spoke to other people during the day

24  about politics in addition to Ed Walsh.

25  A.    I'm not saying I didn't take phone calls about

1 politics. I'm sure I took a phone call from Rich

2 Schaffer. I took phone calls from other elected

3 officials.

4 Q. But you took more when you were running for election.

5 A. Most likely, yes.

6 Q. Okay. So. That's the political season, as they call

7 it?

8 Okay. So let's get to the nonpolitical season?

9 A. Okay.

10 Q. So during the day there would be at least I think we

11 developed 120 phone calls about work. Correct? And some

12 of those may bleed into political talk but they were

13 mostly work related. Or not? I don't know. You have to

14 tell me.

15 A. Probably mostly really work related.

16 Q. Okay. And the 101 phone calls that were between 4 pm

17 and 9 am the next morning, those would be political?

18 A. No. I would assume after a certain hour if I was

19 called on the overnight it was probably a work-related

20 call.

21 Q. Okay. And fair to say that Ed Walsh would not call

22 you at midnight and say: Boss -- how did he refer to you?

23 Vin?

24 A. Sometimes he would refer to me as boss or sheriff or

25 Vin, depending on the situation.

1   Q.   He didn't call you up at midnight and say:  Boss, I

2   have a great idea.  We should get you the Democratic line.

3   It was going to be work related.  Correct?

4   A.   At that hour, definitely.

5   Q.   And of all the 1,300 people in the jail, why was Ed

6   Walsh calling -- he had your home number, didn't he?

7   A.   He did.  My home number was on file with the

8   communication bureau so people could get in touch with me

9   at home.

10  Q.   Why would Ed call --

11  A.   And Ed had my personal, my home phone number.

12  Q.   Okay.  Why would Ed Walsh be the one to call you at

13  midnight if something happened at the jail?

14  A.   Because Ed Walsh was on call.  He's getting standby

15  pay to be on call on the midnight shift.

16          In case anyone died or committed suicide, he was

17  one of the people that would respond.  And his job as

18  liaison to security and gangs was supposed to be a direct,

19  he would respond to the scene with the other security

20  personnel.  And he would call in to Undersheriff

21  Meyerricks or myself as soon as he got there and give us

22  the situation.

23  Q.   So the CO or the sergeant on the scene in

24  Riverhead -- I mean the jail runs 24/7.  Right?

25  A.   Yes, sir.

1    Q.    You don't tuck the prisoners in at night and say

2    we'll see you in the morning.

3    A.    Right.

4    Q.    So an incident occurs, like a stabbing, hanging, an

5    attempt suicide, and the person, he or she, on the job,

6    whether it be a CO or a sergeant, they would call Ed

7    Walsh?

8    A.    The duty lieutenant would notify security, the

9    sergeant in internal security who worked the overnight

10   shift.  They would inform Lieutenant Walsh.  The warden

11   would get a phone call.  And Ed Walsh would respond with

12   the security personnel.  And Ed's responsibility was to

13   notify the undersheriff or myself.

14   Q.    And he would call you.

15   A.    Or the undersheriff.

16         There was a point where I asked the undersheriff

17   that I would prefer him just to take the calls.

18   Q.    Because you didn't want to handle all the phone

19   calls, right?

20   A.    Well, I had a little child at the time and when the

21   phone rang in the middle of the night she would wake up.

22   So if it was important, the undersheriff would get me.

23   Q.    Okay.  And if Ed Walsh got the call from the staff

24   and he didn't think that you needed to be awakened at 2 in

25   the morning or 11 clock, he would make that determination

1   as to whether I call the boss or not.  Correct?

2           He didn't call you for everything that occurred.

3   A.   He would call the undersheriff.

4   Q.   Okay.  Now, things like, for instance you remember

5   there was a snow storm several years ago and the staff at

6   both Riverhead and Yaphank were already on a double tour.

7           You know what a double tour is.  Correct?

8   A.   Correct.

9   Q.   And it is something bad in the contract to keep them

10  a third tour.  Is that correct?  Bad business to keep a

11  third?

12  A.   Yes.  You don't want people working triplets.

13  Q.   Triple.

14  A.   Right.

15  Q.   And do you remember Ed contacting you about triples?

16  A.   I don't remember that conversation.

17  Q.   Because he made that determination.  Correct?

18  A.   I don't remember.

19  Q.   Well, he made the determination to keep some 920

20  employees on triple overtime and you learned about it the

21  next morning.  Correct?

22  A.   I don't think Ed Walsh had the authority to keep

23  people on triple overtime.  I'm sure he had to check with

24  a superior officer before he did that.

25  Q.   Well, did he check with you?

1  A.  I might have checked with me.  He might have checked

2  with the warden or the undersheriff.

3  Q.  You don't know that.  You are guessing.

4  A.  Because he didn't have the authority to do that.

5  Q.  But he had the authority to call you or not call you

6  depending upon whether he thought the incident was

7  sufficient or not.  Correct?

8  A.  Well --

9  Q.  It's yes or -- sheriff, I'm going to hold you to that

10  one.

11  A.  No.

12  Q.  Oh, he didn't.  So how would Ed Walsh know, when he

13  got the phone call at 2 in the morning, do I wake the boss

14  or not?

15  A.  He would know because he was given specific

16  parameters of what is a significant incident:  A death.  A

17  hanging.  I mean a suicide, which were mostly hangings

18  unfortunately.  Or a stabbing.  A riot.  Or a hostage

19  situation.

20  Q.  Okay.  So those incidents he would call you.

21  A.  Or the undersheriff first.

22  Q.  Okay.  And --

23  A.  He did call me.  There were times he did call me in

24  the beginning in the middle of the night.  And my wife

25  answered the phone and the baby woke up.  And then I told

1  Undersheriff Meyerricks to make sure that he takes the

2  calls.  I don't need to be -- I should be notified by the

3  undersheriff.  If it is something I need to know about

4  immediately and respond to, then the undersheriff can make

5  the determination and call.

6  Q.   Also you received phone calls, you even asked me was

7  it on weekends, from Ed Walsh, too.  Correct?

8  A.   Correct.

9  Q.   And let's say Saturdays and Sundays you received

10  phone calls from him and you called him on Saturdays and

11  Sunday.  Right?

12  A.   Could be political.

13  Q.   Could be political.  All right.  And what about when

14  he was on vacation he took phone calls from you and you

15  called him?

16  A.   I don't know that.

17  Q.   Well, you never looked at a calendar and said, Oh, Ed

18  is off.  I better not call him.  Or Ed is on vacation.

19  That was not a regard.  If you needed Ed, you called him.

20  If he needed you, he called you.  Correct?

21  A.   I would call him if -- if he was on vacation, I mean,

22  I wouldn't know if he was, but if I needed to get in touch

23  with him, I would get in touch with him.

24  Q.   And you didn't have that relationship with the other

25  1,300 COs, CO Jones and CO Smith.  You didn't call them up

1  at midnight and say I've got a question or I have politics

2  I want to talk to you at 10 o'clock.  The union would go

3  ballistic if you did that.  Correct?

4  A.    If there were people in positions that I needed

5  answers from immediately, I would them but not the typical

6  Corrections Officer One or Correction Officer Sergeant.

7  No.

8  Q.    You didn't even have their telephone numbers, the

9  typical Correction Officer One or Sergeant.

10  A.    No.

11  Q.    And they certainly didn't have yours.

12  A.    No.  I had the bosses' phone numbers.

13  Q.    Ed had yours and you had his.  Yes?

14  A.    Correct.  But most lieutenants --

15  Q.    Your personal cell?

16  A.    Yes.  But I had most of the captains' cell phone

17  numbers and the lieutenants' phone numbers if I needed to

18  get in touch with them.  And they had my cell phone

19  number, my work cell phone number.

20              (Continued on the following page.)

21

22

23

24

25

1    BY MR. WEXLER:

2    Q.    Did you call the captains about politics at midnight?

3    A.    No, I didn't talk to anybody about politics at

4    midnight.

5    Q.    All right.

6          When did the political light start and stop?

7          When did the first hour that you would talk

8    politics with anybody, including Ed Walsh, start and when

9    did it stop?

10          Would you talk politics during the day?

11   A.    If the conversation went that way, yes.

12   Q.    You mean you never called anybody strictly because it

13   was political, only if it was business and then you would

14   wait until the drift, that magic moment that I could bring

15   it up?  Of course you called people.

16   A.    People?  I thought you said Ed Walsh?

17   Q.    Well, he's a person.

18          You would call Ed Walsh about politics whenever

19   it was important to you, correct?

20   A.    I would call him, yes.

21   Q.    That was the relationship you established with him;

22   isn't that correct?

23   A.    It depends on what year it was, sir.

24   Q.    Wait a while.

25          You ran successfully three times, okay?

1    A.    Yes.

2    Q.    The first time you ran in '06?

3    A.    '05.

4    Q.    '05.

5          The next you ran in '09?

6    A.    Yes.

7    Q.    Okay.

8          Ed Walsh, we saw 427 pictures here earlier, was

9    the Chairman of the Conservative Party, correct?

10   A.    In '09, yes.

11   Q.    That was not a big surprise?  That wasn't a shocker

12   to you that he was your Chairman, correct?

13   A.    Yes, not a shock.

14   Q.    It wasn't a surprise to you that he would speak to

15   Richie Schaffer, the Democratic Chairman, in an attempt to

16   get you the line, correct?  You knew that was going on?

17   A.    To be honest with you, Mr. Wexler, I spoke to Richie

18   Schaffer about me getting a Democratic line in 2009, 2013.

19   Q.    It was in my law office that you were speaking to him

20   about it, wasn't it?

21   A.    No, usually on the phone.  I did speak to him in a

22   law office.

23   Q.    In my office and Richie's office?

24   A.    Yes.

25   Q.    In the middle of the day?

1  A.   Yes.

2  Q.   And Richie Schaffer knows nothing about corrections

3  law?

4  A.   But he's a town supervisor.

5  Q.   Okay.

6       But you weren't there asking him about town

7  supervisory work, you were there talking politics?

8  A.   I was there talking to him about some issues I was

9  having with the County Executive, the legislature.

10  Q.   In fact, you have seen me any number of times in the

11  office, haven't you?

12  A.   Yes.

13  Q.   And that's always between nine and five?

14  A.   Yes.

15  Q.   You even met Sunny in my office, correct?

16  A.   Is that the dog?

17  Q.   Yes.

18  A.   Yes.

19  Q.   Now, let's go back to the telephone calls and we're

20  talking about 2013 to 2014.

21       And is it fair to say that there were numerous,

22  numerous political telephone calls and work-related phone

23  calls?

24  A.   In that time period?

25  Q.   Yes.

675

1  Q.   What did you say, 230?

2       You obviously have the record of it, so I'll

3  assume that's correct.

4  Q.   Okay.

5       In that same year, 2013 into 2014, to be exact

6  June of '14, do you know how many phone calls Ed had to

7  and from the jail at all hours of the night and day?

8  A.   What year?

9  Q.   Same year that we're talking about, 2013, and June of

10 2014?

11 A.   I would have no idea, sir.

12 Q.   If I told you -- well, do you have any idea?

13 A.   Not really.  How could I? Unless it was to my phone

14 number, I don't know.

15 Q.   What I'm saying is, did you ever learn, from any of

16 your staff, hey, we spoke to Ed Walsh about this issue.

17 Just like you spoke to him about issues, we spoke to Ed,

18 something came up last night, something came up at 9:00.

19      Did that ever occur?

20 A.   Yeah, the undersheriff would say Ed called me last

21 night and said this happened.

22 Q.   And are you aware that he had, in that same time

23 period, 2013 to June of 2014, 1819 phone calls back and

24 forth with the jail officials and Ed?

25 A.   No, I'm not aware of that.

1  Q.  Okay.

2        You do not believe that they were talking about

3  politics with the warden and the deputy wardens?

4  A.  I assumed they were work-related or possibly personal

5  phone calls between Ed and his coworkers, but probably

6  work-related.

7  Q.  You knew Ed was taking these phone calls at 5:00,

8  7:00, 10:00, 11:00, and whatever the job required,

9  correct?

10 A.  No.

11 Q.  You knew he was doing that?

12 A.  I would assume he made calls if there was a

13 significant event.

14 Q.  You say assume.  You knew.  It wasn't an assumption.

15 I can make --

16 A.  He would make --

17 Q.  Let me just finish what I'm saying.

18        You used assumed.  I can make certain

19 assumptions that right now it's warm in Acapulco. I don't

20 know, but I think it is.  That's the difference between

21 something I know.

22        It's not that you assumed they were having these

23 phone calls, you knew they were having those phone calls

24 all day and night.

25 A.  I wish I could tell you that, but I couldn't.

1   Q.   As you sit here today, Sheriff, have you ever

2   discussed it with anybody?

3          Whoa, you were calling Ed at 8, 9, 10:00, 11,

4   12, 1, 2, whenever it was required, did you ever have

5   those discussions with anybody?

6   A.   I don't know if those phone calls were happening

7   unless somebody told me they spoke to Ed and it would have

8   to be a significant event.

9          Unfortunately, we don't have that many

10  significant events.

11  Q.   If you had a significant event and the phone calls

12  occurred, then you would know that he was taking these

13  phone calls, correct?

14  A.   Correct.

15  Q.   Let's just go back a few more years.  Let's look at

16  the year 2012, calendar year.

17         Do you remember how many phone calls you had

18  directly with Ed Walsh?

19  A.   No.

20  Q.   If I told you 122, would that ring a bell?

21  A.   For the year?

22  Q.   Yes.

23  A.   It doesn't ring a bell but...

24  Q.   It sounds like it's likely?

25  A.   Yes.

1   Q.   Of those 122 phone calls, those also span the globe

2   so to speak, they were during the workday and the evening?

3   A.   Okay.

4   Q.   Yes?  It's not me --

5   A.   I don't have them in front of me, you do.

6   Q.   Okay.

7          That was the course of conduct and business you

8   had with Ed?

9   A.   Yes.

10  Q.   You had it in 2012, I'll call you, you'll call me, it

11  doesn't matter the time, the date.  You never refrained

12  from calling.  Oh, Ed may be off today.  You called him

13  when you needed him?

14  A.   In 2012 there was significant things going on so

15  there probably was a lot of conversation between Ed and

16  myself that was work-related.

17  Q.   That was work-related?

18  A.   Yes.

19  Q.   You called Ed because you needed advice, input and

20  wanted to know what was going on, correct?

21          You weren't exchanging meatloaf recipes with

22  him.

23  A.   I believe you'll find Ed was calling me more than I

24  was calling him for this incident because it involved him.

25  Q.   So it was some work-related incident?

1    A.   It was an incident, an allegation made about him from

2    a constituent.

3    Q.   Well, let's see.

4         Were you talking about politics with him in 2012

5    or, as you say, I would have a business call and it would

6    lead into politics?

7    A.   If you give me the time frame, I can tell you.

8    Q.   I did.  2012.

9    A.   We were probably talking about the constituent

10   complaint and the complaint --

11   Q.   I know you want to talk about that.

12   A.   I don't want to necessarily talk about it.

13        MS. MIRABILE:  Objection.

14        THE COURT:  Please don't interrupt the question.

15   Wait until the question is over and then make your

16   objection.

17        MS. MIRABILE:  My objection was so that

18   Mr. Wexler will let the witness answer the question,

19   because Mr. Wexler was interrupting the answer of the

20   witness.

21        THE COURT:  He shouldn't do that for sure.

22   BY MR. WEXLER:

23   Q.   Sheriff, again, in 2012, do you know that there were

24   also a thousand phone calls between Ed and the jail?

25   A.   I don't know that.

680

1   Q.   But you're not surprised by that number, you're not

2   shocked?

3   A.   No.

4   Q.   I would be surprised if it was not more than three.

5   A.   No, I'm not shocked.

6   Q.   You knew he had that same relationship that he had

7   with you.  If they needed him, or he needed them, the

8   phone call would be made, correct?

9   A.   I don't follow what you're saying, sir.

10  Q.   Well, I'll rephrase it.

11          Those number of phone calls in 2012, those were

12  business-related, sheriff's office work, correct?

13  A.   They were to the facility I would assume they were,

14  yes.

15  Q.   Once again, Ed would not be getting a call from

16  somebody at the jail, an investigator or a duty

17  lieutenant, to say, hey, I have a great political line for

18  you. I see it's midnight.  Let's talk about Sheriff

19  DeMarco.

20  A.   I'm sure at midnight he wouldn't get that, but during

21  the day he might get a call from a coworker that's not

22  business-related.  That's why I say I assume it's

23  business-related.

24  Q.   Just like you got phone calls that were not

25  business-related, that you called Ed and Ed called you

1    during the day, correct?

2    A.    Yes.

3    Q.    I'll go through a couple more years and then we can

4    move on.

5    A.    Okay.

6    Q.    2011, there were 100 telephone calls between you and

7    Ed Walsh.

8          Does that ring a bell or sound plausible?

9    A.    Sounds plausible.

10   Q.    Okay.  Of those 2011, 51 -- 151 were between four

11   p.m. and nine a.m., once again throughout the night.

12         Would those have been political or would those

13   have been business or a combination?

14   A.    Combination.  Could have been personal as well.

15   Q.    When you would have these phone calls that would

16   start off as business, when you would have those phone

17   calls that would start off as business and drift into

18   politics, would you like hang up and say let's reset the

19   clock, or would it be one continuous phone call?

20   A.    One continuous phone call.

21   Q.    How many did you have, political phone calls, during

22   the day, during the night with Undersheriff Meyerricks?

23   A.    No.

24   Q.    Undersheriff Caracappa?

25   A.    No.

1  Q.  Chief Michael Starkey?

2  A.  Sharkey, no.

3  Q.  Sharkey, excuse me.

4        Deputy Chief Kneitel?

5  A.  No.

6  Q.  Warden Ewald?

7  A.  No.

8  Q.  The deputy warden?

9  A.  No.

10  Q.  Any of the captains?

11  A.  No.

12  Q.  Any of the lieutenants?

13  A.  No.

14  Q.  Any of the -- do they still have matrons in the jail?

15  A.  They don't.

16  Q.  So only Ed Walsh.

17        In fact, politically, of all of the 1300 people

18  in the Suffolk County Jail, who was the most important to

19  you politically?

20  A.  It would be Ed Walsh.

21  Q.  In 2010 you had 154 phone calls with Ed Walsh on your

22  cell phone and/or to his cell phone or -- yeah, his cell

23  phone.

24        Do you remember that?

25  A.  I don't remember it.

1    Q.   Ring a bell?

2    A.   It's plausible.

3    Q.   Again, 45 of those were between four p.m. and nine

4    a.m.

5         Were those business, politics or both?

6    A.   Probably both.

7         There was a significant event going on during

8    that time period.

9    Q.   During the day those phone calls would be

10   business-related?

11   A.   Most likely, yes.

12   Q.   Now, 2000 -- strike that.

13        In 2010, there were 1163 phone calls between Ed

14   and the jail, all hours of the day and night.

15   A.   Okay.

16   Q.   Okay.

17        And he did not get paid for 24 hours a day work,

18   did he, just yes or no?

19   A.   No.

20   Q.   He owed the county seven-and-a-half, correct?

21   A.   He had to be onsite for seven-and-a-half.

22   Q.   I didn't say that, you did.

23        He had to be onsite, that's what your

24   terminology is, correct?  Yes?

25   A.   Yes.

1  Q.   I didn't ask you that.  You volunteered it.  Let's go

2  into it.

3       Onsite, if he's supposed to be onsite, nobody

4  ever reported to you that he wasn't, correct?

5  A.   That's correct.

6  Q.   In fact, that personnel file sitting right on your

7  desk, Exhibit G, your best employee, whoever that may be,

8  the mythical best employee, as far as demerits or letters

9  of reprimand would look just like Ed Walsh's, wouldn't it?

10 It would be zero, yes?

11 A.   That's correct.

12      They might have similar letters of commendation

13 in there but...

14 Q.   That would be the mythical employee.

15      Let's go on to 2009.

16      That was an election year for you, wasn't it?

17 A.   It was.

18 Q.   And you had all lines?

19 A.   Yes.

20 Q.   It's like an old election in the Soviet Union, you

21 couldn't have lost?

22 A.   Yes.

23 Q.   You had the Conservative.  You had -- did Ed help you

24 get the Democratic line?

25 A.   I got the Democratic line through Richie Schaffer.

1  Q.   Ed had nothing to do with it?

2  A.   No.

3       I had direct conversations with Richie Schaffer.

4  I remember getting the phone call.  He was the first one

5  to file the paperwork in February to have me as the

6  candidate.

7  Q.   So you did all the political footwork --

8  A.   No.

9  Q.   -- as sheriff to get the job?

10 A.   I'm not saying that.

11 Q.   Then who did it if -- you got the line?

12 A.   I got that line.

13 Q.   Okay.

14      You did the political footwork to get the

15 Democratic line?

16 A.   I made a phone call.

17 Q.   That was the heavy lifting?  It was more than a phone

18 call, Sheriff, wasn't it?

19 A.   It wasn't that hard.

20      Richie Schaffer gave me my start in politics and

21 I was honored that he backed my reelection immediately.

22 Q.   Okay.

23      So you got the Democratic line on a phone call.

24      What about, let's say, the Independents line,

25 did you get that in a phone call?

1    A.    Yes.

2    Q.    Just like that?

3    A.    Yes.

4    Q.    What about the working families?

5    A.    I didn't have the working families party in 2009.

6    Q.    You got the Republican line?

7    A.    Yes.

8    Q.    Also in a phone call?

9    A.    No.

10   Q.    How did you get that one?

11   A.    Ed Walsh.

12   Q.    Ed Walsh got you that line.  You knew he got you that

13   line?

14   A.    I just told you he did.

15   Q.    In fact, you probably had no less than 50

16   conversations about how am I gonna get it, I want to stay

17   as sheriff.  You had those conversations, correct?

18   A.    I believe I had one conversation with Ed Walsh and he

19   said he would take care of it, don't worry about it.

20   Q.    Oh.  So all it needed was one conversation and Ed

21   Walsh took care of it for you?

22   A.    Yes.

23   Q.    Do you know how Ed Walsh would go about getting the

24   Conservative line?  Did he have that magic ability to make

25   a phone call and it's there?

1   A.   You'd have to ask him.

2   Q.   You have no idea?

3   A.   No.

4   Q.   You also had the Conservative line?

5   A.   Yes.

6   Q.   You knew that having Ed Walsh as your party chairman,

7   you wouldn't have to have a primary, correct?

8   A.   No, that's not necessarily true.  He gave me the

9   endorsement.  Somebody could still primary me.

10  Q.   But nobody did?

11  A.   Nobody did that year.

12  Q.   Nobody primaried you in 2013?

13  A.   I had a Republican primary in 2013.

14  Q.   He can't control the Republican line.

15  A.   You didn't say that.

16  Q.   Okay.

17          On the Conservative?

18  A.   No, I did not.

19  Q.   So in 2009, you had 250 phone calls with Ed Walsh and

20  101 of them were between four p.m. and nine a.m., and of

21  those 101 phone calls, can you tell this jury what

22  percentage were work-related, what percentage were

23  political, or you have no idea?

24  A.   There's a significant event happening that time with

25  the Conservative Party with a lawsuit and hearings going

1   on, so we probably talked a lot about that.

2   Q.   Okay.

3   A.   That year.

4   Q.   Okay.

5           And that would be because the takeover of the

6   highway patrol, correct?

7   A.   Yes, and another union raiding the party, yes.

8   Q.   Let me set the stage if I can.

9           Traditionally in Suffolk County, the Suffolk

10  County Police in the five western towns is the principal

11  law enforcement agency, correct?

12  A.   In the five western towns, that's correct.

13  Q.   So if you pick up 911, you don't get the sheriff.

14  That may happen in Alabama.  In Suffolk County, the five

15  western towns, if you call 911, you get the Suffolk County

16  Police?

17  A.   Or a local village police department.

18  Q.   And in the five eastern towns; Southampton, East

19  Hampton, Shelter Island, Riverhead --

20  A.   And Southold.

21  Q.   Southold.  Okay.

22           You get the town police, correct?

23  A.   Except in certain locations.

24  Q.   Right.  Okay.

25           So what happened in 2008 and 2009 is pursuant to

1    then Suffolk County Executive Steve Levy, the Sheriff's

2    Department, your department was going to take over the

3    highway patrol, correct?

4    A.    That's correct.

5    Q.    This way, rather than the PD, you guys would be

6    wearing -- the deputy sheriffs are wearing the jodhpurs

7    and boots and mirrored sunglasses pulling people over,

8    essentially that's correct?

9    A.    Correct.

10   Q.    That caused a huge firestorm in the county, correct?

11   A.    It did.

12   Q.    And you probably took heat from, let's say, Jeff

13   Frayler was the president of the Suffolk County PBA?

14   A.    Yes.

15   Q.    And they called you everything under the sun?

16   A.    They did.

17   Q.    Because that had a lot to do with overtime and taking

18   away a command from the Suffolk County Police Department?

19   A.    Taking a command away, yes.

20   Q.    This was big stuff to law enforcement agencies

21   battling over who is going to write tickets on the LIE?

22   A.    It was the County Executive's decision to pull the

23   police off the LIE, not mine.

24   Q.    Okay.

25         And you took a lot of heat for that?

1  A.   I took a lot of heat.

2  Q.   In fact, there was a lawsuit involving, that stemmed

3  from that in the Conservative Party?

4  A.   Yes.

5  Q.   And the phone calls that you were having in 2009, per

6  your testimony with Ed, was regarding this lawsuit and

7  this whole event of the sheriffs taking over the highway

8  patrol?

9  A.   It was about the hearings that the party was doing

10 and scheduling the hearings.

11 Q.   Would I be correct if I said that was one of the,

12 probably the crummier times you had as sheriff, all the

13 heat you were taking, all of that from the Suffolk County

14 Police, the unions, Newsday?

15 A.   One of.

16 Q.   One of the crummier times?

17 A.   Yes.

18 Q.   And Ed, the correction officer III, was at the front

19 or the spearhead of that with the lawsuits and dealing

20 with everybody else on your behalf, correct?

21 A.   I think he was doing it on behalf of the party.

22 Q.   But you're a member of the party?

23 A.   Yes.

24 Q.   Without the party, you wouldn't be sheriff?

25 A.   Correct.

1   Q.   Without the party, you'd be a deputy sheriff?

2   A.   Well, I don't think that's true.

3   Q.   What would you be?

4   A.   I wouldn't have been sheriff if the Conservative

5   Party didn't enforce me out here and Ed Walsh was not the

6   chairman so...

7   Q.   If you didn't have the Conservative Party, what line

8   would you have run on?

9   A.   Democratic and Independents and the working families.

10  Q.   But a deal was made to get you that line, you know

11  that?

12  A.   A deal was made in 2005.

13  Q.   In 2009 and in --

14  A.   You just said 2005.

15  Q.   Okay.

16        2009, a deal was put together?

17  A.   Yes.

18  Q.   You were the recipient of that political deal, you

19  knew all about it?

20  A.   Yes.

21  Q.   And the same thing in 2013, another deal was put

22  together?

23  A.   Yes.

24  Q.   Political deals?

25  A.   Yes.

692

1  Q.   So you weren't kind of just I have no idea what's

2  going on, you knew every single day?

3  A.   I spoke to the chairman and --

4  Q.   Every minute of everyday your antenna was up to make

5  sure you can get these lines so you could still be the

6  sheriff, and not like Al Tisch who lost because he didn't

7  have the political lines you had, correct?

8  A.   I just needed to make sure I had my line and another

9  major party line.

10  Q.   Yeah.

11  A.   Right.

12  Q.   Just going back to those phone calls, so 101 after

13  hours, 149 would be during the workday, those would be

14  business-related?

15  A.   For what year, 2009?

16  Q.   Yes.

17  A.   For the year?

18  Q.   Yes.

19  A.   Yes.

20  Q.   So there's 250 days in a calendar year, but law

21  enforcement has a sweeter deal, there's about 215 days in

22  a typical law enforcement calendar year?

23  A.   243.

24  Q.   243.

25  A.   Sheriff's office employees.

1    Q.    I'm thinking the PD.  Sheriffs don't have it as good.

2          243, you had 250 phone calls that year; is it

3    fair to say that everyday, and if you skip a day, you had

4    two the next day with Ed Walsh, yes?

5    A.    I'm sure a lot of those phone calls were missed calls

6    and there could be three and four in one day.

7    Q.    So if there's three and four in one day, you wouldn't

8    have one for a couple of days and then you would make it

9    up later?

10   A.    I don't have them in front of me, sir.

11   Q.    You only have to look back into your mind's eye, your

12   memory.

13   A.    It's a long time ago, sir.

14   Q.    Sheriff, similar in 2009, there was 1367 phone calls

15   between Ed Walsh and the office, all hours of the day and

16   night.

17          Were you aware at least that there was a large

18   volume of phone calls between the sheriff's office and Ed

19   and Ed and the sheriff's office all through the day and

20   night, are you at least aware of that?

21   A.    Yes.

22   Q.    Is that part of the reason, again looking back, you

23   got 1800 phone calls, you got 1400 phone calls, you got

24   1100 all through the night with you.  You have 200, 145,

25   100, is that one of the reasons you think that maybe

1  nobody ever complained that Ed wasn't doing his job

2  because he was doing his job?  Think about it.  Do you

3  think maybe?

4  A.   I don't know.

5  Q.   And we will look at -- we will do two quick years.

6         2008, there were 190 phone calls between you and

7  Ed Walsh.

8         Once again, do you know what percentage of those

9  were political and which were based on your work and his

10  work?

11  A.   No.

12  Q.   Well, was it 50/50, 60/40?  It's a non-election year,

13  so 60/40.  Think about it for a minute.

14  A.   I don't know.

15  Q.   No idea?

16  A.   2008, I don't think there was.

17  Q.   There was nothing going on in politics, right?

18  A.   No.

19  Q.   You didn't have to run until '09.

20  A.   No, but there was the highway patrol issue in 2008.

21  Q.   Okay.

22         So you were talking with him about the highway

23  patrol issue and how do we work this out?

24  A.   The issue the party was having.

25  Q.   Okay.

1        Just going back to 2008, 98 of those were four

2   p.m. to nine a.m., so those would be a mix of business and

3   politics as we discussed; i.e., some would be politics,

4   some would be boss, this is what's come up at the jail,

5   this is what we got to do, correct?

6   A.   I would say the overnight ones would have been

7   work-related, the other ones probably not.

8   Q.   When Ed called you with at any after hours, it could

9   be four p.m., five p.m., it doesn't have to be crazy hours

10  when it woke you up.  If it was waking you up, you

11  understood he was up because he got the phone call from

12  the jail?

13  A.   Yes.

14            MS. MIRABILE:  Objection.

15            THE COURT:  Overruled.

16  BY MR. WEXLER:

17  Q.   And Ed would tell you -- I shouldn't imagine there

18  was a whole lot of discussion when he called you after

19  hours.  Generally you knew it was going to be either work

20  or politics, correct?

21  A.   Correct.

22  Q.   You guys didn't call to talk about fishing stories?

23  A.   There's probably only a handful of phone calls that

24  he called me in the overnight in the whole time I've been

25  sheriff.

1    Q.    When you got the calls at 5:00, 5:00, that's why I

2    said not the crazy hours, he would tell you a

3    conversation.  Looks like a guy was stabbed in cell 16,

4    tier 3, something like that?

5    A.    Most likely he would say there was an attempted

6    suicide.

7    Q.    Attempted suicide.

8            What information would you relay back to him?

9    Would you just say okay, thank you, Ed, nighty-night, or

10   would you instruct him, okay, will you please, or do this,

11   call, make sure, is it a potential crime scene, is it an

12   attempted suicide, do we have medical, what would be your

13   response to him?

14   A.    He was just notifying me of the incident.

15   Q.    So he's just notified you of the incident and says I

16   want you to know.  Thanks, boss, and hang up?

17   A.    Yes.

18   Q.    And no other discussion?

19   A.    Because the duty lieutenant, part of his checklist

20   was to call out the Criminal Investigations Bureau, the

21   Internal Affairs and Internal Security, so they were

22   already notified and they knew to respond or already

23   responded.

24   Q.    Why didn't that duty lieutenant call you directly?

25   Why did you need Ed?  Why did he have to call, Ed, and Ed

1  make the determination whether or not the boss is called?

2  A.  Because the Internal Security Unit was called in for

3  all these major incidents, and they would get there and

4  then determine the situation.

5  Q.  I still don't understand why wouldn't the Internal

6  Security call you directly, why did you have to get it

7  from Ed?

8  A.  Sometimes that did happen.

9  Q.  Most of the time it was from Ed?

10  A.  And a handful of times they would call me in the

11  middle of the night, yes.

12  Q.  Okay.

13      Let's pretend a handful.

14  A.  It's not like I didn't get a phone call from a warden

15  or from sometimes a duty lieutenant about what happened as

16  well.

17  Q.  Why did you need Ed to call you?

18  A.  Because he was responding and his job as liaison is

19  to report what was going on to us.

20      MR. WEXLER:  Judge, what time does the Court

21  want to take it's 11:00 break?

22      THE COURT:  Yes, okay.

23      Members of the jury, we're going to take a 15

24  minute recess.

25      Please don't discuss the case either among

1    yourselves or with anyone else.

2              Keep an open mind.  Come to no conclusions.

3              Please recess yourselves.

4              (The jury is excused.)

5              (Recess taken.)

6              (After recess.)

7              THE CLERK:  Jury entering.

8              (The jury is present.)

9              THE COURT:  Please be seated.

10             You may proceed.

11             Where is the witness?

12             MR. TIERNEY:  They're getting him, your Honor.

13             (The witness resumes the stand.)

14   BY MR. WEXLER:

15   Q.   Sheriff DeMarco, I think we left off with calendar

16   year 2008.

17             I think we had done 2009, an election year, and

18   I think we went through 2008.

19             And, again, are you aware that there were 1291

20   telephone calls between the jail and Eddie that year?

21   A.   I was not aware, but it's plausible.

22   Q.   You're not sure?  You're not shocked?

23   A.   No.

24   Q.   Okay.

25             Do you know what the total number of phone calls

1  between the jail and Ed Walsh were from the time you

2  appointed him as liaison, until the time he was removed as

3  liaison, do you have an idea?

4  A.    I have no idea, sir.

5  Q.    11,163, that includes the approximate 1,000 to you.

6          So all these phone calls, did anybody ever

7  mention to you, or did you ever discuss as you sit here

8  today, that Ed was taking phone calls 24/7, did you ever

9  discuss that with anybody?

10 A.    No.

11 Q.    Did the FBI, when you interviewed with them, ever

12 say, this guy's working 5:00, 6:00, 7:00, 8:00, 9:00, did

13 they ever ask you that?

14 A.    I don't understand the question.

15 Q.    Did they ask you, was he taking phone calls all

16 afternoon and into the evening?

17 A.    I don't think they asked me that, no.

18 Q.    Well, did you ever volunteer it?

19 A.    No.

20 Q.    Did they ever ask you about the political phone calls

21 you were having 24/7 over the eight years that he was the

22 liaison, did they ever ask you about those?

23 A.    No.

24 Q.    Did you ever volunteer it?

25 A.    No.

1  Q.   Did they ask you or want to inquire why nobody ever

2  disciplined Eddie Walsh for the eight years, did they ask

3  you that?

4  A.   We did discuss that.

5  Q.   And what did you tell him?

6  A.   There were several instances where we did look to

7  discipline Ed Walsh, but we did not get the evidence.  Our

8  investigations were precluded.

9  Q.   Well, isn't there a presumption of innocence from the

10  sheriff's office?

11       If you couldn't prove it, isn't it fair it

12  wasn't done?  You couldn't prove it, you couldn't put it

13  in his file.

14  A.   That's why it's not in his file.  We could not

15  proceed with a disciplinary hearing on a couple of

16  instances.

17  Q.   But at no time did the government ever show you or

18  have a copy of his personnel file that you observed?

19  A.   No.

20  Q.   And did they ever ask you about whether or not you

21  discussed with all of your administrative staff why there

22  was no discipline of Ed Walsh, did they discuss that with

23  you, the FBI?

24  A.   I'm sorry, the question again, sir?

25  Q.   Okay.

1        Did they discuss with you, sheriff, did you

2   discuss with Undersheriff Meyerricks or Undersheriff

3   Caracappa why they took no action?

4   A.   Yes.

5        The way I answered the question before this one

6   was that we could not obtain the evidence we needed to

7   discipline.

8   Q.   Well, you could have removed him as your liaison as I

9   said probably the third or fourth question with the stroke

10  of a pen if you had even the slightest doubt, you could

11  have removed him?

12  A.   I could have, but I couldn't remove him from the

13  lieutenant investigator title.

14  Q.   You could get him the heck out of that office,

15  couldn't you?

16  A.   I could have.

17  Q.   You could have reassigned him to some other job?

18  A.   I could have in an investigator capacity.

19  Q.   You could have done a lot of things and who would you

20  need permission from?  You didn't need it from the union.

21  A.   No one, but within the same capacity he was in.  He

22  was still an investigator working in the sense of in an

23  investigative command.

24  Q.   You could move him out of the front office.

25  A.   He wasn't in the front office.

1  Q.  His office was in the front office.  I thought we

2  established it was 10 feet from your office.  I'll get you

3  the map.

4  A.  That depends on the year.  I don't know what year

5  we're talking about, Mr. Wexler.

6  Q.  I'm going to tell you where the front office is?

7  A.  I know where the front office is.

8      What year was it?

9  Q.  Was he in the front?  One second, please.  I thought

10  you drew it.  I'll have to hold it up.

11      I'm showing you Exhibit W in evidence.  Do you

12  remember yesterday you and I drew this?

13  A.  This was for 2006-2008.

14  Q.  Okay.  So 2006-2008, he's in the front office,

15  correct?

16  A.  Yes.

17  Q.  And then from 2008 to 2014, he's all the way over

18  here?

19  A.  He's in the hallway.

20  Q.  He's in the hall1ay.  What did we say that was, 15

21  feet?

22  A.  I don't believe that's what we said, no.

23  Q.  Well, let me see.  I went like this and walked all

24  the way over here and stood right about here, and said is

25  this the furthest it could be from anywhere in the front

1    office.

2    A.    I believe we were talking about his office in the

3    front office from my front door to his front door, not

4    outside.

5    Q.    Sheriff, sheriff, when he moved to the other office

6    as opposed to across the hall from you, was it further

7    than I am standing here?

8    A.    Yes.

9    Q.    All right.  If I stood by that big screen TV, is it

10   all that distance, a good 20 feet?

11   A.    Maybe a little more than that.

12   Q.    A good 23 feet? You're not good with distances?

13   A.    Do you have a tape measure?

14   Q.    Okay.

15         At the end of the day you didn't need anybody's

16   permission to move him anywhere you wanted, correct?

17   A.    Correct.

18   Q.    Let me ask you a question.

19         If you moved him and said you're now in the

20   tiers or you're doing investigations in cell block C,

21   would you have been able to call him 24/7 on business and

22   politics?

23   A.    Excuse me?

24   Q.    Sheriff --

25   A.    I didn't hear you.  You turned that way and I can't

1   hear you.

2   Q.   If you took some sort of disciplinary action, if you

3   had known, if anybody in the sheriff's office had ever

4   told you he wasn't doing his job, let's put all those

5   if's, would you still have disciplined him?  Could you

6   still call him and ask political questions?

7   A.   If he was disciplined?

8           MS. MIRABILE:  Objection.

9           THE COURT:  Sustained.

10  BY MR. WEXLER:

11  Q.   Okay.

12          We talked about some of the times that Ed Walsh

13  would call you and you discussed with him sheriff-related

14  business, correct?

15  A.   Yes.

16  Q.   Now, you are unaware apparently that Ed would go to

17  funerals and wakes on behalf of CO's family.  You're

18  unaware of that, correct?

19  A.   I never directed him to do that.

20  Q.   That's not what I asked. Don't fence with me, please.

21  A.   I'm unaware of that.

22          MS. MIRABILE:  Objection.

23          THE COURT:  Please don't give the witness any

24  instructions.  If you want me to, ask me.

25          MR. WEXLER:  Judge, will you please ask the

1   witness to answer the questions.

2              THE COURT:  Yes.  I instructed the witness

3   already.

4              Most of the questions are going to call for a

5   yes or no answer.  Please try to adhere to that.  If you

6   can't, say I can't answer yes or no, but don't give

7   explanations, which you are continuing to do.

8              THE WITNESS:  Okay, sir.

9              THE COURT:  Of course, Mr. Wexler has not moved

10  to strike your answers, which he could and should when you

11  don't answer responsibly.

12             From now on, listen to the question.  If it

13  calls for a yes or no answer, answer it that way.  If you

14  can't answer yes or no, say so.  But don't make an

15  explanation, which you continuously are doing and

16  Mr. Wexler has allowed you to do it.  He can move to

17  strike those answers, but hasn't done it.

18             THE WITNESS:  Okay, your Honor.

19  BY MR. WEXLER:

20  Q.   All right.  I'll try it again.

21             You are aware that Ed Walsh attended funerals

22  and wakes for Co's and their family members, yes?

23  A.   I can't answer that question completely --

24  Q.   Well, let me ask you.

25  A.   -- with a yes or no.

1  Q.  Okay.

2         You're either aware of something or not aware,

3  correct?

4         Let me give an example.  I am not unaware of

5  what your wife's first name is.  I can tell you that.

6         Are you aware that Ed Walsh attended funerals or

7  not?

8         MS. MIRABILE:  Objection.

9         THE COURT:  Good try.  Sustained.

10 BY MR. WEXLER:

11 Q.  So you have no idea whether he attended or not; just

12 yes or no?

13 A.  I can't answer that question completely with a yes or

14 no answer.

15 Q.  Well, Sergeant Schultz died, didn't he?

16 A.  Yes.

17 Q.  Didn't you drive to the wake with Eddie to go to that

18 funeral?

19 A.  I don't recall that, but Ed Walsh attended funerals

20 for -- if we had a line of duty death, the department

21 would attend those funerals.  Families, no.

22 Q.  So he did attend funerals in a line of duty death?

23 A.  A lot of the department did.

24 Q.  Did they have the funerals in your office?

25 A.  No.

1  Q.   So he left the jail?

2  A.   Yes.

3  Q.   Okay.

4       So there's more than those two occasions,

5  February and March of 2011 that you gave us yesterday,

6  correct?

7  A.   I did not direct him to go to those funerals though.

8  Q.   You didn't direct him, but you knew he was going to

9  them, correct?

10 A.   I saw him there, yes.

11 Q.   If you saw him there, then you knew he was going,

12 correct?

13 A.   I knew he was there.

14 Q.   I don't know.  Maybe I'm not -- you knew he was there

15 and he had to get there, he just wasn't born there, he

16 went?

17 A.   Yes, and that's what I said.

18 Q.   So when you saw him there, you knew he was not at the

19 jail because we established they don't hold funerals and

20 the wake at the jail, you knew he was at the funeral, you

21 saw him, you eyeballed him?

22 A.   Yes.

23 Q.   Did you ever say, Ed, you get back to your office

24 right now?

25 A.   No.

1  Q.   So, well, why not?  If he wasn't supposed to leave

2  his office, why not?  Hey, Ed, you better get back right

3  now.

4  A.   Because the department personnel were supposed to go

5  to a line of duty death.

6  Q.   So he was doing what he was supposed to be doing?

7  A.   Yes.

8  Q.   You had an idea that he was going to funerals for in

9  the line of duty, but you had no idea for relatives,

10  parents of CO's that passed away, that you had no idea,

11  correct?

12  A.   No idea.

13  Q.   Nobody ever told you, not Sheriff Meyerricks or

14  anybody else, that they saw Ed representing you at one of

15  the wakes and funerals, correct?

16  A.   Nobody told me that.

17  Q.   Again, we discussed that the sheriff is an elected

18  position and that's just good management.  These are your

19  people, these are their loved ones.  This is the most

20  trying times of their life.  You would want to have a

21  representative there on your behalf, correct?

22  A.   And I did, yes.

23  Q.   You didn't want to go to 500 funerals and wakes a

24  year, did you?

25  A.   Just wasn't possible.

1  Q.   Okay.

2         So you wanted to have somebody there and you're

3  saying you never knew that Ed Walsh went to those wakes

4  and funerals, that's your testimony?

5  A.   I did not.

6  Q.   When did you first learn, not by Billy Wexler asking

7  you in Judge Spatt's courtroom, when did you first learn?

8  A.   During this process here.

9  Q.   You mean today?

10  A.   During the investigation.

11  Q.   What part of the investigation?

12  A.   When I had heard that Ed Walsh was attending funerals

13  that he wasn't authorized to do on county time.

14  Q.   When did that happen?

15  A.   I don't know the exact date, Mr. Wexler.

16  Q.   You said during this investigation?

17  A.   Yes.

18  Q.   Did the FBI tell you that?

19  A.   No.

20  Q.   Did Sheriff Meyerricks tell you that?

21  A.   No.

22  Q.   Did Undersheriff Caracappa?

23  A.   Correction officers told me.

24  Q.   Oh, correction officers told you that he was

25  attending and that's the first time you learned about it?

1    A.    Yes.

2            I heard that's part of his defense.

3    Q.    Oh, it's part of his defense.

4            Why were you asking correction officers about

5    Eddie's potential defense?

6    A.    I was not asking.

7    Q.    They were volunteering?

8    A.    Yes.

9    Q.    So a corrections officer was coming up or officers

10   were coming up to you and saying, sheriff, not for

11   nothing, but this is what Ed's defense is going to be?

12   A.    Yes.

13   Q.    Did you write that down?

14   A.    I did not.

15   Q.    Did you tell the FBI?

16   A.    Yes.

17   Q.    Okay.

18           And what about going to hospitals?  You have

19   injured COs and sheriffs that are injured, yes?

20   A.    Yes.

21   Q.    And, once again, you didn't want to go to the

22   hospitals every time somebody was injured, correct?

23   A.    Correct.

24   Q.    And it would be good business, good politics in the

25   lower case P politics, and it doesn't have to be for

1 Republican or Democratic politics, good office management

2 to show that you care, correct?

3 A.    Correct.

4 Q.    And you would have wanted to have that person who was

5 injured, a CO, know that even if you didn't really care,

6 that at least it seemed that you cared, correct?

7 A.    Yes.

8 Q.    And you didn't want to be schlepping to hospitals

9 throughout Suffolk County?

10 A.    I did.

11 Q.    Okay.

12        Are you aware, again as you sit here today, that

13 Ed went to hospitals and says I'm here on behalf of the

14 sheriff, is there anything we can do for you, spoke to the

15 wives of the injured or the husbands of injured COs, were

16 you aware of that?

17 A.    No.

18 Q.    Are you learning now for the first time?

19 A.    Yes.

20 Q.    So as of 11:40 on today's date, it's the first time

21 you heard that he would go to hospitals on behalf of

22 injured COs, yes?

23 A.    Yes.

24 Q.    Let me show you what has been marked as I for

25 identification, I as in Indiana.

1    MS. MIRABILE: Can I see it first?

2    THE COURT: Pardon?

3    MS. MIRABILE: Can I see it first?

4    THE COURT: Surely.

5    (Pause in proceedings.)

6  BY MR. WEXLER:

7  Q.   Sheriff, I'm showing you what has been marked I for

8  identification and I'm going to ask you to take a look at

9  these documents and first tell us if you know what they

10 are.

11    (Pause in proceedings.)

12 A.   These are death notices that are put up in the

13 sheriff's office for family members of officers.

14 Q.   Yes.

15    And every one of them I think is initialed by

16 you?

17 A.   Yes.

18 Q.   Okay.

19    Those are kept in the regular course of business

20 of the Suffolk County Sheriff's office?

21 A.   Yes.

22    MR. WEXLER: Judge, I would offer Exhibit I into

23 evidence.

24    THE COURT: Any objection?

25    MS. MIRABILE: No objection.

713

1    THE COURT:  Defendant's Exhibit I, for item, in

2  evidence.

3            (Defense Exhibit I in evidence.)

4            (Continued on next page.)

5

6  BY MR. WEXLER:

7  Q.   And let me show you, I, for Indiana in evidence.

8            If I may read the first one, I think they all

9  read about the same.

10            To all personnel from Sheriff Vincent F.

11  DeMarco.  This one is dated January 16, 2008.

12            I am sorry to advise you of the passing of

13  retired correction officer, in this case it is Susan

14  Gerherki.  The arrangements are as follows.

15            It gives the week, the date, the time, the

16  funeral home.

17            So this is something that your office, I believe

18  there is about 170 here, Sheriff.  This is something that

19  your office posted because it is goodwill.  It is

20  bonhomie, as they say for you and your people that you

21  care, yes?

22  A.   Yes.

23  Q.   And now, you as Sheriff, had two unions to deal with,

24  correct?

25  A.   That's correct.

714

1  Q.   And that was the SCCOA, the Suffolk County Correction

2  Officers Association?

3  A.   Suffolk County Correction Officers Association.

4  Q.   And the other one was the Suffolk County Deputy

5  Sheriffs Association?

6  A.   Yes.

7  Q.   And you were the president of one of them at one

8  time?

9  A.   I was.

10  Q.   In fact John Meyerricks was the vice-president with

11  you?

12  A.   He was.

13  Q.   Okay.  And are you aware that Ed would go to the

14  union and speak with either Anthony Prudenti or Arthur

15  Sanchez about union related business.  Are you aware of

16  that?

17  A.   No.

18  Q.   So have you ever -- who is Anthony Prudenti?

19  A.   He was a past president of the Deputy Sheriffs

20  Association.

21  Q.   And who was Arthur Sanchez?

22  A.   He was a board member of the Deputy Sheriffs

23  Association.

24  Q.   And had you ever spoken to either of those gentlemen?

25  A.   Yes.

1  Q.   And had they ever mentioned to you that Ed came by to

2  speak to us about this issue or that issue?

3  A.   No.

4  Q.   Did they ever call you?

5  A.   About an issue or just call me?

6  Q.   About an issue.

7  A.   They called me about issues.

8  Q.   Did they ever mention Ed's name on the phone?

9  A.   No.

10 Q.   Okay.

11      I digress slightly.  We're talking about

12 political phone calls and we established the percentage or

13 at least the average number of phone calls that were

14 politically related that you made with Ed Walsh.

15      Who else did you have political phone calls with

16 during the day or meetings?

17 A.   Political phone calls.

18      I would talk to Rich Schaffer.

19 Q.   All right.  Richie Schaffer.  Who else?

20 A.   Other elected officials.

21 Q.   I don't know who they are.  I'm asking you.

22 A.   I don't know.

23 Q.   Suffolk County legislators?

24 A.   Sure.

25 Q.   And they are 18 of them?

1    A.    County executives.

2    Q.    The legislators, county executives.  These were all

3    political phone calls.  Did you ever have phone calls with

4    the Republican chairman?

5    A.    I've spoken to them, sure.

6    Q.    And the Independents chairman?

7    A.    Yes.

8    Q.    And the Working Party chairman?

9    A.    No.

10   Q.    Working Family.

11   A.    No, I have not.

12   Q.    So just the Democrat, the Conservative, the

13   Independents.  I'm leaving out one -- and of course the

14   Conservatives?

15   A.    Yes.

16   Q.    In addition to those, and this is during the day, and

17   you also had meetings with them.  You met with Richie

18   Schaffer on any number of occasions?

19   A.    Yes.

20   Q.    What about the Independent Party Chairman, Frank

21   MacKay?

22   A.    Met him for breakfast a couple times.

23   Q.    That's what you do as Sheriff.  Frank has nothing to

24   do with correctional law, Frank MacKay?

25   A.    Correct.

1  Q.   You wouldn't ask him, I have a correctional question,

2  I should go to you.  That's all pure politics?

3  A.   That's also governmental too.

4  Q.   Is this one of the occasions where politics would

5  blend in government and government would blend into

6  politics?

7  A.   If I was having a problem with legislation or a

8  particular legislator, sometime you could go to a

9  particular chairman and ask to speak to the legislator to

10 smooth over a misunderstanding.

11 Q.   You would go to political bosses or party chairmen to

12 have them speak to legislators to get legislation that you

13 felt that was appropriate for the sheriff's office,

14 correct?

15 A.   If there was a misunderstanding, if I was having an

16 argument with a legislator or there was bad blood between

17 them, he would try to manage that.  Richie Schaffer was

18 good at that.

19 Q.   Richie was good of that, he's not your chairman, he's

20 the Democrat?

21 A.   He gave me my start, and he's a very close mentor to

22 me.

23 Q.   Well put Richie Schaffer in there.

24       Frank MacKay, you'd reach out to him to work out

25 political issues for you with legislators and county, yes?

1  A.    Frank was good because he wasn't very partisan.

2  Q.    And did you ever reach out to the Republican Chairman

3  John LaValle?

4  A.    No.

5  Q.    So we know you reached out to the Independents and

6  you reached out to the Democrats.  Did you ever reach out

7  to your own party chairman (indicating)?

8  A.    No, not for issues like that because the county is

9  really run by Democrats and if I was having issues with

10  democratic personnel, I would go to the Democratic

11  Chairman or Frank MacKay who was sort of more in the

12  middle.

13  Q.    So you would go to MacKay, you would go to Richie

14  Schaffer but you wouldn't go to Eddie to see if he could

15  help smooth out those things for you?

16  A.    No.

17  Q.    So that sort of politics you wouldn't go to Eddie

18  for.  Other politics you would go to your chairman for?

19  A.    We would discuss politics.

20  Q.    You attended graduations, graduations and swearing in

21  of COs and deputy sheriffs, correct, yes?

22  A.    Graduations I did.  Swearing in sometimes.

23  Q.    And these graduations would be a milestone event in a

24  young man or woman's life there, starting off their

25  careers as a correction officer or deputy sheriff.  That

1  was something important you would go to, correct?

2  A.   Yes.

3  Q.   You were their boss.  In fact there would be

4  approximately two a year, two in 2011, '12, '13.  You

5  remember going to those?

6  A.   Yes.

7  Q.   Where were they held?

8  A.   St. Joseph's College or -- I'm trying to remember, or

9  Suffolk Community College.

10  Q.   Correct.  And Ed Walsh would attend those?

11  A.   Not to my knowledge.

12  Q.   You never remember sitting on the dais with Eddie

13  Walsh?

14  A.   No.

15  Q.   Well, you never walking around mingling with the

16  families at swearing in, at graduations with Eddie Walsh?

17  A.   No, I don't.

18  Q.   You never remember driving there with him?

19  A.   Never.

20  Q.   Hostage negotiations?

21  A.   Yes.

22  Q.   Is that something that you would be involved in?

23  A.   Yes, I helped formulate the hostage negotiation team.

24  Q.   And anything that Eddie would be involved in?

25  A.   Yes, when we started the team, I asked Ed Walsh to be

1    the commanding officer of the hostage negotiation team.  I

2    believe that was in 2010.

3    Q.    '11?

4    A.    I believe it was '10, sir.

5    Q.    Okay.

6    A.    And we had -- there were four or five person teams we

7    were trying to formulate and I found hostage negotiation

8    training.  We had no experience in this except for one

9    officer.

10          MR. WEXLER:  I didn't ask you the question but

11   I'll let you go on.

12          THE WITNESS:  I'll stop if you want.

13   Q.    That's okay.

14   A.    Okay.

15   Q.    Hostage negotiation is something that you felt could

16   be critical with respect to inmates in the jail, correct?

17   A.    If an officer thought it could be critical and ask me

18   if I would start the hostage negotiation team.

19   Q.    Well, but you thought it was a stupid idea?

20   A.    I thought it was a good idea worth exploring.

21   Q.    You put Ed in charge of the hostage negotiation team

22   were they to require hostage negotiation, right?

23   A.    He was going to be the commanding officer of it.

24   Q.    And he's going to be the commanding officer because

25   --

1    A.    -- He's the Lieutenant investigator.

2    Q.    And you trusted him?

3    A.    Trusted him, yes.

4    Q.    And maybe he was a good talker.  He could talk a

5    hostage situation down, yes?

6    A.    Yes.

7    Q.    Okay.  In fact this is 2010, and in 2011, you took a

8    road trip to Nevada?

9    A.    That was December of 2010.

10   Q.    Okay.  I'm off by a month.  And you went to Las Vegas

11   for a four-day conference on hostage negotiation?

12   A.    It wasn't a conference.  It was a training course on

13   hostage negotiations.

14   Q.    Okay.  And let's see.  You went all by yourself?

15   A.    I went with the people that were picked to be on the

16   hostage negotiation team and I wanted to be there because

17   I was not familiar with hostage negotiations, except what

18   I learned in the academy.

19          If we were going to start the team from scratch,

20   I wanted to have an idea how it works.

21   Q.    Was Eddie there?

22   A.    Eddie Walsh was there.

23   Q.    He flew on the same plane with you?

24   A.    No.

25   Q.    You say different planes?

1   A.   Went by myself.

2   Q.   Well, same hotels?

3   A.   Yes.

4   Q.   You would eat dinners together?

5   A.   Yes.

6   Q.   And you were aware that he was there with you.  This

7   wasn't something that you didn't know until somebody told

8   you?

9   A.   The whole team was there.

10  Q.   Three or four other people, the whole team?

11  A.   Three or four other people.

12  Q.   If you thought he was a slacker or a louse, you

13  wouldn't have taken him and spent the money and train him.

14  Who would want to be with a creep for four days, correct?

15  A.   Correct.

16  Q.   Did he go to all the lectures and conferences with

17  you at the hostage negotiation team?

18  A.   It was mandatory.

19  Q.   Gang seminars, yes?  Gang seminars is something that

20  was put on by the sheriff's office?

21  A.   Yes, training seminars.

22  Q.   And Eddie was in charge of the gang unit?

23  A.   He wasn't in charge.  He was the liaison to it but he

24  played a role in it.

25  Q.   Once again we use this word "liaison to it."

1    What was his job as liaison to the gang's

2  intelligence unit?

3  A.    It was to inform the warden or the undersheriff of

4  any major events having with gang members in the facility.

5  Q.    And is that an important command in your mind?

6         Is that more important than the guy who makes

7  sure or the gal who makes sure that the cars are cleaned

8  in the morning?

9  A.    One of the two most important commands, yes.

10  Q.    And he had one of two for the entire eight years?

11  A.    Part of those, yes.

12  Q.    And was he ever deficient in his gang intelligence

13  unit work?

14  A.    No.

15  Q.    What about the internal security work?

16  A.    No.

17  Q.    And during the eight-year period, you would have

18  removed him awfully quickly if he was deficient or if you

19  were getting reports he's not here.  He's not doing his

20  job.  He's leaving early, coming in late.  You would have

21  removed him, yes?

22  A.    Yes.

23  Q.    A few other areas that we had touched on briefly.

24  You had mentioned hangings in the jail.  They occur, don't

25  they?

1   A.   Unfortunately, they do.

2   Q.   When a hanging occurs, is that like one on the list

3   of bad things that can happen.  That is one of the worst

4   of things that can happen out there?

5   A.   Yes.

6   Q.   When one of those hangings unfortunately occur,

7   generally that would be a phone call that you would get

8   from either Eddie or maybe multiply from him and from

9   maybe the deputy warden, correct?

10  A.   Yes.

11  Q.   He would be in that loop of probably the most

12  important events that happen in the jail, correct?

13  A.   He and others.

14  Q.   Okay.

15        And you could have had just others and x'd him

16  from that phone call at any time?

17  A.   No.

18  Q.   You could have said Eddie, no, no, you don't call me,

19  let the others do it?

20  A.   The job was to call.

21  Q.   But if he didn't want him to -- let me strike that.

22        Did you ever get a complaint that he didn't call

23  you when something important came up and left you hanging?

24  Did you ever get a complaint and maybe put it in his

25  personnel file?

1    A.    No.

2    Q.    Did you ever get a complaint and not put it in his

3    personnel file that he wasn't doing his job?

4    A.    Rather than call him?

5    Q.    Yes.

6    A.    No.

7    Q.    Did you ever hear from anybody in the entire

8    corrections department that Eddie was not doing his job or

9    he was doing it unprofessionally and was documented?

10   A.    I did get complaints, yes.

11   Q.    That he wasn't doing his job?

12         Yes or no?

13   A.    No.

14   Q.    No?

15   A.    No.

16   Q.    That's what I'm talking about, Sheriff.

17   A.    Okay.

18   Q.    And you never got complaints that he didn't do his

19   job professionally, correct?

20   A.    That's correct.

21   Q.    That would have been in that file?

22   A.    Yes.

23   Q.    And you didn't get complaints that he didn't do his

24   job thoroughly, correct?  That would be in that file.

25   A.    That's correct.

1  Q.   And you didn't get complaints as we discussed before,

2  he was leaving early, correct?

3  A.   Correct.

4  Q.   And you didn't get complaints that he was coming in

5  late, correct?

6  A.   That's correct.

7  Q.   You didn't get complaints that he was abusive to

8  people in the office, correct?

9  A.   That's correct.

10 Q.   Or that he came in and he was drunk or looked like he

11 was on drugs?

12 A.   That's correct.

13 Q.   You didn't get any complaints that he had stolen

14 anything in the office or acted inappropriately.  You

15 never got any of those complaints?

16 A.   No.

17 Q.   It would be in that file.

18 A.   Yes.

19 Q.   Okay.  We talked about hangings and attempted

20 suicides.  Once again those are some things that reach

21 critical mass in the jail, correct?

22 A.   Yes.

23 Q.   That is something that Eddie and as you say others

24 would call you to let you know?

25 A.   Yes.

1  Q.    Stabbings, is that always kind of at the high end of

2  priorities?

3  A.    I don't remember any stabbings.  We didn't have many

4  stabbings because that would be an instance where I would

5  expect a phone call.

6  Q.    You would expect one from Ed Walsh?

7  A.    Yes.

8  Q.    What about gang violence?

9  A.    Yes, we did not have much of that.

10  Q.    Is that because of the liaison and the person in

11  charge of the gang intelligence unit was doing his job to

12  prevent and nip it in the bud before it occurs?

13        Isn't that why you have an intelligence unit?

14  A.    I think it was more of a classification system that

15  kept gang members separated, but the gathering of

16  intelligence was helpful.

17  Q.    You don't want to give any credit for that?

18  A.    I gave a lot.

19  Q.    Let's talk about intelligence and the gang unit,

20  giving him credit.

21  A.    Giving him credit for relating the intelligence.

22  Q.    Giving him credit for the internal security?

23  A.    For relaying the incidents in internal security, yes.

24  Q.    Now, you testified under direct that there were some

25  300 county cars assigned to the sheriff's office?

1  A.   Approximately.

2  Q.   Give or take.

3  A.   Yes.

4  Q.   And the people who had county cars -- I'm just a CO,

5  CO Wexler.  I just started out, was sworn last week and

6  I'm on tier 6.

7       I'm not getting a county car, right?

8  A.   No.  Usually just investigators.

9  Q.   And they need it to be outside the jail?

10  A.   To respond to the jail.

11  Q.   No, outside the jail.

12       MR. WEXLER:  I'll put it in a yes or no.  I'll

13  still give you a chance to explain.

14  Q.   But, yes or no, a county car to leave outside the

15  jail?

16       You don't need it inside?

17  A.   To the home and back, yes.

18  Q.   And so they, THE investigator gets a car to go back

19  and forth from home but it wasn't just for that purpose.

20       Don't they have investigations they have to do

21  that take them outside the jail?

22  A.   Not internal security and gangs.

23  Q.   So Eddie was only supposed to use his car to go from

24  East Islip to Yaphank to Riverhead and back?

25  A.   Yes, or if you were going to training, you can use

1  your county vehicle for that.

2  Q.    So as I understand the way the sheriff's office

3  works, at the end of each month you would call, I forget

4  her name, your secretary?  Somebody.

5  A.    Karen.

6  Q.    Karen.  And relay the odometer readings?

7  A.    Yes.

8  Q.    What was the purpose of relaying the odometer

9  readings?

10  A.    They were sent to the transportation section and they

11  were sent to the Department of Public Works.

12  Q.    Okay.  And that was so that an eye could be kept on

13  the mileage being used on these county cars, correct?

14  A.    It was to determine --

15  Q.    No.  Just yes or no.  If you can't answer it say I

16  can't answer it.

17  A.    Ask the question again.

18  Q.    Yes, sir.

19         So that was so somebody could keep track of the

20  mileage being used on county cars?  Yes or no?

21  A.    I don't know because stuff was used for the

22  Department of Public Works.

23  Q.    Be that as it may --

24  A.    Yes.

25  Q.    -- Did anybody ever tell you, Karen or anyone else,

1  Ed Walsh was going to East Islip to Riverhead all these

2  days and has all these miles on his car?  It's like he's

3  traveling on your behalf, being a liaison?

4  A.    No.

5  Q.    Did you ever notice and did Karen ever look at you

6  and look askance and look at the odometer reading, and say

7  this isn't just Riverhead, I drive to Riverhead every day

8  almost.  It's 35 miles away.

9  A.    It wasn't her job to review mileage.  She just took

10  the mileage and sent it out to DPW.

11  Q.    This is over eight years.  You would think East Islip

12  is close to Islip, 70 miles a day.  It should have a very

13  regular reading every week, every month.

14          Eight years and nobody noticed it at your

15  office?

16  A.    My office does not review those.

17  Q.    That wasn't my question.

18          Nobody noticed it?

19  A.    No.

20  Q.    So if somebody put 35,000 miles instead of 5,000,

21  they wouldn't notice it?

22  A.    I don't know.

23  Q.    50,000?

24  A.    Probably not.

25  Q.    What about the gas mileage?  Don't they have to

1  report the gas mileage.  Don't they use a county card for

2  my?

3  A.    No, there are no cards.

4  Q.    Okay.  Well, how do they get reimbursed for gas?

5  A.    They go to the County, Department of Public Works

6  facility.

7  Q.    Okay.  Now with respect to uniforms.  I think even

8  you have a uniform?

9  A.    I do.

10 Q.    You are aware that since Eddie made Lieutenant in

11 2008, he was never issued a sheriff's uniform by the

12 quartermaster.  Are you aware of that?

13 A.    He's an investigator.

14 Q.    That wasn't my question.  Why won't you answer my

15 question?

16 A.    Say it again.

17 Q.    Were you aware that he was never issued a uniform?

18 A.    I'm not.

19 Q.    You knew you how he dressed every day.  Tell the jury

20 how did he come into work?

21 A.    Dressed like every other investigator in plain

22 clothes.

23 Q.    Now, as an elected official, you get campaign

24 contributions, yes?

25 A.    I do.

1    Q.   And we heard testimony about a Gary Melius, an

2    interlocker, yes?

3    A.   Yes.

4    Q.   And you know who Gary Melius is?

5    A.   I do.

6    Q.   He owns or owned a company called Interceptor,

7    correct?

8    A.   Yeah --

9    Q.   He had something to do with it?

10   A.   -- Yes.

11   Q.   And Gary Melius contributed since 2008, $10,600 to

12   your campaign.  Seems like a lot of money to you?

13   A.   What were the years?

14   Q.   2008.

15   A.   Until.

16   Q.   Until 2014, $10,600.

17   A.   Over the course of time, no.

18   Q.   Doesn't seem like a lot?

19   A.   No.

20   Q.   And I mean as the elected Sheriff of Suffolk County,

21   there is nothing you could do for him unless he was an

22   inmate, correct?

23   A.   Yes, nothing.

24   Q.   And you understood that Gary Melius owned a company

25   or was in some sort of legal battle with a John Ruocco

1    over the ownership of Interceptor, aren't you?

2              MS. MIRABILE:  Objection.

3              THE COURT:  Sustained.

4              MR. WEXLER:  Are you aware of that?

5              MS. MIRABILE:  Objection.

6              THE COURT:  Sustained.

7    Q.   Are you aware that Mr. Ruocco testified here in

8    court?

9    A.   No.

10   Q.   Okay.  Do you know who Mr. Ruocco is by name?

11   A.   I do.

12   Q.   And do you know who Gary Melius is by name?

13   A.   Yes.

14   Q.   And you testified that it was only as a result of a

15   FOIL, that you learned that Eddie stopped off at a

16   shareholder meeting in Shirley?

17   A.   No, as a result of a newspaper article.

18   Q.   That's the first time you learned -- did you ever

19   speak to Gary Melius?

20   A.   Not in a long time.

21   Q.   So I mean again, the man gave you $10,600 in

22   contributions.  When was the last time you spoke to him?

23   A.   After he got shot in the hospital.

24   Q.   And he survived, correct?

25   A.   He did.

734

1   Q.   And again what could you do for him as the Sheriff of

2   Suffolk County?

3   A.   Nothing.

4   Q.   Did you ever ask him, Mr. Melius, why do you write me

5   thousand dollar checks every year?

6   A.   No.

7   Q.   Along that line, Sheriff, are you aware how much

8   Undersheriff Meyerricks contributed to you every year?

9   A.   I am not.

10  Q.   If I told you that he would contribute every year

11  350, 450, $500, are you surprised by that?

12  A.   No.

13  Q.   Okay.  And he has an appointed position, correct?

14  A.   He does.

15  Q.   And you appointed him to that position?

16  A.   Yes.

17  Q.   Did you ever ask him why do you contribute all this

18  money to me every year?

19  A.   No.

20  Q.   What about Undersheriff Caracappa.  Over $5,000 to

21  you over the last ten years.  Did you ever ask

22  Undersheriff Caracappa, why do you contribute to me?

23  A.   No.

24  Q.   He has an appointed position?

25  A.   Yes.

1  Q.   And you could remove him with the stroke of a pen?

2  A.   I could.

3  Q.   Your Chief of Staff Michael Sharkey.  He also

4  contributes to you every single year.  You -- by the way

5  what is Friends of Vincent DeMarco?

6  A.   It's a campaign committee.

7  Q.   That is a committee that accepts contributions?

8  A.   Yes.

9  Q.   On your behalf?

10  A.   On behalf of my campaign, yes.

11  Q.   And your campaign is --

12  A.   For the Office of Sheriff.

13  Q.   And the Office of Sheriff is?

14       Who is the Sheriff?

15  A.   I am.

16  Q.   So you are the beneficiary of this money?  It's not

17  some office in Reno, Nevada?

18  A.   Yes.

19  Q.   Okay.

20       So Michael Sharkey, the Chief of Staff is

21  appointed?

22       Yes?

23  A.   No.

24  Q.   Okay.

25       You couldn't remove him as Chief of Staff?

1  A.  No.

2  Q.  You can't reassign him?

3  A.  No.

4  Q.  Really?

5  A.  Civil Service.

6  Q.  Okay.  Well, did you ever ask him why do you donate

7  this money to me?

8  A.  No.

9  Q.  And what about -- how about Brian Baisley.  He's a

10 lieutenant now.  Used to be a sergeant.  He's an appointed

11 position, correct?

12 A.  Yes.  He's appointed as an investigator.  But he's

13 Civil Service.

14 Q.  But you could remove that appointment.

15 A.  I can't.  After 18 months I can't.

16 Q.  He doesn't have to be in the front office or doing

17 investigations.  He can be anywhere else in the jail?

18 A.  No, he would have to be an investigative commander.

19 Q.  Do you know how much he has contributed to you and

20 how much overtime he gets?

21 A.  I imagine he gets a lot of overtime working in

22 Internal Affairs and I don't know how much he contributed.

23 Q.  When you say a lot of overtime, 60 or $70,000 a year

24 in overtime?

25 A.  It could be.

1    Q.    What do you mean it could be?  You don't know?

2    A.    I don't know.

3    Q.    But you are the Sheriff.

4    A.    What year are you talking about?

5    Q.    All right.  2014.  2013.  What is your understanding

6    of the overtime he receives as a result of your

7    appointment?

8    A.    He had a pretty significant investigation going on

9    during that time, so it was pretty high.  I don't know the

10   numbers.

11   Q.    Did you ever ask Lieutenant Baisley why he

12   contributes to your campaign?

13   A.    I never asked him.

14   Q.    How about Arthur LaFranca.  He has an appointed

15   position, yes?

16   A.    Designated as an investigator.

17   Q.    That's appointed by you?

18   A.    Yes.

19   Q.    And so he also contributes over the years thousands

20   of dollars and gets incredible overtime.

21          Do you know how much?  Does he give more than

22   Baisley?  The same?

23   A.    I have no idea.

24   Q.    No idea?

25   A.    No.

1   Q.   About $70,000?

2   A.   I don't know, sir.

3   Q.   Did you ever ask him why he contributes?

4   A.   No.

5   Q.   All right.

6            Here's another name.  He's a CO.  Alice Bryant.

7   He's a barber.

8            MS. MIRABILE:  Objection.

9            THE COURT:  Overruled.

10  Q.   Alex Bryant is the barber in the jail?

11  A.   Not his only job.

12  Q.   What else does he do?

13  A.   Rehabilitation programs, he works in.

14  Q.   And he contributed also over the years thousands of

15  dollars to you.  Are you aware of that?

16  A.   I know he has contributed to me.

17  Q.   And did he ever cut your hair?

18  A.   Yes.

19  Q.   In fact didn't he go to your house and cut your hair?

20  A.   One time.

21  Q.   And you live in Huntington?

22  A.   I do.

23  Q.   And he was paid in 2010, $66,000 in overtime.  Are

24  you aware of that?

25  A.   Yes.

1  Q.   And in 2011, about the same, 65,000 in overtime?

2  A.   He does multiple jobs.

3  Q.   And in 2012 and '13, did even a little better, about

4  68,000 in overtime?

5  A.   Okay.

6  Q.   Why would you have him come to your house in

7  Huntington to cut your hair?

8  A.   Because the evening before that I was contacted by

9  MSNBC, the Dr. Nancy Show, to do a presentation on

10  national TV about drug testing kits and parents testing

11  their kids for all sort of drugs but mainly heroin, and I

12  was to appear with a parent who lost their child to

13  heroin, and at the time I had a flat top and I also needed

14  to bring in a drug testing kit and I didn't have one at my

15  house.

16         I made arrangement for Alex Bryant to bring me a

17  drug test kit to my house the morning of, and I also asked

18  him to bring his buzzer for the top of my hair.

19  Q.   Where does he live?

20  A.   I don't know.

21  Q.   Why don't you just go to the barber like the rest of

22  us?

23  A.   Because I needed him to bring a drug test kit as

24  well.

25  Q.   It would be very different for him to say no.

740

1        He lives out east, yes?

2   A.   Yes.

3   Q.   The gang seminars, not the one held in Las Vegas,

4   there were gang seminars held in the Sheridan hotel every

5   year in Hauppauge; is that correct?

6   A.   That's our annual gang seminar.

7   Q.   You would attend and in fact be one of the keynote

8   speakers?

9   A.   Yes.

10  Q.   And they were held in September of 2010, October of

11  2011, September of 2012, again October, in both '13 and

12  '14.  So over those five years, you would attend and Eddie

13  would attend, correct?

14  A.   Yes.

15  Q.   You saw him there?

16  A.   It was a training seminar.  I expected him to be

17  there.

18  Q.   And did you talk to him when he was there?

19  A.   I'm sure I did.

20  Q.   Now, there was a report prepared by the county

21  comptroller in 2013, Joseph Sawicki was then the county

22  comptroller that you knew was coming out, correct?

23  A.   Which report are you talking about?

24  Q.   I'll show you.  I'm going to show you a document

25  (handing to counsel.)

1    MS. MIRABILE:  Your Honor, could we have a

2    sidebar?

3             THE COURT:  Very well.

4             (Whereupon, at this time the following took

5    place at the sidebar.)

6             (The following takes place in the absence of the

7    jury.)

8             MS. MIRABILE:  I'm objecting to the relevancy of

9    this line of questioning with respect to this document.

10   It has nothing do with the charges against the defendant.

11   It's an attempt to smear the Suffolk County Sheriffs

12   Office and other individuals at the Suffolk County

13   Sheriffs Office.

14            THE COURT:  May I see this?

15            MS. MIRABILE:  It has nothing to do with the

16   charges in this case.

17            MR. TIERNEY:  About a military buy back for

18   service men, and I believe it criticizes the Suffolk

19   County Police Department.

20            THE COURT:  What does this have to do with this

21   case?

22            MR. WEXLER:  Judge, it's not relevant, not so

23   much in the report.  It's relevant that the Sheriff

24   directed Eddie as his liaison to go speak to the

25   comptroller and find out what is in the report because

1    they were all concerned it would be ugly.  And once again

2    he tasked Eddie to leave the building during working hours

3    to speak with an elected official.

4            THE COURT:  I'm sorry?

5            MR. WEXLER:  That he tasked Eddie to leave the

6    building to speak to an elected official about his liaison

7    work.  I don't care about the substance.

8            THE COURT:  I don't think it is relevant.

9            MR. WEXLER:  That he left the building.

10           THE COURT:  Who?

11           MR. WEXLER:  Ed Walsh.  That was his job.  He's

12   saying he was not supposed to leave the building.

13           THE COURT:  You can bring that out.

14           MR. WEXLER:  It has to be in reference to

15   something.  I'm not trying to get into the substance.

16           THE COURT:  You can get --

17           MR. LATO:  Your Honor, I have a suggestion.

18           MR. WEXLER:  I don't want your suggestion.

19           MR. LATO:  If it needs to refresh the witness'

20   recollection, but we'll not offer it.

21           MR. WEXLER:  I'll not discuss the substance of

22   it.

23           THE COURT:  Okay.

24           (End of sidebar conference.)

25           (Continued.)

743

1          (In open court.)

2          MR. WEXLER:  I'm showing the witness, Sheriff

3   DeMarco, what has been marked as Exhibit J for

4   identification, and I'm going to ask you to take a look at

5   that.

6   A.    I'm very familiar with it.

7   Q.    You are very familiar with it?

8   A.    Yes.

9   Q.    That was a report from the comptroller of Suffolk

10  County coming out about your office, correct?

11  A.    That's correct.

12  Q.    And you knew that it was coming out from the records

13  that they were requesting from your office.  They, meaning

14  the comptroller, correct?

15  A.    That's correct.

16  Q.    And this was a multiyear investigation of sheriff's

17  policies and practices, correct?

18          MS. MIRABILE:  Objection.

19          THE COURT:  Sustained.

20          MR. WEXLER:  Correct?

21          MS. MIRABILE:  Objection.

22          THE COURT:  Sustained.

23          MR. WEXLER:  I'm sorry.

24  Q.    And as I said, you were aware that this report was

25  coming out and came out in 2013, yes?

1    A.    Yes.

2    Q.    And do you recall having Eddie go speak to the

3    comptroller who is an elected official, to learn about the

4    reports so you could get a little advanced information

5    about it.

6              Do you remember tasking him to that?

7    A.    No.

8    Q.    Let me ask you, the comptroller is an elected

9    official?

10   A.    He is.

11   Q.    And the comptroller ran with conservative endorsement

12   and won, correct?

13   A.    Yes.

14   Q.    He did.

15   A.    Okay.

16   Q.    And your party, your party that you are a member of.

17   You are the highest elected official in the conservative

18   party, aren't you?

19   A.    Yes.

20   Q.    What is higher than the Sheriff?

21   A.    I'm a conservative, yes.

22   Q.    Once again Ed Walsh gave and the conservative parties

23   gave Joseph Sawicki the conservative line.  He's a

24   registered republican?

25   A.    Yes.

1  Q.   So if Ed Walsh wanted to speak about Joseph Sawicki

2  about anything, you would imagine he would get a return

3  phone call?

4  A.   Yes.

5  Q.   You've spoken to Joseph Sawicki?

6  A.   I have.

7  Q.   And in fact Eddie used to be assigned to give the

8  judges tours of the Suffolk County jail?

9  A.   Yes.

10  Q.   And all judges, county, district, village, town

11  justices, every four years, have to -- I think, even

12  Supreme Court judges if they do criminal?

13  A.   I think they all do.

14  Q.   They all have to take a tour of the jail.  And of all

15  of the people that you could possibly assign to meet and

16  greet the judges and show them around and answer the

17  questions, why did you use Eddie?

18  A.   Because he was part of his job as being a liaison to

19  outside agencies.

20  Q.   You gave him those assignments?

21  A.   Yes.

22  Q.   You gave it to him for a reason.  You didn't use CO

23  Wexler who graduated three weeks ago?

24  A.   I tried to use a higher ranking officer who had

25  knowledge of security procedures to walk judges through

1  the jail.

2  Q.  You could have used a captain.  Higher than a

3  lieutenant.

4  A.  I could.

5  Q.  You could have used a deputy warden.

6  A.  I could have.

7  Q.  Well, a warden?  Undersheriff?

8  A.  I could have.

9  Q.  You could have done it if you wanted to?

10 A.  Yes.

11 Q.  Why did you use this one particular lieutenant?

12 A.  Because he was a liaison with the outside agency.  It

13 was his job.

14 Q.  You knew he had connections and nice workings with

15 all these people and you didn't want to have problems with

16 these judges?

17 A.  I normally don't interact with the judges on that

18 type of letter.

19 Q.  Let me ask you about problems.

20        You know every judge in the county wants to have

21 -- twenty-three different judges want to have their

22 prisoners at 9:30 a.m. and you know it is impossible to do

23 that from the sheriff, right?

24 A.  Right.

25 Q.  You don't have the staffing.  You would need at 300

1   corrections officers.

2   A.   A bigger building.

3   Q.   And you have to understand that fights occur.

4   Inmates don't always want to go and see the smiling faces

5   of a judge, correct?

6   A.   Correct.

7   Q.   As such, you used Eddie for that purpose because he

8   had the intelligence, he understood, worked with these

9   judges.  That's why you put him there.

10  A.   That's not correct.

11  Q.   Really?

12  A.   Really.

13  Q.   You put him there simply because that was the title

14  you gave him?

15  A.   Somebody had to do the job and it fit in with his

16  job.

17  Q.   Out of all the 1300 people, he just happened to be

18  the one on that date.  No other reason?

19  A.   No, that's why he got the job.

20  Q.   Okay.

21       You know when judges would call and complain as

22  they want to do, not in this Court, but as they want to

23  do, about issues with prisoners, who would they call?

24  A.   I received phone calls sometimes.

25  Q.   Anybody else other than you, Sheriff?

1   A.   I don't know.

2   Q.   You don't know if they ever called Ed Walsh?

3   A.   I could imagine they might have.

4   Q.   Why could you imagine?

5   A.   Because he was walking around the jail and I'm sure

6   they gave him his card.  And if you have a problem, call.

7   Q.   You think that's the only reason they called him?

8   A.   I don't know.

9   Q.   So he happened to give a judge a tour.  He gave him

10  his card, and that's the only reason?

11  A.   I wouldn't know, sir.

12  Q.   Okay.  Do you think that maybe Eddie could get

13  whatever their problem was, work it, smooth it out on your

14  behalf?

15  A.   I think that's why he gave them the card so they

16  could call him, and if there was something he could do, he

17  would.

18  Q.   That's something you wanted him to do?

19  A.   If anyone from outside called one of my officers to

20  take care of a problem I would like you to think they

21  could take care of a problem if they could.

22  Q.   But you didn't need agita from the judges, and Ed was

23  there to help you out, correct?

24  A.   Elected officials usually call elected officials

25  first.

1  Q.   So you took all the phone calls from the judges?

2  A.   I didn't say that.

3  Q.   An elected official?

4  A.   A judge could call me, like many would call me, about

5  production of prisoners.  If a prisoner showed up in the

6  jail uniform instead of their court clothes, and if there

7  was an issue, about that, sometimes I would tell the

8  sheriff to take care of it and I'm sure he went to Ed.

9  I'm sure there were judges that called Eddie as well.

10 Q.   Okay.  Okay.  So there are times that Undersheriff

11 Meyerricks would go to Eddie and there are times where

12 judges would call him directly, correct?

13 A.   Yes.

14 Q.   You know that also you sit here?

15 A.   Yes.

16 Q.   There's a Martin Luther King Day event held every

17 year in the court.  Are you aware of that?

18 A.   Not in the court, but, yes.

19 Q.   Where do they hold it?

20 A.   In a hotel.

21 Q.   Are you aware that Eddie went on your behalf?

22 A.   I'm aware that the conservative party bought a table.

23 A.   Well, that's Eddie, isn't it?

24 A.   Yes.

25 Q.   And they bought a party and he attended, didn't he?

 1    A.    He did.

 2    Q.    And he attended as your representative.

 3          Did you go?

 4    A.    I was there.

 5          MS. MIRABILE:  Objection to the form of the

 6    question.  It assumes facts that are not in evidence.

 7          THE COURT:  Overruled.

 8    Q.    There was a Martin Luther King Day event every year,

 9    yes?

10    A.    Yes.

11    Q.    And Eddie and the conservative party which he

12    oversees bought a table at that event, correct?

13    A.    Yes, I was the honoree.

14    Q.    One year you were the honoree?

15    A.    Yes.

16    Q.    And one year he went and one year you went?

17    A.    Yes.

18    Q.    He's there?

19    A.    He's there.

20    Q.    That wasn't the only time.  He went every year.  The

21    conservative party bought a table every year and he went?

22    A.    I don't believe that to be the case.

23    Q.    You believe he bought a table and went to the Martin

24    Luther King Day every other year on your behalf?

25    A.    I don't recall one year.

1    Q.   Did you ever ask him, Ed, this is an important event

2    for a lot of reasons.  I'm an elected official.  We've a

3    lot of African-American COs.  I want to make sure that the

4    Sheriff's office is represented.  I don't want to be

5    conspicuous that every other officer is there except mine.

6    Will you go?

7              You knew he went to those, didn't you?

8    A.   I didn't ask him to go.

9    Q.   Who on your behalf?

10   A.   Me, James Langhorn, Alex Bryant, Everett Oliver.

11   Q.   And you have no idea that Ed went.  When you saw him

12   when you went to the Martin Luther King, that is held

13   during the day, correct?

14   A.   Yes.

15   Q.   Did you say Eddie, what are you doing here?

16   A.   I did not.

17   Q.   Why not, if you were supposed to be at a desk or

18   office?

19   A.   Maybe he was off.  Took the day off.

20   Q.   Oh, he could have been off?  A day off?

21   A.   Could have.

22   Q.   It would have been a nice thing to do?

23   A.   Sheriff, so every time you don't see him, you say he

24   may have been on vacation, he may have been off.

25             When you do see him like a Martin Luther King

1    event, he must have been off.  Is that the default for you

2    in your mind every time you saw him or didn't see him, he

3    must have been off?

4    A.    He was there as a representative of the conservative

5    party.

6    Q.    Well, did you ask him?

7    A.    No.

8    Q.    Weren't you a little curious?

9    A.    No.

10   Q.    Okay.  Correction Officer Dolan, you heard of him.  I

11   don't know his first name.  I'm sorry.

12   A.    Yes.

13   Q.    In fact I believe you gave testimony that CO Dolan

14   shared an office with Eddie Walsh?

15   A.    Yes.

16   Q.    And CO Dolan's responsibility was the Computer Cop

17   and Project Lifesaver?

18   A.    He was the research into the project.

19   Q.    Did he ever leave the building on behalf of his job?

20   A.    Yes.

21   Q.    He left the building because otherwise you would have

22   to bring high schools in the jail and you wouldn't want to

23   do that?

24   A.    That's not why.

25   Q.    Did he leave the building?

1  A.   Yes.

2  Q.   He left the building to do what?

3  A.   To meet with the Computer Cop Company to meet with

4  the Pilot Club of Sayville.

5  Q.   What is the Pilot Club?

6  A.   A not-for-profit club we're working with with Pilot

7  Lifesaver for transmitters for people who couldn't afford

8  them.  For people who needed them.

9  Q.   He left the building for other reasons too, didn't

10  he?

11  A.   Not that I know of.

12  Q.   He didn't have to go to high schools?

13  A.   I don't know if Tony went to high schools.  At night

14  he did presentations and sometimes I went with him.  I do

15  remember going to school, Sachem with him.

16  Q.   Of course you know.  You went with him?

17  A.   Yes.

18  Q.   You gave him those assignments?

19  A.   Yes.

20  Q.   When before you said I don't know --

21  A.   A junior high school.

22  Q.   Junior high or high school?  Anything else?  We have

23  junior high schools, high schools.

24       Elementary schools?

25  A.   I don't know.

1    Q.    So at least junior high schools and high schools?

2    A.    And to meet with the Pilot Club and we also met with

3    the Alzheimer's group once together.

4    Q.    You are aware that he did do those events, correct?

5    A.    Yes.  I told him.

6    Q.    That's the same as being aware, plus a little more?

7    A.    A little more.

8    Q.    Okay.  And who was his immediate supervisor?

9    A.    He was an aid to the sheriff's and fell into

10   corrections so I assume it is the warden.

11               MS. MIRABILE:  I would just like a time frame.

12   What year?

13               MR. WEXLER:  '06 to 2014.  Eddie Walsh didn't

14   oversee him.  They shared an office.

15   A.    I think Tony Dolan may have been retired in 2014.

16   Q.    Let's say when he retired in 2012?

17   A.    Shared an office but --

18   Q.    I'm just asking you when he retired?

19   A.    I don't remember, but I think it was before 2014.

20   Q.    Could it have been 2012?

21   A.    Yes.

22   Q.    At least for a six-year period Eddie oversaw his work

23   product.  They shared an office?

24   A.    They shared an office but Ed was not his supervisor.

25   Q.    Ed signed his time sheet?

1    A.    He may have done his time sheet because he was a

2    superior officer and somebody higher in rank than Tony.

3    Q.    You don't know that?

4    A.    I don't know if he signed his time sheet.  I do not.

5    Q.    So your recollection is that Ed had no

6    responsibilities with respect to CO Dolan?

7    A.    That's correct.

8    Q.    Okay.  Let's talk about Southampton.

9    A.    Okay.

10   Q.    You had an issue that you wanted a particular Chief

11   of Police who worked well with the Sheriff's office to

12   become Chief of Police.

13          Do you remember that?

14   A.    Yes.

15   Q.    And his name is --

16   A.    William Wilson.

17   Q.    William Wilson?

18          You felt that William Wilson worked well with

19   the sheriff's office and it would be good vibrations for

20   lack of a better term between you and him?

21   A.    I felt he was a professional police manager.

22   Q.    In fact you wanted him and did you ever remember

23   asking Ed Walsh to speak to a Mr. Malone, James Malone, to

24   see how that could be arranged?

25   A.    I asked --

1    Q.    No, just if you remember doing it.

2    A.    Ask the question again.  I'm sorry.

3    Q.    Okay.

4          Did you ask Eddie Walsh on your behalf to go

5    speak to Jim Malone to see what he could do about insuring

6    or helping William Wilson become the Chief of Police?  You

7    either did or didn't.

8    A.    I can't answer the question that way.

9    Q.    Then I'll break it down.

10          Did you speak to Eddie about the Southampton

11   Chief of Police position?

12   A.    Yes.

13   Q.    You didn't speak to him because it was something to

14   do with him overseeing a prisoner in the jail, like a

15   CO-1, correct?

16   A.    No, I thought he knew a town board member.

17   Q.    Okay.

18          You knew he knew a town board member and that if

19   Eddie spoke to somebody, that could be influential in

20   helping get you what you wanted as sheriff?

21   A.    I can't answer that question in the way you ask it.

22   Q.    You could have gone to anybody, all 1300 employees,

23   but you went to Ed Walsh, correct?

24   A.    Yes.

25   Q.    And you had a discussion with him, and did you say IN

1  words or effect, Ed, can you see, speak, or help me get

2  Jim Malone, William Wilson, the Chief of Police.  Words to

3  that effect?  Yes or no?

4  A.   Not those words, no.

5  Q.   Did you say I'd like to see it happen?

6  A.   I said I was supportive of him.

7  Q.   Well, but you weren't just saying I support, pick any

8  candidate, Hubert Humphrey.  It wasn't that you would

9  support him.  There was something you wanted him to do and

10  you just said it.

11        He had connections, correct?

12  A.   I wanted him --

13  Q.   No.  No.  No.

14  A.   You want me to answer?

15  Q.   I think the jury deserves a complete answer.  I'm

16  sorry you believe that.  But here's my question.  You

17  wanted him to do something on your behalf?

18  A.   I wanted him to --

19        MR. WEXLER:  Judge, I'm losing patience.  I'm

20  sorry.

21        THE COURT:  What happens, the way to do this, if

22  the witness makes an answer which is not responsive, then

23  please move before me to strike the answer.  But you are

24  not the judge, I am.  So you make the application to me.

25        MR. WEXLER:  Thank you, Judge.

1    MS. MIRABILE:  And I would also ask that if the

2  witness is in the middle of an answer, that Mr. Wexler not

3  interrupt the witness' answer.

4    THE COURT:  You are correct.  Don't interrupt

5  the witness.  Let him answer and then you move to strike

6  the answer, and I will instruct the jury to disregard it.

7    MR. WEXLER:  Thank you.

8    THE COURT:  That's the procedure.

9    MR. WEXLER:  Thank you, Judge.

10    Judge, I'm looking at the clock.  It's almost

11  12:30.

12    THE COURT:  It is time for lunch.  One of my

13  favorite hours.  Have a seat.

14    We'll recess until 1:30.  In the meantime,

15  please don't discuss the case.  Don't talk about it.

16  Don't get any information from outside sources.

17    Keep an open mind.  Come to no conclusions.

18    When you are at the end of the case and

19  deliberating in the jury room, after you heard the

20  attorneys' closing arguments and very importantly after

21  I've instructed you on the law as to these counts.

22    We'll recess until 1:30.  Have a nice lunch.

23    (Whereupon, at this time the jury exits the

24  courtroom.)

25    THE COURT:  Counsel for the defendant and the

1  government, what is the estimate for the length of this

2  trial?

3          MR. TIERNEY:  Your Honor -- how much more do you

4  have, Mr. Wexler?

5          MR. WEXLER:  You know what, I'll give you an

6  idea on my notes.  I'm sorry, Judge.

7          Judge, I probably have at a maximum, half an

8  hour.

9          THE COURT:  That's all right.

10          MR. WEXLER:  Thank you.

11          THE COURT:  What's your estimate?

12          MR. TIERNEY:  I would say we'll certainly be

13  able to rest this week.

14          THE COURT:  You will rest this week.

15          MR. TIERNEY:  Yes.

16          MS. MIRABILE:  Depending on the length of

17  cross-examination, yes.

18          THE COURT:  How many more witnesses do you have?

19          MR. TIERNEY:  We have --

20          MS. MIRABILE:  Today we have eight or nine

21  scheduled that are here and then after that we have three

22  additional witnesses.

23          MR. TIERNEY:  So twelve in total, approximately.

24          MS. MIRABILE:  Approximately.

25          THE COURT:  We'll recess until 1:30.

760

1    A F T E R N O O N   S E S S I O N

2                    1:30 pm

3

4         (The following ensued in the presence of the

5    jury.)

6         THE COURT:  Please be seated, members of the

7    jury.

8         You may proceed.

9

10   **VINCENT DEMARCO**

11        called by the Government, having been previously

12        duly sworn/affirmed, continued testifying as

13        follows:

14

15   CROSS-EXAMINATION (Continued)

16   BY MR. WEXLER:

17   Q.   Sheriff DeMarco, before the lunch break we were

18   talking about contributions to the Friends of Vincent

19   DeMarco.

20        You are aware that filings are made every year

21   with the Board of Elections?

22   A.   Yes.

23   Q.   And you have seen these before, haven't you?

24        Let me show you.

25   A.   Yes.  I know what they are.

761

1          MR. WEXLER:  Let me show them to the government.

2          MS. MIRABILE:  Can we have a sidebar, your

3     Honor?

4          THE COURT:  Yes.

5          (Continued on the following page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (Discussion at sidebar ensued as follows.)

2        MS. MIRABILE:  These are, it appears to be

3   printouts from the Board of Election website for the

4   Friends of Vincent DeMarco.

5        THE COURT:  What are they?

6        MR. WEXLER:  Board of Election documents.

7        I just want to ask if he is familiar.  I'm not

8   even going to offer them.

9        THE COURT:  What is this for?

10       MR. WEXLER:  The earlier cross-examination about

11  the people who contributed to him.

12       MS. MIRABILE:  It's not in the indictment

13  period.  None of this is part of the indictment period.

14       MR. WEXLER:  I think it shows a course and

15  pattern of conduct.

16       THE COURT:  It must be me.  What is this for?

17       MS. MIRABILE:  Here.  You can hold them.

18       MR. LATO:  It has to do with the intertwining of

19  politics and the job.

20       The government in its indictment has said that

21  the defendant was out there doing political activities

22  when he should have been working.

23       We have shown through this witness on

24  cross-examination that there has been an intertwining

25  between politics and his job at the jail.

1       THE COURT:  What are these things?

2       MR. LATO:  These documents that we want to

3   introduce are printouts from the Board of Elections.

4       The government does not contest their

5   authenticity, only their relevance, that because there are

6   outside the indictment period prior to 2011, that they are

7   immaterial.

8       THE COURT:  What have they got to do with the

9   defendant?

10      MR. TIERNEY:  You didn't show me all those.

11      MR. WEXLER:  You know what?  I'll make it easy.

12  I'm not going to introduce these.  I'm just going to ask

13  if he is familiar with what they are.

14      MS. MIRABILE:  I would also like to just note

15  that the witness that is on the stand does not have the

16  same position as the defendant.  They are not similarly

17  situated.

18      MR. TIERNEY:  Well, I would also if -- I would

19  say if they are going to argue that this witness is able

20  too, is able to allow, legally allow this person, the

21  defendant to politic while working, that is illegal.  He

22  doesn't have that authority.

23      And that is a public authority defense and they

24  need to give us notice of that.

25      MR. LATO:  That is entirely inaccurate.  Bias is

1    never collateral.

2              MR. TIERNEY:  But --

3              MR. LATO:  Let me finish, Mr. Tierney.

4              What we are attempting to do is to discredit the

5    sheriff.

6              If in fact the sheriff is authorizing the

7    defendant to do things the sheriff does not have authority

8    to do, that means the sheriff is doing something wrong and

9    it goes to his credibility.  Either way there is an

10   intertwining.

11             THE COURT:  I still don't understand what these

12   things are.

13             MR. LATO:  These exhibits show the contributions

14   Friends of Vincent DeMarco, the amount of money that this

15   man, Vincent DeMarco, has raised from people, including

16   his own employees, which presents a conflict of interest.

17             MR. WEXLER:  Judge, I'm not going to offer them.

18   I'm just going to ask him if he knows what they are.

19             THE COURT:  They are not admissible.

20             MR. WEXLER:  I'm going to ask him if he knows

21   what they are.

22             MS. MIRABILE:  Why?  I'm still objecting to that

23   line of questioning.

24             THE COURT:  I'm going to allow him to question

25   him on it.  A little amount.

1      MS. MIRABILE:  A little amount?  Thank you.

2      (Discussion at sidebar was concluded.)

3      (Continued on the following page.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

766

1      (The following ensued in open court.)

2      THE COURT:  You may proceed.

3      MR. WEXLER:  Thank you, sir.

4  BY MR. WEXLER:

5  Q.   I'm going to show you, Sheriff DeMarco, what has been

6  marked for identification as Defendant's Exhibit K.

7      You recognize what those are?

8  A.   Yes.

9  Q.   Those are filings of the Friends of Vincent DeMarco

10 that's done on an annual basis?

11 A.   Yes.

12 Q.   And that contains a list of all of the contributors

13 to the Friends of Vincent DeMarco.

14 A.   It does.

15 Q.   Let me ask you one question.

16      Has Ed Walsh ever contributed to your campaign?

17 A.   I don't think so.

18 Q.   Now you can move those aside.  I'm on to a different

19 subject so I just switched gears for you.

20 A.   Okay.

21 Q.   We left off -- and I'm almost finished.

22      We left off with the great Town of Southampton.

23 A.   Yes.

24 Q.   And I believe I had asked you several questions, so

25 let me just because I forgot where I was.  I will back up.

1  A.  Okay.

2  Q.  There was a time was it -- and you can tell me the

3  year, that you were desirous of having a William Wilson to

4  be appointed to the Southampton Police Department as

5  chief.

6  A.  Yes.

7  Q.  What year was that, sir?  Approximately.

8        If you can, give me a range.  A real

9  approximation.

10  A.  2011?

11  Q.  Okay.

12  A.  About.

13  Q.  I don't know either so.

14        And in 2011 you were desirous of having William

15  Wilson appointed to chief because you thought there would

16  be an good relationship, a working relationship, with the

17  sheriffs department and the Southampton Police Department.

18  Correct?

19  A.  Yes.

20  Q.  And that is something that you, as sheriff, wanted to

21  foster.  You want to have nice-nice with all of the law

22  enforcement agencies you deal with.

23  A.  Yes.

24  Q.  In fact, Ed Walsh was your liaison to those outside

25  law enforcement agencies.  Correct?

1    A.    Yes.

2    Q.    And that's also you wanted to have a nice working

3    relationship and you figured Eddy was the guy who, of all

4    the people that you could have appointed, would probably

5    be the best suited for that sort of task.  Correct?

6    A.    Yes.

7    Q.    I mean, he has a nice personality, doesn't he?

8    A.    Yes.

9    Q.    You like him.  Make you still do.

10   A.    Correct.  Yes.

11   Q.    Okay.  So you were desirous of having William Wilson

12   appointed.

13         At some point in time in 2011-ish you had a

14   meeting with Eddy Walsh.  Correct?

15   A.    Yes.

16   Q.    And you spoke.

17   A.    Yes.

18   Q.    And you told him in words or fact that could you

19   speak to somebody, you seem to know the lay of the land,

20   to see what we can do to help promote getting William

21   Wilson appointed police chief.  Correct?

22   A.    I don't asking him that.

23   Q.    Do you recall asking him to look into it or help or

24   do something along those lines.

25         Yes?

769

1  A.  Yes.

2  Q.  Okay.  I mean, you didn't say:  Ed, whatever you do,

3  do not do anything to help this SOB.  I hate him.  I want

4  him dead.

5        You didn't do any of that?

6  A.  I did not say that.

7  Q.  Okay.  You wanted him to be the police chief and

8  figured Ed could help him.

9  A.  Yes.

10  Q.  And you went to Ed because of?

11  A.  Because he had a relationship with a town board

12  member named James Malone.

13  Q.  And you figured if Ed spoke to James Malone that

14  could help get the job done.  Correct?

15  A.  I can't answer that in --

16  Q.  All right.  Well, it wouldn't hurt his chances,

17  William Wilson's.  Correct?

18        MS. MIRABILE:  Objection.

19        THE COURT:  Overruled.

20  BY MR. WEXLER:

21  Q.  It wouldn't hurt.

22  A.  It wouldn't hurt.

23  Q.  Then why did you do it?

24  A.  Because William Wilson asked me if I can set up a

25  meeting, if I can ask Ed to set up a meeting with Jim

1  Malone and Bill Wilson so that Bill Wilson could give him

2  his resume.

3          The town supervisor of Southampton suggested

4  that Bill Wilson give his resume out to all the town board

5  members.

6  Q.   And that is the sort of thing that you understood

7  Eddy could do as your political leader.  Correct?

8  A.   Yes.

9  Q.   Did William Wilson ultimately become the chief of

10 police?

11 A.   Yes, he did.

12 Q.   Okay.  And just a few more questions, sheriff.

13          Golf.  You play golf, don't you?

14 A.   I do.

15 Q.   In fact you have played during the day, haven't you?

16 A.   Yes.

17 Q.   And you held your sheriffs golf outing each year?

18 A.   Yes.

19 Q.   And I imagine you attend since --

20 A.   Two times.

21 Q.   And I imagine you attend your own golf outing.

22 A.   I did.

23 Q.   Okay.  And let's see.  The sheriffs, the COs have a

24 golf outing, the union.  Correct?

25 A.   Yes.

1   Q.   And deputy sheriffs also have a golf outing?

2   A.   I don't know.  I never play in the deputy sheriff

3   outings.

4   Q.   Okay.  Let's see.  There is also a -- oh.  The

5   Republicans.  They have their golfers, don't they?  It's

6   not only Conservatives who are golfers.  The Republicans.

7   A.   Yes.

8   Q.   In fact you have been to the various county

9   Republican golf outings.

10  A.   Yes.  I think I've been to one.

11  Q.   Okay.  And then you went to, let's see, town golf

12  outings.  Bill Ellis in Smithtown, you went to his?

13  A.   I think I went to his.

14  Q.   And I imagine the Democrats also golf?  Maybe not.

15  A.   I don't know if they have one.

16  Q.   Okay.  But it is not unusual for yourself to have

17  attended a golf outing during the day.  Correct?

18  A.   That is right.

19  Q.   In fact you have gone golfing with Eddy during the

20  day.

21  A.   I believe on two occasions.

22          MR. WEXLER:  Thank you.

23          No further questions.

24          Thank you sheriff.

25          THE COURT:  Redirect?

772

1    MS. MIRABILE:  Yes.

2    Can I approach the witness to clean up?

3    I also have a question about these, but you can

4    take these.

5    MR. LATO:  Thank you.

6

7    REDIRECT EXAMINATION

8    BY MS. MIRABILE:

9    Q.   You were asked about these.

10   A.   Yes.

11   Q.   Were any of these for the years in the period of the

12   indictment?

13   A.   I would have to look at them again to answer your

14   question.

15   Q.   It is Defendant's Exhibit K.

16   A.   No.

17   Q.   So none of the paperwork is relate to anything within

18   the years of the indictment.

19   A.   No.

20   Q.   Correct?

21   You were asked about a number of phone calls, on

22   cross-examination.  Do you remember that?

23   A.   Yes, I do.

24   Q.   And you were asked about calls between yourself and

25   the defendant.  Correct?

1    A.    Yes.

2    Q.    And you were asked about calls between the defendant

3    and the jail.

4    A.    Yes.

5    Q.    Okay.  Do you know the content of any of the calls

6    between the defendant and anyone at the jail?

7    A.    No.

8    Q.    Do you know who the defendant was speaking with at

9    the jail?

10   A.    No.

11   Q.    Does the defendant have friends that work in the

12   jail?

13   A.    Yes.

14   Q.    Who is Richard Clark?

15   A.    He is a correction officer at the Riverhead

16   Correctional Facility.

17   Q.    Is he a friend of the defendant?

18   A.    Yes.

19   Q.    Who is John Santacroci?

20   A.    He is a correction officer at the Riverhead

21   Correctional Facility.

22   Q.    Is he a friend of the defendant?

23   A.    He's a friend of the defendant.

24   Q.    How about Charles Vallillo?

25   A.    He is a correction officer investigator assigned to

1    personnel investigations.

2    Q.    Is he a friend of the defendant?

3    A.    Yes, he is.

4    Q.    Who is Christopher Lambert?

5    A.    He's a correction officer at the Riverhead

6    Correctional Facility.

7    Q.    Is he a friend of the defendant?

8    A.    Yes, he is.

9    Q.    Does the defendant have other friends at the

10   correctional facility?

11   A.    Yes.

12   Q.    Do you know if any of the phone calls between the

13   defendant and the jail were to any of the defendant's

14   friends?

15   A.    I don't.

16   Q.    Do you know if any of those conversations were

17   personal conversations?

18   A.    No.

19   Q.    Do you know if any of those conversations were about

20   scheduling golf?

21   A.    I don't know.

22   Q.    Do you know if they were about going to Foxwood?

23   A.    I don't know.

24   Q.    Is the defendant entitled to overtime every time he

25   gets a phone call with (sic) a member of law enforcement

1  regardless of the content?

2  A.  No.

3  Q.  Do you know if the defendant noted on any of his time

4  sheets that he worked overtime because he was taking phone

5  calls?

6  A.  No.

7  Q.  You were asked about calls from 2006 between the

8  defendant and the jail as well as between the defendant

9  and you.

10       Do you remember that?

11  A.  Yes.

12  Q.  Is 2006 related to any of the charges in the

13  indictment were here for today?

14  A.  No.

15  Q.  2007.  You were asked about calls between yourself

16  and the defendant and the defendant and the jail in 2007

17  it.

18       Does that have anything to do with the charges

19  in the indictment?

20  A.  No.

21  Q.  You were asked about calls in 2008 between yourself

22  and the defendant and the defendant and the jail.

23       Does that have anything to do with the charges

24  in the indictment?

25  A.  No.

1  Q.  You were asked about calls in 2009 between yourself

2  and the defendant and the defendant and the jail.

3       Does that have anything to do with the charges

4  in the indictment?

5  A.  Nothing.

6  Q.  And you were asked about calls in 2010 between

7  yourself and the defendant and the defendant and the jail.

8       Does that have anything to do with the charges

9  of the indictment?

10  A.  No.

11  Q.  You were also asked about calls between you and the

12  defendant during 2011, '12, '13.  And I'm not sure of '14,

13  I believe '14 might have been in there or at least a part

14  of '14.

15       But in particular with your being asked about

16  calls between you and the defendant in 2012, defense

17  counsel actually cut you off and didn't let you finish

18  your answer, so I would like you to answer about the calls

19  in 2012 between yourself and the defendant.

20       Can you explain to the jury what was going on at

21  that time.

22  A.  Sure.

23       There was a, constituents were mailing me

24  information and a legislator was mailing me information in

25  a letter that she wanted me to commence an investigation

1    into Edward Walsh and how he got hired at the sheriff's

2    office and he --

3    Q.    You don't have to go into the details.

4    A.    Yes.

5    Q.    I don't mean to interrupt you.

6    A.    Yes, how he got hired I believe in 1990.

7    Q.    So your calls with the defendant in 2012, did those

8    relate to the constituent complaints that were calling for

9    you to investigate the defendant?

10   A.    Yes.  Some of them.

11   Q.    You were also asked on cross-examination about

12   complaints.  You were shown the defendant's personnel

13   file, which is somewhere over there.

14   A.    Yes.

15   Q.    And whether or not there were complaints against the

16   defendant.

17         Do you remember those questions?

18   A.    I do.

19   Q.    You were asked if you had ever received complaints

20   that the defendant was unprofessional.

21         Do you remember that question?

22   A.    Yes.

23   Q.    And you were also asked if you received complaints

24   that the defendant was abusive at work.

25         Do you remember that question?

778

1    A.   Yes.

2         MS. MIRABILE:  I would like to approach, your

3    Honor.

4         MR. WEXLER:  I thought you wanted to approach

5    the judge.

6    BY MS. MIRABILE:

7    Q.   I would like you to look at what I have just shown

8    you.

9         Does that refresh your recollection that you are

10   received complaints that the defendant was unprofessional

11   at work?

12   A.   Yes.

13   Q.   Does that refresh your recollection that you received

14   complaints that the defendant was abusive while at work?

15   A.   Yes.

16   Q.   How many complaints did you receive?

17   A.   Three.

18   Q.   Who were they from?

19   A.   They are anonymous.

20   Q.   Do you know why they were anonymous?

21        MR. WEXLER:  I'm sorry.  I didn't hear.

22        MS. MIRABILE:  They are anonymous.

23        MR. WEXLER:  Okay.

24   BY MS. MIRABILE:

25   Q.   Do you know why?

1      MR. WEXLER:  Objection, your Honor, regarding

2  anonymous complaints.

3      THE COURT:  Sustained.

4  BY MS. MIRABILE:

5  Q.   What did you do in response to receiving complaints

6  about the defendant's conduct?

7  A.   The one in 2007 I directed Undersheriff Meyerricks to

8  have a conversation with Edward Walsh and show him the

9  complaint and ask him if he was doing any of these things

10  and, if he was, to cease and desist but it wasn't on this.

11  Q.   What did you do when you received the next complaint?

12  A.   I did the same thing.

13      I directed Undersheriff Meyerricks to speak to

14  Ed Walsh about the anonymous complaint, show it to him and

15  again, if he was doing this, to cease and desist.

16  Q.   What did you counsel the defendant not to do at work?

17  A.   Political work.

18  Q.   So the defendant was counseled or you directed the

19  defendant be counseled to cease doing political work while

20  at the sheriff's office.

21  A.   Yes.  If he was doings it, yes.

22  Q.   That was what year?

23  A.   2007 and 2009.

24  Q.   Did you ask anyone else to speak to the defendant

25  about ceasing doing political work while at work?

780

1    A.   Yes.  In 2010.

2    Q.   Who did you ask?

3    A.   The District Attorney Thomas Spota.

4    Q.   Is the defendant perceived as being politically

5    powerful by members of the Suffolk County Sheriff's

6    Office?

7                MR. WEXLER:  Objection, your Honor.

8                THE COURT:  Sustained.

9    BY MS. MIRABILE:

10   Q.   Did you ever try to discipline the defendant?

11   A.   Yes.

12   Q.   When?

13   A.   In I think it was 2012.

14   Q.   What happened?

15   A.   I received a phone call from the District Attorney

16   that --

17               MR. WEXLER:  Objection, your Honor.  Sidebar,

18   please.

19               THE COURT:  All right.  Come up.

20               (Continued on the following page.)

21

22

23

24

25

1      (Discussion at sidebar ensued as follows.)

2      MR. WEXLER:  Judge, I know the government is

3  chomping at the bit to get in the DA and that whole fight,

4  but I specifically never used even the letters *D-A*.  I

5  never opened any doors.

6      If he took disciplinary action, go at it.  He

7  can talk about it all day long, that he went to another

8  authority, when this court has previously ruled this is

9  not the District Attorney, this is about fraud.

10      That is why in my opening and in my cross I

11  never mentioned the words *District Attorney*.

12      MS. MIRABILE:  He opened the door in his

13  cross-examination about whether or not there was any

14  discipline or any attention to disciplining the defendant

15  during the time period that he was the sheriff and he did

16  attempt to discipline him.

17      THE COURT:  Okay.  I will let you bring out that

18  he attempted to discipline him.  That he called the

19  District Attorney; not what the District Attorney told him

20  or did.

21      I will let you do that.

22      MS. MIRABILE:  Right.  Just that.  Yes.

23      MR. WEXLER:  Okay.

24      (Discussion at sidebar was concluded.)

25      (Continued on the following page.)

1          (The following ensued in open court.)

2     BY MS. MIRABILE:

3     Q.    Without going into the details related to your

4     attempt to discipline him or what you attempted to

5     discipline him for, you attempted to discipline the

6     defendant in 2012?

7     A.    Yes.

8     Q.    Without going into the details, what did you do in

9     attempting to discipline the defendant?

10    A.    We requested certain pieces of evidence from the

11    Suffolk County Police Department and the District

12    Attorneys office.

13    Q.    And did you need that evidence in order to support

14    your charge for discipline?

15    A.    Yes.

16    Q.    Did you get that evidence?

17               MR. WEXLER:  I'm going to object, your Honor,

18    based on the ruling of the court.  I thought it was very

19    clear at sidebar.

20               THE COURT:  Counsel has followed my ruling.

21    BY MS. MIRABILE:

22    Q.    Did you get that evidence?

23    A.    No.

24    Q.    Were you able to discipline the defendant without

25    that evidence?

1    A.    No.

2    Q.    Do you need, did you need that evidence under the

3    civil service regulations?

4    A.    Yes.

5    Q.    Can you just remove someone from a civil service

6    position at will?

7    A.    No.

8    Q.    Does the collective bargaining agreement provide

9    protection for civil service employees?

10   A.    Yes.

11   Q.    And is that in part why you needed evidence?

12   A.    Yes.

13   Q.    And you were not able to get that evidence in 2012.

14   Correct?

15   A.    No.  No.

16   Q.    On cross-examination you were asked if anyone from

17   the Suffolk County Sheriff's Office told you that the

18   defendant wasn't at work.

19         Do you recall that line of questioning?

20   A.    Yes.

21   Q.    Is it fair to say that your investigation didn't come

22   about as a result of anything Undersheriff Meyerricks said

23   to you?

24   A.    Yes.

25   Q.    Or Undersheriff Caracappa?

1   A.   Yes.

2   Q.   The investigation came about how?

3   A.   I read it in the newspaper, that Ed Walsh was at a

4   shareholder meeting and a FOIL request followed that.

5   Q.   For the time sheets.

6   A.   Yes.

7   Q.   And you saw eventually saw film records?

8   A.   Yes.

9   Q.   And you eventually saw golf records?

10  A.   Yes.

11  Q.   You were also asked if you ever had a conversation

12  about the defendant's attendance, with Undersheriff

13  Meyerricks.

14          Do you recall that question?

15  A.   I'm sorry?

16  Q.   You were asked if you ever had a conversation with

17  Undersheriff Meyerricks in 2014 about the defendant's

18  attendance.

19  A.   Yes.

20  Q.   Or time sheets?

21  A.   Yes.

22  Q.   Do you remember that question?

23  A.   Yes.

24  Q.   You were also asked if you ever had a conversation

25  with the Warden Charles Ewald.

1          Do you remember that question?

2   A.    I do.

3   Q.    Is Warden Ewald a person who signs the majority of

4   the defendant's time sheets?

5   A.    Yes.

6   Q.    Did you have a conversation with Warden Ewald about

7   the defendant's time sheets?

8   A.    Yes.

9   Q.    You did?

10  A.    Yes.

11  Q.    And what was the result of that conversation?

12  A.    That when he saw, went to look for Ed, he was unable

13  to fine him.

14          MR. WEXLER:  Objection.

15          THE COURT:  Yes.  Objection sustained.

16  BY MS. MIRABILE:

17  Q.    On cross-examination -- you talked about the

18  investigation, but on cross-examination defense counsel

19  said, and I quote, according to you, that is in the quote,

20  according to you, you met with the District Attorney about

21  the investigation of the defendant.

22          Do you remember that?

23          MR. WEXLER:  Objection, your Honor.  I made no

24  such statement.

25          THE COURT:  Overruled.

1   BY MS. MIRABILE:

2   Q.   Do you remember the question that according to you,

3   you met with the District Attorney?

4   A.   Yes.

5   Q.   And the District Attorney, again, is Tomas Spota?

6   A.   Yes.

7   Q.   How were those meetings set up?  How were they

8   scheduled?

9          MR. WEXLER:  Judge, continuing objection.  I

10  never mentioned --

11         THE COURT:  Sustained.

12         MR. WEXLER:  -- the District Attorney's name.

13         THE COURT:  Sustained.

14  BY MS. MIRABILE:

15  Q.   Do you know the defendant's relationship with the

16  District Attorney?

17         MR. WEXLER:  I'm -- objection, your Honor.

18         THE COURT:  Overruled.  I will allow it.

19  A.   Yes.

20  BY MS. MIRABILE:

21  Q.   What is the defendant's relationship with the

22  District Attorney?

23  A.   There are friends.

24  Q.   Do you know if District Attorney Spota attended

25  Conservative Party events, functions?

1    A.    Yes.

2    Q.    Yes, you know, or yes, he did?

3    A.    Yes, I know.  And yes, he did.

4    Q.    That was, my question was poorly phrased.  Sorry.

5         Do you know that *Thomas Spota for District*

6    *Attorney* has contributed over $26,500 to the Conservative

7    Party in 2009 to 2014?

8    A.    No.

9    Q.    You were asked some questions on cross-examination

10   about the defendant's duties, or Liaison to Outside

11   Agencies and the Internal Security.

12        Do you remember that series of questions?

13   A.    I do.

14   Q.    One of them was also about funerals.  Do you remember

15   those?

16   A.    Yes.

17   Q.    And there was some discussion about line-of-duty

18   deaths?

19   A.    Yes.

20   Q.    How many line of duty deaths have there been since

21   you have been sheriff?

22   A.    Maybe five.  If that.

23   Q.    From 2006 to 2014?

24   A.    Yes.

25   Q.    And other than line-of-duty deaths, are Suffolk

1    County Sheriff Office employees required to attend wakes

2    and funerals of retired Suffolk County Sheriff's Office

3    employees or their family members?

4    A.    No.

5                (Continued on the following page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MS. MIRABILE:

2    Q.    And other than Undersheriff Meyerricks, who you asked

3    to attend the funerals on behalf of the Sheriff's office,

4    did you ask anyone to attend them?

5    A.    No.

6    Q.    Did you ask the defendant to attend?

7    A.    No.

8    Q.    People can go if they want to?

9    A.    Yes.

10    Q.    People can go if they're friends with the person or

11    they know the person's family members, right?

12    A.    Yes.

13    Q.    Is that what those notes are for, to let people in

14    the Sheriff's office to know --

15              THE COURT:  You have to slow down.  I'm having

16    trouble hearing you.

17              MS. MIRABILE:  Sorry.

18    BY MS. MIRABILE:

19    Q.    Is that what those notes are for, to let people know

20    that someone has passed away or a family member has passed

21    away, and if they want to offer their condolences, they're

22    free to go and offer their condolences, right?

23    A.    Yes.

24    Q.    Do you know if the defendant went to these funerals

25    as on behalf of the Suffolk County Conservative Party?

790

1     A.    I don't know.

2     Q.    And you were asked about a Martin Luther King day

3     event; do you remember that, at the hotel?

4     A.    Yes.

5     Q.    And I think you said that the defendant had bought a

6     table for the Conservative Party?

7     A.    Yes.

8     Q.    Was that as part of his duties as liaison to outside

9     agencies and internal security, or was that in his

10    capacity as Chairman of the Suffolk County Conservative

11    Party?

12    A.    As Chairman of the Suffolk County Conservative Party.

13    Q.    And every time the Conservative Party buys a table at

14    a function, do they do it on your behalf?

15    A.    No.

16    Q.    Yesterday, you were asked a number of questions on

17    cross-examination about the defendant's assignment as an

18    aide to the Sheriff; do you recall that?

19    A.    Yes, I do.

20    Q.    And the defendant was an aide to the Sheriff for one

21    month?

22    A.    Yes.

23    Q.    In January until about February 6, February 7 of

24    2006?

25    A.    Yes.

1    Q.   You were also asked a lot of questions on

2    cross-examination about the defendant's assignment as

3    liaison; do you remember that?

4    A.   I do.

5    Q.   That's not just a liaison to outside agencies, it's

6    also a liaison to internal security and gangs?

7    A.   Yes.

8    Q.   Did you expect the defendant to be a liaison to

9    outside agencies in addition to his job responsibility as

10   liaison to internal security and gangs?

11   A.   Yes.

12   Q.   He wasn't supposed to be the liaison to outside

13   agencies to the exclusion of internal security and gangs?

14   A.   Right.

15   Q.   And where is internal securities and gangs located?

16   A.   Inside the correctional facility.  That's where our

17   office is.

18   Q.   Where is the defendant's office located?

19   A.   In the office building outside the secured part of

20   the correctional facility.

21   Q.   And the Yaphank facility, is there an internal

22   security and gangs unit located in Yaphank?

23   A.   There was starting in 2013 I believe.

24   Q.   But before 2013, there wasn't a unit physically at

25   Yaphank?

1   A.   No.

2   Q.   You were asked questions on cross about how the

3   defendant knew what his job duties were; do you remember

4   that?

5   A.   Yes.

6   Q.   You were asked if there was anything in writing; do

7   you remember that?

8   A.   Yes.

9   Q.   And you were asked if there was a written position

10   description for the defendant when he was designated as an

11   aide; do you remember that?

12   A.   Yes, I remember that.

13   Q.   And you were asked if there was a written position

14   description for the defendant when he was designated as a

15   liaison; do you remember that?

16   A.   Yes.

17   Q.   How did the defendant know his job duties?

18   A.   He was told what they were.

19   Q.   And was the defendant required to work a continuous

20   seven-and-a-half hour work schedule?

21   A.   Yes, in conformance with the collective bargaining

22   agreement.

23   Q.   Was the defendant your only aide or liaison?

24   A.   No.

25   Q.   One of them was Anthony Dolan.

1          We know Anthony Dolan, right?

2     A.    Yes.

3     Q.    He was an aide at the same time the defendant was an

4     aide?

5     A.    Yes.

6     Q.    And he was an aide while the defendant was liaison as

7     well, correct?

8     A.    Yes.

9     Q.    Is there a written position description for Anthony

10    Dolan's job duties?

11    A.    No.

12    Q.    Did Anthony Dolan have to comply with the collective

13    bargaining agreement?

14    A.    Yes.

15    Q.    Did Anthony Dolan, as an aide, have to work a

16    seven-and-a-half hour workday?

17    A.    Yes.

18    Q.    Did Anthony Dolan have to work a 37-and-a-half hour

19    workweek?

20    A.    Yes.

21    Q.    Could he get overtime if he hasn't worked those hours

22    or otherwise account for them for vacation or sick time?

23    A.    No.

24    Q.    To your knowledge, did Anthony Dolan comply with the

25    requirements under the collective bargaining agreement?

1    A.    Yes.

2    Q.    And as your time as Sheriff, have you had any other

3    aides or liaison?

4    A.    Yes.

5    Q.    Who are they?

6    A.    Brian Stoothoff is one.

7    Q.    Anyone else?

8    A.    I'm trying to think.  I don't believe so.

9    Q.    Anyone else as liaison?

10   A.    Right now, I don't believe so.

11   Q.    Over the course of the time that you have been

12   Sheriff, not necessarily currently, but over the course

13   that you've been Sheriff, have there been any other

14   liaisons?

15   A.    No.

16   Q.    Does Brian have a position description for his

17   duties?

18   A.    No.

19   Q.    Does he know what -- to your knowledge, does he know

20   what his job duties are?

21   A.    Yes.

22   Q.    Does he have to comply with the collective bargaining

23   agreement?

24   A.    Yes.

25   Q.    Does he have to work a seven-and-a-half hour workday?

1    A.    Yes.

2    Q.    And a 37-and-a-half hour workweek?

3    A.    Yes.

4    Q.    Can he get overtime if he doesn't account for those

5    hours?

6    A.    No.

7    Q.    You were asked about Southampton, the issue with

8    Southampton.

9    A.    Yes.

10   Q.    Did you ask the defendant to arrange for a meeting or

11   your conversation with the defendant, was that as the

12   liaison to outside agencies or was that as Chairman of the

13   Suffolk County Conservative Party?

14   A.    As a liaison at that point.

15   Q.    Do you have the authority under the law or the

16   collective bargaining agreement to direct someone to do

17   political work on county time?

18   A.    No.

19   Q.    Did you expect the defendant to be chained to his

20   deck?

21   A.    No.

22   Q.    Are employees allowed to leave the buildings for

23   short periods of time?

24   A.    Yeah, they can go out to lunch, run an errand on a

25   break, they could run to the store, the deli.

1  Q.  Are employees considered to be professionals?

2  A.  Yes.

3  Q.  Is there a level of trust or expectation you place in

4  your employees?

5  A.  Yes.

6  Q.  What's the level of trust or expectation you place in

7  lieutenant investigators?

8  A.  Pretty high level.

9  Q.  That's a position that the defendant had?

10 A.  Yes.

11 Q.  So you trusted him to do his job?

12 A.  Yes.

13         I expect all my employees to do their jobs.

14 Q.  Did you think that you needed to explain to him that

15 he couldn't golf on county time?

16 A.  No.

17 Q.  Did you think you needed to explain to him that he

18 couldn't be home on county time?

19 A.  No.

20 Q.  Did you think that you needed to explain to him that

21 he couldn't be as Foxwoods on county time?

22 A.  No.

23         THE COURT:  You have to slow down.

24         MS. MIRABILE:  I think I'm almost done.

25

1  BY MS. MIRABILE:

2  Q.  Did any of the defendant's designations as aide, as

3  liaison, or as a correction officer III, lieutenant

4  investigator, did any of those designations -- under any

5  of those designations did the collective bargaining

6  agreement not apply to him?

7  A.  No.

8  Q.  He still had to work a seven-and-a-half hour workday,

9  correct?

10  A.  Yes.

11  Q.  And that's a continuous workday?

12  A.  Yes.

13  Q.  And he had to work a 37-and-a-half hour workweek?

14  A.  Yes.

15  Q.  And he had to account for that time before he was

16  entitled to overtime, correct?

17  A.  Yes.

18  Q.  And you don't have the authority to waive the

19  provisions of the collective bargaining agreement for

20  anyone?

21  A.  No.

22          MS. MIRABILE:  Can I have one moment?

23          No further questions.

24          THE COURT:  Further cross?

25          MR. LATO:  Your Honor, may we just approach for

1  one minute to put something on the record before recross

2  begins at the sidebar, before Mr. Wexler resumes his

3  recross?

4          THE COURT:  Very well.

5          Come up.

6          (Continued on next page.)

1       (The following takes place at sidebar.)

2       MR. LATO:  I am moving to strike Sheriff

3  DeMarco's testimony.

4       THE COURT:  First of all, I said one lawyer for

5  each witness.  You're not the lawyer.

6       MR. WEXLER:  Okay.  Then I'll make the record,

7  Judge.

8       THE COURT:  There's a reason for that.  One

9  lawyer for each witness, not two.

10       MR. WEXLER:  Excuse me a second, Judge.

11       (Pause in proceedings.)

12       MR. WEXLER:  Judge, the objection to be placed

13  on the record is to strike that much of the testimony of

14  this witness concerning his conversations with the

15  District Attorney, and basically it's unfair, it's

16  prejudicial.

17       THE COURT:  I didn't hear any conversations with

18  the District Attorney.

19       MR. WEXLER:  His actions that he took to go to

20  the DA.

21       THE COURT:  Okay.

22       MR. WEXLER:  That they're irrelevant.

23       MR. LATO:  And the fact that they're friends.

24       MR. WEXLER:  Exactly, the fact they're friends,

25  that the government elicited that the DA and Ed Walsh are

1  friends is totally irrelevant.

2      There's nothing that came up in either the

3  direct or the cross-examination that should have been

4  elicited.  It has nothing to do with this case and it is

5  just too prejudicial.

6      MR. LATO:  Under 602 it has to be based on

7  personal knowledge.

8      MR. WEXLER:  Further, on 602, it has to be based

9  on personal knowledge.  There's no personal knowledge.

10      THE COURT:  Okay.

11      Do you feel better now?

12      MR. WEXLER:  I don't know.  Do you?

13      THE COURT:  He doesn't.  Do you feel better?

14      MR. WEXLER:  I feel better, Judge.

15      THE COURT:  Okay.  Thank you.

16      MR. WEXLER:  Thank you.

17      THE COURT:  I don't know what this does, but

18  that's all right.

19      MR. LATO:  I assume then you're not sustaining

20  the objection?

21      THE COURT:  I'm overruling -- I'm sustaining the

22  objection -- withdrawn.

23      I'm allowing counsel to put it on the record in

24  the absence of the jury, yes, that's what I'm doing.

25      MS. MIRABILE:  You're not striking his

1    testimony?

2             THE COURT:  No, I'm not striking the testimony.

3             (Continued on next page.)

1          (The following takes place in open court.)

2          THE COURT:  I was getting used to that sound.

3

4    RECROSS-EXAMINATION

5    BY MR. WEXLER:

6    Q.    Sheriff DeMarco, I inadvertently showed you the

7    previous years.

8          I'm going to show you what's been marked as K-1

9    for identification.

10         And I believe those are the relevant years, 2011

11   through 2014, For Friends of Sheriff DeMarco?

12   A.    Yes.

13   Q.    Just a couple of questions, Sheriff.

14         The government asked you about complaints that

15   you received in an anonymous nature.

16         I think there was two letters put in front of

17   you concerning Eddie Walsh, yes?

18   A.    Yes.

19   Q.    Okay.

20         As you testified correctly, they were anonymous,

21   yes?

22   A.    Yes.

23   Q.    Let me ask you, if you were to count how many times

24   you were sued in the name of the sheriff, does it happen

25   dozens and dozens and dozens of times?

1    A.    Yes.

2    Q.    Probably since you've been Sheriff for 12 years,

3    would I be off if I said 100 times people actually filed

4    lawsuits against you?

5    A.    I don't know the number.

6    Q.    But there's plenty?

7    A.    Yes.

8    Q.    It doesn't mean that they're true, the allegations in

9    there.

10   A.    That's correct.

11   Q.    In fact, hopefully for you, most of the time they're

12   not true?

13   A.    That's correct.

14   Q.    Okay.

15         Additionally, people file complaints against you

16   as the Sheriff, probably every elected official, if

17   they're not getting complaints they're not doing their

18   job, correct?

19   A.    Yes.

20         MR. WEXLER:  Judge, I am going to offer

21   defendant's K-1 into evidence, please.

22         MS. MIRABILE:  Objection.  They're irrelevant.

23         THE COURT:  Pardon?

24         MS. MIRABILE:  They're irrelevant.

25         THE COURT:  Can I see K-1?

804

1       MR. WEXLER:  Certainly.

2       (Pause in proceedings.)

3       THE COURT:  I'm going to sustain the objection.

4       MR. WEXLER:  No further questions.

5       Thank you.

6       THE COURT:  Anything else?

7       MS. MIRABILE:  No, your Honor.

8       THE COURT:  You may step down, Sheriff.

9       (The witness steps down.)

10      THE COURT:  Please call your next witness.

11      MS. MIRABILE:  The United States calls Scott

12 Nolin.

13      THE COURT:  Raise you right hand.

14

15 SCOTT NOLIN,

16          called as a witness, having been first

17          duly sworn, was examined and testified

18          as follows:

19

20      THE COURT:  Please be seated, please speak up in

21 a loud voice, and state your full name and spell your name

22 slowly for the record.

23      THE WITNESS:  Deputy Sheriff Scott Nolin, S C O

24 T T, N O L I N, shield number 514, with the Suffolk County

25 Sheriff's office.

805

1    DIRECT EXAMINATION

2    BY MS. MIRABILE:

3    Q.    Good afternoon, Deputy Sheriff Nolin.

4    A.    Good afternoon.

5    Q.    You're currently employed by the Sheriff's office?

6    A.    Yes.

7    Q.    Your position is deputy sheriff?

8    A.    Yes.

9    Q.    How long have you been a deputy sheriff with the

10   Suffolk County Sheriff's office?

11   A.    It will be eight years in December.

12   Q.    Where are you currently assigned?

13   A.    The District Attorney's East End Drug Task Force.

14   Q.    How long have you been assigned to the East End Drug

15   Task Force?

16   A.    Since 2012.

17   Q.    What are your duties and responsibilities as a deputy

18   sheriff?

19   A.    With my current assignment?

20   Q.    I'm sorry?

21   A.    With my current assignment?

22   Q.    Your duties and responsibilities, yes.

23   A.    I work with a narcotics unit, so we do surveillance,

24   wiretap investigations, undercover operations, we work

25   with confidential informants, we do search warrants,

806

1  things of that nature.

2  Q.   At some point during your time with the Sheriff's

3  office, were you assigned to conduct surveillance on the

4  defendant?

5  A.   Yes.

6  Q.   Who gave you that assignment?

7  A.   I received that assignment from the Sheriff's aide,

8  Pete Burnagossi under the direction of Sheriff DeMarco.

9  Q.   At the time you were given the assignment, did you

10  know the defendant?

11  A.   No.

12  Q.   What was your assignment?

13  A.   I was assigned to sit in the parking lot of the jail

14  and relate to the sheriff what time Mr. Walsh left.

15  Q.   And when you were in the parking lot of the Sheriff's

16  office, were you aware of which car was the defendant's

17  car?

18  A.   Yes.

19  Q.   What car was that?

20  A.   It was a blue Ford Crown Victoria.

21  Q.   Did you in fact conduct surveillance of the

22  defendant?

23  A.   Yes.

24  Q.   Did you take notes of your surveillance?

25  A.   I did.

807

1    Q.    I believe a copy of those notes are in front of you.

2          If you need to look at those notes to refresh

3    your recollection, you can do so.  Just let us know if you

4    need to look at them to refresh your recollection, okay?

5    A.    Yes.

6    Q.    When did you conduct surveillance of the defendant?

7    A.    I'll have to look at my notes to refresh my

8    recollection.

9    Q.    Sure.  What dates?

10   A.    The dates at the jail are March 17, 2014; March 18,

11   2014; and March 19, 2014.

12   Q.    Did you also do surveillance on two other days?

13   A.    March 20, 2014, yes, and March 27, 2014.

14   Q.    So the dates, the first three dates that you

15   mentioned, March 17, 18 and 19 of 2014, those were

16   actually at the jail?

17   A.    Yes, correct.

18   Q.    That's the Riverhead facility?

19   A.    Yes.

20   Q.    What time, starting with March 17, 2014, what time

21   did you begin your surveillance?

22   A.    That will be 1430 or 2:30 p.m.

23   Q.    Was the defendant's car in the parking lot at the

24   time?

25   A.    Yes, it was.

1  Q.  And what happened during the surveillance?

2  A.  Nothing, until 1913 hours, which would be 7:13 p.m.,

3  I observed Mr. Walsh get into his vehicle and exit his

4  parking spot and pull over to what would be the north side

5  of the parking lot, and lost vision of his vehicle through

6  the other vehicles in the parking lot, and I remained at

7  the jail until 10 p.m. and Mr. Walsh never returned.

8  Q.  You didn't follow the defendant?

9  A.  Negative.

10  Q.  On that day?

11  A.  On that day, no.

12  Q.  Why not?

13  A.  Because he went over to the side of the jail and

14  never returned.  I never saw him exit through the main

15  gate.

16       THE COURT:  You have to slow down when you

17  speak.

18       THE WITNESS:  Sorry, your Honor.

19  BY MS. MIRABILE:

20  Q.  You didn't see him exit the main gate?

21  A.  Negative.

22  Q.  So there's a main entrance and exit from the jail?

23  A.  Yes.

24  Q.  Is there a guard that sits at that location?

25  A.  There is a deputy sheriff, yes.

809

1    Q.    And during the time that you stayed there, I think

2    you said until 10 p.m.?

3    A.    Correct.

4    Q.    Did you see the defendant return at all that night?

5    A.    No, I did not.

6    Q.    And you conducted surveillance again the next day,

7    March 18, 2014?

8    A.    Yes, that's correct.

9    Q.    Did you set up again at the Riverhead facility?

10   A.    Yes, I did.

11   Q.    What time did you begin your surveillance on March

12   18, 2014?

13   A.    1415 hours or 2:15 p.m.

14   Q.    And was the defendant's car in the parking lot at

15   that time?

16   A.    Yes, it was.

17   Q.    Did you observe him leave that day?

18   A.    I did.

19   Q.    What time did he leave the Riverhead jail on March

20   18, 2014?

21   A.    1900 hours or seven p.m.

22   Q.    And did you observe how he left?

23   A.    I did.

24   Q.    Can you explain to the jury how he left?

25   A.    I observed the defendant travel to the north side of

1  the parking lot again.

2          There is a dirt access road that goes behind the

3  entire county center over in that area that will actually

4  leave you to the south side of the county center and push

5  you onto County Road 51.

6          Having seen the defendant head in that direction

7  the prior day, I assumed he was taking said dirt road.

8          So once the target left, I exited the main

9  entrance of the jail and traveled to County Road 51 where

10  I observed the defendant pulling out from that rear road.

11  Q.    You saw him pulling out of the dirt road or the

12  parking lot?

13  A.    The parking lot that led from the dirt road, yes.

14  Q.    Is this dirt road that goes behind the jail, is this

15  a dirt road that you've seen in your experience that

16  people use to exit, enter or exit the facility?

17  A.    No.

18          We have impounded vehicles back there, we have

19  trucks and some of our small marine boats back there, I've

20  never seen it used as an entrance or exit.

21  Q.    Did you follow him?

22  A.    On that date I did follow the target down County Road

23  51 until he got onto Sunrise Highway heading west, and

24  then I stopped following him because it was my job to see

25  in what direction he was going in.

811

1   Q.   Then did you return back to Riverhead?

2   A.   Yes, I did.

3   Q.   Why did you return back to Riverhead?

4   A.   To see if Mr. Walsh ever returned to the location.

5   Q.   How long did you stay there?

6   A.   Until 2200 or 10 p.m.

7   Q.   Did the defendant return to the jail that evening

8   before you ended your surveillance?

9   A.   Not that day, no.

10  Q.   On the next day, March 19, 2014, did you set up at

11  Riverhead facility?

12  A.   Yes, I did.

13  Q.   What time did you begin conducting surveillance at

14  Riverhead jail that day?

15  A.   1415 or 2:15 p.m.

16  Q.   Was the defendant's vehicle at the jail when you

17  began your surveillance?

18  A.   Not at that time, no.

19  Q.   Did you see the defendant arrive?

20  A.   Yes, I did.

21       The defendant arrived at 1500 or 3 p.m.

22  Q.   Did you see him leave that evening?

23  A.   I did.

24       Mr. Walsh left at 1704 or 5:04 p.m. through the

25  main gate and went north on Route 24.

812

1 Q. Did you follow the defendant?

2 A. I followed the defendant up to the Long Island

3 Expressway, where he got on westbound, and I believe

4 another surveillance team might have conducted things from

5 there. I did not. I stopped following him once he got on

6 the Expressway.

7 Q. What did you do?

8 A. I went back to the jail.

9 Q. Why is that?

10 A. To see if the target returned.

11 Q. Did he return?

12 A. No.

13 Q. What time did you end your surveillance at the jail

14 that evening?

15 A. At 2200 or 10 p.m.

16 Q. I would like you to look at Government's Exhibit 87-A

17 for identification, 87-B for identification --

18 THE COURT: What's the numbers?

19 MS. MIRABILE: 87-A, B, C and D for

20 identification.

21 BY MS. MIRABILE:

22 Q. Do you recognize what's depicted in these photographs

23 or these pictures, 87-A, B C and D?

24 A. I don't believe I have these photographs.

25 Q. You don't have them?

813

1   A.   I don't think so, no.

2          MS. MIRABILE:  My mistake.  I'm sorry.

3   BY MS. MIRABILE:

4   Q.   Do you recognize what's depicted in these

5   photographs?

6   A.   Yes.

7   Q.   What is this?

8   A.   This is the county center in Riverhead.

9   Q.   The Riverhead facility?

10  A.   The Riverhead jail.

11  Q.   The jail and the adjoining buildings?

12  A.   Yes.

13  Q.   Is this an aerial view?

14  A.   Yes.

15  Q.   And some of them are close-ups of certain areas?

16  A.   Yes.

17  Q.   Do these photographs, 87-A, B, C and D accurately

18  depict the layout of the complex in Riverhead?

19  A.   Yes.

20          MS. MIRABILE: The government offers 87-A, B, C

21  and D into evidence.

22          THE COURT:  Any objection?

23          MR. LATO:  Brief voir dire, your Honor?

24          THE COURT:  Yes.

25

814

1  VOIR DIRE EXAMINATION

2  BY MR. LATO:

3  Q.   More appropriately, sir, do 87-A, 87-B, 87-C and 87-D

4  fairly and accurately represent how the facility looked

5  during your surveillance as opposed to how it looks today?

6  A.   I didn't see it from this point of view.

7  Q.   Do you know how the jail looked from this point of

8  view when you conducted your surveillance?

9  A.   No, I don't.

10         MR. LATO:  Objection.

11         THE COURT:  Sustained.

12

13  BY MS. MIRABILE:

14  Q.   Do these photographs accurately show the entrance to

15  the facility, the main entrance?

16  A.   Yes.

17  Q.   Have you been by the main entrance?

18  A.   Yes.

19  Q.   Have you drove through the main entrance?

20  A.   Yes.

21  Q.   If you look at 87-D, does that depict the main

22  entrance?

23  A.   Yes.

24  Q.   Have you driven by the dirt road?

25  A.   Yes.

815

1  Q.   Have you seen the dirt road that goes around the

2  correctional facility?

3  A.   Yes.

4  Q.   And does 87-C depict that dirt road?

5  A.   Yes.

6  Q.   Do you see that dirt road in 87-B that goes around

7  the facility?

8  A.   Yes.

9  Q.   And, again, have you seen that road yourself?

10  A.   Yes.

11  Q.   I understand you haven't seen it from the air, but

12  have you seen it as to where it goes around the building?

13  A.   Yes.

14  Q.   And does that depict where the road goes around the

15  building?

16  A.   Yes, it does.

17  Q.   How about 87-A, does that depict where the dirt road

18  goes around the building?

19  A.   Yes, it does.

20  Q.   Does 87-A and 87-B also show where the entrance is to

21  the correctional facility?

22  A.   Yes, they do.

23  Q.   Do you know where that entrance is to the

24  correctional facility based on you entering the

25  correctional facility through that main gate?

816

1    A.    Yes.

2    Q.    And do you know where it is in proportion to the

3    jail?

4    A.    Yes.

5            MS. MIRABILE:  The Government offers 87-A, B, C

6    and D into evidence.

7            MR. LATO:  Additional voir dire, your Honor.

8

9    VOIR DIRE EXAMINATION

10   BY MR. LATO:

11   Q.    Putting aside where everything is, current tense of

12   the word is, when you conducted your surveillance between

13   March 17 and March 20 of 2014, do these pictures

14   accurately reflect where the dirt road was at the time,

15   where the entrance to the jail was at the time, not how it

16   is today, some two years later?

17   A.    Yes.

18   Q.    So these pictures are then accurate the way it was in

19   2014?

20   A.    As far as I can recollect, yes.

21           MR. LATO:  No objection.

22           THE COURT:  Government's Exhibits 87-A, for

23   able, through 87-D for dog in evidence.

24           (Government Exhibit 87-A through 87-D in

25   evidence.)

817

1    MS. MIRABILE:  Sorry, your Honor, I'm just going

2    to turn on the overhead.

3    BY MS. MIRABILE:

4    Q.    We're looking at Government's Exhibit 87-A.

5          I'm going to try and use a pointer.

6          Does this picture depict the layout of the

7    complex at the Riverhead facility?

8    A.    Yes.

9    Q.    What's right here?

10   A.    That would be the main entrance to the facility.

11   Q.    Is this the facility right over here?

12   A.    Yes.

13   Q.    Is this the dirt road that we were talking about?

14   A.    Yes, it is.

15   Q.    Do you recall where you were set up?

16         You know what it might be easier, if you use

17   this so you can point better.

18         MS. MIRABILE:  May I approach?

19         THE COURT:  Yes.

20   BY MS. MIRABILE:

21   Q.    Could you show me where you were set up for

22   surveillance, approximately where?

23   A.    For each date of surveillance at the jail, I was set

24   up under these solar panels in this parking lot.  I was in

25   a different spot everyday.  I couldn't tell you which one

1    on which day.

2    Q.    Where did the defendant park?

3    A.    The defendant parked -- I have to look at this.

4    Q.    Do you need another picture?

5    A.    No, I'm all right.

6           The defendant parked over here by the side

7    entrance.

8    Q.    You can step down.

9           (The witness steps down.)

10   A.    The defendant parked right in this area, this

11   administration lot over here.

12   Q.    When you saw the defendant leave by -- you said to

13   the north side of the building, is that what you said?

14   A.    Yes.

15   Q.    Could you use your pointer and show the jury what you

16   observed, how you observed the defendant leaving?

17   A.    The defendant, like I said, was parked in this

18   location.

19          He then pulled out onto this, what I describe as

20   a traffic circle right here, pulled this way through this

21   lot, and then accessed the dirt road I'm assuming from

22   right here.  It's the only access point of the dirt road,

23   and I did not observe him pull onto the dirt road, only

24   off of.

25   Q.    From where he was parked, how would you be able to

819

1    leave by the main entrance?

2    A.    He could have pulled straight out here and exited

3    right at this location here.

4    Q.    And there's a guard or a deputy sheriff at that main

5    entrance?

6    A.    Yes.

7    Q.    What direction is that deputy sheriff facing?

8    A.    Usually facing the road here, Nugent Drive or 24, to

9    see who is pulling into the facility.

10   Q.    So it's to see who is entering the facility?

11   A.    Correct.

12   Q.    Not who is leaving the facility, right?

13   A.    Yes.

14   Q.    And when the defendant made that turn over that

15   circle that you had described, was that before or after

16   that deputy sheriff booth?  Did he have to pass the deputy

17   sheriff to make that turn?

18   A.    Yes, he did.

19          He had to pass -- the booth is right here, so he

20   would have to pass the actual booth going this way.

21   Q.    Looking at Government's Exhibit 87-B, is that a

22   closer view of that?

23   A.    Yes.

24   Q.    Can you please describe that?

25   A.    This, again, is a closer view of the Suffolk County

820

1  center, the correctional facility and the buildings on the

2  same grounds.

3  Q.   Could you please use the pointer and describe what

4  you observed, how the defendant left?

5  A.   Which route is this, through the dirt road or through

6  the -- on the next day from Nugent Drive?

7  Q.   On the second day.

8  A.   I have to look at notes to see which way he went on

9  the second day.  I don't remember.

10  Q.   Sure.  You can look at your notes.

11  A.   Just to see which day was which.

12        (Pause in proceedings.)

13        On the second day the defendant left his parking

14  spot over in this direction, again traveled through the --

15  passed the booth this way over into the employee parking

16  lot, and then again this is where I lost sight of him over

17  this dirt road access.

18  Q.   Okay.

19        Just so that the record is clear, when you

20  describe it, when you say he was going this way, we can

21  see you pointing, but when we read it back, we need to

22  know what you're pointing to, so if you could describe

23  that again for us.

24  A.   The defendant was parked in this area next to the

25  jail in the administrative parking lot.

821

1  Q.  That is as you're looking at the photograph, there's

2  two sets of solar panels, correct?

3  A.  Correct.

4  Q.  There's a right solar panel?

5  A.  Correct.

6  Q.  And he was to the left as you look at the picture of

7  those solar panels, the lower solar panel?

8  A.  Yes.

9  Q.  And then he went around that circle?

10  A.  Correct.

11  Q.  Passed the next set of solar panels?

12  A.  Correct.

13  Q.  And then he went down the picture towards the dirt

14  road?

15  A.  Correct.

16  Q.  And then down the dirt road around the building?

17  A.  Correct.

18  Q.  Okay.

19        I would like to show you 87-D.  I'm going to

20  zoom in on 87-D.  Zooming in on 87-D right here on the

21  right of that photograph, those are solar panels?

22  A.  Yes.

23  Q.  That's the solar panel where you can park underneath,

24  correct?

25  A.  Correct.

822

1  Q.   And there's one on the left and the right, and the

2  defendant would park to the right of that, I mean to the

3  left of that?

4  A.   To the left of it, yes.

5  Q.   To the left of the right set of solar panels?

6  A.   Yes.

7  Q.   When he left, you saw him go around that circle,

8  correct?

9  A.   Correct.

10 Q.   And as you look at the circle, do you see the guard

11 booth?

12 A.   Yes.

13 Q.   Where is the guard booth in relation to the circle?

14 A.   I guess to the right of it, this white structure.

15 Q.   So when the defendant passes the guard booth around

16 that circle, the guard booth would be, as he drives around

17 the circle, the guard booth would be to his right,

18 correct?

19 A.   Correct.

20 Q.   The person sitting in that guard booth is to watch

21 the traffic coming in, correct?

22 A.   Yes, correct.

23 Q.   Not the traffic that's going behind him in the

24 parking lot, correct?

25 A.   Correct.

823

1    Q.    And then continued around?

2    A.    Yes.

3    Q.    Towards the solar panels on the left-hand side?

4    A.    Correct.

5    Q.    To the dirt road, correct?

6    A.    Correct.

7    Q.    And 87-C, that's the dirt road that goes along the

8    back?

9    A.    Yes.

10   Q.    I would like to go back to 87-A which is a broader

11   view of the aerial view of the location, correct?

12   A.    Correct.

13   Q.    So when you saw the defendant on the second day leave

14   towards -- go around the circle towards the dirt road,

15   what did you do?

16   A.    Being I didn't see him return the day prior, I

17   assumed that he was using this dirt road as an exit point.

18        So when he exited, I went out the main entrance

19   on to Route 24 here and then drove down to County Road 51

20   right here where I observed the defendant pulling out of

21   the dirt road into this side lot.

22   Q.    When you say this side lot there is, at the bottom of

23   the picture, there's another set of solar panels?

24   A.    Yes.

25   Q.    And that's solar panels above a parking lot, correct?

824

1  A.   Correct.

2  Q.   Is that where you saw the defendant exit on to Route

3  51, I believe you said it was?

4  A.   Yes.

5  Q.   And the road that goes across the top of the

6  photograph, that's 24?

7  A.   Yes.

8  Q.   The road that goes sort of at a diagonal in the

9  picture, that's 51?

10  A.   Yes.

11  Q.   Did you make it to where the defendant exited before

12  he did?

13  A.   Yes.

14       Actually I had to go quite slow to make sure he

15  pulled out in front of me so I could be behind him.

16  Q.   From your experience in exiting the vehicle, you got

17  here faster than the defendant even though you went at a

18  slower rate of speed, correct?

19  A.   Yes.

20  Q.   And the defendant, instead of exiting the main

21  entrance, took a longer, slower route around the dirt road

22  around the back of the building, correct?

23  A.   Correct.

24  Q.   Is it faster to exit the correctional facility from

25  the main entrance than the dirt road?

825

1    A.    I've never actually left it from the dirt road so I

2    can't say.

3    Q.    But you exited the main entrance and even going at a

4    slow rate of speed, you managed to get to the same

5    location back faster than the defendant?

6    A.    Yes.

7    Q.    And following your surveillance in March of 2014, did

8    you report this back to the sheriff?

9    A.    Yes, I did.

10           MS. MIRABILE:  One moment, your Honor.

11           (Pause in proceedings.)

12           MS. MIRABILE:  Nothing further.

13           No further questions.

14           THE COURT:  Cross-examination.

15

16   CROSS-EXAMINATION

17   BY MR. LATO:

18   Q.    Good afternoon, sir.

19   A.    Good afternoon.

20   Q.    Do you still have that laser pointer?

21   A.    I do.

22   Q.    On March 17 of 2014, did you initiate surveillance of

23   Mr. Walsh or his vehicle?

24   A.    Yes.

25   Q.    It would be a fair statement on March 17, somewhere

826

1  in the Sheriff's office parking lot, you sat in your car?

2  A.   Yes.

3  Q.   Were you alone?

4  A.   Yes.

5  Q.   Is it fair to say that at approximately 2:30 p.m.

6  from your car, you observed Mr. Walsh's car parked in the

7  parking lot?

8  A.   Yes.

9  Q.   Do you remember where it was parked in the parking

10 lot?

11 A.   Not which spot, but he was on the side lot every

12 time.

13 Q.   And by the side lot, do you mean the lot near the

14 side entrance as opposed to the main entrance?

15 A.   Correct.

16 Q.   And is that the side lot where the Sheriff parks his

17 car as well?

18 A.   Yes.

19 Q.   Now, is it fair to say that you first saw Mr. Walsh

20 after you initiated surveillance at approximately 7:13

21 p.m.?

22 A.   Yes.

23 Q.   So for several hours Mr. Walsh's car did not move,

24 correct?

25 A.   Correct.

1  Q.   And for several hours you did not see Mr. Walsh,

2  correct?

3  A.   Correct.

4  Q.   And is it fair to say that at 2:30 p.m., it was light

5  out?

6  A.   Yes.

7  Q.   Is it fair to say that at around 5:00 a lot of

8  corrections officers and deputy sheriffs left?

9  A.   Yes.

10 Q.   Is it fair to say that Mr. Walsh was not one of those

11 persons who left at 5:00?

12 A.   Yes.

13 Q.   Is it fair to say that you first saw him at 7:13 or

14 so p.m., correct?

15 A.   Correct.

16 Q.   Now, is it fair to say that he left in his vehicle?

17 A.   Yes.

18 Q.   On that day did you try to follow him?

19 A.   No.

20 Q.   Do you know where he went?

21 A.   No, I do not.

22 Q.   For instance, for all you know, he went to the

23 Yaphank jail, correct?

24 A.   Correct.

25 Q.   For all you know, he met the Sheriff somewhere,

1  correct?

2  A.    Correct.

3  Q.    Now, did you stay in your car conducting surveillance

4  of that general area in the lot until about 10 p.m.?

5  A.    Yes.

6  Q.    So is it fair to say that you were in your car

7  conducting surveillance in the lot for approximately

8  seven-and-a-half hours?

9  A.    Correct.

10  Q.    Did you ever leave to go to the bathroom?

11  A.    Not that I noted.

12  Q.    Okay.  I see you didn't note it.

13          Do you have a recollection of whether you sat in

14  your car for seven-and-a-half hours without going into the

15  building to go to the bathroom?

16  A.    No, I don't.

17  Q.    You don't remember?

18  A.    I don't remember.

19  Q.    So basically then you could have gone in and you

20  could not have gone in, you don't remember one way or the

21  other?

22  A.    That's fair to say, correct.

23  Q.    And if you did go in, was there anybody else to take

24  over for you that day?

25  A.    I don't know.

829

1    Q.    You certainly are not aware of anyone else, correct?

2    A.    Nope, not on that day.

3    Q.    Now, is it fair to say on the next day, March 18,

4    2014, again you were assigned to conduct surveillance of

5    Mr. Walsh and/or his vehicle?

6    A.    Yes, sir.

7    Q.    Is it fair to say that you initiated surveillance in

8    the same place, the side lot of the Sheriff's office?

9    A.    Yes, it is.

10   Q.    Is it fair to say that about 2:15 you observed

11   Mr. Walsh's car in the side lot?

12   A.    Yes, it is.

13   Q.    Is it a fair statement, once again, that it was the

14   same lot where the Sheriff parked his car?

15   A.    That's correct.

16   Q.    Now, is it a fair statement that you did not see

17   Mr. Walsh at 2:15, correct?

18   A.    Correct.

19   Q.    And you didn't see him at say 5:15, correct?

20   A.    Correct.

21   Q.    The first time you saw him was approximately seven

22   p.m., correct?

23   A.    Correct.

24   Q.    And, once again, it was dark already, correct?

25   A.    I don't recall.

830

1  Q.   Seven p.m. in March, March 17, you don't remember

2  whether it was dark?

3  A.   Probably getting dark.

4  Q.   Now, is it your recollection or looking at your notes

5  that you saw Mr. Walsh leave in his county vehicle?

6  A.   Yes.

7  Q.   Do you see where he went?

8  A.   Yes.

9       MR. LATO: Now, may I have the exhibit that the

10  witness was using.

11       I think it's 87-A.

12  Q.   I'm going to give you 87-A, 87-B, 87-C and 87-D,

13  unless you already have them.

14       Do you have them?

15  A.   I have them.

16  Q.   Please pick the one that best depicts the route that

17  you followed Mr. Walsh on that day.

18       You testified on direct -- you used the pointer.

19  Use the same one.

20  A.   I believe that was 87-A.

21  Q.   87 is up on the screen.

22       Can you see about where the dirt road was on

23  March 18, 2014?

24  A.   Yes.

25  Q.   Could you please use your pointer, sir, and is it

831

1 fair to say at about seven p.m., you followed or you saw

2 Mr. Walsh go on this dirt road, correct?

3 A.    I did not see him go on the dirt road.  I said I saw

4 him come off the dirt road.

5 Q.    Show us where you saw him come off.

6 A.    Right around this parking lot right here.  I observed

7 him drive through this parking lot to County Road 51.

8 Q.    From where you first observed him coming out, what

9 path would he have had to have taken to get there from the

10 side lot?

11 A.    The dirt road.

12 Q.    Trace it for us, please, the lot, the whole way from

13 where he was until you picked him up again.

14 A.    This is where I lost contact of him.

15 Q.    Keep going where he would have had to have gone.  Let

16 me stop you there.  Keep the light on.

17        Is there a fence there to prevent prisoners from

18 escaping?

19 A.    I would assume so, yes.

20 Q.    When you say you assume so, is it fair to say you've

21 never been down that road?

22 A.    I have.

23 Q.    Well, is there or was there a fence there on March 18

24 of 2014, do you remember?

25 A.    I wasn't there.  I wasn't back there on that day.

832

1   Q.   You don't know, one way or another, whether there was

2   a fence there, correct?

3   A.   No.

4   Q.   You wouldn't know, if there was a fence, whether it

5   had been damaged?

6   A.   Correct.

7   Q.   So is it fair to say that you don't know what Ed

8   Walsh was doing back there, correct?

9   A.   Correct.

10  Q.   You don't know whether he got out of his car to look

11  at the fence, correct?

12  A.   Correct.

13  Q.   Do you know whether right around that time, March 17,

14  18 and 19, a prisoner had escaped from the jail, do you

15  remember one way or the other?

16  A.   No.

17  Q.   Now at any time on March 18, when you actually

18  observed Mr. Walsh, did you witness him engage in any

19  nefarious activity, such as drinking a beer or smoking a

20  joint?

21  A.   No.

22  Q.   Now, did you follow Mr. Walsh somewhere?

23  A.   Yes.

24  Q.   Did you follow him onto Sunrise Highway?

25  A.   Yes.

833

1  Q.   And did you break off surveillance at that point or

2  shortly thereafter?

3  A.   Shortly thereafter at William Floyd Parkway.

4  Q.   And that would be heading west, correct?

5  A.   Correct.

6  Q.   Is it fair to say that the Yaphank jail is west of

7  where you left Mr. Walsh?

8  A.   Yes, it is.

9  Q.   And to be fair, southwest?

10 A.   Correct, yes.

11 Q.   On the other days that you surveilled Mr. Walsh, did

12 you witness him engage in any improper or illegal

13 activity?

14 A.   No, I did not.

15 Q.   When he left, do you have any idea where he went or

16 why he went there?

17 A.   No, I do not.

18          MR. LATO:  Nothing further.

19          MS. MIRABILE:  Just a couple of questions.

20

21 REDIRECT EXAMINATION

22 BY MS. MIRABILE:

23 Q.   Looking at Government's Exhibit 87-A, on the date

24 that you followed the defendant and exited the

25 correctional facility onto 24 and down to 51 to where you

1  saw the defendant exit from the dirt road, how long did

2  that take you?

3  A.    I don't recall.  It could only be a few seconds.

4  Q.    It took you a couple of seconds to get down there?

5  A.    More than a couple, approximately 15 seconds.

6  Q.    Could it be less than a minute?

7  A.    Yes.

8  Q.    And how long did you have to wait for the defendant

9  to come out of that dirt road?

10  A.    Not very long.

11  Q.    More than a minute or less than a minute?

12  A.    Less than a minute.

13  Q.    Less than a minute.

14        Between the time you saw the defendant leave his

15  parking spot until the time you saw him exiting the dirt

16  road, approximately how long of a period of time was that?

17  A.    Two minutes.

18  Q.    When you say him get into his car to drive around and

19  exit?

20  A.    Correct.

21        MS. MIRABILE:  No further questions.

22        MR. LATO:  No questions.

23        THE COURT:  You may step down.

24        (The witness steps down.)

25        THE COURT:  Please call your next witness.

1        I think we will take a break at this time.

2   We're going to take a 15 minutes recess.

3        Please don't discuss the case, keep an open

4   mind.  Please recess yourselves.

5             (The jury is excused.)

6             (Recess taken.)

7             (Continued on next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

836

1           (After recess.)

2           (Whereupon, the jury at this time enters the

3    courtroom.)

4           THE COURT:  Please be seated, members of the

5    jury.  Please proceed.

6           MR. TIERNEY:  Thank you, your Honor.  The

7    Government calls Richard Schaffer.

8           THE CLERK:  Please raise your right hand.

9    **R I C H A R D   S C H A F F E R**,

10           called as a witness, having been first

11           duly sworn, was examined and testified

12           as follows:

13           THE CLERK:  Please state your name and spell it

14    slowly for the record.

15           THE WITNESS:  Sure.  Richard S-c-h-a-f-f-e-r.

16           THE COURT:  Keep your voice up, Mr. Schaffer.

17           THE WITNESS:  Yes, your Honor.

18    DIRECT EXAMINATION

19    BY MR. TIERNEY:

20    Q    You are employed by the Town of Babylon?

21    A    Yes.

22    Q    And how are you employed by the Town of Babylon?

23    A    I'm the Supervisor of the Town of Babylon.

24    Q    For how long have you been the Supervisor for the

25    Town of Babylon?

837

1    A    I served from November 19, 1992, to December 31,

2    2001, and then I was appointed on January 1, 2012, and I'm

3    currently still serving.

4    Q    And what are your duties and responsibilities as the

5    Supervisor for the Town of Babylon?

6    A    I'm the Chief Executive Officer of the town, Chief

7    Financial Officer, responsible for the day-to-day

8    activities of the town, responsible for all various

9    departments that fall under the town.

10   Q    And Supervisor of the Town of Babylon, is that an

11   elected position?

12   A    Yes, it is.

13   Q    Are you a member of a particular political party?

14   A    Yes.

15   Q    What is that?

16   A    That's the Democratic Party.

17   Q    Now, in addition to being the Supervisor of the Town

18   of Babylon, do you have a position within the Democratic

19   Party?

20   A    Yes, I'm the the Chairman of the Democratic

21   Committee.

22   Q    Is that a position that you get elected in the

23   Democratic Party itself?

24   A    Yes, correct.

25   Q    How long have you been the Chairman of the Suffolk

838

1    County Democratic Party?

2    A    I've been the Chairman since September of 2000.

3    Q    And as leader of the Town of Babylon as well as

4    leader of the Suffolk County Democrats, how are you able

5    to manage those two duties?

6    A    That's a question my therapist has asked me.  But

7    there are governmental responsibilities with the Town of

8    Babylon.  There are political responsibilities with the

9    Suffolk County Democratic Committee and no political

10   activities can take place in the governmental building, so

11   I manage them to keep them separate by doing them in two

12   separate places at two separate times.

13   Q    Are you required to fill out time sheets?

14   A    No, no time sheets.

15            There is something called a record of activity.

16   And so every elected official in New York State has to

17   fill out a sample three months of activities of what he or

18   she does in their position.

19            So, for example, right now, during January,

20   February and March, I chose those three months for this

21   year, 2016, where I have to complete a calendar and list

22   all of the various activities that are performed with

23   regard to my Town of Babylon Supervisor position and those

24   are submitted.  It's for -- it's for verification that I

25   qualify as an employee for pension.

1  Q    And the rules with regard to politics for an elected

2  official, are they different than the rules for Suffolk

3  County employees?

4  A    For elected officials, it's either politics or

5  government.  The would go hand in hand because we're both

6  a political creature as well as a governmental creature.

7  So they work hand in hand.

8  Q    As Suffolk County Democratic Party Chairman, are you

9  familiar with the leaders of the other parties?

10  A    Yes, I am.

11  Q    Can you name some of them?

12  A    The Republican Party is John LaValle, the Suffolk

13  County Republican Party.

14        Suffolk Conservative Party is Ed Walsh.

15        The Suffolk County Independents Party is Frank

16  MacKay and the Suffolk County Working Family's party is

17  Michele Lynch.

18  Q    Do you see Ed Walsh in the courtroom today?

19  A    Yes, I do.

20  Q    Please point him out and identify an article of

21  clothing?

22  A    Sitting off to the side, wearing a green colored

23  jacket with a tie, green-brown, and an American flag on

24  his lapel.

25        MR. TIERNEY:  May the record reflect.

1     THE COURT:  Yes.

2     MR. TIERNEY:  Thank you, your Honor.

3  Q    Regarding the political party you just mentioned,

4  which are the two biggest as far as the number of

5  registered voters?

6  A    That would be the Democratic and Republican Parties.

7  Q    What are the relative sizes of the two?

8  A    They each have about approximately 300,000 registered

9  voters in both the Republican and Democratic Party.

10 Q    And with regard to the Conservative, Independents and

11 Working Family, are those the so-called minor parties?

12 A    Yes, those are considered minor parties.

13 Q    Which one is the next biggest in size?

14 A    Actually it would be no party which is we determine

15 blank when a voter does not list a political party or does

16 not wish to be involved in a political party, they check

17 off "I do not wish to be enrolled in a political party,"

18 that is classified as blank.  That's about 240,000 people

19 to do that.  That's the next one.

20     After that would be the Independents Party which

21 has I think approximately 50,000 registered.  The

22 Conservative Party has about 23, 24,000, and Working

23 Family Party is much smaller.

24 Q    And typically when a candidate runs for office how

25 does he or she get on the ballot?

1   A    Couple ways.

2          One, you can be nominated by the political party

3   itself, and in some cases when there's something called a

4   special election, just by virtue of the party nominating

5   you that will put you on the ballot.

6          In most cases, though, you are required to get

7   signatures on what are called nominating petitions and the

8   nominating parties are usually carried by the party, but

9   you don't necessarily have to be nominated by the party.

10  You can challenge the party's selection of a candidate and

11  decide to go out and get signatures on your own.

12         All candidates are required to get the same

13  number of signatures and that's all submitted to, in this

14  case, the Suffolk County Board of Elections.

15  Q    Once that process is completed, do the various

16  political parties pick their candidates?

17  A    Well, the political parties would pick the candidates

18  prior to the petitioning process.  I'll give you an

19  example.  I use this as an example.

20         In 2016 all of the parties would conduct their

21  nominating conventions sometime in May of this year.  And

22  then the nominating petition period would run from say

23  approximately June 4th or 5th, through the first week in

24  July.

25         Then all of those petitions would be submitted

1    to the Board of Elections sometime in mid-July.  And then

2    those people that have petitions submitted and the number

3    of signatures, if they meet the requirement of the number

4    of signatures, they would be officially nominated.

5            If there are two candidates running for the same

6    office, those people would run in a primary election held

7    in September.  If there is only one candidate, that person

8    would run for that party in the November general election.

9    Q    Once a candidate is picked for the various parties,

10   typically do the Republican and Democratic Parties pick

11   the same candidate for a particular office?

12   A    No.  There are some cases that that does happen, but

13   in more cases than none, each party selects a different

14   candidate.

15   Q    Given that fact and the relative similarities in size

16   between the Democratic and Republicans, what has that done

17   to the importance of securing a Conservative Party line

18   for a candidate?

19   A    It's very important to have a Conservative or one of

20   the other minor parties because if you look the at

21   numbers, typically the Democratic line or the Republican

22   line alone doesn't get you to 50 percent.  Obviously you

23   need 50 percent plus one to win the election, so the minor

24   parties would become much more important to a candidate

25   seeking a particular office.

1    Q    Now, as a Suffolk County Democratic leader as well as

2    the Supervisor for the Town of Babylon, how would you

3    describe your schedule?

4    A    Very hectic.

5    Q    And how do you keep and maintain such a hectic

6    schedule?

7    A    So I in terms of keeping it down, I work out of a

8    gmail or Google calendar and I keep my own schedule myself

9    and I have an assistant, I have an assistant in the

10    Democratic Party who keeps a schedule for the political

11    activities.

12    Q    What, if anything, do you do with your schedule as

13    you go through your day?

14    A    As I go through, I will delete items that I don't

15    attend.

16        So, for example, over this past week, there was

17    an event on that I actually couldn't get to because I had

18    four events on Saturday night, and I was unable to get to

19    the fifth, so I delete that off my calendar so I'm able to

20    at least recall what events I did attend or didn't attend

21    and I do that mostly for income tax purposes.

22        My accountant requires me to submit to him exact

23    information regarding mileage, so that I can claim for tax

24    purposes mileage related to both jobs for income tax

25    purposes.

844

1  Q    Do you keep and maintain your calendars that

2  memorialize the events and meetings you attended relating

3  to all your work?

4  A    Yes.

5  Q    And did you receive a subpoena from the United States

6  Attorney's Office asking me to look through your calendar

7  and phone and to provide the U.S. Attorney's Office with

8  information regarding meetings that you had with the

9  defendant?

10 A    Yes, I did.

11 Q    And did you do that?

12 A    Yes, I did.

13 Q    And do you have the document that you prepared in

14 response to that subpoena?

15 A    Yes, I do.

16 Q    And is that marked as Government's Exhibit -- I'm

17 sorry, 3500 RS-1, I believe.

18 A    Yes, it is.

19 Q    Okay.  And are you testifying here pursuant to

20 another subpoena issued by the U.S. Attorney's Office?

21 A    Yes, I am.

22 Q    I'm just going to show you what has been marked as

23 Government's Exhibit 88 for identification only.

24 A    Yes.

25 Q    Do you recognize that, sir?

845

1   A    Yes, I do.

2   Q    Is that the document that you prepared in compliance

3   with the U.S. Attorney's Office subpoena?

4   A    Yes, it is.

5   Q    And does it help to refresh your recollection about

6   the number of meetings or interactions with the defendant

7   you've had?

8   A    Yes, it does.

9   Q    And when they occurred?

10  A    Yes.

11          MR. TIERNEY:  You can put that down, and if you

12  need to you may refer to it.

13  Q    Calling your attention to March 30, 2011, did you

14  attend a Women's History Month event.

15  A    Yes, with the Suffolk County Women's Bar Association.

16  Q    Was that at the Melville Marriott?

17  A    Yes, it was.

18  Q    And do you remember what time it was?

19  A    It was approximately 6:30 to approximately 8:30.

20  Six o'clock I think it started.  I got there about 6:30

21  and it ran until about 8:30.

22  Q    Did you see the defendant there?

23  A    Yes.

24  Q    Now, on April 7, 2011, did you attend an event?

25  A    Yes, I did.

846

1   Q    What event did you attend?

2   A    That was a Suffolk County Conservative Party

3   fund-raiser at the Venetian Yacht Club in Babylon.

4   Q    What time was that?

5   A    That ran from 6 to 8:00 p.m.

6   Q    And did you see the defendant at that event?

7   A    Yes, I did.

8   Q    Next I'll call your attention to April 25, 2012.

9         Did you have any interaction with the defendant

10  on that day?

11  A    Yes, I did.

12  Q    What interaction did you have?

13  A    He and I had lunch at the Kitchen Kabaret on Saxon

14  Avenue in Bayshore.

15  Q    From what period of time to what period of time was

16  that lunch?

17  A    That was approximately 12:30 to 1:30 p.m.

18  Q    And I'm next going to call your attention to

19  October 30, 2012.  Did you have something scheduled in

20  your calendar for that day?

21  A    Yes.

22  Q    What was that?

23  A    That was a Suffolk County Conservative Party

24  fund-raiser at the West Lake Inn, in Patchogue.

25  Q    Did you end up attending that event?

847

1    A    No, I did not.

2    Q    Why is that?

3    A    That was the night after Superstorm Sandy hit and I

4    was pretty busy.

5    Q    I'm next going to call your attention to February 13,

6    2013.  Did you have any interaction with the defendant on

7    that day?

8    A    Yes, I did.

9    Q    What, if anything, did you do on that day?

10   A    I had breakfast at the Oconee Diner on Main Street,

11   in Islip.

12   Q    Do you remember from what period of time to what

13   period of time did you have breakfast with the defendant?

14   A    Approximately 8:30 a.m. to 9:30 a.m.

15   Q    I'm next going to call your attention to March 20,

16   2013.  Did you have an interaction with the defendant on

17   that day.

18   Q    Yes, I did?

19   Q    What, if anything, occurred on March 20, 2013?

20   A    That I was at the St. Patrick's/St. Joseph's Day

21   celebration hosted by the Independents Party and the

22   Conservative Party.

23   Q    Where was that located?

24   A    That was held at the Out of the Box Studios in

25   Bohemia.

848

1  Q   And do you remember what time that event was?

2  A   It was scheduled to run from 6 to 9:00 p.m. and I

3  recall that I got there relatively late.  I had a couple

4  of other events that night.

5  Q   Did you see the defendant there that day?

6  A   Yes, I did.

7  Q   I next call your attention to May 9, 2013.  What, if

8  anything, did you do on that day?

9  A   That was, I had breakfast with Ed Walsh at the Peter

10  Pan Diner on Sunrise Highway in Bayshore.

11  Q   What time was that?

12  A   That was approximately 8:00 a.m. to 9:00 a.m.

13  Q   And I'll next call your attention to May 22, 2013.

14  Did you have any interaction with the defendant on that

15  day?

16  A   Yes.

17  Q   What, if anything, was the interaction?

18  A   That was the Suffolk County Conservative Party

19  fund-raiser at the Chairman Club at the West Lake Inn in

20  Patchogue.

21  Q   From what period of time to what period of time?

22  A   I have myself being there between 6 and 7:00 p.m.

23  Q   And do you know -- did you see the defendant there?

24  A   Yes.

25  Q   Do you know how long that event ran?

849

1   A    I don't.  It wasn't on my schedule, so I couldn't

2   recall.  Typically they run from six to eight.

3   Q    Next, I'll call your attention to January 17th of

4   2014.  Did you have any interaction with the defendant on

5   that day?

6   A    Yes, I had breakfast with him at the Oconee Diner.

7   Q    And from what period of time to what period of time

8   was that breakfast?

9   A    That was approximately 8:00 a.m. to 9:00 a.m.

10  Q    And finally, I'll call your attention to April 19th,

11  I'm sorry, April 9, 2014.  Did you have any interaction

12  with the defendant on that day?

13  A    Yes.

14  Q    What, if anything, did you do?

15  A    I had breakfast at the Oconee Diner on Main Street in

16  Islip.

17  Q    With the defendant?

18  A    Yes, with the defendant.  Yes.

19  Q    From what period of time to what period of time?

20  A    Approximately 8:00 a.m. to 9:00 a.m.

21  Q    And with regard to these interactions with the

22  defendant, how would you characterize them?

23  A    The fund-raisers were activities for the Conservative

24  parties so they were attended by a number of people.

25          The interactions for lunch or breakfast were

850

1    just he and I.

2    Q    And the meetings and meals, is it fair to say, the

3    discussions were of a political nature?

4    A    Yes.

5    Q    Were there times you would discuss Democratic

6    candidates?

7    A    Yes.

8    Q    Would you also discuss Conservative candidates?

9    A    Yes.

10   Q    Among those Conservative candidates at times would

11   you talk about Sheriff DeMarco?

12   A    Yes.

13   Q    Now, do you yourself have a relationship with Sheriff

14   DeMarco?

15   A    Yes.

16   Q    And if Sheriff DeMarco needs to speak with you, could

17   he talk to you?

18   A    Yes.

19   Q    And have you spoken with Sheriff DeMarco with regard

20   to Conservative or Democratic Party issues?

21   A    Yes.

22   Q    And was Sheriff DeMarco able to speak to you without

23   going through the Defendant Walsh first?

24   A    Yes.

25   Q    And in any event, the events that you attended and

1  the meals that you had with the defendant, they didn't

2  have anything to do with the Suffolk County Sheriff's

3  Office, did they?

4  A    No, other than if it was political in nature to

5  Sheriff DeMarco.

6          MR. TIERNEY:  Thank you.  Nothing further.

7  CROSS-EXAMINATION

8  BY MR. WEXLER:

9  Q    Good afternoon, Mr. Schaffer.

10 A    Good afternoon.

11 Q    Is it fair to say that you and I have met prior to

12 today?

13 A    Yes, it is.

14 Q    And we have spoken prior to today?

15 A    Yes.

16 Q    Approximately how many occasions have you and I met

17 and/or spoken?

18 A    Probably a number that I can't repeat.  96 million.

19 Q    Okay.  And why --

20 A    I do know Sonny.

21 Q    And have you and I had the opportunity to meet and

22 speak on at least 96 million occasions?

23 A    We have rented space in the same law -- suite of law

24 offices in North Babylon.

25 Q    How long does that go back?

1    A    At least 16 years.

2    Q    Okay.  So let me just ask you some basic questions,

3    Mr. Schaffer.

4         When you testified that you had in your diary

5    scheduled an hour to meet with Ed Walsh, does that mean

6    that the meeting lasted an hour or you had it scheduled

7    and it could have been shorter or longer at this juncture,

8    or you don't know?

9    A    Correct.

10   Q    Let me just ask, for instance, when you went to a

11   fund-raiser, let's say the Conservative fund-raiser of

12   May 22, 2013.  That was in the p.m.?

13   A    That was in the p.m., yes.

14   Q    And do you know what time approximately you arrived

15   there?

16   A    Well, I had it down that I was there between six and

17   seven.

18   Q    Okay.

19   A    Because I had other events scheduled that night.

20   Q    Okay.  Let's go to the event or the breakfast on

21   February 13, 2013.  That was at the Oconee?

22   A    Yes, it was.

23   Q    And you are scheduled for 8:30 to 9:30?

24   A    Yes.

25   Q    Okay.  And that was an election year for the Sheriff,

1  wasn't it?

2  A    2013 was, yes.

3  Q    And various other county officers?

4  A    Yes.

5  Q    And you met with Ed Walsh to discuss politics,

6  correct?

7  A    Yes, correct.

8  Q    You had nothing to do with the running nor do you

9  care for the running of the Suffolk County jail?

10  A    No.

11  Q    You have enough headaches of your own.

12  A    Correct.

13  Q    During that discussion, was Eddie talking to you on

14  behalf of the Sheriff about his election?

15  A    Yes, he would be talking, yes, to me about the

16  upcoming election.  I don't recall specifically what was

17  said, but the context would be in the context of the

18  upcoming election year.

19  Q    Can you give us an example or a for instance.  Like

20  what sorts of things he would discuss with you as the

21  Democratic Chair and Ed as the Conservative Chair.

22         What sorts of things would you discuss let's say

23  on behalf of Sheriff DeMarco at the Oconee meeting on

24  February 13th of 2013?

25  A    We would probably discuss potential opponents since

854

1    he was an incumbent.  We would discuss election strategy

2    since we had supported Sheriff DeMarco in the past

3    elections.

4           We might just talk about particular issues that

5    could come up in the election.  So just general

6    conversation.

7    Q    Okay.  And in fact you met with Ed Walsh again on

8    May 9th at 8:00 a.m. to 9:00 a.m., this time at the Peter

9    Pan Diner?

10   A    Correct.

11   Q    You like diners, or that's just where you meet?

12   A    I don't cook.

13   Q    So you met with him between eight and nine and once

14   again it was 2013.  It was Sheriff DeMarco's election

15   year.

16          Is it your best recollection that you were

17   discussing Sheriff DeMarco among other elected officials?

18   A    Yes, it wouldn't just have been Sheriff DeMarco.

19   There would have been other items.

20   Q    Mr. Schaffer, when you had had discussions -- strike

21   that.

22          You had discussions directly with Vincent

23   DeMarco, the Sheriff, correct?

24   A    Correct.

25   Q    And in your discussions with Vincent DeMarco, did you

1 ever circle back:  Oh, I spoke with Eddie concerning this,

2 that or that other issue?

3 A    I don't recall specifically but I'm sure that we

4 spoke about items, I spoke about items with Sheriff

5 DeMarco that I would have spoken to Ed Walsh about and

6 vice versa --

7 Q    Okay.  And --

8 A    -- Of a political nature.

9 Q    Sure.  So it would not have been unusual for you to

10 after you spoke to Ed or after you spoke to Sheriff

11 DeMarco, to say to one another, oh, I just spoke to Eddie

12 or I spoke to Vinnie and I discussed and worked through

13 these issues?

14 A    Yes.

15 Q    So it wasn't to your knowledge this shock or surprise

16 that Eddie had spoken to you on Sheriff DeMarco's behalf?

17 A    No.

18 Q    He didn't say, oh, my God, I don't believe you spoke

19 to him?

20 A    No.

21 Q    It's fair, is it not, that he basically expected

22 that's what you would be doing chairman to chairman on his

23 behalf.

24 A    He to who?

25 Q    I'm sorry, the Sheriff.

856

1        MR. TIERNEY:  Objection.

2        THE COURT:  Sustained as to form.  Strike out

3   the answer.  The jury is instructed to disregard it.

4   Q    When you spoke to Sheriff DeMarco, he didn't express

5   shock that you had spoken to Eddie about his election?

6   A    No.

7        MR. WEXLER:  Thank you, Supervisor Schaffer.

8        THE WITNESS:  Thank you.

9   REDIRECT EXAMINATION

10  BY MR. TIERNEY:

11       THE COURT:  Anything else?

12       MR. TIERNEY:  Briefly, your Honor.

13  Q    When you spoke with the defendant at the diner, in

14  what capacity was the defendant acting?

15  A    He was the chairman of the Conservative Party.

16  Q    When you discussed with him, when you spoke with him,

17  is it fair to say that you discussed with him a number of

18  candidates?

19  A    Yes.

20  Q    That at times included Sheriff DeMarco?

21  A    Yes.

22  Q    And as you sit here today, do you know on whose

23  behalf the defendant was there, whether he was there on

24  his own behalf, Sheriff DeMarco's behalf or someone else's

25  behalf?

1  A    The Conservative Party.

2          MR. TIERNEY:  Thank you, nothing further.

3  FURTHER RECROSS EXAMINATION

4  BY MR. WEXLER:

5  Q    When you made or came to an agreement, a political

6  arrangement, that the Democrats wouldn't in fact support

7  the Conservative candidates, was that made with you and

8  Sheriff DeMarco or was that made with you and Ed Walsh?

9  A    Me and Ed Walsh.

10  Q    Okay.  So it's not as though Sheriff DeMarco let's

11  say left Supervisor Shaffer out of the blue, called you

12  one day and say I want your nomination and endorsement for

13  any group.  It didn't happen that way, did it?

14  A    No, sir.

15          MR. WEXLER:  Thank you.

16          MR. TIERNEY:  May I ask one question, your

17  Honor?

18  FURTHER REDIRECT EXAMINATION

19  BY MR. TIERNEY:

20  Q    Could Sheriff DeMarco pick up the phone and talk to

21  you any time he wanted?

22  A    Yes.

23          MR. TIERNEY:  Nothing further.

24          THE COURT:  Anything else?

25          MR. WEXLER:  Nothing further.

858

1          THE WITNESS:  Thank you, your Honor.

2          THE COURT:  You are excused.

3          Call your next witness.

4          MR. TIERNEY:  The Government calls Frank Tinari.

5          MR. TIERNEY:  The witness is in the bathroom,

6   your Honor.

7          THE COURT:  I'll tell you, we'll break a little

8   earlier tomorrow, 4:45, so you'll make your arrangements.

9          (Pause in proceedings.)

10          THE COURT:  Do you want to rise, please.  Raise

11   your right hand.

12   F R A N K   T I N A R I,

13          called as a witness, having been first

14          duly sworn, was examined and testified

15          as follows:

16          THE COURT:  Please be seated, please speak up in

17   a loud voice near the microphone.  State your full nail

18   and spell your name slowly for the record.

19          THE WITNESS:  First name is Frank.  Last name

20   T-i-n-a-r-i.

21   DIRECT EXAMINATION

22   BY MR. TIERNEY:

23   Q    Mr. Tinari, what is it that you do for a living?

24   A    I'm an attorney.

25   Q    Are you a member of a political party?

859

1    A    Yes.

2    Q    What is your position.  I'm sorry.  What political

3    party?

4    A    The Conservative Party.

5    Q    Do you have a position within the political party?

6    A    I have two positions.  I'm the Vice Chairman of the

7    Suffolk County Conservative Party, and I'm also the

8    Chairman of the Huntington Conservative Committee.

9    Q    And how long have you been the Vice Chairman of the

10   Suffolk County Conservative Party?

11   A    About a year and a half.

12   Q    And who is the Chairman of the Suffolk County

13   Conservative Party?

14   A    Edward Walsh.

15   Q    Do you see him in the courtroom today?

16   A    Yes, I do.

17   Q    Could you please point him out and identify an

18   article of clothing?

19   A    The third person at the table.  He's wearing an

20   interesting tie.

21   Q    Where is he?  On the far left or far right side?

22   A    He's on my far left (indicating).

23        MR. TIERNEY:  Your Honor may the record reflect

24   --

25        THE COURT:  Where is he?

1          THE WITNESS:  The third person on the table.

2   I'm pointing to him.

3          THE COURT:  The one on the extreme left?

4          THE WITNESS:  Yes.

5          THE COURT:  Let the record show he's identified

6   the defendant.

7   Q    As a member of the Conservative Party, are you

8   involved in fund-raising?

9   A    Yes.

10  Q    How does the fund-raising work among the various

11  Conservative groups, whether they be town or county?

12  A    Well, there's a separate Conservative committee for

13  each town in Suffolk County which it has a separate

14  chairperson and executive committee and the members of

15  each town will do their own fund-raising.

16          They'll have a town-wide political fund-raising

17  event for their town.  And then the Suffolk County

18  Conservative Committee which Ed Walsh is the chairman,

19  they'll have, they'll raise money on a county level three

20  or four times a year they'll have a fund-raiser.

21  Q    Okay.  And with regard to yourself, by a fund-raiser,

22  what do you mean by a fund-raiser?

23  A    We'd have an event, maybe honor a person in the

24  community or an elected official and we'd sell tickets and

25  hopefully we'd get people to show up at the event and

1   that's one of the ways that a political party raises money

2   to be used in elections, whether it is taking out ads or

3   whatever, buying signs, or any money that would be needed

4   to run a political campaign.

5   Q    And you yourself, do you attend many of these events?

6   A    Yes, I do.

7   Q    How would you characterize your attendance at these

8   events with regard to local and county Conservative

9   events?

10  A    I've been a member of the Conservative Party for

11  probably 30 years.  I would say over the last ten years,

12  I've been very active and I would say over the last six,

13  seven, eight years, I've attended almost all of the

14  Suffolk County Conservative Committee fund-raisers.  I try

15  to show up at the individual towns also.

16  Q    And with regard to the County Conservative Party,

17  would the defendant attend?

18  A    Yes.

19  Q    What was his rate of attendance at the Conservative

20  Party events?

21  A    The County Conservative events, you know, I'd say Ed

22  Walsh was there almost all the time.  I mean there may

23  have been one or two times that he didn't make it.  I

24  don't have specific dates, but he usually was at the

25  events.

862

1   Q    Could you recall a time where he ever did not make an

2   event?

3   A    No, I can't.

4   Q    Now, did you recall going to a Conservative

5   fund-raiser in 2011 right after Hurricane Sandy?

6   A    What I can say. I don't remember the actual event

7   because I probably go to 40 or 50 political events a year.

8   But I'm confident I was there because I very rarely miss

9   Conservative events and also it was in my diary, my

10   personal office diary that listed that event on

11   November 1, 2012.

12          MR. TIERNEY: I apologize, Mr. Tinari. I said

13   2011. Hurricane Sandy was in 2012. But you corrected me,

14   so thank you.

15   Q    So you don't have specific recollection of attending

16   that fund-raiser the day or two after Sandy?

17   A    No, not a specific recollection. I had 40 or 50 a

18   year. They kind of blend together. It's hard to

19   differentiate the specific event.

20   Q    I'm going to show you some photos that have been

21   marked as Government's 1085 and Government's Exhibit 1109.

22   I ask you if you recognize those.

23          THE COURT: What is the number?

24          MR. TIERNEY: Government's Exhibit 1085 and

25   Government's Exhibit 1109 in evidence.

1    THE COURT:  It's in evidence, you say?

2    MR. TIERNEY:  I'm sorry, for Identification.  I

3 apologize, your Honor.

4  A    Okay.  Mr. Tierney, I can tell you that --

5    MR. TIERNEY:  Wait.

6  Q    You have just been handed those documents.  First

7 off, do you recognize who the individuals are depicted in

8 the photos?

9  A    Starting with 1109, there are four individuals.  I

10 recognize all four of them.

11    MR. TIERNEY:  You started with 1185.

12    THE WITNESS:  Yes.

13  Q    And then the next one.  What is the next one?

14  A    No, the first one is 1109.  There were four

15 individuals, and 1085, there were three individuals in

16 that photograph.

17  Q    And do you recognize what type of event that is?

18  A    It looks like a Conservative political event.

19  Q    But you can't, with specificity, say when it

20 occurred?

21  A    Well, in the picture, Exhibit No. 1105, in the

22 background, I can see West Lake, which would be the West

23 Lake Inn, and there are many Conservative political events

24 in that location in Patchogue.  So I would say this looks

25 like a political event AT the West Lake Inn.  But in

864

1  looking at the picture, I can't tell you what the date of

2  the event was.

3  Q    And that is photograph 1109.

4  A    Yes.

5  Q    Okay.  Does that photograph fairly and accurately

6  depict the way those individuals in the picture appeared,

7  as well as the West Lake appeared?

8  A    I would say yes.

9          MR. TIERNEY:  I would move it into evidence as

10  Government's Exhibit 1109 at this time.

11          THE COURT:  Any objection?

12          MR. WEXLER:  May I see them please, Judge?

13          THE COURT:  Yes.

14          MR. WEXLER:  A brief voir dire, Judge, please.

15          THE COURT:  Sure.

16  VOIR DIRE EXAMINATION

17  BY MR. WEXLER:

18  Q    Mr. Tinari, good afternoon.

19  A    Good afternoon, Mr. Wexler.

20  Q    You were shown two photographs for Identification,

21  1085 and 1109 by the government.  Is it fair to say that

22  you don't know whether these were taken last year, the

23  year before, the year before that?

24          It could be five, six years ago?

25          Have no idea?

1  A    That's correct.

2           MR. WEXLER:  No further questions.

3           MR. TIERNEY:  Do you have an objection?

4           MR. WEXLER:  No objection, Judge.

5           THE COURT:  Are you offering both photographs?

6           MR. TIERNEY:  I am, your Honor.

7           MR. WEXLER:  No objection to either.

8           THE COURT:  Government's Exhibit 1085 and 1109,

9  the photographs, are in evidence.

10          (Whereupon, Government Exhibit 1085 and 1109

11 received in evidence.)

12 BY MR. TIERNEY:

13 Q    This is Government's Exhibit 1085.

14          Who is on the far left of the photo?  Who is

15 depicted in that photograph?

16 A    That's District Attorney Thomas Spota.

17 Q    Who is in the middle?

18 A    My wife Marian.

19 Q    And that's you at the end?

20 A    Yes.

21 Q    What is it that your wife does for a living?

22 A    A district court judge.  She sits in the state

23 building next door.

24 Q    I take it she was endorsed by the Conservatives?

25 A    Yes, she was.

1  Q    Government's Exhibit 1109, and again to the left, the

2  woman in the pink shirt.  Is that your wife?

3  A    That is my wife Marian.

4  Q    And you are to the far left?

5  A    Yes.

6  Q    And the person in the middle?

7  A    Gene Cook, a councilman from the Town of Huntington.

8  Q    And the individual furthest from you?

9  A    Is Michael Helfer.  He's an attorney from Huntington

10  and he also was the Vice-Chairman of the Huntington

11  Conservative Committee.

12  Q    And in the background, do you see any of those signs?

13  A    Well, I see to the left.

14  Q    If it's easier, perhaps you can look on the monitor.

15  A    In the back, again, there's a sign showing it is the

16  West Lake Inn, and then to the right of the photograph

17  there are signs that are called sponsorships.

18       Some people would, they could buy a ticket to

19  the event or they could pay for a sponsorship.  It's like

20  advertising for their business.  It could be 250,

21  whatever, $500, whatever the sponsorship was.

22       Those signs on the right show various

23  sponsorships that were paid for by either individuals or

24  businesses, and they are put for the guests to see.

25  Q    And regard -- what does it say on the top of those

1    placards?

2    A    Oktoberfest.

3    Q    And is that Oktoberfest, is that a fundraiser that

4    the Conservative Party has?

5    A    Yes.

6    Q    Do they have that every year?

7    A    Yes.

8    Q    I would imagine around October, November?

9    A    That's correct.

10   Q    Now, with regard to the November 1st fund-raiser, do

11   you recall attending a fund-raising a couple of days after

12   Hurricane Sandy where the attendance was sparse due to the

13   storm?

14   A    As I said before, I go to quite a few fund-raisers.

15   I don't have a specific recollection of the November 1,

16   2012, fund-raiser, but also I said before, I usually go to

17   all of the fund-raisers so I'm confident that I was there.

18   I don't have a specific recollection as to whether it was

19   sparsely attended or not.

20   Q    And it was on your calendar?

21   A    It was on my calendar, which again means that I was

22   most likely there, that I'm confident that I was there.

23   Q    And I'll next call your attention to January 25,

24   2013.  Do you remember attending a Town of Islip

25   Conservative event?

868

1  A  Was that January 24th or January 25th?

2  Q  January 24, 2013.

3  A  Again, I'm confident that I was at that fund-raiser

4  for the Islip Town Conservative Committee.  I usually

5  attend most of the town functions.

6        I also looked at my diary and I did have a diary

7  entry for that date and time.

8        I don't specifically remember that event of

9  January 24, 2013, but I am confident that I was there.

10        MR. TIERNEY:  Your Honor, with the consent of

11  the defendants, I'm moving to enter Government's

12  Exhibit 1282 and 1284 in evidence at this time.

13        THE COURT:  12 --

14        MR. TIERNEY: -- 82.  And 1284.

15        THE COURT:  Any objection?

16        MR. WEXLER:  No objection, your Honor.

17        (Whereupon, Government Exhibits 1282 and 1284

18  received in evidence.)

19  Q  Government's Exhibit 1282.  Do you recognize yourself

20  in that photograph?

21  A  Yes, I do.

22  Q  And to your right, do you recognize that individual?

23  A  Yes.  That is Michael Torres.  He was the Islip Town

24  Conservative Committee Chairman.

25  Q  And the person next to him?

1  A    Is Senator Croce, but I think whether it was when he

2  was the Senator or when he was the Supervisor of Islip.

3  Q    The person next to Mr. Croce?

4  A    Is Jim Malone.  He's a member of the Conservative

5  Party.  He was a former chairman of the Southampton Town

6  Conservative Committee.

7  Q    And on the end?

8  A    Is Judge Deborah Poulos.  She's a family court judge

9  and she sits in the building next door.

10 Q    P-o-u-l-i-s?

11 A    P-o-u-l-o-s.

12 Q    And as you look at that photograph, can you say when

13 and where that photograph was taken?

14 A    In looking at the photograph, I can't tell you what

15 date that that photograph was taken or what event it was.

16 Q    And then looking at 1084 in evidence, is it fair to

17 say the three individuals are members of the Conservative

18 Party?

19 A    No.  If we start on the person on the right with the

20 gray hair --

21 Q    And the striped tie?

22 A    Yes.

23 Q    Okay.

24 A    -- That is Frank Tantone.  Frank Tantone is the

25 chairmen of the Islip Republican Committee.

1      The woman next to him is Trisha Bergen.  She's a

2  town councilwoman in the town of Islip.

3      And to the left is Judge Anthony Senft.  He was

4  formerly the town councilman in the town of Islip, now a

5  district court judge.

6  Q    Can you see the placard in the back?

7  A    Yes.  It is a sponsorship listing, the Islip Town

8  Conservative Committee.

9  Q    Is it fair to say that photograph was taken at an

10  Islip Town Conservative Party function?

11  A    I would say yes.

12      MR. TIERNEY:  Thank you.  Nothing further.

13  CROSS-EXAMINATION

14  BY MR. WEXLER:

15  Q    Mr. Tinari, you have gone to a lot of functions in

16  your life, correct?

17  A    As I said before, probably over the last 30 years.

18  But over the last seven or eight years I'm probably going

19  40 or 50 a year.

20  Q    Okay.  Now, when you go -- you have gone to County

21  events over the years, County Conservative Committee

22  events?

23  A    Yes.

24  Q    And Sheriff DeMarco is always at those, isn't he?

25  A    At many of them, yes.  I can't say he was at all of

1    them, but at many of them.

2    Q    You wouldn't be surprised to see him at an event?

3    A    That's correct.

4    Q    In fact at those events they would probably call out

5    his name and there would be a round of applause and maybe

6    he would take the dais and wave to the crowd?

7    A    Usually if they are elected officials, they will

8    recognize, you know, that they were there.

9    Q    You made a big to-do over them?

10   A    Yes, we did.

11   Q    What about say town events, like the Huntington Town

12   Conservative event.  Vincent DeMarco would show up at

13   those and his mere presence would be recognized?

14   A    Again he wasn't at all of them, but at many of the

15   events in Huntington.

16   Q    In fact, is it fair to say at many of the

17   Conservative events that you went to, it was likely you

18   would run into Vincent DeMarco?

19   A    That is correct.

20   Q    In fact it was likely enough you and he could easily

21   chat over a Diet Coke or something like that?

22   A    I shouldn't be drinking Diet Coke, but yes, we could

23   chat.

24            MR. WEXLER:  Thank you, Mr. Tinari.

25            THE COURT:  Anything else?

872

1          MR. TIERNEY:  No, your Honor.

2          THE COURT:  You may step down.  Please call your

3    next witness.

4          MS. MIRABILE:  The United States calls Monique

5    McCray.

6          THE COURT:  Please remain standing.  Raise your

7    right hand.

8    **M O N I Q U E    M c C R A Y**,

9          called as a witness, having been first

10         duly sworn, was examined and testified

11         as follows:

12         THE COURT:  Please be seated and place state in

13    a loud voice your name and spell your name slowly for the

14    record.

15         THE WITNESS:  M-o-n-i-q-u-e.  M-c-C-r-a-y.

16    DIRECT EXAMINATION

17    BY MS. MIRABILE:

18    Q    Good afternoon, Ms. McCray.

19    A    Good afternoon.

20    Q    Please tell the members of the jury where you are

21    currently employed?

22    A    The Suffolk County Sheriff's Office.

23    Q    And for how long have you been employed by the

24    Sheriff's Office?

25    A    12 years.

873

1  Q    And what is your position?

2  A    I'm a Corrections Officer.

3  Q    And where are you assigned?

4  A    I'm currently in Yaphank.

5  Q    How long have you been in Yaphank?

6  A    Two months.

7  Q    Where were you assigned before Yaphank?

8  A    Riverhead.

9  Q    You work on a crew?

10 A    Yes.

11 Q    And what does that mean?

12 A    C-Crew.

13 Q    What does that mean for the jury?  Can you explain

14 what your duties and responsibilities are?

15 A    Care and custody of inmates.  I work a 25-man or

16 30-man block.

17 Q    And in addition to working on your crew, do you have

18 any other duties and responsibilities with the Sheriff's

19 Office?

20 A    Yes.

21 Q    What are those additional duties and

22 responsibilities?

23 A    I work in community relations.  I work as a GREAT

24 Officer, Gang Representative, Education and Training.  I

25 teach the at Suffolk County Academy, and I also do

1   community work.

2   Q    Let's take each one in part, it's a lot.  You

3   mentioned the academy.

4              Do you teach at the academy?

5   A    Yes.

6   Q    Where is that located?

7   A    In Brentwood.

8   Q    What classes do you teach the a the academy?

9   A    Child abuse, adult abuse, communication, and if

10  someone calls in, I will take on their assignment if need

11  be.

12  Q    Do you have to be certified to teach at the academy?

13  A    Yes.

14  Q    Certified by whom?

15  A    New York State.

16  Q    Are you certified?

17  A    Yes.

18  Q    When were you certified?

19  A    I was certified last year, approximately.

20  Q    Do you know the defendant Edward Walsh?

21  A    Yes.

22  Q    Do you see him in the courtroom?

23  A    Yes.

24  Q    Could you please identify him in the courtroom by an

25  article of clothing?

875

```
1    A    The black and green tie with designs on it.  Tannish.
2              MS. MIRABILE:  Let the record reflect that the
3    witness had identified the defendant.
4              THE COURT:  Yes.
5    Q    Have you ever seen the defendant teach at the
6    academy?
7    A    No.
8    Q    To your knowledge, is the defendant certified to
9    teach in the academy?
10             MR. LATO:  Objection.
11             THE COURT:  I'm sorry, I didn't hear the
12   question.
13             MS. MIRABILE:  To your knowledge, is the
14   defendant certified to teach at the academy.
15             THE COURT:  Sustained.
16             THE WITNESS:  The --
17             MS. MIRABILE:  When the Judge sustains it, you
18   do not answer.
19   A    Okay.
20   Q    You mentioned -- when you taught at the academy, have
21   you ever taught with the defendant?
22   A    No.
23   Q    Have you ever seen the defendant teaching at the
24   academy?
25   A    No.
```

876

1  Q    Have you ever seen the defendant while you were at

2  the academy?

3  A    No.

4  Q    You mentioned that you also worked in community

5  relations?

6  A    Yes.

7  Q    Can you tell the jury what community relations

8  programs or outreach programs are available in the

9  Sheriff's Office?

10 A    We do Operation Safe Child.  We go out to schools and

11 we talk to students.  We go out and we do events with the

12 children.  We do jump buggies and different, how do you

13 say, different types of activities with kids.

14       We do a lot.  Mostly Operation Safe Child where

15 we take the pictures of the kids, fingerprint them, give

16 their parents cards, identifying marks, or anything.

17 Q    Are you familiar -- I think you mentioned the GREAT

18 program?

19 A    Gang Representation Education and Training, and we

20 actually go out to schools for actually 13 weeks or six

21 weeks, depends if it's elementary or junior high, and

22 teach kids about gang violence, how to prevent bullying,

23 how to stay out of trouble.

24       We have a curriculum that we follow.  We also do

25 in the GREAT program, I do, it's called GREAT Families.

1  So we go out to the community once a week and we have

2  dinner with the families and we provide food and we have

3  dinner with the families, and we provide also have a GREAT

4  camp during the summertime.  We go out to the counties,

5  Brentwood, Bayshore, Central Islip and spend the summer

6  with the kids, playing with them, things of that nature.

7  Q    Are you familiar with a program called the YES

8  program?

9  A    Yes.  I also do the YES program.

10  Q    What is the YES program?

11  A    Also called Scared Straight.  We bring the students

12  in from schools to actually come to the facility.  They

13  get a firsthand look to be incarcerated.  They get to

14  speak with the inmates.  They can sort of get to go into a

15  cell, and we do that.

16  Q    Did the defendant ever assist you in any of the

17  community outreach programs?

18  A    No.

19  Q    Did he ever supervise you?

20  A    No.

21  Q    Did he ever come to any community outreach events

22  that you were involved in?

23  A    No.

24  Q    You mentioned the GREAT program?

25  A    Yes.

1    Q    Do you have to be certified to be an instructor?

2    A    Yes, by federal government.

3    Q    Are you certified?

4    A    Yes.

5    Q    When did you become certified in that?

6    A    2008.  You have to be certified for the GREAT

7    families and for the camps actually also.

8    Q    Are you familiar with the other certified instructors

9    in the GREAT program from the Sheriff's Office?

10   A    Yes.

11   Q    Is the defendant a certified instructor in the GREAT

12   program?

13   A    Not to my knowledge.

14   Q    Are you familiar with an individual named Christopher

15   Lambert?

16   A    Yes.

17   Q    Is he involved in the GREAT program?

18   A    Yes.

19   Q    Have you done a class in the GREAT program with

20   Correction Officer Lambert?

21   A    Yes.

22   Q    How long was that program?

23   A    How long was the program?

24   Q    That you did with Christopher Lambert.

25   A    Are you talking about --

1  Q    The specific time you worked with Christopher

2  Lambert.

3  A    Approximately five years ago.

4        We worked in Central Islip School District for

5  the 13 weeks.  Actually turned out to be 26 weeks because

6  we break up our classes.

7  Q    And during that time that you taught or were a

8  instructor for that class with Christopher Lambert, did

9  the defendant ever assist in the program?

10 A    No.

11 Q    Did he supervise your work?

12 A    No.

13 Q    Did you ever see him at a community outreach or a

14 community relations event?

15 A    No.

16 Q    To your knowledge, was the defendant involved in any

17 community relations or outreach program?

18 A    Not to my knowledge.

19 Q    As a correction officer, how long is your workday?

20 A    7.5.

21 Q    Seven and a half hours a day?

22 A    Yes.

23 Q    How long is your work week?

24 A    37.5.

25 Q    And when you are scheduled to work a full day, you

880

1  actually work the full seven and a half hour day?

2  A    Yes.

3  Q    Are you familiar with the term RDO?

4  A    Yes.  Regular day off.

5  Q    Have you ever been recalled to work when you were at

6  home from your regular day off?

7  A    No.

8  Q    I'd like to show you what is in evidence as

9  Government's Exhibit 87-A.  You can see there is a screen

10  right in front of you.

11  A    Oh.

12  Q    It might be easier to look at it behind you.

13        Do you recognize this as an aerial view of the

14  Riverhead facility complex?

15  A    Yes.

16  Q    Do you see this dirt road that is on the left of the

17  photograph that goes alongside the left of the building?

18  A    Yes.

19  Q    Have you ever taken that road to enter the Riverhead

20  facility?

21        MR. WEXLER:  Objection, relevance.

22        THE COURT:  Overruled.

23  Q    Have you ever taken that road to enter the facility?

24  A    No.

25  Q    Have you ever taken that road to exit the facility?

1    A    No.

2    Q    Is the entrance and exits to the facility up front?

3    A    Yes.

4    A    I apologize.  Is that the deputies area?

5    Q    I'll zoom in so you can see better.

6    A    Thank you.

7    A    Yes, that's the entrance.

8    Q    And so we can be clear what I'm pointing to.  You see

9    there are two solar panels actually on the top.  I'm

10   sorry, left-hand side of the picture.  There's two solar

11   panels?

12   A    Yes.

13              (Continued.)

14

15

16

17

18

19

20

21

22

23

24

25

882

1    DIRECT EXAMINATION (Continued)

2    BY MS. MIRABILE:

3    Q.   For above the parking lots?

4    A.   Yes.

5    Q.   And then the entrance is between that, to the top of

6    the photograph.  Correct?

7    A.   Yes.

8    Q.   And that is the entrance in and out of the Riverhead

9    facility.

10   A.   Yes.

11          MS. MIRABILE:  No further questions.

12          THE COURT:  Cross-examination.

13

14   CROSS-EXAMINATION

15   BY MR. LATO:

16   Q.   Good afternoon.

17   A.   Good afternoon.

18   Q.   Three minutes.  No more.

19          How long have you been working for the Suffolk

20   County Sheriffs Office?

21   A.   Approximately 12 years.

22   Q.   Now, is it your testimony that sometimes your job

23   requires you to go outside the jail also?

24   A.   Yes.

25   Q.   About how often do you have to go outside the jail,

1   say in a given month?

2   A.    It depends on the schedule.  We have a schedule of

3   events that we keep a calendar in community relations.  So

4   it could be five times.

5   Q.    Now, do you recall being shown a picture a couple of

6   minutes ago about how the outside of the jail looks?

7   A.    Yes.

8   Q.    And has it been your job in the last 12 years to be

9   involved in external security of the jail, meaning, the

10  perimeter of the jail, the fences?

11  A.    No.

12  Q.    You testified that you know Ed Walsh.  Correct?

13  A.    Yes.

14  Q.    Are you friends with him?

15  A.    No. When I see him in passing, I will speak and say

16  hello.

17  Q.    Now, when you have seen him in passing, has that been

18  inside the jail?

19  A.    Yes.

20  Q.    And is there a place in the jail called the lobby or

21  the north lobby or front lobby?

22  A.    Yes.

23  Q.    And have you ever seen Ed Walsh there?

24  A.    Yes.

25  Q.    Do you recall how many times you have seen him there

884

1  over the years you have been working there?

2  A.   I honestly can't recall.  I don't see him that often

3  so I can't recall that.

4  Q.   Now, do you know what Ed's job at the jail was during

5  the term of your employment?

6  A.   No.

7  Q.   Do you know what the job responsibilities were of

8  either a sheriff or the sheriff's liaison?

9  A.   No.

10       MR. LATO:  Nothing further.

11       MS. MIRABILE:  One more question.

12

13  REDIRECT EXAMINATION

14  BY MS. MIRABILE:

15  Q.   Another question.

16  A.   Yes.

17  Q.   When you go outside the jail to go to events, do you

18  keep a calendar of that?  Or is there a calendar of that?

19  A.   Yes.

20  Q.   So there is a record of your activity of the work

21  that you do outside the jail.

22  A.   Actually, if we go to the schools to do the GREAT

23  Program we have to sign in and out of the school.  That is

24  how we show our supervisors that we actually went to our

25  assignment.

885

1   Q.   When you go outside to the school or are asigned to

2   teach a class or run a program at a school, are you

3   actually assigned to do that or can you just show up one

4   day at a school?

5   A.   No.  You have to be assigned.

6   Q.   And who assigns you?

7   A.   Your -- you and the teacher.

8        You sit down and you make up a schedule and you

9   come when, you know, you and the teacher put the schedule

10  together.

11  Q.   And does your supervisor know when you are going out

12  to a particular school or other schedule?

13  A.   Yes, because you have to, once you get your schedule

14  you have to send it over to your supervisor, and he -- to

15  let him know where you are going to be at on those days.

16        MS. MIRABILE:  No further questions.

17        MR. LATO:  No questions, your Honor.

18        THE COURT:  All right.  You may step down.

19        (The witness was excused.)

20        THE COURT:  Please call your next witness.

21        MS. MIRABILE:  The government call Julius

22  Nelson.

23

24  **JULIUS NELSON**

25        called by the Government, having been first duly

886

1          sworn/affirmed, was examined and testified as

2          follows:

3

4     DIRECT EXAMINATION

5     BY MS. MIRABILE:

6     Q.    Good afternoon.

7     A.    Good afternoon.

8     Q.    Can you please tell the members of the jury where you

9     are currently employed.

10    A.    Suffolk County Sheriffs Office, Community Relations

11    Unit.

12    Q.    For how long have you been employed by the Suffolk

13    County Sheriffs Office?

14    A.    I've been with the Suffolk County Sheriffs Office for

15    24 years.

16    Q.    What is your current assignment?

17    A.    Community relations.

18    Q.    How long have you been assigned to community

19    relations?

20    A.    I've been in community relations for about two years.

21    Q.    And where were you assigned before that?

22    A.    Midnights Yaphank.  I actually worked there 22 years.

23    Q.    And can you please tell the jury what kind of

24    community relations programs there are at the Suffolk

25    County Sheriffs Office.

1  A.   We do the YES program, which is the Youth

2  Enlightenment Seminar, which is basically a jail tour.

3        We do the GREAT Program, which is gang

4  resistance education and training.  We do McGruff The

5  Crime Dog.  And other events.  And we do the Operation

6  Safe Child ID cards.

7  Q.   Do you know the defendant, Ed Walsh?

8  A.   Not personally.  Not really.

9  Q.   Do you know who he is?

10  A.   Yes, I do.

11  Q.   Do you see him in the courtroom?

12  A.   Yes.

13  Q.   Can you please identify him by an article of

14  clothing.

15  A.   He's right here with the brown tie.

16        THE COURT:  Is he the first person?

17        THE WITNESS:  He's on the left.

18        THE COURT:  Of the three, where is he?  The one

19  on the left?

20        THE WITNESS:  The one on the left.

21        THE COURT:  Okay.

22        MS. MIRABILE:  Let the record reflect that he

23  has identified the defendant.

24  BY MS. MIRABILE:

25  Q.   Did the defendant ever assist you in any community

1   outreach programs?

2   A.   No.

3   Q.   Did he ever supervise you?

4   A.   No.  He is not in my chain of command.

5   Q.   Did he ever come to any community relations programs

6   inside or outside the jail?

7   A.   No.  Just the YES program, the Youth Enlightenment

8   Seminars.

9   Q.   Okay.  What about that program?

10  A.   When we were bringing the school, he was familiar,

11  with he was coming to speak to the kids.

12  Q.   What school is that?

13  A.   From his -- I believe East Islip.

14  Q.   Did the defendant have any connection to East Islip?

15  A.   I don't know if he lives in East Islip.  He is a

16  supervisor so I just I didn't ask questions.  I just do as

17  I was told.

18  Q.   Did he come for any other high schools other than

19  East Islip?

20  A.   Not that I know of.

21  Q.   Did you invite him to come to East Islip when the

22  East Islip students were in the jail?

23  A.   No.  He would say when East Islip comes, let me know

24  and --

25  Q.   And the times that the defendant came to meet the

1    students from East Islip, were those occasions inside the

2    Riverhead facility?

3    A.    Yes.  Inside the chapel.

4    Q.    And there is a program called the GREAT Program?

5    A.    Yes.  Gang Resistance Education and Training.

6    Q.    Do you have to be a certified instructor to be -- do

7    you have to be certified to be an instructor in that

8    program?

9    A.    Yes.  It is a federal program.

10   Q.    Are you certified?

11   A.    Yes.

12   Q.    For how long have you been a certified instructor in

13   the GREAT Program?

14   A.    About two years.  As soon as I got into the unit they

15   sent me to training.

16   Q.    Are you familiar with the other certified instructors

17   in the program?

18   A.    Not all of them, some of them, because we have a few.

19   Q.    Have you ever worked with the defendant in the GREAT

20   Program?

21   A.    No.

22   Q.    Did he ever supervise your work in the GREAT Program?

23   A.    No.

24   Q.    Other than the students that were present from East

25   Islip at the Riverhead facility, did you ever see the

1   defendant at any other community relations events?

2   A.   Not that I can recalling.

3   Q.   To your knowledge was the defendant involved in any

4   community relations program or activity?

5   A.   I'm not --

6            MR. LATO:   Objection.

7            THE COURT:   Overruled.

8   A.   Not that I know of.

9   BY MS. MIRABILE:

10  Q.   Are you familiar with an event for Martin Luther King

11  day that happened at a hotel in Hauppauge?

12  A.   Yes.

13  Q.   Have you attended that?

14  A.   I attended twice.  I've been in the unit two years.

15  They have a breakfast and a lunch and I went to the

16  breakfast.

17  Q.   Who have you gone to that event with?

18  A.   There will be a tableful of people so it depends.

19  Q.   A tableful of people from the Sheriffs Office?

20  A.   Yes?

21  Q.   Was the defendant among the people present at the

22  table from the Sheriffs Office?

23  A.   Not that I could recall.

24  Q.   When you the attend that event and were at a table,

25  was that a table to your knowledge that was paid for by

1  the Conservative Party?

2  A.   I don't believe so.

3  Q.   As a correction officer how long is your workday?

4  A.   Eight hours.

5  Q.   And your work week?

6  A.   40 hours.

7  Q.   When you are scheduled to work a full day, do you

8  actually work your full day?

9  A.   Yes.

10  Q.   Now, are you familiar with the term RDO?

11  A.   Regular Day Off.  Yes.

12  Q.   Have you ever been at home and been called to work on

13  your regular day off?

14  A.   No.

15  Q.   I would like to show you what has been marked into

16  evidence as Government Exhibit 87A.

17           Is this an aerial view of the -- actually there

18  is a screen right in front of you.  That way you don't

19  have to turn around and contort yourself.

20           Is this an aerial view of the Riverhead

21  facility?

22  A.   Oh.  Yes.

23  Q.   I will zoom it in a little bit so you can see.

24           On the left-hand side of this photograph 87A

25  this is the Riverhead facility?

1    A.   Yes.

2    Q.   Do you see that there is two sets of solar panels

3    above the parking lot?

4    A.   Yes.  I'm looking at the parking lot.  Yes.

5    Q.   And is the main entrance to the Riverhead facility in

6    between those two solar panel parking lots?

7    A.   Yes.

8    Q.   And do you see around the left-hand side of the jail

9    facility there is a dirt road?

10   A.   Yes.

11   Q.   Have you ever used that dirt road to exit the

12   correctional facility?

13   A.   No.  I've never been back there.

14   Q.   You have never used it to enter the facility or

15   exist?

16   A.   No.

17           MS. MIRABILE:  No further questions.

18           THE COURT:  Cross-examination.

19

20   CROSS-EXAMINATION

21   BY MR. LATO:

22   Q.   Good afternoon, sir.

23   A.   Good afternoon.

24   Q.   Is your present job centered in Riverhead?

25   A.   Yes.

893

1  Q.   And it is fair to say you have been assigned to the

2  Riverhead facility for about two years?

3  A.   Yes.

4  Q.   And what is your job, sir, with the Riverhead -- I'm

5  sorry, with the sheriffs office in Riverhead?

6  A.   Community Relations Unit.

7  Q.   Is that a day job?

8  A.   Yes.

9  Q.   And what are the hours of the day job?

10  A.   7 to 3.

11  Q.   Is there any flexibility with that?  Sometimes 8 to

12  4, 9 to 5?  Or is it always 7 to 3?

13  A.   It is always 7 to 3.

14  Q.   Now, before you had this job, you had a worse

15  schedule.  Correct?

16  A.   Yes.

17  Q.   You were working steady midnights.  Correct?

18  A.   Yes.

19  Q.   That was for how many years, sir?

20  A.   22 years.

21  Q.   And that was in Yaphank.  Correct?

22  A.   Yes.

23  Q.   Now, in Yaphank is there a relatively new facility in

24  Yaphank?

25  A.   Yes.

1  Q.  And were you working at that newer facility before

2  you were reassigned to Riverhead and you were promoted?

3  A.  No.

4  Q.  Were you always at the old facility in Yaphank?

5  A.  Yes.

6  Q.  Now, in the 22 years or so that you worked midnights,

7  did you ever see Ed Walsh there?

8  A.  No.

9  Q.  Did you ever see Ed Walsh in Yaphank at all?

10  A.  No.

11  Q.  Have you seen him in Riverhead?

12  A.  Yes.

13  Q.  And that would be over the last two years?

14  A.  Yes.

15  Q.  Do you remember where in Riverhead you saw him?

16  A.  Usually in the north lobby or if I had to go out

17  front to the offices.

18  Q.  When you say out front, is that the offices --

19  A.  The sheriffs office area.

20  Q.  Where the sheriffs --

21  A.  Where the wardens are.  Deputy wardens.

22  Q.  I see.

23  A.  The bosses.

24  Q.  Now, had you been to the Martin Luther King Day

25  events in the last few years?

1  A.  Yes.

2  Q.  Has that been only since you have been promoted to

3  your current position?

4  A.  Yes.  But I'm not promoted.  I'm just, I'm still a

5  regular correction officer.

6  Q.  Well, let's call it a promotion.

7       In the prior years --

8       MS. MIRABILE:  Objection to calling it a

9  promotion.

10       MR. LATO:  I will withdraw it.

11  BY MR. LATO:

12  Q.  In your position with better hours, okay?  In the

13  prior years in Yaphank when you were in Yaphank, did you

14  go to any of the Martin Luther King Day events?

15  A.  No.

16  Q.  Do you have any idea whether Ed Walsh ever went to

17  those?

18  A.  Not at all.

19  Q.  Now, you know what your job responsibilities are.

20  Correct?

21  A.  Yes.

22  Q.  Do you know what the job responsibilities have been

23  for the liaison to the sheriff?

24  A.  I have no idea.

25       MR. LATO:  Nothing further.

896

1          MS. MIRABILE:  No further questions.

2          THE COURT:  Anything else?

3          MS. MIRABILE:  No.

4          THE COURT:  You may step down.

5          (The witness was excused.)

6          THE COURT:  please call your next witness.

7          MS. MIRABILE:  The United States calls John

8   Roche.

9

10  **JOHN ROCHE**

11          called by the Government, having been first duly

12          sworn/affirmed, was examined and testified as

13          follows:

14          THE COURT:  You may proceed.

15

16  DIRECT EXAMINATION

17  BY MS. MIRABILE:

18  Q.   Good afternoon.

19  A.   Hello.

20  Q.   I ask you please tell the members of the jury where

21  you are currently assigned -- where you are currently

22  employed.

23  A.   I am currently employed as a correction officer for

24  the Suffolk County Sheriffs Office.

25  Q.   And for how long have you been employed by the

1  Sheriffs Office?

2  A.   A little over 20 years.

3  Q.   What is your current position?

4  A.   I'm presently a sergeant in the Medical Evaluation

5  Unit.

6  Q.   When did you become a sergeant?

7  A.   I became a sergeant three years ago this month.

8  Q.   So March of 2013?

9  A.   Correct.

10 Q.   And is the title of sergeant, is that also called a

11 Correction Officer Two?

12 A.   Correct.

13 Q.   Is a Correction Officer Two a sergeant?

14 A.   Yes.

15 Q.   What was your position before you were you a

16 sergeant?

17 A.   I worked in the Community Relations Unit for

18 approximately four and a half years.

19 Q.   And before that?

20 A.   I worked at the commissary unit for three years.  And

21 before that I worked on a regular crew, A Crew, in the

22 Riverhead facility for about eight and a half to nine

23 years.

24 Q.   And as a sergeant currently, where is your office?

25 Where are you assigned?

1  A.    I am currently assigned to West Hampton.  We have, it

2  is a plain clothes unit that is outside the facility in

3  Westhampton.  We have our own building there.

4  Q.    When you were assigned to community relations where

5  was that located?

6  A.    That was located by the visitors entrance in the

7  Riverhead Correctional Facility.

8  Q.    Can you please tell the jury what community

9  relations -- how long were you assigned to community

10  relations?

11  A.    About four and a half years.

12  Q.    And can you tell the jury what programs are available

13  or what are community relations program are available at

14  the Suffolk County Sheriffs Office.

15  A.    In the Community Relations Unit, we do various

16  functions.

17         We are very accessible to the community,

18  different church groups, organizations.  The bulk of what

19  we really did was a program called the YES program.  It

20  stood for Youth Enlightenment Seminars, similar to like a

21  Scared Straight type of program.  The sheriff was very

22  proactive in this.

23         We had about 4,000 high school students came

24  into the jail.  It wasn't as intense as Scared Straight

25  but we would allow the students to come in.  They would

1    tour the jail.

2         Once we were done touring the jail, we would

3    take them to different housing units and then, when we

4    were done, we would go down to an auditorium area and the

5    students would sit down in the auditorium or chapel area

6    and we would invite inmates to come down and speak to

7    students; this way the students can hear directly from the

8    inmates maybe some of the poor choices they made or the

9    path that led them to jail.  And then we also have a

10   question and answer.  So that was one of the main things

11   that we did in community relations.

12        We also did some other things.  We did

13   fingerprinting for small children at firehouses, community

14   events, town events.

15        We also did a McGruff program.  McGruff is the

16   crime dog.  That would go, we would dress in uniform and

17   we would go to usually first or second grade.  It was more

18   of an antibullying stranger-danger.  We would keep it very

19   simple.  And it was a four-week program that we would do

20   in the school free of charge.

21        And also we would just go to career days, any

22   type of careers.  We spoke at a lot of colleges.  We would

23   promote anything to do with the Sheriffs Office.  We were

24   very proactive whenever we were giving our civil service

25   test, whether was on the deputy side or the correction

1 side.

2          We would also take requests from the community

3 or organizations if they wanted to come in and tour the

4 jail.

5 Q.   Are you familiar with a program called the GREAT

6 Program?

7 A.   I am.

8 Q.   What is the GREAT Program?

9 A.   The GREAT programming stands for Gang Resistant

10 Education and Training.  It is a 13-week lesson plan.  We

11 are in various school districts within the County of

12 Suffolk.  And not only does it touch on gangs, but it also

13 touches on, it is a life skills program.

14          So as an officer, I would go into a school once

15 a week and we would talk about, not only antigangs, we

16 would have a section on antibullying, how to be a good

17 communicator, how to set goals for yourself, how to

18 achieve those goals.  And at the end of the 13 weeks the

19 student would get a certificate.  And, you know, that was

20 really it, I guess.

21 Q.   Did the defendant ever assist in any of the community

22 outreach programs?

23 A.   No.

24 Q.   Did he ever supervise you?

25 A.   No.

901

1  Q.  Do you know the defendant, Ed Walsh?

2  A.  I do.

3  Q.  Do you see him in the courtroom?

4  A.  O do.

5  Q.  Would you please identify him by an article of

6  clothing.

7  A.  He's the gentleman wearing a tweed jacket with a

8  multicolor tie.

9  Q.  Of the three gentlemen sitting there, is he on your

10  far left.  Middle or far right?

11  A.  On my far left.

12       MS. MIRABILE:  Let the record reflect that the

13  witness has identified the defendant.

14       THE COURT:  Yes.

15  BY MS. MIRABILE:

16  Q.  You indicated that he did not supervise you or assist

17  you in any of your community relations programs.

18  A.  No.

19  Q.  The GREAT Program, do you have to be a certified

20  instructor to teach in that program?

21  A.  Yes.

22  Q.  For how long have you been a certified instructor?

23  A.  Approximately seven years.

24  Q.  Are you familiar with the other certified

25  instructors?

1   A.   I am.

2   Q.   Is the defendant a certified instructor?

3   A.   To the best of my knowledge, I don't think so.

4   Q.   Has he ever participated in the GREAT Program with

5   you?

6   A.   Not with me, personally, no.

7   Q.   Are you familiar with an individual named Christopher

8   Lambert?

9   A.   I am.

10  Q.   Is he a GREAT instructor?

11  A.   Yes.

12  Q.   Have you ever done any classes with Correction

13  Officer Lambert?

14  A.   Me and Chris did a 13-week class together in the

15  Sachem School District maybe four or five years ago.  Yes.

16  Q.   And when you did that program, did the defendant

17  assist in any way?  When you did that program with Chris

18  Lambert.

19  A.   No.

20  Q.   And did he supervise your work in any way?

21  A.   No.

22  Q.   Did you ever see the defendant at any community

23  outreach programs?

24  A.   No.

25  Q.   To your knowledge was the defendant involved in any

1  community outreach programs?

2  A.   Again, I can only answer pertaining to my particular

3  unit.  But no.

4  Q.   As a Correction Officer Two Sergeant, how long is

5  your workday?

6  A.   Eight hours.

7  Q.   And your work week?

8  A.   Five days a week.

9  Q.   When you are scheduled to work a full day, do you

10  actually work those hours?

11  A.   Yes.

12  Q.   Are you familiar with the term RDO?

13  A.   Yes.

14  Q.   What does that mean?

15  A.   RDO would stand for regular day off.

16  Q.   Have you ever been re-called to work on your regular

17  day off?

18  A.   Well, when I was in the Community Relations Unit, a

19  lot of times the events that -- we were assigned Monday

20  through Friday; however, some of the community events,

21  open houses at fire houses, different things require us to

22  be there on a Saturday or a Sunday.  And I would be called

23  in on my RDO, yes.

24  Q.   And were you aware of that in advance of that?

25  A.   Yes.

904

1   Q.   So that would be something that would be on the

2   calendar prior to that Saturday.

3   A.   Correct.

4   Q.   And is there a calendar of your, in community

5   relations is there a calendar of the events that you need

6   to attend to?

7   A.   Yes.

8   Q.   I would like to show you what is in evidence as

9   Government Exhibit 87A, which is an aerial view of the

10  Riverhead facility.

11          Do you see that?

12  A.   I do.

13  Q.   Do you see on the top left-hand a much larger

14  picture?  So on the top left-hand side of the picture

15  there are two sets of solar panels for the parking lot.

16  Correct?

17  A.   Yes.

18  Q.   And in between the two panels, a little bit above the

19  two panels, in the middle what is that?

20  A.   That would be possibly the deputy booth.

21  Q.   All right.  Is this a main entrance in and out of the

22  facility?

23  A.   Yes.

24  Q.   Do you see this dirt road that goes alongside the

25  Riverhead jail on the left of the jail?

1  A.    I do.

2  Q.    Have you ever used that road to enter the Riverhead

3  jail?

4  A.    No.

5  Q.    Have you ever used it to exit the facility?

6  A.    No.

7  Q.    When you enter and exit the Riverhead jail facility,

8  do you use the main entrance?

9  A.    I do.

10  Q.    Just one moment.

11         (There was a pause in the proceedings.)

12  Q.    Sorry.  I just have a quick question.

13         Was there a period of time that you were

14  assigned to Yaphank?

15  A.    We I got promoted to sergeant, I worked in the

16  Yaphank facility for three years.  Yes.

17  Q.    And what years was that?

18  A.    That would be March of 2013 till February 2013.

19  (Sic)

20  Q.    And during the period of time that you were assigned

21  to the Yaphank facility, did you see the defendant?

22  A.    Once in a while he would pop in to say hello to a

23  duty lieutenant or a captain possibly.  Yes.

24  Q.    How frequently in the three years that you were

25  assigned there?  How frequently did you see the defendant?

1    A.    Maybe a handful of times.

2              MS. MIRABILE:  No further questions.

3              THE COURT:  I think we are going to have to wait

4    until tomorrow.

5              Do you have cross?

6              MR. LATO:  Two minutes worth.

7              THE COURT:  We will have to wait until tomorrow.

8    I want to get the jury out.

9              Members of the jury, we are going to recess

10   until 9:30 tomorrow morning, Wednesday, March 23.

11             The case is moving along, you might not think

12   so, but pretty rapidly.  I think the lawyers are doing a

13   very fine job of moving the case along.  They are working

14   very hard at it and it is succeeding.

15             We are going to recess until tomorrow morning.

16   Meantime, please don't discuss there case either among

17   yourselves or with anyone else at home.  I am sure the

18   people at home are asking you about it, and you will till

19   them:  No, the judge told me or directed that I not talk

20   to you.

21             Don't do any investigation.  Don't do any

22   research on the internet.  Don't read the very fine

23   newspaper Newsday or watch Channel 12.  I want you to

24   decide this case based on the evidence in this case and

25   your own common sense.  All of that.  So keep an open mind

1  and come to no conclusions.

2          Enjoy the night.  We will see you tomorrow

3  morning.  Have a nice evening.

4          (The following ensued in the absence of the

5  jury.)

6          THE COURT:  Again, please wait about five

7  minutes before you leave, everyone.

8          And you will have to return tomorrow.

9          THE WITNESS:  Yes.

10          THE COURT:  Thank you.

11          MS. MIRABILE:  Thank you, your Honor.

12          (Proceedings adjourned at 4:45 pm.)

13

14

15

16

17

18

19

20

21

22

23

24

25

I N D E X

**VINCENT DEMARCO**                                        623
CROSS-EXAMINATION (Continued)                             623
BY MR. WEXLER
CROSS-EXAMINATION (Continued)                             623
BY MR. WEXLER
VINCENT DEMARCO                                           760
CROSS-EXAMINATION (Continued)                             760
BY MR. WEXLER
REDIRECT EXAMINATION                                      772
BY MS. MIRABILE
RECROSS-EXAMINATION                                       802
BY MR. WEXLER

**SCOTT NOLIN**                                           804
DIRECT EXAMINATION                                        805
BY MS. MIRABILE
VOIR DIRE EXAMINATION                                     813
BY MR. LATO
VOIR DIRE EXAMINATION                                     816
BY MR. LATO
CROSS-EXAMINATION                                         825
BY MR. LATO
REDIRECT EXAMINATION                                      833
BY MS. MIRABILE

**RICHARD SCHAFFER**
DIRECT EXAMINATION                                        836
BY MR. TIERNEY
CROSS-EXAMINATION                                         851
BY MR. WEXLER
REDIRECT EXAMINATION                                      856
BY MR. TIERNEY
FURTHER RECROSS EXAMINATION                               857
BY MR. WEXLER
FURTHER REDIRECT EXAMINATION                              857
BY MR. TIERNEY
DIRECT EXAMINATION                                        858
BY MR. TIERNEY
VOIR DIRE EXAMINATION                                     864
BY MR. WEXLER
CROSS-EXAMINATION                                         870
BY MR. WEXLER

909

**MONIQUE McCRAY**
DIRECT EXAMINATION                              872
BY MS. MIRABILE
CROSS-EXAMINATION                               882
BY MR. LATO
REDIRECT EXAMINATION                            884
BY MS. MIRABILE

**JULIUS NELSON**                               885
DIRECT EXAMINATION                              886
BY MS. MIRABILE
CROSS-EXAMINATION                               892
BY MR. LATO

**JOHN ROCHE**
DIRECT EXAMINATION                              896
BY MS. MIRABILE


E X H I B I T S

Government Exhibit 87-A through 87-D in         816
evidence
Defense Exhibit G in evidence                  651
Defense Exhibit I in evidence                  713
Government Exhibit 1085 and 1109 received in    865
evidence
Government Exhibits 1282 and 1284 received in   868
evidence