UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X
UNITED STATES OF AMERICA      :  15-CR-91

    -against-                    US District Court
                              Central Islip, NY
EDWARD WALSH, JR.,
               Defendant. :  March 23, 2016
- - - - - - - - - - - - - - - X   9:30 am

        TRANSCRIPT OF TRIAL
        BEFORE THE HONORABLE ARTHUR D. SPATT
        UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:

                             ROBERT L. CAPERS
                             United States Attorney
                             271 Cadman Plaza East
                             Brooklyn, New York 11201
                             By:  CATHERINE MIRABILE, ESQ.
                                  RAYMOND TIERNEY, ESQ.
                             Assistant US Attorney

For the Defense:          LEONARD LATO, ESQ.
                             WILLIAM WEXLER, ESQ.

Court Reporter:           Dominick M. Tursi, CM, CSR
                             US District Courthouse
                             1180 Federal Plaza
                             Central Islip, New York 11722
                             (631) 712-6108  Fax:  712-6124
                             DomTursi@email.com

        Proceedings recorded by mechanical stenography.
           Transcript produced by CAT.

1          THE CLERK:  Jury entering.

2          THE COURT:  Good morning, members of the jury.

3          ALL JURORS:  Good morning.

4          THE COURT:  Please be seated.

5          Please accept my compliments, all 18 of you here

6    ahead of time or on time.  You're breaking all the

7    records, and I thank you for very much, coming from all

8    over this District; Staten Island, Brooklyn, Queens,

9    Nassau and Suffolk, and all here ahead of time.

10         Thank you.

11         You may proceed.

12         Where is the witness?

13         THE CLERK:  Please raise you right hand.

14

15   JOHN ROCHE,

16              called as a witness, having been first

17              duly sworn, was examined and testified

18              as follows:

19

20         THE CLERK:  Please state your name for the

21   record.

22         THE WITNESS:  John Roche, R O C H E.

23         THE COURT:  One other thing.  I want to remind

24   you that we're leaving a little early today, about 4:30,

25   or a few minutes earlier.  So those of you who want to

1  stay later, too bad.

2          You may proceed, Mr. Lato.

3          MR. LATO:  Thank you.

4

5  CROSS-EXAMINATION

6  BY MR. LATO:

7  Q.  Good morning, sir.

8  A.  Good morning.

9  Q.  Sorry I made you come back today.

10  A.  No problem.

11  Q.  Two minutes worth of questioning, tops.

12          Do you know Ed Walsh?

13  A.  I do.

14  Q.  About how many years do you know him?

15  A.  My full career, 20 years.

16  Q.  In those 20 years, have you seen him inside the jail?

17  A.  Yes.

18  Q.  Which jail have you seen him inside?

19  A.  I've seen him, my first seven years I was at

20  Riverhead facility, I've seen him numerous times there.

21  My three years in Yaphank, up until February, occasionally

22  I would see him there.

23  Q.  Now, when you say occasionally in Yaphank, what would

24  be occasionally?

25  A.  Again, I worked the rotating shift so it was

1    different hours.  It was a morning shift and evening

2    shift.  Maybe a handful of times.

3    Q.    What about in the Riverhead facility, would that be

4    more than a handful of times that you have seen him?

5    A.    Yes.

6    Q.    About how many times over your entire career have you

7    seen Ed Walsh in the Riverhead facility?

8    A.    Over 100.

9    Q.    Would that be at various times of the day that you

10   would see him there?

11   A.    Correct.

12   Q.    What times of the day would you see him there?

13   A.    Usually, I would see him midday, usually I would see

14   him somewhere between maybe 10:30 and 1:30.

15   Q.    That's 1030 a.m. to 1:30 p.m.?

16   A.    10:30 to 1:30, yes.

17   Q.    Did you always see him in about the same place, or in

18   different places?

19   A.    He had different capacities in the jail.

20            When I first saw him he was in the union, so I

21   wouldn't see him too often my first year or two on the

22   job.

23            Then when he -- I believe he was in charge of

24   our security section for a while, and I would see him more

25   often.

1    He was then in what's called PIB, personal

2  investigations.  That's where they investigate new

3  officers.  I would not see him as much because his office

4  was not in Riverhead.

5    Other than that, the last few years he was in

6  the front office and I would see him occasionally, as I

7  mentioned, between those hours.

8  Q.   Now, in the front office, did you know what his job

9  was?

10  A.   Not in particular, no.

11  Q.   Now, who sits in the front office, do you know, or at

12  the time that you saw him in the front office, do you know

13  who sat there?

14  A.   I do, yes.

15  Q.   Who sat there?

16  A.   That was administrative part of the facility, so you

17  would have the sheriff, two undersheriffs, personnel, the

18  warden's office, the lieutenant's office, all part of that

19  wing of the administration.

20  Q.   Would you see the sheriff there in addition to Ed

21  Walsh?

22  A.   I have seen the sheriff there, yes.

23    MR. LATO:  Nothing further.

24    THE COURT:  Anything else?

25    MS. MIRABILE:  No, your Honor.

915

1    THE COURT:  You may step down.

2    (The witness steps down.)

3    THE COURT:  Please call your next witness.

4    MS. MIRABILE:  The United States calls Michael

5    Newman, N E W M A N.

6    THE COURT:  Raise you right hand.

7

8    MICHAEL NEWMAN,

9         called as a witness, having been first

10        duly sworn, was examined and testified

11        as follows:

12

13    THE COURT:  Please be seated.

14    Please state, in a loud voice, your name and

15    spell your name slowly for the record.

16    THE WITNESS:  Michael Newman, N E W M A N.

17    THE COURT:  You may proceed.

18    MS. MIRABILE:  Thank you.

19

20    DIRECT EXAMINATION

21    BY MS. MIRABILE:

22    Q.   Good morning.

23    A.   Good morning.

24    Q.   Can you please tell the members of the jury where you

25    are currently employed?

916

1    A.    Suffolk County Sheriff's office.

2    Q.    How long have you been employed by the Sheriff's

3    office?

4    A.    Since 2002.

5    Q.    What is your position?

6    A.    Currently I'm a fire safety officer.

7              THE COURT:  You're a what?

8              THE WITNESS:  Fire safety officer.

9    BY MS. MIRABILE:

10   Q.    How long have you been a fire safety officer?

11   A.    Almost a month now.

12   Q.    What was your position before that?

13   A.    I worked in the Riverhead jail in the holding pen.

14   Q.    As a corrections officer?

15   A.    As a corrections officer, yes.

16   Q.    Is that still your Civil Service title, corrections

17   officer?

18   A.    It's still corrections officer, yes.

19   Q.    Your designation is as fire safety officer, but

20   you're Civil Service title is corrections officer?

21   A.    Correct.

22   Q.    And what are your duties and responsibilities?

23   A.    As the fire safety officer?

24   Q.    Yes.

25   A.    To maintain the fire alarm system, sprinklers,

1  extinguishers, meet with the county fire marshals, first

2  aid kits and so on.

3  Q.    What were your duties prior to being designated as a

4  fire safety officer?

5  A.    I was working in the holding pen, which is the intake

6  area of the Riverhead jail.

7  Q.    During your career at the sheriff's office, have you

8  been involved in any community outreach or community

9  relations programs?

10  A.    Yes, I have.

11  Q.    Are you assigned to that unit?

12  A.    The GREAT program yes.

13  Q.    You're assigned to the GREAT program?

14  A.    Yes.

15  Q.    Have you done any additional --  what is the GREAT

16  program?

17  A.    The GREAT program is a federal program; Gang

18  Resistance Education and Training.

19        We go in to elementary schools and middle

20  schools and teach students about anti-bullying, gang

21  prevention, decision-making, how to deal with their anger.

22  Q.    How long have you been involved in that program?

23  A.    Since 2008.

24  Q.    Are you an instructor in that program?

25  A.    Yes, I am.

1  Q.   Do you have to be certified to be an instructor?

2  A.   Yes.

3  Q.   Certified by who?

4  A.   The federal government.

5  Q.   Are you familiar with the other certified instructors

6  in the GREAT program?

7  A.   Yes, I am.

8  Q.   Is the defendant -- first of all, do you know the

9  defendant Ed Walsh?

10 A.   Yes.

11 Q.   Do you see him in this courtroom?

12 A.   Yes.

13 Q.   Can you please identify him by an article of

14 clothing?

15 A.   Right there (indicating).

16 Q.   Could you identify him by an article of clothing?

17 A.   I'm sorry.  Brown jacket, red tie.

18 Q.   Is he the one, as you're facing that table, on the

19 far left?

20 A.   Yes.

21        MS. MIRABILE:  Let the record reflect the

22 witness has identified the defendant.

23        THE COURT:  Yes.

24 BY MS. MIRABILE:

25 Q.   Is the defendant an instructor in the GREAT program?

1   A.   Not that I'm aware of.

2   Q.   Have you participated in any other community

3   relations or community outreach activities, in addition to

4   the GREAT program?

5   A.   The YES program.

6   Q.   What's the YES program?

7   A.   High schools come to the Riverhead jail and you

8   escort them around the jail, showing them housing units,

9   and they have inmates that come down and speak to them.

10  Q.   And any other community outreach programs that you

11  participated in?

12  A.   That's it.

13  Q.   In any of the community outreach programs you

14  participated in, did the defendant ever assist you?

15  A.   No.

16  Q.   Did he ever supervise you?

17  A.   No.

18  Q.   Did he ever come to any events inside or outside the

19  jail?

20  A.   Not that I'm aware of.

21  Q.   Are you familiar with an instructor, a GREAT

22  instructor named Christopher Lambert?

23  A.   Yes, I am.

24  Q.   Have you participated in any or instructed any class

25  with Chris Lambert?

1   A.   Yes, I have.

2   Q.   How frequently?

3   A.   One school year, which is eight weeks.

4   Q.   Eight weeks each year?

5   A.   Yes.

6   Q.   So you've done a class with Chris Lambert once a year

7   for how long?

8   A.   Once a week for eight weeks.

9   Q.   I meant for how many years?

10  A.   I'm sorry.  I would say about six years I guess in

11  total.

12  Q.   During the times that you've done classes with Chris

13  Lambert in the GREAT program, did the defendant ever

14  assist in that program?

15  A.   Not that I'm aware of.

16  Q.   Did he ever supervise that work, your work?

17  A.   No.

18  Q.   Did you ever see him in any community relations

19  events?

20  A.   No.

21  Q.   As a corrections officer, how long is your workday?

22  A.   Seven-and-a-half hours.

23  Q.   And how long is your work week?

24  A.   37-and-a-half hours.

25  Q.   When you're scheduled to work a full day, do you

1  actually work that full seven-and-a-half hours?

2  A.    Yes.

3  Q.    Are you familiar with the term RDO?

4  A.    Yes.

5  Q.    That's regular day off?

6  A.    Correct.

7  Q.    Have you ever been recalled to work on your regular

8  day off?

9  A.    Yes.

10  Q.    How many times?

11  A.    Not a lot.

12  Q.    Could you describe the circumstances of an occasion

13  where you've been called to work?

14  A.    On a recall you come in -- just recently, because the

15  fire alarm is going off at the Yaphank jail, and they

16  couldn't reset the fire doors, so we got called in to work

17  with maintenance to reset the alarms so they could fix

18  those doors.

19  Q.    When you were recalled to assist in that, how long

20  were you at the Yaphank jail?

21  A.    Four hours.

22  Q.    You were there physically for the four hours?

23  A.    Yes.

24  Q.    That was in an emergency situation?

25  A.    Yes.

922

1     That's a recall.

2  Q.   I would like to show you what's already in evidence

3  as Government's Exhibit 87-A, which is an aerial view of

4  the Riverhead facility.

5     Do you recognize that?

6     MS. MIRABILE:  If we can dim the lights maybe.

7  I'm sorry, your Honor.

8  BY MS. MIRABILE:

9  Q.   Is it easier to see?

10 A.   Yes.

11 Q.   That's an aerial view of the Riverhead facility?

12 A.   Correct.

13 Q.   And do you see these two parking lots with the solar

14 panels?

15 A.   Yes.

16 Q.   On the top left-hand corner of that photograph.

17     Is this the main entrance in and out of the

18 Riverhead facility?

19 A.   Yes.

20 Q.   Do you see this dirt road that goes along the left of

21 the Riverhead facility?

22 A.   Yes.

23 Q.   Have you ever used that dirt road to enter the

24 Riverhead facility?

25 A.   No, I have not.

923

1  Q.   Have you ever used it to exit the Riverhead facility?

2  A.   No, I have not.

3  Q.   The times you come and leave work, do you use the

4  main entrance?

5  A.   Yes, that's the only place.

6       MS. MIRABILE:  No further questions.

7       THE COURT:  Cross-examination.

8       MR. WEXLER:  Thank you, Judge.

9

10 CROSS-EXAMINATION

11 BY MR. WEXLER:

12 Q.   Good afternoon, Mr. Newman?

13 A.   Good afternoon.

14 Q.   Mr. Newman, I didn't hear you.

15       What town do you live in or hamlet?

16 A.   Lindenhurst.

17 Q.   You testified that you didn't see Ed Walsh involved

18 with the GREAT or YES programs, correct?

19 A.   Yes.

20 Q.   Because that wasn't part of his assignment, you're

21 aware of that?

22 A.   Correct.

23 Q.   For instance, if somebody would testify here, they

24 say, Michael Newman, I didn't see him in the MEU, correct?

25       MS. MIRABILE:  Objection.

924

1        THE COURT: Sustained.

2        MR. WEXLER: Okay.

3   BY MR. WEXLER:

4   Q.   What is the MEU?

5   A.   I believe that's our medical unit.

6   Q.   Would one expect to see you there on a regular basis

7   if you weren't assigned to it?

8   A.   No.

9   Q.   Okay.

10       What about the PIB, what does that stand for?

11  A.   That's personal investigations.

12  Q.   You weren't assigned to that and you're not assigned

13  to that?

14  A.   No.

15  Q.   So would it be a surprise that somebody would testify

16  or state I didn't see Mr. Newman in PIB?

17       MS. MIRABILE: Objection.

18       THE COURT: Overruled.

19  BY MR. WEXLER:

20  Q.   You wouldn't expect them to see you there, you're not

21  assigned to it, correct?

22  A.   Correct.

23  Q.   Similarly, the record room, and we don't need an

24  explanation for that, you weren't assigned to that, sir?

25  A.   Yes, correct.

1  Q.   So you wouldn't be seen in that part of the building?

2  A.   Yes.

3  Q.   I can name the psychiatric part, the hospital, claims

4  investigation, you were not assigned to those commands and

5  one would not expect to see CO Newman?

6  A.   Correct.

7  Q.   Okay.

8        With respect to -- you have approximately 13

9  years as a corrections officer?

10  A.   Correct.

11  Q.   You were mostly in Riverhead?

12  A.   Yes.

13  Q.   Okay.

14        Did you have occasion to see Ed Walsh?  You know

15  who he is in, and about Riverhead?

16  A.   Yes.

17  Q.   Would you see him in various parts of the jail?

18  A.   Yes.

19  Q.   In fact, was it not uncommon to see Ed in almost

20  every different part of the jail at some time or another

21  doing something?

22  A.   I guess you could, yes.

23  Q.   Was he more of the visible guys you would see, or

24  women that you would see, in the jail?

25  A.   Yes.

1 Q. He wasn't someone that, as you sit here, you never

2 saw him or he was hiding in an office or you had no idea

3 if he was even in the place, correct?

4 A. Correct.

5 Q. Just a few other questions, CO Newman.

6 You testified about minimum recall?

7 A. Um-hum.

8 Q. You have to say yes or no.

9 A. Yes.

10 Q. And there is one hour for travel?

11 A. Correct.

12 Q. That's one hour and you probably use every bit of the

13 one hour because you live in Lindenhurst?

14 A. Yes.

15 Q. The extreme western end of the island.

16 Is it your understanding of the contract, were

17 you to live on Edwards Avenue in Riverhead, and it took

18 you five minutes, you would still get the one hour,

19 correct?

20 A. Correct.

21 Q. Under your contract?

22 A. Yes.

23 Q. And, additionally, you had nothing to do with

24 negotiating that contract, did you?

25 A. No, I did not.

1 Q.   Additionally, the four hours, if you got called in on

2 an RDO, regular day off, and you worked for an

3 hour-and-a-half on whatever assignment that you were

4 finished with, if a supervisor said, Newman, split, you

5 didn't have to work the full four hours to get the four

6 hours under the contract, correct?

7 A.   Correct.

8 Q.   And that's pretty common.

9        Is that something that you have understood since

10 a very young corrections officer that the contract, you're

11 allowed to, on that one and four, if you were told to

12 leave, and even after 25 minutes if someone said blow, you

13 got your four hours, correct?

14 A.   Correct.

15 Q.   And, in fact, that's probably happened to you on

16 occasion?

17 A.   Yes.

18 Q.   When you were driving back home to Lindenhurst, you

19 didn't have the grin on your face that you thought you

20 were stealing from the county, did you?

21 A.   No.

22        MR. WEXLER:  Thank you very much, sir.

23        MS. MIRABILE:  Just a couple of questions.

24        THE COURT:  Yes.

25

928

1   REDIRECT EXAMINATION

2   BY MS. MIRABILE:

3   Q.   When you came in for recall, you had to be called in

4   by a supervisor, right?

5   A.   Yes.

6   Q.   If you're going to leave before that four hours, you

7   have been have to be released by a supervisor?

8   A.   Correct.

9   Q.   And in order to get that hour travel, you actually

10  have to go to the facility, right?

11  A.   Correct.

12  Q.   You can't get it if you don't go to Riverhead or

13  Yaphank, right?

14  A.   No.

15          MS. MIRABILE:  No further questions.

16          THE COURT:  Anything else?

17          MR. WEXLER:  Nothing, sir.

18          THE COURT:  You may step down.

19          (The witness steps down.)

20          THE COURT:  Please call your next witness.

21          MS. MIRABILE:  Everett Oliver.

22          THE COURT:  Please raise you right hand.

23  EVERETT OLIVER,

24              called as a witness, having been first

25              duly sworn, was examined and testified

1          as follows:

2               THE COURT:  Please be seated.

3               Please state, in a loud voice, your full name

4     and spell your name slowly for the record.

5               THE WITNESS:  Everett Oliver, E V E R E T T, O L

6     I V E R.

7               THE COURT:  Well done.

8               You may proceed.

9               MS. MIRABILE:  Thank you.

10

11    DIRECT EXAMINATION

12    BY MS. MIRABILE:

13    Q.   Good morning.

14               Can you please tell the members of the jury

15    where you are currently employed?

16    A.   I'm currently employed with the Suffolk County

17    Sheriff's office.

18    Q.   How long have you been employed by the Sheriff's

19    office?

20    A.   A little over 24 years.

21    Q.   What's your position?

22    A.   Correction officer.

23    Q.   Where are you currently assigned?

24    A.   Community relations unit.

25    Q.   How long have you been assigned to the community

1  relations unit?

2  A.    15 years.

3  Q.    Where is that office locate?

4  A.    Riverhead.

5  Q.    What are your duties and responsibilities as a

6  correction officer in the community relations unit?

7  A.    To coordinate all of the community programs that the

8  Sheriff's office offers.

9  Q.    What kind of programs are those?

10  A.    We have several programs; a YES program, we have a

11  McGruff program, the GREAT program, we do lectures to

12  colleges and high schools.

13  Q.    The YES program, what is that program?

14  A.    The YES program, it's a program where we bring high

15  school students, some at risk students, college students

16  into the facility for them to view the facility and let

17  them speak to select inmates about life in jail.

18  Q.    And the GREAT program?

19  A.    The GREAT program is a middle school and elementary

20  school program where we go to the schools, in the

21  classroom with the students, and it's a life skills based

22  program teaching them about decision making, anger

23  management, confrontation, managing things like that.

24  Q.    Do you know the defendant Ed Walsh?

25  A.    Yes.

931

1    Q.   Do you see him in the courtroom?

2    A.   Yes.

3    Q.   Can you please identify him by an article of clothing

4    or where he's sitting at the table?

5    A.   He's sitting to my left with a maroon color tie.

6            MS. MIRABILE:  Let the record reflect that the

7    witness has identified the defendant.

8            THE COURT:  Yes.

9    BY MS. MIRABILE:

10   Q.   Was the defendant -- did the defendant ever assist

11   you in any community outreach programs?

12   A.   No.

13   Q.   Did he ever supervise you?

14   A.   No.

15   Q.   Did he ever come to any community relations events?

16   A.   No.

17   Q.   You mentioned that you were an instructor, you're

18   involved in the GREAT program?

19   A.   Yes.

20   Q.   You're an instructor?

21   A.   Yes.

22   Q.   Are you certified for that?

23   A.   Yes.

24   Q.   Who certified you?

25   A.   The GREAT program itself.

1  Q.   And are you familiar with the other instructors in

2  the GREAT program?

3  A.   Yes.

4  Q.   Is the defendant an instructor in the GREAT program?

5  A.   Not to my knowledge.

6  Q.   Did he ever supervise your work in the GREAT program?

7  A.   No.

8  Q.   Have you ever attended an event for Martin Luther

9  King day with members of the Sheriff's office?

10  A.   Yes.

11  Q.   Where was that?

12  A.   The Sheraton Hotel in Hauppauge.

13  Q.   Do you remember who you attended with?

14  A.   There was several people there.

15       Yes, I can remember some of the individuals,

16  yes.

17  Q.   Who do you remember being there?

18  A.   My partner, Julius Nelson, Sergeant Marzenowski (phn)

19  was there.

20       THE COURT:  How do you spell that?

21       THE WITNESS:  I'm not sure.

22       THE COURT:  How do you say it again?

23       THE WITNESS:  Marzenowski (phn).

24       THE COURT:  Forget it.

25

933

1   BY MS. MIRABILE:

2   Q.   Was the defendant present at the Martin Luther King

3   day event at that hotel?

4   A.   No, I didn't see him.

5   Q.   Were you at a table with employees from the Sheriff's

6   office?

7   A.   Yes.

8   Q.   Were you at a table for the Suffolk County

9   Conservative Party?

10  A.   No.

11  Q.   Have you ever sat a table purchased by the Suffolk

12  County Conservative Party at a Martin Luther King day

13  event?

14  A.   No.

15  Q.   I'm going to show you what's already been marked --

16  you know what, a couple of questions before I show you

17  this.

18         As a correction officer, how long is your

19  workday?

20  A.   It's eight hours a day.  We get a 30 minute break, so

21  seven-and-a-half, 7.5.

22  Q.   Seven-and-a-half hours a day and a half hour for

23  lunch?

24  A.   Yes.

25  Q.   And your workweek?

1    A.    35.5.

2    Q.    When you're scheduled to work full-time, do you work

3    that full seven-and-a-half hours?

4    A.    Yes.

5    Q.    Are you familiar with the term regular day off or

6    RDO?

7    A.    Yes.

8    Q.    That's your regular day off?

9    A.    Yes, a regular day off, yes.

10   Q.    Have you ever been recalled to work on your RDO?

11   A.    Yes, I have, yes.

12   Q.    Under what circumstances have you been recalled?

13   A.    If we do -- if we have a community event that is on a

14   Saturday or Sunday, then I would have to go to that event.

15   Q.    Is that something that your supervisors are aware of?

16   A.    Yes.

17   Q.    Is that something that was scheduled in advance?

18   A.    Yes.

19   Q.    So that's already on the calendar and you know that

20   you have to come in on that day?

21   A.    Yes.

22   Q.    Your supervisors are aware of when you arrive and

23   when you leave?

24   A.    Yes.

25   Q.    I would like to show you what's already in evidence

1    as 87-A, which is an aerial view of the Suffolk County

2    Sheriff's office facility in Riverhead.

3            Do you see that?

4    A.    Yes.

5    Q.    Do you see on the top, it's a larger picture, so on

6    the top left-hand corner of this picture there are two

7    side parking lots with solar panels; do you see that?

8    A.    Yes.

9    Q.    Is that the main entrance that's in between those

10   two, just above it?

11   A.    Yes, it is.

12   Q.    I can zoom in if it's easier for you to see.

13           Do you see the main entrance between these two

14   solar paneled parking lots?

15   A.    Yes.

16   Q.    Can you see the dirt road that goes along the side

17   the left of the Riverhead facility?

18   A.    Yes.

19   Q.    Are you familiar with that road?

20   A.    Yes, I know it's back there.

21   Q.    Have you ever used that road to enter or exit the

22   Riverhead facility?

23   A.    No.

24   Q.    When you come to work and leave work, do you use that

25   main entrance in the front?

1  A.  Yes.

2          MS. MIRABILE:  No further questions.

3          THE COURT:  Cross-examination.

4          MR. WEXLER:  Thank you, Judge.

5

6  CROSS-EXAMINATION

7  BY MR. WEXLER:

8  Q.  Good afternoon.  Good morning.  I apologize,

9  Mr. Oliver.

10  A.  Good morning.

11  Q.  You have been a correction officer with Suffolk

12  County Sheriff's office for 24 years?

13  A.  Yes.

14  Q.  Okay.

15          If you look back in your mind's eye over the 24

16  years, you know who Eddie is, Ed Walsh?

17  A.  Yes.

18  Q.  And you've seen him in the building?

19  A.  Yes.

20  Q.  Fair to say you've seen him in every part of the

21  building that you've been in?

22  A.  Yes.

23  Q.  Is he one of the more visible people in the building,

24  as you recall?

25  A.  Well, he's a boss, so I wouldn't see him regularly as

1  I would see other officers, uniformed officers regularly.

2  Q.  Those that were assigned to you or assigned to the

3  same crew you were in?

4  A.  Yes.

5  Q.  But I guess, without belaboring it, you saw him

6  throughout the building?  If you were in parts of the

7  building, you would run into him?  I'm not saying every

8  day, every second.

9  A.  Yes.

10  Q.  And was Ed Walsh ever present or did he ever speak to

11  any of the YES classes in the jail?

12  A.  Yes.

13  Q.  Yes or YES class?

14  A.  Yes, YES classes.

15  Q.  What type of classes did he speak to?

16  A.  It was classes that he would come down on occasion.

17  It would be a high school class.

18  Q.  Was this something that was scheduled or Ed would

19  kind of show up and say, Everett, do you mind if I give a

20  lecture to this class?  How did that work?

21  A.  He would just show up.

22  Q.  Okay.

23        How long would his presentation be?

24  A.  10, 15 minutes maybe.

25  Q.  Was he any good?

1  A.  Yes.

2  Q.  Is that something he had to do?  He wasn't assigned

3  to that, was he?

4  A.  No.

5  Q.  It was something, as far as you understood, something

6  that he wanted to do, enjoyed doing and thought would be

7  helpful?

8  A.  Yes.

9  Q.  Just a few other questions, sir.

10      You were asked about RDO, regular day off, and

11 you said, yes, you were called and they were regularly

12 scheduled events, usually community events, that you and

13 the rest of your unit knew were going to happen in

14 advance?

15 A.  Yes.

16 Q.  It's not like you have a spontaneous community event?

17 A.  No.

18 Q.  You were never in investigations, correct?

19 A.  Correct.

20 Q.  So you don't know with investigations, or maybe you

21 do know, that investigators get called to respond to

22 spontaneous fights, assaults, stabbings, things like that,

23 correct?

24 A.  Yeah, correct.

25 Q.  And they're not scheduled?  There's no scheduled

1    there's going to be a stabbing on this day on cell block

2    C?

3    A.    No, not scheduled, no.

4    Q.    One or two other questions, sir.

5          At the Martin Luther King day event, how many of

6    them did you go to?

7    A.    Several over the years.

8    Q.    You sat at the Sheriff's table?

9    A.    Yes.

10   Q.    And you did not see Ed Walsh at that Sheriff's table?

11   A.    Not that I can recall.

12   Q.    But am I to infer that he may have been there, you

13   didn't just see him sitting at the table?

14   A.    It's a possibility, yes.

15   Q.    I mean, you weren't, five years ago, you weren't

16   sitting there thinking; you know, I better take an eye

17   count, head count and see if Ed Walsh is here?

18   A.    No.

19   Q.    He wasn't at the immediate table that you were seated

20   at?

21   A.    Correct.

22   Q.    And just one other question, Mr. Oliver, Correction

23   Officer Oliver.

24         You've been to the St. Patrick's Day parades?

25   A.    No.

1  Q.   Maybe it's a different Oliver.

2        Are there any other Olivers in the jail?

3  A.   Yes, there are.

4  Q.   Okay.  Let me try that.

5        What about with McGruff, he's a crime fighting

6  dog, do you remember?  I know that's not something you

7  easily forget.

8  A.   Yes.

9        No, I have not done the St. Patty's Day parade

10  with McGruff, no.

11        MR. WEXLER:  Thank you, sir.

12

13  REDIRECT EXAMINATION

14  BY MS. MIRABILE:

15  Q.   Just a couple of questions.

16        The YES program where the defendant has spoken

17  to high school students, is that for every school?

18  A.   No.

19  Q.   Is there a particular school?

20  A.   Yes.

21  Q.   What school is that?

22  A.   East Islip.

23  Q.   Do you know why it's that school?

24  A.   I believe that his alma mater.

25  Q.   And when he came to speak to the students from his

1    alma mater, that was in the facility, correct?

2    A.   Yes.

3    Q.   He didn't go outside of the school, didn't go to East

4    Islip high school?

5    A.   No.

6    Q.   He spoke to them inside the jail?

7    A.   Correct.

8    Q.   He didn't speak to high school students from any

9    other high school?

10   A.   Not that I'm aware of, no.

11             MS. MIRABILE:  No further questions.

12             MR. WEXLER:  Just very briefly.

13

14   RECROSS-EXAMINATION

15   BY MR. WEXLER:

16   Q.   Mr. Oliver, you testified about East Islip high

17   school.

18             Do you remember Connetquot high school?

19   A.   Honestly, I do so many schools.  I do remember

20   Connetquot high school coming in.  Yes, they do come into

21   the facility.

22   Q.   And with respect to Eddie, was Eddie also speaking to

23   Connetquot?

24   A.   I cannot remember.  It's so many schools, I can't

25   remember.

1    Q.    What about Sayville?

2    A.    Sayville?  I cannot remember.

3    Q.    Okay.

4          I guess what I'm asking you is different.  Can

5    you say that he definitely wasn't there; or, as a result

6    of the number of schools, to be honest you can't say yes

7    or no as to those other schools?

8    A.    To be honest, I cannot say yes or no to those other

9    schools.

10         MR. WEXLER:  Thank you, sir.

11

12   REDIRECT EXAMINATION

13   BY MS. MIRABILE:

14   Q.    Regardless of the school that was inside the jail, he

15   spoke to them inside the jail?

16   A.    Yes, correct.

17         MS. MIRABILE:  No further questions.

18         THE COURT:  Anything else?

19         MR. WEXLER:  No, sir.

20         THE COURT:  You may step down.

21         (The witness steps down.)

22         THE COURT:  Please call your next witness.

23         MR. TIERNEY:  Your Honor, the government calls

24   Michelle Mahler, M A H L E R.

25         THE COURT:  Rise, please, and raise you right

1 hand.

2

3 MICHELLE MAHLER,

4          called as a witness, having been first

5          duly sworn, was examined and testified

6          as follows:

7

8          THE COURT:  Please be seated.

9          Please state your full name in a loud voice and

10 spell your name slowly for the record.

11          THE WITNESS:  It's Michelle R. Mahler, M I C H E

12 L L E, R, M A H L E R.

13          MR. TIERNEY:  May I proceed, your Honor?

14          THE COURT:  Yes.

15

16 DIRECT EXAMINATION

17 BY MR. TIERNEY:

18 Q.   Ms. Mahler, are you employed by the County of

19 Suffolk?

20 A.   Yes.

21 Q.   For how long?

22 A.   For 16 years.

23 Q.   Where are you currently employed within the County of

24 Suffolk?

25 A.   Suffolk County Sheriff's.

1  Q.    How long have you been working for the Suffolk County

2  Sheriff's office?

3  A.    Three-and-a-half, almost four years.

4  Q.    And prior to that, where did you work within the

5  County of Suffolk?

6  A.    Suffolk County Community College.

7  Q.    For how long approximately did you work for Suffolk

8  County Community College?

9  A.    A little over 12 years.

10  Q.    And what is it that you did with the Suffolk County

11  Community College.

12  A.    I was in human resources.

13  Q.    Once you transferred over to the Suffolk County

14  Sheriff's office, where did you work?

15  A.    In the payroll office.

16  Q.    You've been working in the payroll office for the

17  last three-and-a-half years?

18  A.    Yes.

19          THE COURT:  I'm sorry, where do you work?

20          THE WITNESS:  At the Suffolk County Sheriff's

21  office.

22          THE COURT:  Where?

23          THE WITNESS:  In the payroll office.

24  BY MR. TIERNEY:

25  Q.    And what are your duties and responsibilities with

1  the payroll office?

2  A.    I'm the payroll supervisor, so I oversee all of the

3  activities that go on in the payroll department.

4  Q.    Are you familiar with the Civil Service title of

5  correction officer within the Suffolk County Sheriff's

6  office?

7  A.    Yes.

8  Q.    Are you familiar with the procedure used to calculate

9  the work hours of the correction officers?

10  A.    Yes.

11  Q.    Are you familiar with the procedure used to calculate

12  the wages earned by correction officers?

13  A.    Yes.

14  Q.    Is it the responsibility of the payroll department to

15  keep and maintain the hours worked and the wages earned by

16  all members of the Suffolk County Sheriff's office?

17  A.    Yes.

18  Q.    That's including correction officers?

19        THE COURT:  You have to slow down, Mr. Tierney.

20  I can't keep up with you.

21        MR. TIERNEY:  Sorry, your Honor.

22        THE COURT:  I'm sure everybody else can, but I

23  can't.

24        MR. TIERNEY:  I'm sorry, your Honor.

25

1  BY MR. TIERNEY:

2  Q.   I'll ask the question again.

3       As a supervisor with the payroll department, are

4  you familiar with the way the payroll records are prepared

5  and maintained?

6  A.   Yes.

7  Q.   Is it the responsibility of the payroll department to

8  keep and maintain the hours worked and the wages earned by

9  all members of the Suffolk County Sheriff's office?

10 A.   Yes.

11 Q.   That's including correction officers?

12 A.   Yes.

13 Q.   Are you familiar with a former correction officer by

14 the name of Ed Walsh?

15 A.   Yes.

16 Q.   I'm going to show you --

17       MR. TIERNEY:  May I approach the witness, your

18 Honor?

19       THE COURT:  Yes.

20 BY MR. TIERNEY:

21 Q.   I'm going to ask that you take a look at Government's

22 Exhibit 11.

23 A.   Yes.

24       THE COURT:  Is that for identification or in

25 evidence?

1      MR. TIERNEY:  It's in evidence, your Honor.

2  BY MR. TIERNEY:

3  Q.   Government's Exhibit 11, are those the overtime

4  records for the defendant Ed Walsh?

5  A.   Yes.

6  Q.   Now, do you know what shift Ed Walsh worked?

7  A.   Yes.

8  Q.   What was his shift?

9  A.   He was on a rotating shift, Monday to Friday, eight

10  to four and two to ten.

11  Q.   His regular workweek was Monday to Friday?

12  A.   Yes.

13  Q.   And his work hours were either eight to four or two

14  to ten?

15  A.   Yes.

16  Q.   Again, you indicated that it was the responsibility

17  of the payroll department to determine the defendant's

18  hours and wages for a pay period?

19  A.   Yes.

20  Q.   I'm going to show you Government's Exhibit -- a

21  portion of Government's Exhibit 11, the overtime records

22  for Ed Walsh marked Bates number 476.

23       We see Ed Walsh's name at the top and then the

24  date, the regular shift and the overtime shift?

25  A.   Yes.

948

1  Q.   And then you have Monday, Tuesday, Wednesday,

2  Thursday, Friday?

3  A.   Right.

4  Q.   Then you have the regular shift, eight to four, and

5  then obviously he worked overtime Monday through Thursday?

6  A.   Yes.

7  Q.   And then Friday, the Friday here is left blank.

8       What is his shift for that Friday?

9  A.   We would assume it would be eight to four.

10 Q.   Because of the other ones?

11 A.   Correct.

12 Q.   If the shift had been changed, how would that be

13 noted?

14 A.   It would be noted if he did overtime on that day, on

15 the Friday.

16 Q.   It would be two to ten?

17 A.   Yes.

18 Q.   So absent any other direction or memoranda, you would

19 just follow through with the eight to four?

20 A.   Correct.

21 Q.   And then showing you what's been marked as

22 Government's Exhibit 11, Bates number 477, do you see on

23 this date what's the defendant's regular shift on this

24 week?

25 A.   Two to ten.

1 Q. And then again he's worked overtime Tuesday and

2 Wednesday. Monday, Wednesday and Friday are left blank.

3 So absent anything noted or any other memo to

4 the payroll department, what do they calculate that as?

5 A. Two to ten.

6 Q. Now, did there come a time when you were asked to

7 calculate the hourly wage of the defendant as well as the

8 overtime wage for the defendant as a correction officer

9 III?

10 A. Yes.

11 Q. Did the payroll department do that?

12 A. Yes.

13 Q. Do you have that figure?

14 A. I do.

15 Q. Do you have to refer to your notes?

16 A. I do.

17 MR. TIERNEY: Your Honor, may the witness refer

18 to her notes? It's 3500 material, one page.

19 THE COURT: Yes.

20 A. The current hourly rate is $60.78 and the overtime

21 rate is $92.99.

22 THE COURT: What's the overtime?

23 THE WITNESS: The overtime was $92.99.

24 MR. TIERNEY: Nothing further, your Honor.

25 Thank you.

950

1  Q.  And that was the rate between 2011 and 2014?

2  A.  Yes.

3

4  CROSS-EXAMINATION

5  BY MR. WEXLER:

6  Q.  Good morning, Ms. Mahler.

7  A.  Good morning.

8  Q.  You have been employed for how long by the Suffolk

9  County Sheriff's office?

10  A.  Almost four years.  In July it will be fours years.

11  Q.  When did you first start?

12  A.  In July of 2012.

13  Q.  July 2012.

14        Did you get to know who Ed Walsh was?

15  A.  Yes, I've seen him in the Sheriff's office.

16  Q.  And where was your office relative to Ed Walsh's?

17  A.  It was diagonally across the hall.

18  Q.  Did you see him often?

19  A.  I saw him at work, yes.

20        It's hard to leave the payroll office because

21  it's always very busy, but when I would go to the ladies

22  room I would see him, yes.

23  Q.  But not in the ladies room?

24  A.  No, not in the ladies room.  Sorry.  No.

25  Q.  You would see him at the jail?

1    A.    Yes.

2    Q.    Did you see him -- and again I understand you weren't

3    keeping tabs on what Ed Walsh was doing -- but in your

4    travels outside of the payroll office, would you see him

5    in the morning, the afternoon, the evening?  Was it kind

6    of throughout the day?

7    A.    I would see him during the day.  I don't work after

8    five usually.

9    Q.    Your workday would be nine to five you would see him

10   in and about the jail?

11   A.    Yes.

12   Q.    And it wasn't infrequent to say, oh, there's Ed?

13   A.    No.

14   Q.    You were asked about shifts and payroll shifts?

15   A.    Yes.

16   Q.    Do you know that the change was instituted regarding

17   shifts in April of 2014 via memo by Undersheriff

18   Meyerricks?

19   A.    Yes.

20   Q.    What was the old way and then what was I guess the

21   current way, the new way?

22   A.    The new way is everything has to go through

23   Undersheriff Meyerricks for any kind of change in shift.

24   Q.    The old way prior to the Meyerricks memo, how did

25   that work?

952

1   A.   They would note it on their overtime slip or

2   sometimes they would note it in the remarks column of the

3   timesheet.

4   Q.   If you're an investigator, you didn't need a formal

5   approval to do a shift change?

6   A.   No.

7   Q.   So, let's say I'm CO Investigator Wexler, and I'm

8   scheduled to work an eight to four, and I want to do an

9   eleven to six that day, ten to six.

10          I wouldn't need Meyerricks' approve because the

11  memo had yet come out prior to April of '14?

12  A.   I don't know that.

13          There's usually like a form 6-something that

14  sometimes we did not see but it would be noted somewhere.

15  Q.   And for billing purposes in payroll, prior to April

16  '14, would my shift still read the original eight to four?

17  A.   No.

18  Q.   That would be changed?

19  A.   That should be changed.  We would see that on the

20  overtime slip if he had overtime on that day.

21  Q.   If there was no overtime, even if a shift change

22  occurred, it would still read the old time pre-April '14?

23  A.   Say that again?

24  Q.   Am I confusing you?

25  A.   Yes.

1   Q.   You know it better than I do.

2         We're talking about prior to April of '14.

3         If I was going to change my shift, and let's say

4   I came in and I'm an investigator and I want to do a nine

5   to five rather than an eight to four, would my shift still

6   read the eight to four?

7   A.   The shift was not.  Unless he did overtime on that

8   day, we wouldn't know what the shift would be if he

9   changed his shift.

10   Q.   It would still read the original time, eight to four.

11   You wouldn't know and you wouldn't care that as an

12   investigator I moved my shift around?

13   A.   No.

14   Q.   Additionally, just so I know, if I worked overtime

15   and for billing purposes does the overtime -- let's say I

16   put in two hours of overtime.

17   A.   Okay.

18   Q.   Does that, for billing purposes and payroll, does

19   that OT get tagged to the end of my shift?  Do you see

20   what I'm saying?

21         Let's say I work an eight to four, but let's say

22   I didn't work -- my overtime wasn't four to six, it was

23   some other time.

24         For billing purposes, it would just say eight to

25   four, four to six, two hours, four to six for overtime?

1  A.   Usually on the overtime slip it would show the actual

2  hours that they worked overtime.

3  Q.   It would show the number of hours.

4           Time-wise it would go to the end of the shift?

5  A.   It usually would say the regular shift and the actual

6  overtime hours that they were worked.

7  Q.   Okay.

8           So if I worked --

9  A.   Eight to four, and you worked two hours of overtime,

10  and it was not from four to six, it should be noted eight

11  to ten, the two hours that they actually worked overtime.

12  Q.   Okay.

13           The number of hours would be listed?

14  A.   The number of hours along with the time.

15  Q.   Okay.

16           You've seen those pay slips like the one that

17  was just put up?

18  A.   Yes.

19  Q.   You've seen thousands and thousands?

20  A.   Yes.

21  Q.   Do they all have the approval of supervisors?

22  A.   Yes, they had to.

23  Q.   I'm sorry?

24  A.   They had to.  We would send them back if they didn't

25  have a supervisor's signature.

955

1          MR. WEXLER:  Thank you.

2          THE COURT:  Anything else?

3

4    REDIRECT EXAMINATION

5    BY MR. TIERNEY:

6    Q.   With regard to the time sheets, are the employees

7    required to honestly account for their time on those time

8    sheets?

9    A.   Yes.

10   Q.   And are they required to state the actual hours that

11   they worked?

12   A.   Yes.

13   Q.   That's with regard to both regular and overtime

14   hours?

15   A.   Yes.

16          MR. TIERNEY:  Thank you.

17          Nothing further.

18          MR. WEXLER:  No questions, your Honor.

19          THE COURT:  You may step down.

20          (The witness steps down.)

21          (Continued on next page.)

22

23

24

25

956

1          THE COURT:  Please call your next witness.

2          MR. TIERNEY:  Yes, your Honor.  The government

3   calls Frank Profeta.

4

5   **FRANK PROFETA**

6          called by the Government, having been first duly

7          sworn/affirmed, was examined and testified as

8          follows:

9          MR. TIERNEY:  May I proceed, your Honor?

10          THE COURT:  Yes.

11          MR. TIERNEY:  Thank you.

12

13   DIRECT EXAMINATION

14   BY MR. TIERNEY:

15   Q.   Mr. Profeta, what is it that you do for a living?

16   A.   I own a real estate company.

17   Q.   For how long have you worked in real estate?

18   A.   This year will be my 25th year.

19   Q.   And in addition to owning that real estate company,

20   do you do anything else?

21   A.   Yes.  I actually own a music venue in Patchogue.

22   Q.   What is the name of that music venue?

23   A.   The Emporium.  I'm a partner in it.

24          THE COURT:  You are going to have to talk into

25   the mic and slow down.

957

1    What is the name of it?

2    THE WITNESS:  The Emporium.

3    BY MR. TIERNEY:

4    Q.    Are you a member of a political party?

5    A.    I am.

6    Q.    What political party is that?

7    A.    The Conservative Party.

8    Q.    For how long have you been a member of the

9    Conservative Party?

10    A.    Since 1991.

11    Q.    And do you have a position within the Conservative

12    Party?

13    A.    I do.

14    Q.    What is your position?

15    A.    I am the cochair of the Brookhaven Town Conservative

16    Committee.

17    Q.    There are different Conservative groups on Long

18    Island.  Is that correct?

19    A.    Yes.

20    Q.    There are town groups and then the county groups?

21    A.    Correct.

22    Q.    You belong to the county group?

23    A.    Yes.

24    Q.    And you are also cochair of the town group.

25    A.    Correct.

1   Q.   And pursuant to your membership with the Conservative

2   Party, do you attend fund raisers?

3   A.   Yes.

4   Q.   I'm going to call your attention to the end of 2012.

5        Do you remember what occurred around that time?

6   A.   There was an election.

7   Q.   And with regard to the, was there a Conservative fund

8   raiser and that time as well?

9   A.   Yes.

10  Q.   What was also occurring with regard to the weather at

11  the end of October of 2012?

12  A.   Super Storm Sandy.

13  Q.   And originally was there a Conservative Party fund

14  raiser scheduled for the end of October?

15  A.   Yes.

16  Q.   When it scheduled?

17  A.   That was scheduled for October 30, on a Tuesday.

18  Q.   And initially was it your intention to attend that

19  first?

20  A.   I was unable to.

21  Q.   Why is that?

22  A.   I was at a conference in Phoenix.

23  Q.   What happened with regard to the original date of

24  that fund raiser?

25  A.   It was pushed, because of the storm, to Thursday,

1    November 1.

2    Q.    And as a result of Super Storm Sandy, the cancelation

3    of that, what happened?

4    A.    I was able to attend because I flew back on

5    Wednesday.

6    Q.    So you in fact attended that function on November 1,

7    2012?

8    A.    Yes.

9    Q.    Where was that function?

10   A.    That was at West Lake in Patchogue.

11   Q.    How did you pay for that function?

12   A.    With a check.

13   Q.    And do you remember what the time of that have

14   function was?

15   A.    There is actually two parts to the function.  The

16   first part of it was a VIP cocktail hour and that was from

17   6 to 7.  And then from 7 to 10 was the event.

18   Q.    Okay.  And do you recall approximately what time you

19   got there that day?

20   A.    I got there approximately between 6:30 and 7.

21   Q.    And how long did you stay?

22   A.    Well until everybody was done speaking and I was

23   full.

24   Q.    When do you think that was?

25   A.    About 9 o'clock.

960

1    Q.   About 9 o'clock?  Okay.

2         And during the time that you were there, from pm

3    6:30 7 to 9 o'clock, did you see the defendant there?

4    A.   I did.

5    Q.   Was he there the entire time that you were there?

6    A.   Yes.

7         MR. TIERNEY:  If I could have a moment, your

8    Honor.

9         (There was a pause in the proceedings.)

10   BY MR. TIERNEY:

11   Q.   I'm going to show you what has been marked for

12   identification as 1081, 1091, 1118, and 1119.

13        Do you recognize those photos?

14   A.   Yes.

15   Q.   Where were those photos taken?

16   A.   At West Lake.

17   Q.   On November 1, 2012?

18   A.   Yes.

19   Q.   And do those photos fairly and accurately depict the

20   way the west lake looked on November 1, 2001 (sic), as

21   well as the people you took those photographs with?

22   A.   Yes, sir.  But 2012.

23   Q.   I'm sorry.  2012.

24   A.   It does, yes.

25        MR. TIERNEY:  Your Honor, I move that in at this

961

1    time.

2                    THE COURT:  Any objection?

3                    MR. WEXLER:  I'm sorry.  Can I take a look?

4                    (There was a pause in the proceedings.)

5                    MR. WEXLER:  No objection, your Honor.

6                    THE COURT:  Government Exhibits 1081, 1091,

7    1118, and 1119, in evidence.

8                    (Government Exhibits 1081, 1091, 1118, and 1119

9    in evidence.)

10   BY MR. TIERNEY:

11   Q.   We are going to go through this real quick.

12                   The tallest individual in the photograph, who is

13   that?

14   A.   Ed Walsh.

15   Q.   And the person to Ed Walsh's left, who is that?

16   A.   That's me.

17   Q.   And there are other people in that photograph as

18   well.

19   A.   Excuse me.  You said left.  That is the right.

20                   The left would be Kenny Auerbach.

21   Q.   So in between Ed Walsh, the person not wearing the

22   suit, that is Ken Auerbach?

23   A.   Correct.

24   Q.   And you are on the other side of Ed Walsh, in the

25   suit.

962

1   A.   Yes, I am.

2   Q.   And Government Exhibit 1119.  Again, the tallest

3   individual in that photograph, is that Ed?

4   A.   Ed Walsh.

5   Q.   And again, the individual next to Ed Walsh, who is

6   that?

7   A.   That is me.

8   Q.   And Government Exhibit 1091 in evidence.  Is that a

9   photograph of you at the event?

10  A.   Yes.

11  Q.   And as the jury looks at the photographs, you are on

12  the far right-hand side.  Correct?

13  A.   Correct.

14  Q.   And Government Exhibit 1081.  Starting left to right,

15  is that Ed Walsh?

16  A.   Yes, it is.

17  Q.   Ed Romaine?

18  A.   Yes.

19  Q.   Do you who that woman is?

20  A.   Her name is Nicole.

21  Q.   And that is James Malone?

22  A.   Yes.

23  Q.   And is that you?

24  A.   Yes.

25       MR. TIERNEY:  No further questions.

963

1       (There was a pause in the proceedings.)

2   BY MR. TIERNEY:

3   Q.   These photos were from the event of November 1,

4   2001 -- 2012, right after Super Storm Sandy?

5   A.   Yes.

6           MR. TIERNEY:  Thank you.

7           THE COURT:  Cross-examination.

8

9   CROSS-EXAMINATION

10  BY MR. WEXLER:

11  Q.   Mr. Profeta, fair to say that you have been to any

12  number of Conservative events?

13  A.   Yes.

14  Q.   Like, loads and loads?

15  A.   A fair share.  Yes.

16  Q.   Fare share.  I don't know, the last ten years would

17  you have been to 20, 25, 30?

18  A.   Conservative events?  Yes.

19  Q.   Okay.  And you see the sheriff.  You know who the

20  sheriff of Suffolk County is, don't you?

21  A.   Yes?

22  Q.   You see him at those events?

23  A.   Not all the time.

24  Q.   Okay.  Well, do you ever see him?

25  A.   Maybe a few times.

1  Q.   Okay.  Do you ever talk to him at those events?

2  A.   Maybe shake his hand.

3         MR. WEXLER:  Thank you.

4         Nothing further, judge.

5         THE COURT:  Anything else?

6

7  REDIRECT EXAMINATION

8  BY MR. TIERNEY:

9  Q.   I'm just going to show you part of your 3500

10 material.

11        The second item down, do you recognize what that

12 is?

13 A.   Yes.

14 Q.   What do you recognize that as?

15 A.   That is a check that I wrote and signed for the

16 November 1, 2012, fund raiser.

17 Q.   Is it dated that date?

18 A.   It is.

19 Q.   Do you have a recollection of filling that check out

20 shortly before the event?

21 A.   I did.

22        MR. TIERNEY:  Thank you.  Nothing further.

23        MR. WEXLER:  Nothing else your Honor.

24        THE COURT:  You may step down.

25        (The witness was excused.)

965

1    THE COURT:  Please call your next witness.

2    MR. TIERNEY:  Thank you, your Honor.

3    The government calls Robert Kanas.

4

5    **ROBERT KANAS**

6    called by the Government, having been first duly

7    sworn/affirmed, was examined and testified as

8    follows:

9

10   DIRECT EXAMINATION

11   BY MR. TIERNEY:

12   Q.   Mr. Kanas, are you retired?

13   A.   Yes.

14   Q.   From where?

15   A.   The Suffolk County Sheriff's Office.

16   Q.   How long have you been retired for?

17   A.   Approximately 17 months.

18   Q.   So since about August of 2014?

19   A.   Correct.

20   Q.   And prior to August of 2014 where did you work?

21   A.   I worked at the Internal Affairs Bureau with the

22   sheriffs office.

23   THE COURT:  You have to get closer to the

24   microphone and speak up.

25   THE WITNESS:  I'm sorry, Judge.

1    A.    At the Internal Affairs Bureau.

2    BY MR. TIERNEY:

3    Q.    Okay.  And when you retired with the Suffolk County

4    Sheriff's Office, what was your title within the Internal

5    Affairs Bureau?

6    A.    I was commanding officer.

7    Q.    Now, when did you begin working at the Suffolk County

8    Sheriffs Office?

9    A.    In 1982.

10   Q.    And what did you begin doing in 1982 with the Suffolk

11   County Sheriffs Office?

12   A.    I was a civilian dispatcher.

13   Q.    And you said civilian dispatcher.  You mean you were

14   a civilian employee?

15   A.    Yes.

16   Q.    And what did you do as a civilian employee?

17   A.    As a civilian dispatcher you answer phone calls and

18   work the radio system.

19   Q.    How long did you do that for the Suffolk County

20   Sheriff's Office?

21   A.    About two and a half years.

22   Q.    And in approximately 1985 what happened?

23   A.    I became a deputy sheriff.

24   Q.    And by deputy sheriff, is it fair to say there is the

25   corrections side of the sheriffs department and then there

1    is the outside, enforcement side?

2    A.    Correct.

3    Q.    What side were you on?

4    A.    On the enforcement side.

5    Q.    So you were a deputy sheriff.

6    A.    Correct.

7    Q.    And that is separate from the correction officers?

8    A.    Yes.

9    Q.    And what were your duties and responsibilities

10   initially as a uniform deputy sheriff?

11   A.    I worked out of the headquarters bureau, mainly doing

12   traffic enforcement and prisoner transports.

13   Q.    For how long were you a uniform deputy sheriff?

14   A.    Approximately eight years.

15   Q.    So what occurred in approximately 1993?

16   A.    I became a plainclothes investigator.

17   Q.    And once you became a plainclothes investigator, were

18   you assigned to a particular area within the Suffolk

19   County Sheriffs Office?

20   A.    Yes.

21   Q.    Where was that?

22   A.    The Family Court bureau warrant squad.

23   Q.    And what were your duties and responsibility as a

24   Family Court warrant squad plainclothes investigator?

25   A.    We serve processes of the court and effected warrant

1   arrests, both Family Court and criminal.

2   Q.   How long have did you do that for?

3   A.   Until approximately 1998.

4   Q.   And so that is about five years?

5   A.   About five years.

6   Q.   And what occurred in 1998?

7   A.   I was transferred to the criminal investigations

8   unit.

9   Q.   And what was it that you did with the criminal

10  investigations unit in 1998?

11  A.   Investigate crimes, both inside the jail and outside

12  around the sheriffs department property.

13  Q.   And how long did you do that for?

14  A.   A little over a year.

15  Q.   So then in 1999 where were you assigned?

16  A.   I was promoted to uniform lieutenant -- excuse me.

17  Sergeant.

18  Q.   And once you were promoted to uniform sergeant, where

19  were you assigned?

20  A.   To the headquarters bureau.

21  Q.   And what was it that you did as a uniform sergeant in

22  the headquarters bureau?

23  A.   Supervise uniform deputy sheriffs in their jobs.

24  Q.   Approximately how long did you do that for?

25  A.   Approximately eight months.

1  Q.    And after that where were you assigned?

2  A.    I was reassigned back to the Family Court warrant

3  squad bureau as a sergeant investigator.

4  Q.    How long did you work back at that warrant squad?

5  A.    Until approximately 2006.  About six years.

6  Q.    So you worked approximately 2000 to 2006 back at the

7  warrant squad?

8  A.    Correct.

9  Q.    What happened in 2006?

10  A.    I was promoted to uniform lieutenant.

11  Q.    And once you got promoted back to uniform lieutenant,

12  where were you reassigned?

13  A.    Back to the headquarters bureau.

14  Q.    And once back at the headquarters bureau as a uniform

15  lieutenant, what were your duties and responsibilities?

16  A.    To supervise the uniform sergeants in performing

17  their duties.

18  Q.    And for how long did you do that?

19  A.    Almost a year.

20  Q.    So then back in 2007 where were you assigned?

21  A.    I was promoted to investigator lieutenant and asigned

22  as commanding officer of internal affairs.

23  Q.    And did you remain as commanding officer of internal

24  affairs from 2007 through your retirement, in August of

25  2014?

1  A.  Yes.

2  Q.  Do you know Ed Walsh?

3  A.  Yes.

4  Q.  How do you know Ed Walsh?

5  A.  From employment at the sheriffs office.

6  Q.  And through the course of your career, did you ever

7  work directly with Ed Walsh?

8  A.  No.

9  Q.  Why not?

10  A.  We were in separate divisions.  He was in the

11  corrections division.  I was in the deputy division.

12  Q.  Do you see Ed Walsh in the courtroom today?

13  A.  Yes.

14  Q.  Please point him out and identify an article of

15  clothing he is wearing.

16  A.  He is seated at the table there in the beige jacket,

17  sport jacket.  The third one to my left.

18        MR. TIERNEY:  Your Honor, could the record

19  reflect that the witness has picked out the defendant?

20        THE COURT:  Yes.

21  BY MR. TIERNEY:

22  Q.  Now again back in May of 2014.  What was your portion

23  within the Suffolk County Sheriff's Office?

24  A.  I was commanding officer of internal affairs.

25  Q.  And did there come a time in May of 2014 that an

1   internal affairs investigation was opened of the

2   defendant?

3   A.   Yes.

4   Q.   Who ordered the opening of that internal affairs

5   investigation?

6   A.   Sheriff Vincent DeMarco.

7   Q.   And what was your role in the investigation?

8   A.   I was a supervisor of the internal affairs section

9   doing the investigation.

10  Q.   Did you participate on a day-to-day basis in the

11  investigation?

12  A.   No.

13  Q.   And what was Sheriff DeMarco's role?

14  A.   He oversaw the investigation.

15  Q.   And with regard to the individuals who were actually

16  assigned the case, who were they?

17  A.   Sergeant Investigator LaFranca.  And his backup was

18  Investigator Kral.

19  Q.   I'm going to call your attention to May 16, 2014.

20       Were you working for the Suffolk County

21  Sheriff's Office on that date?

22  A.   Yes.

23  Q.   Where were you?

24  A.   At the Internal Affairs Bureau office.

25  Q.   And where is the Internal Affairs Bureau office?

1    A.    At 400 West Main Street in Riverhead.

2    Q.    And where is that in relation to the Suffolk County

3    jail?

4    A.    It is north of the jail, on the other side of the

5    Peconic River, almost in like downtown Riverhead.

6    Q.    You indicate that it is across the river, the Peconic

7    River, from the Suffolk County jail?

8    A.    Right.

9    Q.    Are there any other county offices located across the

10   river in the area of the Suffolk County jail?

11   A.    There is an entire complex there.

12   Q.    What other Suffolk County agencies are located within

13   that complex?

14   A.    I believe the Suffolk County Clerk.  The County

15   Treasurer.  The District Attorneys office.  I believe the

16   Health Department has an office there.

17   Q.    And what was your purpose for being in the internal

18   affairs office on May 16, 2014?

19   A.    We were going to advise Lieutenant Walsh that he was

20   going to be named the target of an administrative

21   investigation.

22   Q.    And was it your intention to just notify him about it

23   or interview him as well?

24   A.    No, just notify him.

25   Q.    And were you the only one who participated in this

973

1   notification?

2   A.   No.

3   Q.   Or were there other Suffolk County Sheriff office

4   personnel there?

5   A.   Yes, there were.

6   Q.   Who were you with on that day?

7   A.   Lieutenant Investigator Brian Baisley.

8   Q.   And did there come a time when you did notify the

9   defendant that he was going to be the target of an

10  administrative investigation?

11  A.   Yes.

12  Q.   And where did this occur?

13  A.   In the conference room at the internal affairs

14  bureau.

15  Q.   And who was in the room when the notification

16  occurred?

17  A.   Lieutenant Walsh.  Lieutenant Baisley.  And myself.

18  Q.   And what if anything occurred during the

19  notification?

20  A.   Lieutenant Baisley made the, advised him that he was

21  going to be named the target of an administrative

22  investigation.  And Lieutenant Walsh, you know, seemed to

23  be a little upset.  He asked why it was happening and then

24  stated that if you're worried about that other agency

25  across the river, they're not doing anything with this.

1    Q.    And when he said if you are worried about the other

2    agency across the river, who did you take that to mean?

3                MR. WEXLER:  Objection, your Honor.

4                THE COURT:  Overruled.  I will allow it.

5                MR. WEXLER:  I'm sorry, judge.  Who this witness

6    took it to mean?

7                THE COURT:  Pardon?

8                MR. WEXLER:  Who this witness took it to mean?

9                THE COURT:  Yes.

10               MR. WEXLER:  Okay.

11   A.    I took it to mean the District Attorneys office.

12   BY MR. TIERNEY:

13   Q.    Why is that?

14   A.    That in my opinion would be the only other agency

15   across the river that would be interested.

16   Q.    You mean as opposed to the clerk's office or the

17   social services?

18   A.    Correct.

19               MR. TIERNEY:  Thank you.  I have no further

20   questions.

21               THE COURT:  Cross-examination.

22

23   CROSS-EXAMINATION

24   BY MR. WEXLER:

25   Q.    Mr. Kanas.

1    A.    Yes, sir.

2    Q.    You were employed by the sheriff's office for how

3    many years?

4    A.    32.  Plus.

5    Q.    And you were a regular contributor to the Friends of

6    Sheriff DeMarco, weren't you?

7    A.    Fairly regularly.  Yes.

8    Q.    Well, and the command that you had, the last command,

9    and any of the prior commands, those were commands that

10   were assigned to you by the sheriff.  Correct?

11   A.    Correct.

12   Q.    Sheriff DeMarco.

13   A.    Correct.

14   Q.    And the sheriff giveth and the sheriff can taketh

15   away.  Correct?  He could reassign you.

16   A.    He could reassign me.

17   Q.    Right.  And it is not like a democracy, where you can

18   appeal the decision.  It was strictly up to the sheriff.

19   A.    Correct.

20   Q.    Okay.  So do you remember how much you contributed in

21   2009?  To the sheriff?

22   A.    No, I don't.

23   Q.    Do you remember on how many occasions you contributed

24   in 2009?

25         Do you remember on how many occasions?

976

1   A.   No.  I would estimate two to four.

2   Q.   Okay.  Let me show you --

3   A.   Sure.

4        MR. WEXLER:  I'm going to have this marked,

5   judge, as Defendant's Exhibit Z for identification.

6   BY MR. WEXLER:

7   Q.   I'm showing a document, and see if this refreshes

8   your recollection on how many -- you know what?  I marked

9   it for you.

10  A.   I just don't have my glasses.

11  Q.   Do you want to borrow mine?

12  A.   No.  I'm okay.  Thank you.

13       It says six.

14  Q.   Pardon me?

15  A.   It says six.  But one is $10.  I don't know what that

16  is.

17  Q.   Okay.  Does that refresh your recollection?

18  A.   Yes.

19  Q.   On about how much how much you contributed in 2009?

20  A.   I'm sorry.

21  Q.   You don't have to apologize.  I didn't ask you how

22  much.  I just asked you how many?

23  A.   No.  You have six highlighted.  This is all 2009.

24  Yes.

25  Q.   Okay.

1   A.   Yes.

2   Q.   Okay.  And do you remember contributing to the

3   Friends of the Suffolk County Sheriff in 2010?

4   A.   I don't have a direct recollection but I'm sure I

5   did.

6   Q.   Okay.  And you know what?  I neglected to ask you how

7   much you contributed in 2009.

8   A.   Can I see that again?

9   Q.   Yes.

10   A.   Sure.

11   Q.   I can give you a pad and pencil?

12   A.   I will try to do in it my head.

13        $480, roughly, give or take.  I can be a few

14   dollars off.

15   Q.   Close enough.  Is there a particular reason in 2009

16   you contributed to the Friends of Vincent DeMarco?

17   A.   I supported the sheriff.  I thought he was doing a

18   good job.

19   Q.   Okay.  And you received overtime in 2009, didn't you?

20        You made overtime in 2009.  Overtime.  2009.

21   A.   I don't believe so.  As a lieutenant I didn't get

22   compensated overtime.  I believe I was a lieutenant.  I

23   didn't get paid overtime.

24   Q.   Okay.  Did you get comp time?

25   A.   No, I didn't get paid comp time, either.  It might

1   have been a contract settlement, a retrocheck, but it

2   wasn't overtime.

3        In my classification we are not paid overtime at

4   time and a half. We don't get extra money.

5   Q.  Okay. Let me show you, do you recall how much you

6   contributed in 2011?

7   A.  No.

8   Q.  I will show you again, this is part of Defendant's Z.

9   Just see if that refreshes your recollection.

10        THE COURT: Defendant's Exhibit Z for

11   identification?

12        MR. WEXLER: Yes, sir.

13   A.  Two, sir.

14   BY MR. WEXLER:

15   Q.  And again, how much did you contribute?

16   A.  $225.

17   Q.  Okay. Let me just show you a couple of more.

18        Do you remember how much in 2012?

19   A.  No, sir.

20   Q.  All right. I will show it to you and see if it

21   refreshes your recollection.

22   A.  Yes, sir. Twice, sir.

23   Q.  Okay. How much?

24   A.  That one that you highlighted isn't me.

25        That is not me. That's my cousin.

979

1   Q.   Okay.  It is not you.

2   A.   Not.

3   Q.   Okay.  It's not you.  Then you don't have to include

4   your cousin.

5           How much did you contribute?

6   A.   $225.

7   Q.   Total?

8   A.   Yes.

9   Q.   Where did I leave off?  2013?

10  A.   You don't have 2010, sir.  You have 2009 and you went

11  right to 2011.

12  Q.   It may be back at my desk.

13  A.   Three times, sir.

14  Q.   How much?

15  A.   $375.

16  Q.   Who is Cindy Kanas?

17  A.   My wife.

18  Q.   And did she contribute?

19  A.   She might have wrote the check out when she was doing

20  the bills and it was mailed in.  If she signed it, she

21  wrote it out.

22  Q.   So what was the total for the Kanases?

23  A.   375.

24  Q.   Okay.  How about 2014?

25  A.   One time, sir.

980

1    Q.    How much?

2    A.    $125.

3    Q.    Okay.  Now, you retired in 2015.  Is that correct?

4    A.    2014.

5    Q.    Oh.  Okay.  How much did you indicate in 2015?

6    A.    I don't know if I did, sir.

7    Q.    Okay.

8    A.    Well, I don't recall.

9    Q.    Okay.  I have the records, if it will help you

10   refresh your recollection.

11   A.    Okay.

12   Q.    Take a look and see if you see a Kansas.  I forgot

13   your first name.  I'm sorry.

14   A.    Robert.

15   Q.    Robert Kanas.

16   A.    No, sir.

17   Q.    Okay.  So you contributed regularly.  And why did you

18   stop?  You still supported the sheriff, didn't you?

19   A.    Sure.

20   Q.    Why did you stop all of a sudden when you retired?

21   A.    I supported him when worked for him.

22   Q.    You supported him when you worked for him?  Isn't it

23   a fact that when you worked for him he could do good

24   things for you, and when you didn't work for him and he

25   had no control he couldn't help or hurt you?

1        Is that a fair statement?

2  A.   No, it is not a fair statement.

3  Q.   Okay.

4  A.   I was where I was.  I would have been an investigator

5  without disciplinary charges no matter where.  He could

6  have transferred me wherever he wanted, that's true, but I

7  would maintain my title and my salary.

8  Q.   Okay.  But you enjoyed the command that you were in

9  while you worked for him, I guess.  Yes?

10 A.   To a degree.

11 Q.   As to a degree.  Okay.  But when you left, he

12 couldn't do anything.  He, meaning the sheriff.  He

13 couldn't assign you.  He couldn't do anything.

14 A.   That's true.  He couldn't assign me.

15 Q.   And is that part and parcel of the reason why you

16 stopped contributing?

17 A.   No.

18 Q.   Okay.  The reason you stopped is because you simply

19 didn't work for him any more.

20 A.   No.  Part of the reason I stopped is.  My income was

21 less at that point because I was now retired.

22 Q.   Okay.  Well, you could have contributed.  One of

23 those checks was $10.  You still supported him.  Why

24 didn't you contribute $10?

25 A.   I was no idea, sir, what that $10 check was for.  I

982

1  honestly don't.  I would love to know.

2  Q.    I'm not dickering over the $10 check --

3  A.    That is true.  I could have sent a check for $10.

4  Q.    You could have sent $15:  You have a nice life

5  sheriff.

6  A.    Yes.

7  Q.    But you stopped cold turkey.

8  A.    Yes.

9  Q.    Now, when you interviewed Ed Walsh, was a Lieutenant

10  Baisley present with you?

11  A.    Yes.  It wasn't a interview, though, sir.  It was

12  just an advisement.

13  Q.    Okay.  Fair enough.  And in fact Lieutenant Baisley

14  is outside.

15  A.    Yes.

16  Q.    Did you see him today?

17  A.    Yes.

18  Q.    And you were here more than just today?

19  A.    Yes.

20  Q.    You were here yesterday.

21  A.    Yes.

22  Q.    And the day before, perhaps?

23  A.    Yes.

24  Q.    And Lieutenant Baisley has been standing outside

25  every single day.  Correct?

1   A.   Yes.

2   Q.   Okay.  And did you and he discuss this issue of what

3   your testimony was going to be?

4   A.   My actual testimony, no, sir.

5   Q.   Did you discuss the case?

6   A.   As a generality, yes.

7   Q.   Not in particular?

8   A.   Not any particulars as to my testimony.

9   Q.   And in a generality, you will have to explain what

10  that means.  What do you mean in a generality?

11  A.   Just how the case was going.  How many witnesses were

12  going to be on.  Whether I would be called yesterday.

13  Whether I would be called today.

14  Q.   And you were given assignment or this assignment to

15  tell Lieutenant Walsh that he was being brought up on

16  disciplinary charges by the sheriff.  Correct?

17  A.   Correct.

18  Q.   And did you know what Ed Walsh's job was or who he

19  responded to?

20  A.   No, sir.

21  Q.   Prior to the disciplinary charges?

22  A.   No, sir.

23  Q.   Well, he wasn't in your bureau.  Correct?

24  A.   Correct.

25  Q.   And he wasn't on a crew.

984

1  A.  As far as I know, no.

2  Q.  Okay.  And he wasn't in the medical unit.  I mean you

3  knew -- did you know where his office was?

4  A.  Yes.

5  Q.  And where was it?

6  A.  It was in the, when you go in the sheriff's main

7  office, it was down the hallway, to the left I believe.

8  Q.  Is it right cross from the sheriff diagonally?

9  A.  It was in that area, yes.

10  Q.  And you didn't occupy an office in that part --

11  A.  No, sir.

12  Q.  -- of the executive wing he felt?

13  A.  No.

14  Q.  But you are a lieutenant.  Correct?

15  A.  Yes, sir.

16  Q.  Any other lieutenants that you know of had an office

17  in that executive wing?

18  A.  Sir, honestly I don't know.

19  Q.  Okay.

20  A.  I don't recall.

21  Q.  Okay.

22  A.  My exposure over there was relatively limited other

23  than maybe once a week, you know, coming over.  It wasn't

24  often, sir.

25  Q.  Let me put it this way.  As you sit there today, or

985

1  you sit here today, you are not aware of any other

2  lieutenants assigned to that section of the jail.

3  Correct?

4  A.    No, I wasn't.

5  Q.    And I mean you knew what your command was:  Internal

6  affairs.

7  A.    Yes.

8  Q.    Prior.  Did you have any idea what Ed's job was or

9  who he reported to?

10  A.    I knew he worked by front office, I mean outside the

11  jail in the front, but I did not know what his job was or

12  who he reported to, no, sir.

13  Q.    All right.  Well, did you have an understanding the

14  that he reported to the sheriff?  Was that your kind of

15  understanding?

16  A.    I wasn't sure.  I didn't know if he reported to the

17  sheriff.  The warden.  I'm being honest with you, sir.  It

18  wasn't -- I --

19  Q.    Okay.

20  A.    I believe didn't notification.

21  Q.    I understand.  I only want what you know.

22  A.    Okay.

23  Q.    From the tenor of your tone I'm to understand that he

24  reported to somebody higher up, either the sheriff or the

25  warden.  He wasn't reporting to a duty captain or another

986

1   lieutenant.  Fair enough?

2   A.   That would be an assumption on my part.

3   Q.   Okay.  Well, let's do it logically.  Long were you in

4   the sheriff's office?

5   A.   32 years, sir.

6   Q.   You can make a logical assumption --

7           MR. TIERNEY:  Objection, your Honor.

8           THE COURT:  Yes.  Sustained.

9   BY MR. WEXLER:

10  Q.   Okay.  So do you know what his assignments were?

11  A.   No, sir.

12  Q.   Did you ever ask the sheriff what his assignments

13  were?

14  A.   No, sir.

15  Q.   Did you ever ask anybody what his assignments were?

16  A.   No.

17  Q.   What about as of today, standing in the hallway.  You

18  have been here.  You know what that case is about.  Did

19  you ever ask anybody, including the sheriff:  What was

20  Ed's assignment, sheriff?

21  A.   No.

22  Q.   Were you curious?

23  A.   Not particularly, no.

24  Q.   Is it fair to say you knew, almost by your dint of

25  experience in the sheriffs office you knew basically what

1  other people's assignments were?  You knew what the warden

2  did.  You knew what a deputy warden did, correct?  You

3  knew what a captain in IA did or a captain in another

4  command.  You generally knew by their title what they did.

5  A.   I'll try to explain it to you this way.

6  Q.   I don't mean to interrupt --

7  A.   No, I'm trying to answer your question.

8  Q.   I know that but let me do it my way, and if I can't

9  get it out my way I'll let you explain.

10 A.   Not totally, no.  Now I would like a chance to

11 explain.

12 Q.   Well, I promise you will get your chance.

13 A.   Okay.

14 Q.   I'm just trying to establish you understood what

15 other people's respective job functions were.  Like if I

16 asked you --

17 A.   And I'm trying to explain to you not everyone.  I

18 know with a warden does.

19 Q.   Okay.  Let's just look at the front office.

20 A.   Right.

21      My exposure to that section there is relatively

22 limited.  That's what I'm trying to tell you.

23 Q.   I understand that.  Only to the degree that you know.

24      In the front office you understood the job of a

25 sheriff.  You got that.  Correct?

1   A.   Correct.

2   Q.   And you understood the job and the duties and

3   responsibilities of Undersheriff Meyerricks.  Correct?

4   A.   Correct.

5   Q.   You understood the job duty of Michael Sharkey, the

6   chief of staff.

7   A.   Correct.

8   Q.   Okay.  Not that you sat in or chatted about what he

9   did in a day.

10  A.   Correct.

11  Q.   But you understood.  In 32 years you had an idea.

12  You are an investigator.

13  A.   Correct.

14  Q.   The deputy chief of staff, you had an understanding

15  of what he does.  Correct?

16  A.   Correct.

17  Q.   You had an idea of what the warden did.

18  A.   Correct.

19  Q.   I mean, after 32 years you kind of -- and I think the

20  other person in the front office there was the deputy

21  warden.  Was he in the front or was he out --

22  A.   I'm not -- it wouldn't be sure.  I know there were

23  other people in the warden's office but I don't know what

24  they were:  Lieutenants, sergeants.  I couldn't tell you,

25  sir.

1    Q.    Okay.  So I just identified everybody in that front

2    executive office, and you agreed with me, you understood

3    what their relative functions were.

4    A.    Relatively, yes.

5    Q.    And I'm going to ask you one more time.  Ed Walsh was

6    the only other person in that front office.  And did you

7    know what his duties were?

8    A.    I assumed he had some type of administrative function

9    but I don't know what it was, sir.

10   Q.    Okay.

11   A.    It wasn't my particular business to know that.

12   Q.    Fair enough.  And did you ever see in writing or

13   bulletin or in a memo what the sheriff assigned Ed Walsh

14   to do?

15   A.    No, sir.

16   Q.    Did the sheriff ever tell you?

17   A.    No, sir.

18   Q.    What about the undersheriffs?  Did they ever say --

19   A.    No, sir.

20   Q.    -- this is Ed's job?

21   A.    No, sir.

22   Q.    And prior to you advising Ed of the disciplinary

23   charges that were being brought against him, had you ever

24   spoken to the sheriff or the two undersheriffs -- I forgot

25   Undersheriff Caracappa, chief of staff, the warden or the

1  deputy warden, did anybody ever mention to you that Ed

2  wasn't doing his job?

3  A.   No, sir.

4  Q.   And --

5  A.   Prior.  Prior to the advise --

6  Q.   Yes.  Prior.

7  A.   No, sir.

8  Q.   So in all the years you were in the, in a position --

9  IA.  How long were you in IA?

10  A.   Approximately seven years, maybe.

11  Q.   Okay.  So of the seven years, did anybody ever inform

12  you that Ed was leaving work early or coming in late or

13  not doing his assigned work?

14  A.   I don't believe so, sir.

15          MR. WEXLER:  Thank you, lieutenant.  Retired.

16          THE WITNESS:  Thank you sir.

17          MR. TIERNEY:  May I inquire, your Honor.

18          THE COURT:  Yes.

19

20  REDIRECT EXAMINATION

21  BY MR. TIERNEY:

22  Q.   Do you remember you were asked questions on

23  cross-examination with regard to your contributions?

24  A.   Correct.

25  Q.   And that money you paid, was it just money or was it

991

1    tied to anything?

2    A.    No.

3    Q.    Were they event or --

4    A.    Yes.  They were fund raiser events.  I believe it was

5    like a claim bake or something like that.  I think there

6    was a winter fund raiser.  Christmas party type of things.

7    Q.    So while you worked, you went to the claim bakes?

8    A.    Yes.

9    Q.    And the Christmas party?

10   A.    Yes.

11   Q.    And when you retired, you stopped going to the clam

12   bakes --

13   A.    Yes.

14   Q.    -- and the Christmas parties.  Okay.

15         You were asked questions with regard to the area

16   in the front of the jail referred to as the front office.

17   A.    Yes.

18   Q.    Are you familiar with an Anthony Dolan?

19   A.    I know who he is, yes.

20   Q.    Do you know where his office was?

21   A.    I believe it was in the front administrative office

22   also.

23   Q.    Okay.  You weren't asked my questions on

24   cross-examination with regard to Anthony Dolan, were you?

25   A.    No.

1  Q.   Now, you were also asked with regard to your

2  overtime.

3  A.   Correct.

4  Q.   Correct?

5       And you're a deputy sheriff.  Correct?

6  A.   Correct.

7  Q.   Is your contract different than the correction

8  officers' contract?

9  A.   Yes, it is.

10 Q.   And as a result of that, are you, as a detective

11 (sic) lieutenant in the deputy sheriff union, entitled to

12 overtime?

13 A.   No.

14 Q.   And --

15 A.   Not overtime pay.

16 Q.   You can't get overtime pay.

17 A.   Correct.

18 Q.   You get your salary.

19 A.   You get your salary.

20 Q.   So if the sheriff was displeased with you and he

21 moved you, you would still get the same salary?

22 A.   Correct.

23 Q.   And overtime wouldn't matter.

24 A.   It would not have mattered.

25 Q.   And the lieutenants in the corrections side, they had

993

1   a different collective bargaining agreement.  Correct?

2   A.    Correct.

3   Q.    So they received overtime.

4   A.    I believe so.

5   Q.    So they made more money than you.

6   A.    Yes.

7   Q.    And that was pursuant to the collective bargaining

8   agreement?

9   A.    Correct.

10  Q.    That is what they are entitled to so they got it?

11  A.    Yes.

12  Q.    You are not entitled to get it so you don't get it.

13  A.    Correct.

14  Q.    Under the collective bargaining agreement for both

15  the corrections officers and the deputy sheriffs, are you

16  required to work the hours that you are assigned?

17  A.    Yes.

18  Q.    Are you required to actually show up when you are

19  assigned overtime?

20  A.    Yes.

21          MR. TIERNEY:  Thank you.  Nothing further.

22

23  RECROSS-EXAMINATION

24  BY MR. WEXLER:

25  Q.    Since I neglected to ask you about Anthony Dolan.  Do

1  you know who CO Anthony Dolan is?

2  A.   I know who his face is.  I don't have a lot of

3  recollection with him.  I know who he is.  Yes.

4        MR. WEXLER:  Okay.  Now I asked you about it.

5  All right?

6        THE WITNESS:  Okay.

7        THE COURT:  Anything else?

8        MR. WEXLER:  Anything else?

9        MR. TIERNEY:  Nothing else, your Honor.

10       THE COURT:  Members of the jury, we are going to

11 take a 15-minute recess.  We are a little late.  Meantime,

12 please don't discuss the case either among yourselves or

13 with anyone else.  Keep an open mind.  Come to no

14 conclusion until you are in that jury room deliberating.

15       Please recess yourselves.

16       (The following ensued in the absence of the

17 jury.)

18       THE COURT:  How many more witnesses do you have?

19       MR. TIERNEY:  Your Honor, we have three

20 scheduled for today and that might be it, your Honor.

21       THE COURT:  Okay.

22       MR. TIERNEY:  I don't know if we are going to

23 get to all of them but that is what we have scheduled.

24       THE COURT:  15-minute recess.

25       (Recess taken at 11:05 am.)

995

1    (The following ensued in the presence of the
2    jury.)
3    THE COURT:  Please be seated, members of the
4    jury.
5    You may proceed.
6    MR. TIERNEY:  Thank you, your Honor.  The
7    government calls Eduardo Orellano.
8
9    **EDUARDO ORELLANO**
10    called by the Government, having been first duly
11    sworn/affirmed, was examined and testified as
12    follows:
13    MR. TIERNEY:  May I proceed, your Honor?
14    THE COURT:  Yes.
15
16    DIRECT EXAMINATION
17    BY MR. TIERNEY:
18    Q.   Mr. Orellano, where are you employed?
19    A.   I works for Integrated Strategic Resources or, ISR.
20    We are based in New York subsidy.
21    Q.   What type of company is ISR?
22    A.   We are an engineering consulting firm.  We do
23    engineering, mostly in the transportation industry.
24    THE COURT:  What is the name of the firm?
25    THE WITNESS:  Integrated Strategic Resources.

996

1   We say ISR, for short.

2   BY MR. TIERNEY:

3   Q.   And what is your current position with ISR?

4   A.   I'm the vice president of communications, our RF and

5   wireless division.

6   Q.   And RF:  What is that, sir?

7   A.   Radio frequency.

8   Q.   And what is it that you do for ISR?

9   A.   Presently I do processing.  I focus on, I'm the

10  deputy project manager for the Second Avenue Subway

11  Project.  We are building a communications network.

12          Also one of the lead engineers on New Jersey

13  Transit's Positive Train Control System.  That is a

14  wireless communications system between towers and trains.

15  Q.   So you are working on using your background in radio

16  frequency to work on those projects?

17  A.   That's correct.  And communications in general.

18  Q.   Now, in addition to those duties with ISR do you also

19  consult in the analyzing of billing records and cell site

20  date from phone companies?

21  A.   Yes.

22  Q.   How long have you been employed with ISR?

23  A.   I started with ISR in 2010, so about a little over

24  five years.

25  Q.   And previously where did you work?

1  A.    Prior to that I worked with a number of cellular

2  telephone carriers.  I worked with Nextel Communications

3  from 1999 really through 2005.

4        In 2005 Nextel was acquired by Sprint so

5  following that, a year later I started working on the

6  Sprint network.

7  Q.    Let me just stop you.  And when you worked with

8  Nextel, did they use a particular technology with regard

9  to there are cellular phone business?

10 A.    That's correct.  IDEN technology.

11 Q.    That IDEN technology, that is just a type of

12 particular knowledge that they use with regard to their

13 cellular business.

14 A.    Correct.  So behind any wireless technology there is

15 software and equipment, and generally we refer to Nextel

16 as the IDEN technology.

17 Q.    And when you transferred over to Sprint, was there a

18 particular technology that the Sprint company used for

19 their cellular phone service?

20 A.    Correct.  That technology is called CDMA:  Code

21 Division Multiple Access:  A much different technology

22 used by Sprint, Verizon, and up until recently Metro-PCS.

23 Q.    I believe you indicated that you worked for Nextel

24 and Sprint until about 2009, 2010.

25 A.    I have actually continued working with them.  It was

998

1   corporate moves, that they call us.

2           So in 2009 all the Sprint jurors were outsourced

3   to Ericsson.  And that I continued working on Sprint for a

4   while and then finished up working for Ericsson on AT&T

5   networks using another technology, called UMTS.

6   Q.    And what type of work did you do for those companies?

7   A.    So as an RF engineer, there is two main functions.

8   One is to design or redesign sites.  That involves

9   selecting the equipment that puts out the radio signal.

10          Also, most cell sites point the RF, or radio

11  signal, in specific directions and we use antennas and

12  cables to connect from that radio equipment.

13          So we design the site in a particular area and

14  that is one of the job functions.

15  Q.    Did you actually participate in the actual design of

16  cell sites and cell towers for those companies?

17  A.    Absolutely.  That is one of my primary functions.

18  Q.    And did you do that, those cell sites.  Were they

19  located here on Long Island?

20  A.    They were located in Brooklyn, Queens, and Long

21  Island.

22  Q.    And are you familiar with a term known as

23  optimization?

24  A.    Yes.

25  Q.    What is optimization?

1   A.   So once you design a site and turn it up in an area

2   or throughout the year, you have a number of cell sites in

3   an area, you basically need to make sure that you don't

4   drop and block calls throughout that network.

5        We are all familiar with the complaints when we

6   drop and block.  So we make software adjustments as well

7   as antenna and power adjustments, again to make sure that

8   the towers don't block or drop calls.

9   Q.   And you participated in this optimization process.

10  A.   Absolutely.  It is my secondary main focus as an RF

11  engineer.

12  Q.   And essentially, that is the function of these

13  various sites, to optimize the coverage or the quality and

14  coverage of the tower.

15  A.   Yes.  That's correct.

16  Q.   Now, you have been talking about the term radio

17  frequency or RF.  What is that?

18  A.   So radio frequencies are the signals that are used to

19  communicate wirelessly.

20       So at home if you have a wireless phone you have

21  a little base and your phone, and when you disconnect from

22  it there is a radio frequency signal.  Similarly for cell

23  phones.  There is usually a tower, or many towers

24  actually, in the area, and your cell phone is

25  communicating using radio frequencies.

1    DIRECT EXAMINATION   (Continued)

2    BY MR. TIERNEY:

3    Q    Now what is your educational background?

4    A    I have a Bachelor of Electrical Engineering from

5    Manhattan College.  A Master of Science in Electrical

6    Engineering from Polytechnic University with a focus on

7    wireless communications and broadband networks.

8    Q    And have you had training about technologies used by

9    major phone carriers, major cell phone carriers in the

10   implementing and optimizing cellular telephone networks?

11   A    Yes.  So for the Nextel technology which is no longer

12   being used, I was trained by Motorola manufacturer of that

13   equipment.  For the and -- technology, for the CDMA type

14   technology I was trained by Alcatel-Lucent.  They're

15   manufacturers of the CDMA equipment that Spring and

16   actually Verizon use.  And then for the UMTS technology I

17   was trained by Ericsson.

18   Q    And that training is in addition to your practical

19   experience too, right?

20   A    Yes, that's correct.

21          Practical experience is on the software and how

22   the technologies actually work.

23   Q    Have you had experience in the field of all detailed

24   records and billing records analysis?

25   A    Yes.

1  Q    What has that experience been?

2  A    Since 2005 when I was working with Sprint/Nextel I

3  have been asked to assist in the analysis of those

4  records.  I have provided testimony in certain trials, all

5  in the Eastern District of New York.

6  Q    And in addition to that have you had experience in

7  analyzing cell tower location records?

8  A    Yes.

9  Q    Well first of all, what are cell tower location

10  records?

11  A    So each one of the carriers has very specific

12  information about each of their towers; and specifically

13  where they're located using GPS data, latitudes and

14  longitudes.

15  Q    And you indicated that you previously testified as an

16  expert in the area of RF or radio frequency engineering,

17  wireless engineering and cellular call data analysis?

18  A    Yes.

19  Q    Again, that was in the Eastern District of New York?

20  A    Yes.  Some cases in Brooklyn, and the rest of them

21  out here in Central Islip.

22  Q    How many occasions?

23  A    Thirteen.

24  Q    And in those 13 cases who did you testify for?

25  A    In those cases I testified for the US attorney, or

1002

1    the Assistant US attorneys.

2    Q    And did you participate in any civil cases?

3    A    I have a case that I have been working on and off for

4    a defense attorney.  It's a civil case.  It's also here in

5    the Eastern District of New York.

6         I have also worked with three different defense

7    attorneys on cases over the years preparing similar data

8    analysis.  Those did not go to trial so I don't put those

9    officially as trials that I served on.

10   Q    Has any court ever declined to certify you as an

11   expert?

12   A    No.

13        MR. TIERNEY:  Your Honor, pursuant to Rule 702,

14   the United States moves to qualify Eduardo Orellano as an

15   expert in the field of cellar phone data and analysis

16   including location data.

17        THE COURT:  Cellar field analysis?

18        MR. TIERNEY:  Cellular phone data analysis

19   including location data.

20        THE COURT:  Any objection?

21        MR. LATO:  No, your Honor.

22        THE COURT:  I find that he is an expert in

23   cellular phone data analysis including location data.

24   BY MR. TIERNEY:

25   Q    And are you familiar, sir, with the names of the

1  major cellular phone carriers in the New York metropolitan

2  area?

3  A    There has been a lot of consolidation, but the main

4  carriers are AT and T and Verizon, Sprint, and T-Mobile

5  which acquired MetroPCS.

6  Q    Now how is a cellular phone call made?

7  A    So any time you're in an area of a cell phone tower

8  your phone is always looking for the closest tower,

9  normally speaking with the best signal strength and the

10 best signal quality.

11        So once you dial a number or someone calls you,

12 the phone already knows what tower to connect to.  And it

13 connects using radio frequencies to set up a

14 communication.

15 Q    And what is the role of the cell tower in the

16 transition of cellular tower phone calls?

17 A    So both the cell phone as well as the cell phone

18 tower generate the signals that are used to communicate

19 wirelessly.  The cell phone tower particularly sends out

20 the energy that we use in terms of sectors.  They point in

21 various directions.  And so that energy is sent out to

22 actually on the phone so you can serve off the sectors.

23 But it's the way that you communicate to a network.  Every

24 cell phone tower then has a line basically that connects

25 back to a switch.

1  Q    And that may answer my next question.

2         What information is stored by a cellular phone

3  carrier when someone makes a cellular phone call?

4  A    So the switch really is, processes a lot of, some of

5  the information is processed locally, but it's recorded in

6  the switch.  Things like the tower that served a phone has

7  specific data, time obviously, the date.

8         In the case of Verizon what tower service as

9  well as the sectors that are referred to that serve the

10  call.  How long the call took.  That sort of information.

11  Q    And is this information reported by the telephone

12  company?

13  A    Yes, it's recorded in the switch.

14  Q    And how is that information recorded in the switch?

15  A    It's really all computer-based.

16         So as I mentioned before, we connect back to the

17  switch.  The switch tends to manage the number of sites in

18  a particular area and has some equipment that is dedicated

19  to processing that information, computer-based.

20  Q    So it's not done manually, it's done in a computer?

21  A    That's correct.  It's automatically generated.

22  Q    And you testified that you have experience with

23  viewing cell site data including all of the detail records

24  from phone companies?

25  A    Yes, that's correct.

1  Q    Could you please explain to the jury what call detail

2  records are?

3  A    So the call detail records specify calls that were

4  placed at very specific times.  Depending on the carrier,

5  there is more information.

6         In the case of Verizon, again we'll have the

7  date, when the call time, the time the call was placed.

8  We'll have the serving tower.  So there is a cell number,

9  and as well as a sector.  That cell number tells me

10 exactly the tower that served at that specific time.

11        Verizon also gives us the tower on which the

12 call ended, giving us the same information; the cell

13 number as well as the sector.

14 Q    And where is that cell site data found?

15 A    So the cell site data actually is a generic term.  It

16 refers to the call detail records.  More importantly --

17 I'm sorry, I thought there was a question -- so the call

18 detail records, billing records and cell phone tower

19 location records.  So all of this information comes off of

20 different equipment in the switch.

21 Q    And can you pinpoint a particular phone location

22 using the cell site data?

23 A    No.

24 Q    Why not?

25 A    You can pinpoint using GPS data.

1          So what we're able to record is the tower that

2    served the phone in a specific area.  So we can't pinpoint

3    it.  We can know the general area around the tower.

4    Q    So these records, they don't pinpoint the phone, they

5    pinpoint the area that the phone, for lack of a better

6    word pinged off of?

7    A    In the general area that the tower is located.

8    Q    And what information is contained on billing records?

9    A    So billing records are similar to call detail

10   records.  They are also maintained off different equipment

11   in the switch, automatically records, generally it is

12   recorded.  The only difference being that the billing

13   records will tell you the date and the time of the call.

14   Call detail records have more details.  And specifically

15   they can tell you what cell phone tower served a

16   particular phone, whereas the billing record makes a

17   generic reference to a tower.

18          So, and so in say Brooklyn you can't really

19   pinpoint much more.  Out on Long Island it may say

20   Mattituck or Islip.  As I said, it gives some more general

21   area.

22   Q    So a billing record pinpoints the town, but unlike

23   the CERs, not the particular cell tower in a town?

24   A    That's correct.

25   Q    And can you pinpoint the phone location using billing

1    records?

2    A    So again, we're going to have to pinpoint several

3    towers in the, in that town basically.  So we can't

4    pinpoint, no.

5    Q    Now the government asked you to review certain

6    records to determine the location of certain cellular

7    telephone calls made on certain dates from approximately

8    2011 to April of 2014?

9    A    That's correct.

10   Q    And do you remember what phone number that was for?

11   A    Can I refer to --

12   Q    Sure.

13   A    I don't know the number off the top of my head.  I'll

14   check here.

15            The phone number ends in 2151.

16            THE COURT:  What is the phone number?

17   A    The complete number his 631-748-2151.

18   Q    And for the purposes of your testimony we're just

19   going to refer to it as phone number ending in 2151?

20   A    Correct.

21   Q    I want to show you some exhibits.  And obviously

22   you've seen these before.

23            MR. TIERNEY:  For the record I'm showing the

24   witness Government Exhibit 71 C through F?

25            THE COURT:  What is the number?

1008

1    MR. TIERNEY:  71 C through F.

2  BY MR. TIERNEY:

3  Q    And also, you earlier on, on the disk you saw

4  Government Exhibit 272, 73 A and 73 B, correct?

5  A    Correct.

6  Q    And do those records contain both billing records,

7  call detail records and cell tower records?

8  A    Yes.  The billing records and the call detail records

9  to be more specific.

10  Q    And do those records contain cell tower data?

11  A    Yes, there are cell site data.

12  Q    And are those the records that you reviewed for the

13  phone number ending in 7151?

14  A    That ends in 2151.

15  Q    2151, yes.

16        And who provided those records?

17  A    These are Verizon records.

18  Q    And what are the date range of the call detail

19  records?

20  A    The call detail records on the disk started in August

21  30 of 2013 and ended in March, on March 31 of 2014.

22  Q    And do the cell phone towers only maintain those call

23  detail records for a certain amount of time?

24  A    That's correct.

25  Q    And did you also review cell phone tower records?

1  A    Correct.  Verizon provided cell phone tower location

2  records.

3  Q    And what did you view those cell phone tower records

4  for?

5  A    So in order to analyze both the billing and the call

6  detail records, but more specifically for the call detail

7  records, I had mentioned before there is a cell number on

8  the call detail records.

9         The cell phone tower location records then give

10  me the latitude, longitude and GPS data for the tower.

11  And that allows me to create maps relative to both the

12  billing records and the call detail records.

13  Q    And with regard to the maps that you created, did the

14  government also provide you with certain areas of

15  interest?

16  A    Yes, I was provided some addresses.

17  Q    And are you familiar with the coverage of cellular

18  telephone service on Long Island?

19  A    Yes.

20  Q    And you actually worked on cell phone towers and cell

21  phone areas on Long Island?

22  A    Yes.

23  Q    Typically, how far does a cell tower signal extend?

24  A    So I'm going to talk in general numbers, and it

25  depends on the area.  In a more urban environment where

1   there is a lot more people, basically a cell site can

2   serve anywhere from a half a mile to a mile.  In a more

3   suburban environment, some areas could be like Huntington

4   and out on Long Island like Holbrook, you could expect

5   those towers to serve one to two miles.

6           And then out east in the Hamptons, Montauk and

7   Orient Point, when we don't have as many towers or as many

8   people, you can have a tower serves three to six miles or

9   so.

10  Q    And is it good practice to extend the signal?

11  A    When you say practice, I wouldn't design a site to

12  serve much further than six miles unless there is a reason

13  for it.  And that reason would be, I have no other towers

14  around me.  I might consider it then.

15  Q    And what about the configuration of the cell tower

16  with regard to particular CDMA technology?

17  A    So the CDMA technology is really the basis for some

18  of the newer technologies.  We use the same frequencies

19  same base frequencies throughout the entire area.  So

20  there is different challenges to CDMA in terms of capacity

21  in particular.

22          Capacity means the number of users that a cell

23  phone tower can handle.  A specific example is if you have

24  too many users on one CDMA tower, the coverage actually

25  begins to shrink.  You don't have enough power to give to

1   all of those users in an area.

2   Q    Explain to the jury how that works.

3   A    So we design a site with three sectors pointing in

4   three different areas.

5         So how we add capacity is by adding another

6   frequency.  However, I would use as an example, the

7   Hempstead area is a very congested area.  So we've added

8   up to six or seven, we added up to six frequencies on one

9   tower.  But again, at some point in time, and because

10  there is not many frequencies that the carriers can buy,

11  you start blocking calls.

12        So you have a busy tone basically.  And the way

13  to manage that is to offload the traffic because the

14  coverage starts to shrink.  You don't have enough power.

15        So in any design process you take a look at,

16  it's a balance between adding frequencies to a site or

17  building sites then around that site to, as I said offload

18  some of that traffic onto other towers.

19  Q    And do you know what a signal to noise ratio is?

20  A    The signal to noise ratio is a generic term called

21  the signal quality.

22        For a phone call you need your signal power,

23  good signal power and good signal quality.  When we talk

24  about coverage, many people think that that's, that first

25  of all that is the signal power and that signal power can

1   extend long distances.  However, because of a signal to

2   noise ratio, if I have too much noise or interference the

3   quality is not good so you cannot serve a phone.  A phone

4   wouldn't be able to be served by a cell phone tower,

5   generally speaking, that is too far away because your

6   signal power could be, or the quality would generally be

7   degraded.

8   Q    Did you ever design a cell site capable of covering a

9   distance of 27 miles?

10  A    A dance of?

11  Q    27 miles?

12  A    Absolutely not.  And I want to say that is for a cell

13  phone tower.

14  Q    Yes.

15  A    Definitely not realistic out on Long Island.

16        There are radio towers, walkie-talkies that take

17  advantage of frequencies but not for a cell phone tower,

18  no.

19  Q    Now I believe you indicated that you used the records

20  containing government exhibits to create maps depicting

21  locations for cell sites for the phone numbers ending in

22  2151?

23  A    Correct.

24  Q    I'm just going show you what has previously been

25  marked as Government Exhibits 77, 78, 79, 80, 81, 82 A,

1  83, 84, 90, 91, 92, 93, and 94.

2          Do you recognize those?

3  A    Yes.  These are the maps that I created.

4  Q    And you also, Exhibit 95 B, 95 A and 82 B.

5  A    Can I approach?

6  Q    Sure.

7  A    Yes.

8  Q    And those are some other maps that you created?

9  A    That's correct.

10 Q    And those maps are based upon certain dates and

11 certain locations pertaining to that cell phone from 2011

12 to 2014?

13 A    That's correct.

14 Q    And all the maps that you created, were they based on

15 records that you reviewed in the Government Exhibits?

16 A    Yes.  Just to summarize, they were call detail

17 records, billing records and the cell phone tower location

18 records.

19 Q    And how did you plot the cellular site locations seen

20 on those exhibits using the call detail records and

21 billing records?

22 A    There are two different approaches.

23          For call detail records the information is very

24 precise.  So I used software called MapInfo.  It takes the

25 GPS information found in the cell phone tower locations.

1   I merge it with the call detail records.  If you remember

2   there is a cell number that gives me the specific GPS

3   data.  And using the map I can map them.

4           For the bill records, because it only mentions

5   the tower, the approach was different.  And you will see

6   on the maps that the only thing I can specify is towers in

7   the town, basically.  So I match the town name specified

8   on the billing record with the towers located in those

9   towns.  So you'll see that they were mapped differently.

10  Q    So do those exhibits fairly and accurately depict the

11  locations of various cellular sites used by the phone

12  ending in 7851 and certain dates and certain times during

13  2011 and 2014?

14  A    That's correct.

15          MR. TIERNEY:  Your Honor, I'm sorry --  2151.

16  A    Oh sorry, yes.

17          MR. TIERNEY:  I would offer those maps into

18  evidence at this time, your Honor.

19          THE COURT:  Any objection?

20          MR. LATO:  Which numbers again?

21          MR. TIERNEY:  Government Exhibits 77, 78, 79,

22  80, 81 A, 82 A, 83, 84, 90, 91, 92, 93, 94, 82 B, 95 A,

23  and 95 B.

24          MR. LATO:  I just want to see the charts.

25          No objection.

1      THE COURT:  In evidence.  Exhibits 77, 78, 79,

2  80, 81 A, 82 A, 83, 84, 90, 91, 92, 93, 94, 82 B, 95 A and

3  95 B.  All in evidence.

4      (Government Exhibit 77, 78, 79, 80, 81 A, 82 A,

5  83, 84, 90, 91, 92, 93, 94, 82 B, 95 A and 95 B in

6  evidence.)

7  BY MR. TIERNEY:

8  Q    So I'm going to show you what has previously been

9  marked in evidence as Government Exhibit 77.  And it's

10  fair to say it's a three-part exhibit?

11  A    Okay, yes.

12  Q    The first part, what is depicted in the first part?

13  A    Just to make some comments here.  The blue lines,

14  they look like they're tower icons.  That represents every

15  Verizon cell phone tower in the area that is generally

16  depicted here.

17      The numbers that you see, for instance 275, 240,

18  they're off to the top right of that icon.  That's a cell

19  number that I refer to for which in the cell phone tower

20  records there is a GPS data that allows me to map it.

21      Up in the top left of this slide you will see

22  the codes or the colors that I used.  So for instance if

23  you see a green diamond on a particular tower, you're

24  pointing at that green diamond that indicates the call was

25  placed -- it's not working it looks like.  Can I point to

1  it?

2  Q    Sure.  All right, you can just stand up and point.

3  A    So if you look here at this one, 239, there is a

4  green diamond.  It indicates that a call was placed on

5  cell 239 between 8 am and 10 am.

6          There is also a blue circle right in the middle,

7  which is, going again to the top left, indicates that a

8  call was also placed on that tower later in the day

9  between 2 and 4 pm.

10          And again, all that is reflected on this map,

11  you will see a yellow box, a square.  It represents a

12  called placed on cell tower 190, right here between 10 am

13  and 12 pm.  Most of the maps will indicate that.  You just

14  took my eye out.

15  Q    Sorry.  Does it work from back there?  Does it work?

16  A    Now it does, sorry.

17  Q    Okay, and were you also asked to map out some points

18  of interest, in this case the defendant's house?

19  A    Correct.

20          So I took the locations that the cells provided

21  was given an address.  And I verified them in different

22  mapping software to get the latitude and longitude which

23  allows me to map.  In this case, and again that was

24  whatever information was provided to me as a location of

25  interest.  It was 211 Apex Lane.  And this little house

1    icon indicates exactly where that house is located.

2    Q    And for the first part of 77, it is a title that you

3    put, 2011 Central Islip - Medford area?

4    A    That's correct.  Those are general references to the

5    areas.  In this case most of those calls were placed, most

6    of them were placed in the morning.

7    Q    So just to point out to the jury, Exhibit 71 B, what

8    is that?  What is that depicted on that map?

9    A    So once again, on this map you will see the same

10   information we had on the other map.  We have another

11   location of interest.  Actually it's not, so we'll talk

12   about that on another slide.

13        But once again this indicates that most of the

14   calls in this area, which is identified by, it says

15   Calverton - Manorville - Riverhead, most of these calls

16   were placed between 10 and 12.  And then the red circle

17   here now indicates calls that were placed between 12 and

18   2.

19        So on each one of these sites, this site is

20   specific to Riverhead or one of the ones.  This one is

21   specific to Calverton, according to Verizon records.  And

22   this site is specific to Manorville.

23   Q    And is the Suffolk County Correctional Center, is

24   that out in Riverhead?

25   A    That's correct.  That is one of the locations of

1    interest.  We'll see on another map, but generally located

2    right here.

3            I just want to point out that this cell phone

4    tower with the red 52 was not on there until July.  I'm

5    sorry, December 31 of 2013.  I did represent it because

6    Verizon provided that to us.  They also verified it wasn't

7    on there until the end of 2013.

8            The last call in this area.

9    Q    Just let me stop and then we'll go to the individual

10   maps.

11           And this is the third part.  And where is this,

12   what area does this contain?

13   A    This is now as it indicates here, the Manhattan area.

14   You can make out the Central Park right there.

15   Q    Now going back to the Central Islip - Patchogue -

16   Medford area.

17           Could you just point out to the jury what is

18   depicted in this, this particular slide?

19   A    So in chronological area I'm going to point to a few

20   cell sites; 148, 46, 239, 104 and 6.

21           All those cell sites had called placed or calls

22   received.

23   Q    Did you do this from your records or the call detail

24   records?

25   A    This one is off the call detail records.  I'm sorry.

1    This one is not.  As it indicates when it says, call

2    timers, it is also means the year, 2011.  Those are

3    billing records.  I apologize for that.

4    Q    That's okay.

5         So what is depicted on the slide, the various

6    towns where calls were placed?

7    A    Yes.

8         In this, whenever we deal with billing records

9    you notice that I left out a number of sites here.  It was

10   a little confusing because, for instance, this area was

11   referred to in Verizon's records, billing records as

12   Bohemia, I believe.  So it would list, we would have to

13   map two towers since I don't know how many, which specific

14   towers it was, so I mapped the towers in that area.

15        So you see a lot of towers around here in the

16   Patchogue area.  And again the billing records said

17   Patchogue.  What I'm trying to show is only the towers

18   that are in specific areas.

19   Q    And the areas there were phone calls marked in green,

20   is it fair to say that those are, those green indicate

21   that based on the times of the calls, the calls are

22   heading out east?

23   A    When we look at the actual billing records, yes.  We

24   can tell the particular times.  And we can see the general

25   direction going out east.

1  Q    And next I'm going to show you the Riverhead area.

2         Do you know where the, do you have a copy of --

3  I'll get rid of some of that clutter.

4         Do you have the billing records?

5         Based on the billing records, do you know when

6  the first call on that phone was recorded in Riverhead?

7  A    I'm going to the actual billing records now.

8         So the first call in the actual Riverhead area

9  is at 11:07 am.

10 Q    And the last call in the Riverhead area on that date?

11 A    The last call in the Riverhead area is at 1:39 pm.  I

12 believe I have that there.

13 Q    And then you have the yellow, and I'm sorry the red.

14 And those red, those areas marked in red.  Does that

15 signify that given the times the flow of, the direction of

16 the phone is moving west?

17 A    That's correct.

18 Q    And then from this, from the Manorville Riverhead

19 area, did the phone then travel back to the Central Islip

20 - Patchogue and Medford areas?

21 A    Correct.  We go back to the map we had previously

22 seen.  And as you see here we have a call placed between 2

23 and 4 pm.  Over here.

24         Also on cell 10, down to 239, and 148.  And

25 again those are general references because the phone is in

1   this general area.  I'm not saying it was on that specific

2   tower.  It was in the general centralized area.

3   Q    And once the phone returned to the general area was

4   the last call made at 3:13 pm?

5   A    Yes.  The last call in the Islip area was at 3:13,

6   correct.

7   Q    And when was the next call after 3:13?

8   A    At 4:28 pm

9   Q    And where was that?

10  A    The Verizon records indicate New York, New York.  And

11  I point to the general area.  All of the blue icons here

12  are obviously cell phone towers in the New York City,

13  Manhattan.  Again billing records don't tell me which one,

14  but we know that it would have been any one of these

15  towers in the city.

16  Q    And do you know whether or not Manhattan is 27 miles

17  away from Riverhead?

18  A    It's a lot more, probably 70 to 80 miles away.

19  Q    Now next I'm going to show you Government Exhibit 78.

20       Do you see that?

21  A    Yes.

22  Q    And for Government Exhibit 78, were you asked to look

23  at a particular, analyze the phone for a particular time

24  period?

25  A    That's correct.  Once again if you look at the code

1  down here, the time frame was 8 am to 4 pm

2  Q   Again, I'm just going to start you with the Central

3  Islip area on Government Exhibit 78.

4      And again what is depicted in -- we have the 211

5  Apex Lane?

6  A   Once again this is based on billing records.  So

7  similar to 8 to 4, in this case we have these two towers

8  in this area, this tower with the green diamond.  So these

9  calls were placed or received on these two towers in the

10  morning between 8 am to 10 am.  And this depicts the 211

11  Apex Lane that we've seen before.

12      These are the only calls in these areas, the

13  only areas that calls were placed between 8 am and 10 am

14  on this pap.

15  Q   And given the time of the call, is it fair to say

16  that the phone is moving in an easterly direction?

17  A   That's correct.

18  Q   Now we have December 5, 2011 in the Calverton -

19  Eastport and Riverhead area.

20      What is depicted in this slide?

21  A   So once again, in this case all the calls are also

22  between 8 am and 10 am.

23      We start off with a call down here in the

24  Eastport area.  And we have other calls up here in the

25  Riverhead, in the Calverton area.  Here we are specifying

1    the location of SCSO in Riverhead.

2    Q    And that is the Suffolk County Sheriff's Office?

3    A    That's correct.

4    Q    And so on this date there were two calls that gave a

5    location of Riverhead at 8:42 am and 8:58 am?

6    A    That's correct.

7    Q    And we go back to the Central Islip - Oakdale -

8    Bohemia area.

9         What activity is occurring after 10 am in this

10   photo?

11   A    So if you look at the yellow squares again, there is

12   a call placed on this tower 46, or this area I should say.

13   And generally the Central Islip area calls here.

14        And then we see the rest of the phone activity

15   between 12 and 2 pm is in this general area.  And the last

16   calls between 12 pm and 4 pm are in this general area.

17        THE COURT:  What Exhibit is this?

18        MR. TIERNEY:  This is Government Exhibit 78,

19   your Honor.

20   A    I should mention one other call here in this general

21   area also between 2 pm and 4 pm

22   Q    And before that general area that is Central Islip?

23   A    I call it -- this is definitely Oakdale.

24   Q    And by the way, are you mapping all phone calls?

25   A    Mapping all of the phone calls and all the towers in

1    the particular town.

2    Q    And next I'm going to show you December 5, 2011,

3    Wantagh - Amityville and West Babylon areas.

4         What is depicted in that map?

5    A    So following the code here, there was one call

6    between 10 and 12 pm, continuous with the previous map in

7    the Central Islip area.

8         And then the rest of the calls that are depicted

9    here were between 12 pm and 2 pm.  And you'll see it in a

10   number of areas.  Again all of these towers would have

11   been associated with the difference towns, going west.

12   Q    And other than those calls, other than the location

13   of Riverhead at 8:42 and 8:58 were there any other

14   Riverhead-based calls?

15   A    No, not for that date, no.

16   Q    And next I'm going to call your attention to

17   Government Exhibit 79, which is July 13, 2011.

18        And you have the Suffolk area on July 13th of

19   2012.  And what are we looking at here?

20   A    You got some calls that were in Brightwaters called

21   Brightwaters, down in the general Bay Shore area, and one

22   in the Central Islip area, Oakdale over here.

23   Q    And what about over here?

24   A    Yes, that is the Oakdale area.

25   Q    And all of those calls were made either between 8 and

1  10 or 10 and 12 pm?

2  A    That's correct, yes.

3            THE COURT:  You said the calls were between?

4            MR. TIERNEY:  8 and 10 and 10 and 12 pm.

5  Q    And then on July 13, 2012, what area is this, is this

6  the Nassau and the Nassau - Queens border?

7  A    So you start off in Nassau around Wantagh, and you

8  travel.  The phone then placed calls near the Nassau -

9  Queens border between 10 and 12 pm.

10           In this general area we're now in Queens.

11 Q    And again, the direction of the phone calls given the

12 time, is the direction of phone calls heading west into

13 the city?

14 A    That's correct.

15 Q    And then finally, Brooklyn and Queens for July 13.

16           What is depicted in that?

17 A    So we have a number of calls between 12 and 2 P pm

18 that are placed in Brooklyn.  There are 10 calls between

19 12:39 and 3:04 pm.  Again in this case it's billing

20 records.

21           We just know that it was in Brooklyn which is

22 highlighted in yellow here.  That's Prospect Park over

23 here.  The rest of the calls between 12 and 2 pm and

24 between 2 pm and 4 pm are all in the blue areas.  You can

25 see the blue circles all the way into this Flushing area.

1    But the rest of the phone activity between 12 to 2, as

2    well as 2 to 4 were firstly in Brooklyn, and then in

3    Queens.

4    Q    And Brooklyn and Queens are they more than 27 miles

5    away from Riverhead?

6    A    Yes.

7    Q    And on this date, July 13th, 2012, how many calls

8    were traded off the Riverhead sites?

9    A    There were none.

10   Q    I'm just going to leave it.

11          The next one I want to show you is July 14,

12   2012.  And just --

13          THE COURT:  What exhibit is that?

14          MR. TIERNEY:  That exhibit, your Honor, I'm

15   sorry, is Exhibit 95 A.

16   BY MR. TIERNEY:

17   Q    And what is depicted in Government Exhibit 95 A?

18   A    So this is a map that shows --

19   Q    I just realized --

20          MR. TIERNEY:  Could I move this closer to the

21   jury?  It might be a little hard for them to see all the

22   way back there.

23          THE COURT:  You can move it closer.

24          MR. TIERNEY:  Thank you, your Honor.

25          THE COURT:  Defense counsel want to come up and

1  get closer to it.  You're free to do so.

2  A    It shows a much larger area.

3         So it depicts Connecticut up to the north, Long

4  Island to the south, the southwest.  Once again, this type

5  of program that I used divides it up, time sensitive, so

6  between 8 am and 11 am you see green circles.

7         And we see on the map that those calls again

8  started in the Islip area, Central Islip - Oakdale.  This

9  was in the Holbrook area.

10        THE COURT:  You have to keep your voice up.

11        THE WITNESS:  Sorry.

12 A    This was further out east, I believe in the Holbrook

13 area.  And then we travel further east to the North Fork.

14 And the sequence of calls pretty much shows that between

15 11 and 3 pm we're now placing calls going further east.

16        This Sag Harbor site, which is a very tall site,

17 RF tends to travel across the water.  So there was a call

18 placed in Sag Harbor, or was received in the Sag Harbor

19 site, but because of the time stamps it's obvious that we

20 were on the North Fork, again between 11 and 3 pm.

21        After this last call on the Orient Point site we

22 end up in Connecticut.  This is the Groton area.  We

23 travel out east, because of the time stamps.  Again this

24 was 11 and 3 pm, those yellow circles.  And we finally see

25 a call placed on towers that are in the area of another

1    location of interest.

2    Q    What exact location is that?

3    A    The Foxwoods casino in Connecticut.  And from 3 to 4

4    pm there is at least one call.  I don't remember exactly

5    how many.  The red circles indicate that we're now in the

6    Foxwoods Resort casino area.

7                THE COURT:  We're going to have to take a break.

8                MR. TIERNEY:  Yes, your Honor.

9                THE COURT:  You can move that back and you can

10   move it back again.

11               Members of the jury, we're going to take a

12   recess for lunch.  In the meantime, please don't discuss

13   this case either among yourselves or with anyone else.

14   And keep an open mind.

15               By the time you finish this trial you will be

16   able to give the instructions to yourselves.  You won't

17   need me to do this.  But keep an open mind.  Don't discuss

18   the case.

19               We'll recess until 1:30.

20               Have a nice lunch.

21               (A luncheon recess was taken at 12:30 p.m.)

22

23

24

25

1    A F T E R N O O N   S E S S I O N

2                    1:30 pm

3

4         (The following ensued in the presence of the

5    jury.)

6         THE COURT:  Please be seated, members of the

7    jury.

8         You may proceed.

9         MR. TIERNEY:  Thank you, your Honor.

10

11   **EDUARDO ORELLANO**

12        called by the Government, having been previously

13        duly sworn/affirmed, continued testifying as

14        follows:

15

16   DIRECT EXAMINATION (Continued)

17   BY MR. TIERNEY:

18   Q    Prior to the break you indicated the flow of the

19   calls going out east to Long Island and to Connecticut.

20   A    Correct.

21   Q    Go ahead.

22   A    So again, these circles here represent early calls

23   between 8 am and 11 am.  And you have a series of calls

24   that are further out east between 11 am and 3 pm.

25        Then you have are calls show up in Connecticut

1 | over, here again between 11 am and 3 pm, including one up
2 | here.

3 | And then the last phone activity from 3 pm to 4
4 | pm.  The last phone activity between 3 and 4 pm is right
5 | here, around the Foxwood Resort Casino.

6 | Q   And I believe you indicated that with regard to the
7 | Sag Harbor site.

8 | Could you explain that just a little bit.

9 | A   The Sag Harbor is down here.  There is a call that is
10 | placed in between these two.

11 | I had mentioned previously that I generally
12 | design, if I were the design engineer we try to design it
13 | for to cover five to six miles.  This one serves a lot
14 | more and the reason is because it is on a hill.

15 | Well, generally speaking, the two towers in this
16 | area are very high.  And there is water here.  RF signals
17 | tend to, what we say, propagate; they travel father across
18 | the water.  But the time stamps indicate that the calls
19 | were pretty much in succession.

20 | Q   I'm just going show you what has been marked in
21 | evidence as 95B.

22 | Did you take a look at the terrain in that Sag
23 | Harbor area?

24 | A   So I'm always asked to really talk to whether or not
25 | it was possible that the phone was being served by towers.

1   And so yes, that is part of my analysis.

2              In this case, because of the issue with the Sag

3   Harbor showing up within a short period of time --

4   Q    And just to orient the jury.  This is the satellite

5   photo of this area of Long Island, the east end of Long

6   Island, that is depicted in 95A?

7   A    Yes.  So this general area here on this map.

8   Q    You are pointing to the --

9   A    Sag Harbor, which is on the south fork, and also to

10  this area on the north fork.

11             So this is Sag Harbor here and this is the north

12  fork.  This dark area here is the water that is depicted

13  down here as well.

14             And what I have indicated here is that the Sag

15  Harbor terrain is as high as 230 feet above sea level

16  basically.  So that is a very high terrain.  And when a

17  sites is designed so high with power, it will extend

18  further than you would normally design it.

19             One of the reasons, if you look at the distance

20  between these sites one of the reasons it servers is

21  because there is not a lot of sites in between here.  That

22  is more typical of the east end of Long Island.  From

23  Amagansett to Montauk there are only two sites about five

24  miles separation.  You get the best; you know, you get

25  what you can from the sites that are there.

1   Q    If you can, sit back down.

2         And those calls were on July 14, 2012?

3   A    That's correct.

4   Q    So do you have the time and the billing records for

5   the times that those calls were made that you plotted out?

6   A    Yes.

7   Q    Could you just read them to the jury starting with

8   the Oakdale site, with the Oakdale town, at 10:36 am.

9   A    Okay.  So the 10:36 is Oakdale.  10:51 am is Shirley.

10  10:53 am is also in Shirley.  11:26, 27 am is in

11  Northville.  11:29 am is in Northville.  11:30 am is

12  Mattituck.  11:32 am is Cutchogue.  11:33 am is Cutchogue

13  again.  11:40 am is Greenport.  11:41 am is Greenport.

14  12:06 is Sag Harbor.  12:07 is Sag Harbor.  12:12 is

15  Orient Point.

16         12:13 is Nyantic in Connecticut.  12:21 is

17  Westbrook in Connecticut.  12:26 is Nyantic, Connecticut,

18  once again.  12:40 pm is Old Lime, Connecticut.  12:53 is

19  Groton, Connecticut.  12:55 is Waterford, Connecticut.

20  1:04 is once again Groton, Connecticut.

21  Q    That is it.

22         And this area here, is this Shirley?

23  A    Again, both of those towers are in the Shirley area.

24  Correct.

25  Q    And then this is the Northville area up here?

1  A    The Northville area would be the last site between

2  that gap there.

3  Q    Okay.  Now, I'm next going to call your attention to

4  September 2, 2013.

5        Did you compose a map for the day as well?

6  A    Yes.

7  Q    Now, with regard to the September 2, 2013, and the

8  dates proceeding upward, what records did you have access

9  to?

10 A    So once again, the call detail records we had

11 covering August 30 of 2013, to March 31 of 2014.  These

12 were the ones that specified the actual tower.

13       Using the cell phone tower location records, I'm

14 able to map them, the towers, precisely.

15 Q    Rather than just the towns that the towers are in.

16 A    That's correct.

17 Q    Now with regard to September 2, 2013.

18       Were you asked to look at a particular location?

19 A    I would have to look at the exhibit.  I don't recall.

20       MR. TIERNEY:  May I approach the witness, your

21 Honor?

22       THE COURT:  Yes.

23 BY MR. TIERNEY:

24 Q    You have just been shown Government Exhibit 80.

25 A    Yes.

1    Q    What area were you focusing on?

2    A    So there's three sites, three areas, Central Islip

3    and Oakdale.  And then another general area, Hauppauge

4    Yaphank, and Center Moriches.  And another area, Riverhead

5    and Calverton.

6    Q    And with regard to the Central Islip and Oakdale area

7    slide on.  Again, there are two areas of interest

8    portrayed on that slide.  What are they?

9    A    So the 211 Apex Lane, the residence that we had

10   previously spoken about.  And I was also asked to map the

11   Timber Point Golf Course.

12   Q    Now starting -- and were you focusing on the period

13   of time between 8 in the morning until 4 in the afternoon?

14   A    That's correct.

15   Q    And what if anything did your analysis show with

16   regard to the Central Islip and Oakdale areas in the

17   morning hours?

18   A    Yes.  So we didn't see actually any calls.  The key

19   that we have here, again it always starts at 8 am to 10

20   am, there is no calls in that time frame.  So between 10

21   am and --

22   Q    Do you see up there?

23   A    Yes.

24   Q    Is that a yellow call?

25   A    That is exactly what I was about to point to.

1    So between 10 am and 12 pm we do have a call on

2   this site, which, like before, I can say was specifically

3   on cell 239 which is in the Oakdale area.

4   Q    And it is actually bouncing off of that cell tower

5   239.

6   A    Correct.

7        THE COURT:  What exhibit is this now?

8        MR. TIERNEY:  This is Exhibit 80, your Honor.

9   BY MR. TIERNEY:

10  Q    And then we have in September, I will show you

11  September 2, 2013, the Holbrook, Yaphank, and Center

12  Moriches area.  What if anything is indicated in this area

13  in the morning hours?

14  A    So once again we have a call on this cell 277, right

15  here, between the hours of 10 am and 2 pm.  That is just

16  east of Shirley.

17  Q    Okay.  And again, the direction of the phones are

18  moving out east?

19  A    Correct.  From the Central Islip area, the first map,

20  we are moving out further east.

21  Q    Now I'm showing you September 2, 2013, the Riverhead

22  and Calverton area.

23       What is depicted on that slide?

24  A    So once again on this map we have the SCSO in

25  Riverhead is here.  And we see a call on Verizon cell 202,

1  which is in Riverhead or some calls between the hours of

2  10 am to 12 pm.

3  Q    And was there a series of calls in this Riverhead

4  area at this time?

5  A    I would have to looks at the records.  I don't

6  recall.

7  Q    Could you be do that.

8  A    Sure.  If you will allow me a minute.

9  Q    Sure.

10      And for the record, you are looking at the disk?

11 A    Yes.

12 Q    That pertains to what record, sir?

13 A    These are call detail records.  Yes.

14      I apologize.  The computer shut down, so I'm

15 going to have to wait for a few minute for it to restart

16 it.

17      (There was a pause in the proceedings.)

18 Q    We are looking to the calls on September 2, 2013, in

19 Riverhead.

20 A    Okay.

21      Almost there.

22      Okay.  So on cell 202, which I indicated is up

23 here on the map, I have calls at 11:24 am, 11:25 am, 11:26

24 am.

25 Q    When is the last call?

1  A    The last call on cell 202 is at 1:24 pm.

2  Q    When is the next call after that last call hitting

3  off cell site 202 in Riverhead?

4  A    I apologize.  Could you repeat that question?

5  Q    When is the next call after that 1:24 call?

6  A    That is at 1:28 pm, and that is now on cell 235 in

7  the Calverton area.

8  Q    Okay.  Now I'm going to put back the slide of the

9  Central Islip and Oakdale areas, and tell the jury what

10  activity is depicted in this.

11  A    So once again, we see a call in cell 239 that we had

12  see earlier.  But the blue circle here indicates that

13  there is a call placed between 2 pm and 4 pm.  And you see

14  a number of calls on cell 154 -- it looks like 148 -- and

15  239.

16          In this case I was asked if it was possible that

17  these towers would serve the Timber Point Golf Course.  I

18  have indicated in pink the sectors, the sectors of

19  antennas that point in specific direction on which calls

20  were placed.

21  Q    Now, if I can just stop you, sir.

22          You have the various cell sites and then you

23  have, those are antennas?

24  A    Yes.  So these pie shapes here, which here I

25  highlighted in pink, really represent the sector antennas.

1   Sector antennas can point very wide or they can point more

2   narrow.

3         This case they are about average for a cell

4   phone site in this particular area.

5   Q    And starting with cell 239.  You indicate the middle

6   antenna.  How do you know that that is the antenna that

7   the call bounced off of?

8   A    So the call detail records specified the tower as

9   well as the sector.

10  Q    And so that center sector was --

11  A    Not the center.  I just want to highlight the pink

12  pie over here.  It is covered by the box but it is this

13  one here.  And there is a call there at 2:13 pm.

14  Q    What about moving over to 154?

15  A    Similarly, the call detail records specified that

16  this sector here, which points in this direction, there

17  was a call at 2:57 pm.

18  Q    Okay.  Any other cell site or cell tower?

19  A    So as I mentioned before, when you are on the water,

20  you know, RF signals can travel further.

21        So it is possible that this site also served,

22  this is cell 249, and at 3:21 pm there was a call on this

23  set of antennas that point more or less in the north

24  direction.

25  Q    Thank you.  I'm next going to call your attention to

1    September 6 of 2013.

2           Did you create a map for that location?

3    A    Yes.

4    Q    And again, were you asked to concentrate your

5    analysis in a certain location with regard to certain

6    landmarks?

7    A    Yes.  In this case there were three locations of

8    interest.

9    Q    What were those?

10   A    One was the residence that we had seen before, the

11   211 Apex Lane.  There was a Gull Haven Golf Club.  And an

12   Astoria Bank.

13   Q    And I'm just going to show you this map marked as

14   Government Exhibit 81A.

15          And what is this map?

16   A    So I was asked specifically to look at the time frame

17   between 309 pm and 15:23 pm.

18          And what this depicts is that we had two towers

19   that served calls.  I will focus on this one which is

20   1:48.

21          One again, the green in this case indicates,

22   from the call detail records, the sectors it would have

23   served.  I was asked was it possible that this tower could

24   serve Astoria bank.  You can tell that this generally

25   points in that direction.

1    It is possible that it could serve, which is why

2  I've highlighted in green.

3    There was also a series of calling at 3:09,

4  3:09, 4:50 and 5:21 pm.  They served off of this site,

5  cell 46.  And this is, again the sector it would have

6  served points generally in this direction.

7    And I was asked was it possible that site could

8  serve the Gull Haven Golf Club, and it is.

9  Q    And with regard to this location at this time, did

10  you also prepare a video presentation of that cell site in

11  relation to the golf course?

12  A    That is correct.  I was asked to look into that a

13  little further and I prepared a video clip of that.

14  Q    And that videotape clip, does that fairly and

15  accurately depict the relationship between the Gull Haven

16  Golf Course and that cell phone tower as it existed on

17  September 2, 2013?

18  A    That's correct.

19    And I just want to emphasize that because these

20  are call detail records, the location are precise based on

21  latitude and longitude as far as the towers.

22  Q    All right.  And in that video you had the opportunity

23  to see that, and that is marked as 81B?

24  A    Yes.

25    MR. TIERNEY:  I would move 81B into evidence,

1    judge, and ask to play it for the jury.

2              THE COURT:  Any objection?

3              MR. LATO:  No, your Honor.

4              THE COURT:  Government Exhibit 81B in evidence.

5              (Government Exhibit 81B in evidence.)

6              (Video playing.)

7    BY MR. TIERNEY:

8    Q    So, if you can, just tell us what is depicted here.

9    A    In general this is cell 92.  As it says here, that is

10   a Verizon site actually on this building.  It is a site

11   that is stealth, there is material covering the antennas.

12   So it doesn't seem to serve.

13             When I worked for Sprint, because of the

14   stealthy material it doesn't seem to serve as far.  This

15   is the information in the cell phone tower location

16   records that we have.

17             Again, I would just highlight that there is for

18   cell No. 92, as it says right here.  We will give it a

19   minute, because I was then asked to look at cell 46, right

20   over here.

21             This is Google earth.  Again, there is cell

22   phone tower location record information for Verizon cell

23   site 46, number 46, again the latitude and longitude that

24   specifies this location.

25             And these are two sites that had the possibility

1  of serving the location of interest.

2          You are actually seeing the movements that I did

3  to generate this.  And I was now looking at this location

4  right here, just east.

5          And you see there is a Google icon, and when I

6  click on it that is the icon for the golf club basically

7  and I saw that it said Gull Haven.

8          Now I zoomed in and moved over.  And as we zoom

9  in, you can start to see that the latitude longitude is

10  accurate.  And that is the top of the water tank that you

11  are seeing.

12          I'm now looking into a street view and this is

13  the water tank.  So cell 46 that you saw before is this

14  water tank.  And you start to see these white rectangular

15  shapes -- oops!

16          (Video stopped.)

17  A    I think you can fast-forward it.

18          (Video resumed.)

19          So you see them up here to the right.  You can

20  obviously tell they are pointing in a different direction.

21  In this case those would be pointing north.

22          And these here, as you can see clearly, you see

23  a whole bunch of them.  That means there are different

24  carriers.  Not just Verizon but these would be the ones

25  that point east towards the actual golf course.

1    So this is a typical water tank cell phone

2  tower.  You we are going to zoom back out.

3    We can also tell, it is hard to appreciate but

4  as we are zooming out that the water tank is way above the

5  tree line.  That is how we designed it, so that the

6  coverage would be clearer going further east.  That is why

7  water tanks are chosen as cell phone towers.

8    We are now zooming back out.  And you see the

9  perspective that the water tank is further west.  You

10  can't see the Gulf Haven Golf Club here.  And if you

11  remember, the antennas point in this general direction.  A

12  little bit south in this discretion, but again because

13  their wider beam they point here.

14    And as it indicates here, that is about .7 miles

15  from the water tank to the Gulf Haven Golf Club.

16    That is it on that clip.

17    (Video ends.)

18  Q    Okay.  I'm next going to ask that you take a look at

19  the October 8, 2013 --

20    THE COURT:  What date?

21    MR. TIERNEY:  October 8, 2013.

22  BY MR. TIERNEY:

23  Q    And were you asked to look at the area of Long Island

24  for a particular time frame pertaining to this phone?

25  A    Yes.

1    Once again, I was asked to look at specifically

2    the 8 am to 4 pm.  We did a different approach on this one

3    where we actually put time stamps from the call detail

4    records.

5    Q    So 82A, the first slide, that is October 8, 2013,

6    8:26 am to 9:31 am.  And again the Apex Lane location is

7    depicted on the map.  And this is the Central Islip and

8    Patchogue area.

9    And what activity does it show?

10   A    So again these are call detail records.  So we have a

11   call that hits off of 8:26 am registers on that tower.  We

12   then have a call, a little bit later, in the Oakdale area

13   at 8:55 am.  That is cell 239.

14   And at 9:51 we have a cell phone call on this

15   tower 267.  And you can tell from the time stamps that the

16   phone has moved further east.

17   Q    Okay.  Now, on October 18 (sic) we have from the time

18   period 9:36 am to 11:53 am, and we are looking at the

19   Riverhead area.

20   What is depicted on this slide?

21   A    That was October 8, by the way.

22   Q    I'm sorry.

23   A    So we have a call.  It is registered on both of these

24   towers.  In particular, there is 11 calls between 9:36 am

25   and 11:53 am on cell 202.  And the last call would have

1    been at 11:53 am.

2           We then see that at 11:55 am there is a call

3    placed on this Calverton site, I mentioned it before,

4    2:35.

5    Q    And the red icon right underneath cell tower or

6    underneath cell tower 202, is that the Suffolk County

7    Sheriffs Office?

8    A    That is correct, in Riverhead.

9    Q    Now we are going to, next slide is October 8, 2013,

10   from 12:04 pm to 12:55 pm Yaphank to Bayport.

11          What is depicted in this slide?

12   A    In this case again we see on cell 281 a call at

13   12:04.  Then we go into this Patchogue area where cell 104

14   is, and you have two calls registered at 12:17 and 12:24

15   pm.

16          And then we move down here and we see a series

17   of calls between 12:30, five calls basically, between

18   12:30 pm and 12:55 pm.  So we have moved further west.

19          I was asked if it is possible that this site

20   could serve in this case the West Sayville Country Club.

21   The calls were placed on this sector, you know, I didn't

22   highlight it in green but based on the call detail

23   records, it was the antennas that do point in this general

24   direction so that is the possibility.

25   Q    Okay.  And the next area you mapped was from October

1   8, 2013, from 12:57 pm to 3:36 pm in the Central Islip and

2   Wyandanch areas.

3           It also covers, in general, the Islip area.  Is

4   that correct?

5   A    Correct.

6           I will just say this is one of the reasons we

7   didn't put all the time stamps, because sometimes they are

8   not relevant.

9           But you see a lot of call activity.  And these,

10  the specific time stamps, from the previous slide we see a

11  call basically at 239 but there are a number of calls

12  placed on this cell phone tower.  So generally, there is

13  activity in the Central Islip-Oakdale area all afternoon.

14          I would call then your attention up here to this

15  call placed at 3:07 pm off of, I think that looks like

16  255 -- 288, actually.  The angle is tough from here.  288

17  at 3:07 pm.

18          Then you see a series of calls:  3:25 pm off of

19  237, 3:28 pm off of cell 280, 3:32 pm off of cell 224, and

20  3:36 pm off of cell 170.

21  Q    I'm next going show you -- and just around those

22  calls, that line down the center, do you know what that

23  is?

24  A    So there is the Long Island Rail Road.  The Central

25  Islip station is right around this area.  And it is

1    possible, yes, that the phone was being served while on

2    the Long Island Rail Road.

3    Q    And then the final slide on October 8, 2013, from

4    5:30 to 9:21 in the evening.  What is depicted in this

5    slide?

6    A    So as it indicates up here, it is Manhattan.  That's

7    Central Park.  And you can see all the Verizon sites in

8    this area.

9              But the call detail records indicate the calls

10   were placed, five calls, between 5:30 pm and 9:21 pm on

11   this cell site.  Because this is Manhattan, and we have so

12   many sites in the area, certainly the phone was much

13   closer to this site.

14             (Continued on the following page.)

15

16

17

18

19

20

21

22

23

24

25

1048

1  BY MR. TIERNEY:

2  Q.   And, in addition to this, did you provide a poster

3  board which depicts this activity?

4  A.   Yes.

5       MR. TIERNEY:  Your Honor, may the witness show

6  the poster board to the jury?

7       THE COURT:  Yes.

8       (The witness steps down.)

9       THE COURT:  What exhibit is this?

10      MR. TIERNEY:  Judge, this is 82-B your Honor.

11 BY MR. TIERNEY:

12 Q.   Go ahead.

13 A.   So what we did in this case is there's an inner

14 circle in green, the inner circles here all the way up to

15 this location right there.  So we had seen the details

16 before.

17      Once again, the general flow of the green calls

18 is in the easterly direction starting out in Central

19 Islip, Oakdale, going up to the Riverhead area where the

20 last calls were placed.

21      Then, if you recall, we had a call on 235 which

22 is in the Calverton area.  So we start to head back west

23 and we see these calls.

24      This is the cell where we had a number of calls

25 registered that could have served the West Sayville

1    Country Club.

2            If you look in this little inset here, it

3    clarifies the Central Islip area.  And if you see this

4    little train icon, as I mentioned before, that's the

5    Central Islip Long Island Rail Road station.  This cell

6    could have served that site or that area.

7            And if we look up here now, as we were

8    describing before, we see a series of calls that tend to

9    mimic the path of the Long Island Rail Road.  It's a very

10   real possibility that the phone was on the Long Island

11   Rail Road.

12           Lastly, this inset here is what we had seen

13   before.  Here, you can see I used a different icon.  You

14   can see there's two sites in that area.  We were

15   specifically on cell 6 Verizon site in that same midtown

16   area.

17           MR. TIERNEY:  Thank you.

18           (The witness resumes the stand.)

19   BY MR. TIERNEY:

20   Q.   And other than that last call in Riverhead on 11:53,

21   were there any other calls after 11:53 a.m. on October 8,

22   2013?

23   A.   No.  Everything was further west.

24   Q.   Again, I neglected to do this.  I apologize.  I'll

25   hold it up here.

1050

1    Are these all the cell towers depicted on Long

2    Island for -- that serve Verizon phones?

3    A.    For that area that I zoomed in, absolutely, yes.

4    Would you mind if I came around?

5    Q.    Sure, if you could speak to that, please.

6    (The witness steps down.)

7    A.    As I mentioned before, we got the cell tower location

8    records; and, yes, for these circles as you see or the

9    symbols I used indicate that a call was placed on that

10   specific tower.

11   So there's a number of sites between the Central

12   Islip area and this Riverhead area.

13   Q.    The area from the Suffolk County Jail to the area in

14   Islip by the Long Island Rail Road station, that's

15   approximately 30 miles?

16   A.    That's correct.

17   I indicated that this software where the arrow

18   was here and the arrow is here, actually tells me what

19   that distance is and that's approximately 30 miles.

20   Q.    So for cell tower 288, it's approximately 30 miles

21   and all of these cell towers are in between cell 288 and

22   the Suffolk County Sheriff's office?

23   A.    That's correct.

24   (The witness resumes the stand.)

25   Q.    I'm next going to call your attention to October 9,

1    2013.

2            Did you prepare a slide for that day?

3    A.   Yes.

4    Q.   And on October 9th, for the day October 9th, 2013,

5    were you looking at a particular period of time?

6    A.   So we started off actually with both slides.  I was

7    asked to look at two specific times.  I'm sorry.

8    Q.   And I'm just going to show you October 9, 2013, 8:26

9    a.m. and 9:17 a.m. in the Central Islip and Oakdale areas.

10           Again, you've got two points of interest, the

11   Astoria Bank on the bottom and above that you have 211

12   Apex Lane.

13           What else is depicted in that slot?

14   A.   So, again, for the 8:26 and 9:17 a.m. call, we see

15   the 8:26 call was placed off of cell 148, and that's the

16   green sector which is a set of antennas that point in the

17   southwest direction towards Astoria Bank.

18           And I was asked if it was possible that it could

19   have served and it is.  Cell 37 is, once again, a stealth

20   site.  There's material covering the antennas.  It doesn't

21   cover much of an area, and so it is possible that cell 148

22   served.

23           We also see cell 239, this green sector here.

24   It points in the southwest direction and that's a 9:17

25   a.m. call.

1052

1  Q.   And then the next slide is October 9, 2013, 3:14 p.m.

2  and 4:33 p.m. in the Riverhead area.

3       What is depicted in this slide?

4  A.   Again, this is the call activity.  This is now in the

5  afternoon.  We see a 3:14 call on this Riverhead site.

6  Then I'll call your attention to this general area.

7  Q.   Before you do that, I see cell tower 52 there.

8       What is cell tower 52?

9  A.   So cell 52, I think I mentioned before, the 52 is in

10  red.  That site was not on air.  It wasn't working.

11  Q.   When did it come on air again?

12  A.   December 31st of 2013.

13  Q.   So we're still two months approximately away from

14  that?

15  A.   That's correct.

16       And so I was asked to look at what sites could

17  have served this Hampton Hills Golf and Country Club.

18       If you see there's a series of calls at 3:52,

19  3:54 and then some later 4:32 and 4:33.

20       In particular here I have highlighted cell 296,

21  this sector here in green, and 202, this sector here in

22  green.

23       They both generally point towards the Hampton

24  Hills Golf and Country Club.  There are terrains around

25  here and so I was asked if it was possible, and it is

1    possible, that these do serve and to a lesser degree this

2    one might have served more likely further up in this

3    direction.

4    Q.    You examined the terrain issues?

5    A.    Yes.

6    Q.    As part of Government's Exhibit 83, is this the slide

7    of the terrain issue you examined with regard to the golf

8    course?

9    A.    Correct.

10             As I had done and I now used Google Earth, it

11   tells you the height above being sea level, the terrain as

12   we call it, and what you generally see is cell 202 is at

13   34 feet, cell 296 is 42 feet, cell 175 is 30 feet.  10

14   feet of difference between per towers doesn't really make

15   a whole lot of difference.

16             However, the northeast corner of the Hampton

17   Hills Golf and Country Club is 105 feet high and even

18   higher at the southwest corner, 185 feet.

19             So we have sites that are way lower than the

20   actual golf course, and so that presents a challenge and

21   one of the reasons that you probably have a few cites

22   serving the golf course.

23             Again, this is just Google Earth, just to

24   appreciate how much the terrain changes, if you look at

25   the golf course from the northeast corner to the southwest

1    corner, which we had seen on the previous map.

2    Q.    Now, you next were asked to prepare a map pertaining

3    to the phone activity from November 8, 2013, in the

4    morning, Government's Exhibit 84.

5    A.    Yes.

6    Q.    Was that a particular point of interest that you were

7    focusing upon?

8    A.    I was asked to focus on two calls that were placed at

9    9:04 a.m. and 9:21 a.m. and the location of interest was

10   California Diner.

11   Q.    Did you map that?

12   A.    Yes.

13   Q.    This slide is entitled November 8, 2013, 9:04 to 9:21

14   a.m., the Patchogue area?

15   A.    That's correct.

16   Q.    The red icon is a cup of coffee; is that the

17   California diner?

18   A.    That is correct.

19   Q.    What is depicted on that slide?

20   A.    So, in this case, I was asked if it was possible that

21   these calls off of cell 104 served the California diner.

22          And because of the short distance, I think it's

23   about a mile, don't quote me, but it's very close to this

24   site.  You can tell the other sites are further away.

25          So, yes, it's very probable in this situation

1  that that phone could have been in the California diner

2  and certainly would have served that area.

3  Q.    I next call your attention to November 14, 2013,

4  Government's Exhibit 90, do you see that?

5  A.    Yes.

6  Q.    And were you asked to examine a particular location

7  at a particular time with regard to the cell phone

8  activity?

9  A.    Yes.

10          In this case, I was asked to look at two calls

11  placed at 7:51 p.m., or received, and 7:52 p.m., and the

12  location of interest was a residence at 2 Hunters Way.

13  Q.    Is that in Nissequogue?

14  A.    Nissequogue, yes, right here.

15  Q.    And just -- and what, if anything, does that -- what,

16  if anything, did your analysis reveal?

17  A.    Once again, I was asked if these calls were served by

18  this tower or if it was possible that this tower served

19  this area.

20          And you can tell, once again, the green sector

21  is pointing generally to the north and so it is possible

22  that this site served this residence here.

23  Q.    That address, obviously the blue is the water,

24  correct?

25  A.    Correct.

1  Q.  That's in Nissequogue on the north shore of Suffolk

2  County?

3  A.  Yes.

4  Q.  Did you do a Google Earth look at that neighborhood

5  through Google Earth?

6  A.  Yes.

7  Q.  What, if anything, did you observe with regard to

8  that Nissequogue area?

9  A.  It's a very residential area, not a lot of homes in

10  the area, probably more exclusive, a lot of pools in the

11  area.

12  Q.  What does that usually -- what does that --

13  withdrawn.

14          How does that usually implicate cell service?

15  A.  If you look at the cell sites, they're all around.

16  Most -- I can use Oyster Bay as an example.

17          Some of the more exclusive areas do not want

18  towers on their property because it depreciates the land

19  value.

20          So this is typical.  You'll see that the cell

21  phone sites are around the area.  In fact, these little

22  sites here are what we call building sites.  That's on the

23  Stony Brook University campus.

24  Q.  That's cell tower 70?

25  A.  Correct.  They wouldn't serve other than the

1057

1  buildings on the campus.  You don't have a lot of sites in

2  the area.

3  Q.   Again, on cell tower 30, where the cell phone bounced

4  off of, you have the antenna marked in green.

5           Is that the particular antenna that the phone

6  bounced off on those two occasions?

7  A.   That's a sector in the call detail records right

8  there.

9  Q.   I'm next going to call your attention to December

10  20th of 2013.

11           Were you asked to map that area as well?

12  A.   Yes.

13  Q.   With regard to December 20, 2013, were you asked to

14  look at the hours of eight and six?

15  A.   That's correct.

16  Q.   So I'm just going to put December 20, 2013 in the

17  Central Islip area.

18           Again, you have the Apex Lane icon.  What else

19  is depicted in this photograph?

20  A.   I'll refer you again to the codes up here.

21           Calls placed between eight a.m. and twelve p.m.

22  are a green diamond.

23           In this case, the green diamond, again because

24  it's call detail records specify that cell phone tower 37

25  served in the morning, cell phone tower 148 served a call

1    in the morning, and cell phone tower 239 served a call in

2    the morning.

3    Q.    And December 20th in the Patchogue, Holtsville,

4    Medford areas?

5    A.    There's a lot of phone activity in this area.  You

6    see on cells 166 and 104 in the Patchogue area, you can

7    barely make out the green diamond.  It's underneath

8    everything else.  Those would be calls between 8 a.m. and

9    12 p.m.

10            Then the next time period is 12 p.m. to 1 p.m.

11   and you see calls on cell 267, cell 225, cell 104, cell

12   10, and cell 14, and those are between 12 and 1 p.m. in

13   this particular area.

14   Q.    And then December 20, 2013, in the Wading River,

15   Ridge and Manorville areas.

16   A.    So we're now at the last time frame, 1 p.m. to 4 p.m.

17   in this case and you see calls on cell 276, 289, 9, 262.

18   That's this general area basically.

19   Q.    Did you do an overall map with regard to the activity

20   on this day?

21   A.    That's correct.

22            Here you can more clearly see the symbols.  The

23   green diamonds focus on this area further west all the way

24   up to Patchogue.  Then we see the afternoon calls between

25   12 and 1 p.m.

1059

1    Then if you look at the time stamps, we have

2  calls here and then back in this general area and you see

3  calls between 1 and 4 p.m. back in that Oakdale Islip

4  area.

5  Q.   On December 20, 2013, did any phone calls bounce off

6  of the Riverhead sites on that day?

7  A.   No.

8  Q.   I'm next going to call your attention to January 17

9  of 2014, Government's Exhibits marked 92, and did you

10 prepare a map with regard to that day?

11 A.   Yes.

12 Q.   Were you focusing on the time period between 2 in the

13 afternoon and 10 at night?

14 A.   That's correct.

15 Q.   I'm just going to show you the slide marked January

16 17, 2014, Bayshore, Central Islip and Patchogue areas.

17     What is depicted on this slide?

18 A.   So, once again, in this case it's from 2 p.m. to 4

19 p.m.

20     The green diamond over a specific cell phone

21 tower indicates the serving tower in the early afternoon

22 in this case, cells 239, 92, 37, 154, and 294 in the

23 Bayshore area.  These calls are calls hit off of those

24 towers between 2 and 4 p.m..

25 Q.   And then January 17, 2014, in the Smithtown, St.

1060

1  James and Islandia area, what's depicted here?

2  A.  So those are three specific towers.  That's 242, 195

3  and 288.

4       These were calls between 2 p.m. and 4 p.m., no

5  other activity for the rest of the day on these sites.

6  Q.  And on January 17, 2014, the Huntington, Commack and

7  Deer Park areas, what's depicted on that?

8  A.  It's further west and we have a call between 4 p.m.

9  and 6 p.m. up here at cell 285, and then another call here

10  between 6 and 8 p.m. on this cell 223.

11       Then we see from 8 to 10 p.m. some calls

12  registered on cell 250 and cell 280.  We actually moved

13  further east now because of the time stamps.

14  Q.  On January 17, 2014, how many calls placed on this

15  phone bounced off of the Riverhead cell sites?

16  A.  None.

17  Q.  Again, the furthest east tower hit was in the

18  Patchogue area, correct?

19  A.  That's correct, that's cell 104.

20  Q.  And next I'm going to call your attention to March

21  17, 2014.

22       Did you prepare some maps with regard to that

23  day?

24  A.  Yes.

25  Q.  Were you focusing in the time period of 10 in the

1    morning until 10 at night?

2    A.    That's correct.

3    Q.    I'm going to call your attention to March 17, 2014,

4    in the Central Islip, Oakdale and Patchogue areas.

5          What, if anything, is depicted in this slide?

6    A.    So, once again, this is the residence at 211 Apex

7    Lane.

8          The green diamonds in this case are between 10

9    a.m. and 1 p.m., and so you have calls between 10 a.m. and

10   1 p.m. placed on cell phone tower 148, 37, 239, up here on

11   cell 166, generally going east.

12   Q.    Then March 17, 2014, in the Riverhead area and again

13   the icon, is that the Suffolk County Sheriff's office?

14   A.    That's correct.

15         THE COURT:  What exhibit is this?

16         MR. TIERNEY:  This is 93, your Honor.

17   A.    So, in this case, it is now March 17, 2014.

18         Cell 52 which was previously not on air is on

19   air and a call hits off of that tower or registers off of

20   that tower between 10 a.m. and 1 p.m., then the next call

21   registers between 1 p.m. and 4 p.m. off of cell 202.

22   Q.    It indicates the last call on cell 202 was 4:37 p.m.?

23   A.    That's correct.

24         And that's the red dot here, 4 p.m. to 7 p.m.,

25   and you also notice after that call we're back on cell 52

1062

1    and there's some calls placed or received between 4 p.m.

2    and 7 p.m.

3         You can make out the blue circle in the center

4    were there were also some calls there on cell 52 between 7

5    and 10 p.m..

6    Q.   Then on March 17, in the Central Islip, Oakdale and

7    Patchogue areas, what, if anything, is indicated with

8    regard to the evening hours?

9    A.   So, once again, we have seen these in the morning.

10   We had seen on the previous slide some calls now on 7 p.m.

11   to 10 p.m., and they show up around Patchogue, Oakdale,

12   Central Islip areas with the blue circles between 7 p.m.

13   and 10 p.m., and we move further west again.

14   Q.   Just if you could look at the call detail record for

15   March 17, 2014.

16   A.   Sorry?

17   Q.   The call detail records, could you tell the jury the

18   times on March 17, when in the evening, when the cell

19   towers in the Central Islip, Oakdale and Patchogue areas

20   were being hit.

21   A.   Sure.

22        You did say for March 17?

23   Q.   Yes, March 17.

24   A.   In the evening?

25   Q.   Yes.

1063

1  A.  The first call in the evening is back in that area

2  around Patchogue, and Patchogue is cell 104, and at 7:36

3  p.m., then at 7:48 p.m., and I have 239 in Oakdale and

4  then we have 7:58, 8:00.

5  Q.  Thank you.

6      Were you also asked to prepare a map for the

7  phone activity pertaining to that phone on March 18 of

8  2014?

9  A.  Yes.

10  Q.  Again, on this day, were you looking at the hours

11  between 2 and 10?

12  A.  Between 11 and 10.

13  Q.  What, if anything, is depicted on Government's

14  Exhibit 94, the slide marked March 18, 2014, Patchogue and

15  Oakdale areas?

16  A.  These calls are in the evening basically.  Yes, late

17  evening, 7 p.m. to 10 p.m., and we see some calls on cells

18  239, 104.

19  Q.  I did this one backwards.

20      Let's start out with Government's Exhibit 94,

21  March 18, 2014, Riverhead area.

22      What's depicted there?

23  A.  So the morning activity, 11 a.m. to 1 p.m., and this

24  is a green diamond.

25      You see calls from the Calverton sites,

1    Riverhead sites 52 and 202.

2            From 1 p.m. to 4 p.m. you see calls registered

3    again on the cell 52 as well as cell 202.  Then calls

4    between 4 p.m. and 7 p.m. registered on cell 52, 202.  You

5    see some of the activity between the sites because of the

6    terrain issues.  The last call in the Riverhead area is on

7    cell 202 at 6:38 p.m.

8    Q.    Do you know, using the call detail records, do you

9    know what the next phone call is after the 6:38 phone

10   call?

11   A.    The time stamp?

12   Q.    Yes.

13   A.    Let me look that up.

14            After the 6:38 p.m. call?

15   Q.    Yes.

16   A.    That is on cell 225 at 7:16 p.m.

17            Actually it's on the other map.  That's right

18   here.

19   Q.    Again, the phone activity is moving west at this

20   point?

21   A.    That's correct, yes.

22   Q.    And once the phone activity moves west, at around

23   that time is there anymore phone calls placed in the

24   Riverhead area for this day?

25   A.    No.

1065

1  Q.   Now, I just want to clarify something.  I think I

2  might have misspoke.

3         Earlier when I asked about your experience as

4  working with the phone companies as an engineer for cell

5  sites and an optimization engineer, I asked you if you had

6  ever built a site that extended 27 miles.

7         I want to amend that question and ask you would

8  you ever serve -- would you ever design and optimize a

9  site designed to serve an area of up to 21.7 miles?

10  A.   Not for a CDMA network.

11         If you look at what we reviewed, the most I've

12  seen is about 9 miles, 10 miles.  That's only because

13  there's a lack of towers.  Generally speaking, you

14  wouldn't design them that big.

15         MR. TIERNEY:  Thank you.

16         I have nothing further.

17         THE COURT:  Cross-examination.

18         MR. LATO:  I need a minute to set up, your

19  Honor.

20         (Pause in proceedings.)

21

22  CROSS-EXAMINATION

23  BY MR. LATO:

24  Q.   Good afternoon, sir?

25  A.   Good afternoon.

1    Q.   Is it fair to say that a cell phone is the equivalent

2    of a two-way radio?

3    A.   They operate differently, sir.

4         MR. LATO:  Your Honor, please instruct the

5    witness to answer my question.

6         THE COURT:  Yes.

7         You're going to be asked questions that are

8    going to call for a yes or no answer.  Please try to

9    answer yes or no.  There may be some questions you cannot

10   answer yes or no.  In that event, just say I can't answer

11   that yes or no.  But don't make an explanation when the

12   question doesn't call for it.

13   A.   I would say no.

14   Q.   Is a cell phone a transmitter?

15   A.   Yes.

16   Q.   Is it also a receiver?

17   A.   Yes.

18   Q.   Is it fair to say then it is both a transmitter and a

19   receiver?

20   A.   Yes.

21   Q.   Now, is it fair to say that a cell tower is a

22   transceiver?

23   A.   Yes.

24   Q.   Is it a fair statement that when a person makes a

25   cell phone call, a cell tower may accept that cell phone's

1 transmissions?

2 A.    Yes.

3 Q.    Now, is it fair to say that ideally cell phone towers

4 are set up to form the shape of a hexagon?

5 A.    What was the other option?

6            THE COURT:  If you can answer that question yes

7 or no.

8 A.    I would say no.

9 Q.    Is it fair to say that cell phone towers are set up

10 say in Long Island so that there is limited danger of a

11 dropped call?

12 A.    Yes.

13 Q.    Is it fair to say that notwithstanding that everyone,

14 including yourself, has experienced a dropped call?

15 A.    Yes.

16 Q.    In fact, sometimes a call can be dropped even if

17 you're not moving, correct?

18 A.    Yes.

19 Q.    And, of course, if you're driving or on the Long

20 Island Rail Road, you can have a dropped call, correct?

21 A.    Yes.

22            THE COURT:  What's a dropped call?

23            THE WITNESS:  So a drop call, if you're on the

24 phone, it disconnects basically.  There is no connection

25 between the cell phone tower and the cell phone.

1  BY MR. LATO:

2  Q.   So is it a fair statement that notwithstanding that

3  cell towers overlap, calls get dropped, correct?

4  A.   Yes.

5  Q.   Is it a fair -- let me backtrack.

6          Do you know what a dead zone is?

7  A.   Yes.

8  Q.   Is it a fair statement that a dead zone is where

9  there is no cell phone coverage?

10 A.   Yes.

11 Q.   Is it a fair statement that even within a given

12 building there might be a location where there's a dead

13 zone, yet a few feet away there's a live zone?

14 A.   Yes.

15 Q.   Now, when a cell phone is turned on, but before a

16 call is made, is a cell phone communicating with the

17 tower?

18 A.   Could you repeat the question, the very beginning of

19 it actually.

20 Q.   When a cell phone is turned on, but before a call is

21 made, is the cell phone communicating with a cell tower?

22 A.   Yes.

23 Q.   Is it a fair statement that every few seconds, say

24 every several seconds or so, that cell phone is

25 communicating with some cell tower?

1069

 1   A.   No.

 2   Q.   Well, how often does a cell phone communicate with a

 3   tower?

 4   A.   It depends on the technology.  It's a software

 5   setting that we set, so I couldn't tell you, but seven

 6   seconds is too little, too short of a time frame.

 7   Q.   So are you saying that it might communicate say every

 8   10 seconds or 20 seconds?

 9   A.   More every couple of minutes otherwise.  I don't want

10   to answer more.

11   Q.   Now, do you have a cell phone?

12   A.   Yes.

13   Q.   Do you have a smart phone?

14   A.   Yes.

15   Q.   Is it fair to say that a smart phone does more than

16   send and receive phone calls?

17   A.   Yes.

18   Q.   A smart phone, in fact, you can send and receive text

19   messages, correct?

20   A.   Yes.

21   Q.   And on a smart phone you can, for instance, send and

22   receive e-mails?

23   A.   Yes.

24   Q.   Now, on most cell phones is there an indication on

25   the screen with respect to battery life?

1  A.  Yes.

2  Q.  And is there also something on the home screen to

3  show whether the phone is in range of a tower?

4  A.  Yes.

5  Q.  And is there something on the phone that shows how

6  strong the signal is at a given moment?

7  A.  Yes.

8  Q.  In fact, it's sometimes referred to as bars on a cell

9  phone, correct?

10  A.  Yes.

11  Q.  The greater the number of bars, the stronger the

12  signal?

13  A.  Yes.

14  Q.  Is it fair to say that that signal strength varies

15  throughout the day?

16  A.  Yes.

17  Q.  And, in fact, standing in this courtroom right now, a

18  cell phone, even if I didn't move, that strength could

19  vary, correct?

20  A.  Yes.

21  Q.  Now, when I'm standing in the courtroom, are the cell

22  towers moving?

23  A.  No.

24  Q.  Yet, the strength of the signal changes, correct?

25  A.  Yes.

1  Q.   Is it fair to say that there are a lot of factors

2  that affect the strength of a cell phone signal at any

3  given moment in time?

4  A.   Yes.

5  Q.   Is it fair to say that the worldwide usage of cell

6  phone is growing every year?

7  A.   Yes.

8  Q.   And in the United States alone, please correct me if

9  I'm wrong with your number, is it fair to say that in 2015

10  about at least 2.3 trillion minutes of phone time was used

11  on a cell phone?

12  A.   I would say yes.

13  Q.   And is it fair to say that more and more people are

14  using smart phones as opposed to the old-style flip

15  phones?

16  A.   Yes.

17  Q.   Is it a fair statement that more and more people are

18  using their cell phones for text messages and e-mail than

19  they were years ago?

20  A.   Yes.

21  Q.   Is it also fair to say that perhaps in the last year,

22  2015, that at least 2.2 trillion text messages were sent

23  or received in the United States alone?

24  A.   I would say yes.  I'm guessing, but yes.

25  Q.   Is it fair to say in the United States the number of

1   cell towers is growing every year?

2   A.   Yes.

3   Q.   Is it fair to say that there's at least say 280 cell

4   towers in the United States?

5   A.   I couldn't really answer.

6   Q.   Are you familiar with the cell tower growth in Long

7   Island?

8   A.   Yes.

9   Q.   Are you familiar with the cell tower growth in the

10  five boroughs of New York City?

11  A.   Yes.

12  Q.   Is it fair to say that in the five boroughs of New

13  York City and in Long Island, the number of towers has

14  grown every year?

15  A.   If I can't answer with a technical answer, the answer

16  is no.

17  Q.   Is cell phone traffic a problem?

18       In other words, the more and more people who use

19  their cell phones, it can start to overload a particular

20  tower?

21  A.   Yes.

22  Q.   Now, is it fair to say that in an urban area, say in

23  Manhattan, that area tends to be more populated than say

24  Long Island?

25  A.   Yes.

1   Q.   Is it fair to say at any given moment in time there

2   are probably more cell phones used in Manhattan than in

3   Suffolk County?

4   A.   Yes.

5   Q.   Now, is it also fair to say that the further east one

6   goes from Manhattan to Montauk Point, the future cell

7   phone towers there are?

8   A.   Yes.

9   Q.   And, in fact, between say Amagansett and the eastern

10  most point of the south point of Long Island, Montauk, how

11  many cell towers are there?

12  A.   Five or so.

13  Q.   Do you know the distance between Amagansett and

14  Montauk?

15  A.   I think I measured about 10 miles.  It's less

16  actually.  10 miles is an approximation.

17  Q.   Now, when a person makes a phone call using a cell

18  phone, say from this courtroom, will that phone call

19  always communicate with the same cell tower every time?

20  A.   In this courtroom, yes.

21  Q.   If I'm standing in the parking lot and I make a phone

22  call, is it always going to be the same cell tower?

23  A.   No.

24  Q.   In fact, I can make a call say in the parking lot,

25  Mr. Wexler can be next to me making a call, and we could

1  both hit different cell towers, correct?

2  A.   Yes.

3  Q.   Now, the maps that you created and the charts -- let

4  me go back.

5           Did you create those maps and charts?

6  A.   Yes.

7  Q.   Is it a fair statement that Verizon did not ask you

8  to make those?

9  A.   Yes.

10 Q.   Is it a fair statement that Verizon had no input in

11 making those charts in terms of telling you what to do?

12 A.   Yes.

13 Q.   Is it a fair statement it was the government, either

14 the U.S. Attorney's office or the FBI, that asked you to

15 make these maps and charts?

16 A.   Can you repeat the question?

17 Q.   Is it a fair statement that the government, meaning

18 either the attorneys or the FBI agent, asked you to make

19 these maps and charts?

20 A.   Yes.

21 Q.   Is it a fair statement that you're being paid by the

22 government for your time?

23 A.   Yes.

24 Q.   And you're being paid for testifying here today,

25 correct?

1    A.    Yes.

2    Q.    In fact, those maps and charts you created you're

3    paid for that as well, correct?

4    A.    Yes.

5    Q.    About how much money have you earned at this point,

6    irrespective of whether you have been paid?

7    A.    We have finance people, but based on the number of

8    hours, in the $12,000 range.

9    Q.    Now, is it a fair statement that you've testified for

10   the government before, correct?

11   A.    Yes.

12   Q.    And every time you've testified, you've been paid,

13   correct?

14   A.    Yes.

15   Q.    And every time you prepared maps or prepared for your

16   testimony, you're paid for that time as well?

17   A.    Yes.

18   Q.    Now, are you familiar with the difference between GPS

19   or global positioning systems, triangulation and cell site

20   or historical cell site information?

21   A.    Yes.

22   Q.    Is GPS the most accurate way to determine where a

23   phone is at any given point?

24   A.    Yes.

25   Q.    The maps and charts that you created, were they

1076

1   created with GPS?

2   A.   No.

3   Q.   And, in fact, is it a fair statement that phone

4   companies typically do not store the GPS information?

5   A.   Yes.

6   Q.   Now, triangulation, is triangulation basically what

7   it seems like, there's a triangle or three towers are

8   involved, correct?

9   A.   Yes.

10  Q.   Is it a fair statement that in triangulation that

11  there are pings, P I N G S, off of the towers to try and

12  pinpoint where someone is in the triangle, correct?

13  A.   Yes.

14  Q.   And that is less accurate than GPS, correct?

15  A.   That's correct.

16  Q.   However, it is more accurate than historical cell

17  site information, correct?

18  A.   Yes.

19  Q.   The charts and maps that you prepared in this case,

20  was that done with triangulation?

21  A.   No.

22  Q.   Is it a fair statement that phone companies do not

23  store triangulation data?

24  A.   Yes.

25  Q.   Now, with triangulation, is it a fair statement that

1077

1    the closer the towers are together, the three towers, the

2    more accurate the pinpointing will be, correct?

3    A.    Yes.

4    Q.    Now, is it a fair statement that there are also

5    disadvantages with GPS, for instance?

6    A.    Yes.

7    Q.    Is it a fair statement that GPS works on line of

8    sight?

9    A.    Yes.

10   Q.    In other words, if one is outside using a GPS phone,

11   a signal would be sent from that phone to a satellite,

12   correct?

13   A.    No.

14   Q.    I'm sorry, is it sent to a tower first?

15   A.    No.

16   Q.    Tell us the rare time, please.  Explain how it works.

17   A.    The satellite is actually what's sending the phone,

18   the information, and it's then registered on the tower.

19   The phone communicates to the tower.

20   Q.    You need, however, line of sight, correct?

21   A.    For GPS you need visibility to the southern horizon

22   wherever you are.

23   Q.    In other words, line of sight to the satellite in the

24   southern horizon, correct?

25   A.    Yes.

1078

1  Q.   If one goes inside a tunnel, say the Midtown Tunnel,

2  on the water you're not going to get that line of sight to

3  that satellite, correct?

4  A.   That's correct.

5  Q.   So that's a disadvantage, correct?

6  A.   Yes.

7  Q.   Now, if sometimes animals in the wild, say a dolphin

8  or whale, they can be tagged with a chip with GPS

9  technology, correct?

10  A.   Yes.

11  Q.   And if, say, a great white shark is tagged and

12  underwater, that shark's chip is not communicating with

13  that satellite; is that correct?

14  A.   That's correct.

15  Q.   When the shark surfaces, that will be a ping with the

16  satellite and you can determine the exact location of that

17  shark, correct?

18  A.   Yes.

19  Q.   Now, is it a fair statement, as you turn to

20  historical cell site tower, once again, the three ways to

21  determine where the phone is, that's the least accurate in

22  terms of particularizing where somebody is?

23  A.   Yes.

24  Q.   And the charts and the maps that you created in this

25  case, everyone was with historical cell site data?

1079

1   A.   Yes.

2   Q.   Now, once again, does the signal strength from the

3   tower affect reception?

4   A.   Does?

5   Q.   Well, let me rephrase that.

6        When I'm standing in a parking lot, say with

7   Mr. Wexler, we can each get a different tower even though

8   we're standing next to each other, correct?

9   A.   Correct.

10  Q.   Now, even though the towers are not next to each

11  other, Mr. Wexler and I, our phones are communicating with

12  different towers, correct?

13  A.   Correct.

14  Q.   So is it a fair statement that at a given moment in

15  time, a cell phone may not connect with the nearest tower

16  but with the clearest tower?

17  A.   Yes.

18  Q.   In fact, sometimes, like all mechanical things,

19  towers break down, correct?

20  A.   Yes.

21  Q.   And they need regular maintenance, correct?

22  A.   Yes.

23  Q.   And, in fact, there are computer systems associated

24  with the tower, correct?

25  A.   Yes.

1080

1   Q.   In other words, on say a water tower, it's more than

2   simply an antenna on top of the water tower, correct?

3   A.   There's more to the site, yes.

4   Q.   What are some of the things, please explain, that are

5   on the site in addition to the antenna on top of the

6   tower?

7   A.   We're using radio heads as they're called or tower

8   top amplifiers that make reception a little stronger, the

9   received signal stronger, and the rest is standard base

10  station equipment we call it.

11  Q.   The base station equipment, would there be one or

12  more computers in that base station?

13  A.   Yes.  The brains of it, yes.

14  Q.   It's the computer itself, that's the brains, correct,

15  not the antenna on top of the tower?

16  A.   Yes.

17  Q.   If that brain isn't working right, it has to be

18  serviced, correct?

19  A.   Yes.

20  Q.   And the caller may have to use a different tower?

21  A.   Yes.

22  Q.   Now, sometimes -- let me rephrase that.

23       In a cell phone tower, the station, that's

24  powered with electricity, correct?

25  A.   Yes.

1  Q.   Is it a fair statement that if there's a power outage

2  that cell tower is not working, correct?

3  A.   Yes.

4  Q.   Now, is it also a fair statement that sometimes there

5  are fluctuations in the amount of power that goes to the

6  tower, electrical fluctuations on the line?

7  A.   Yes.

8  Q.   For instance, if it's a really hot day and everyone

9  is using their air conditioning in Central Islip or for

10  some other reason there might be a problem with power at a

11  given moment in time?

12  A.   I can't answer that yes or no.

13  Q.   In electrical lines does power fluctuate?

14  A.   Yes.

15  Q.   Are electrical lines connected to the brains of the

16  cell phone tower, the standard stuff?

17  A.   Yes.

18  Q.   The signal strength that say a person such as myself

19  gets on a cell phone, does that depend in part on the

20  number of cell towers in the area?

21  A.   Yes, in part.

22  Q.   And it also depends on whether maintenance is being

23  done on any given tower, correct?

24  A.   Yes.

25  Q.   Also if the tower is broken, correct?

1    A.   No.

2    Q.   Well, if the brains, the computer is being maintained

3    or something is being done, that's a factor that will

4    affect signal strength, correct?

5    A.   I can't answer unless you clarify.

6    Q.   Well, does the height of a tower matter?

7    A.   Yes.

8    Q.   And, in fact, in a flatter area you don't need as

9    tall a tower, correct?

10   A.   That's correct.

11   Q.   And in a mountainous region you need a taller tower,

12   correct?

13   A.   No.

14   Q.   Well, what about if there are a lot of tall buildings

15   around, would you need a taller tower?

16   A.   I can't answer that question the way it's phrased.

17   Q.   Well, is it a fair statement that in New York City

18   radios broadcast from the top of the World Trade Center?

19   A.   Yes.

20   Q.   Is it a fair statement that the World Trade Center is

21   the tallest building in New York City?

22   A.   Yes.

23   Q.   Is it a coincidence that the tallest building in New

24   York City is broadcasting radio?

25   A.   No.

1083

1 Q. Now, with respect to signal strength, does wattage

2 output matter?

3 A. Yes.

4 Q. Is that the wattage output of the cell tower that

5 matters, or the cell phone?

6 A. Both.

7 Q. Actually a cell phone, if it's about to go dead on

8 the battery, it may have a weaker signal, correct?

9 A. Yes.

10 Q. And if a person plugs in the charger say either in

11 the DC charger in the car or the AC charger in the wall,

12 the signal strength can rapidly increase?

13 A. I can't answer that question.

14 Q. Well, does the strength of a signal depend upon the

15 range of the tower?

16 A. The strength of the cell phone tower signal, yes.

17 Q. In other words, it would be a fair statement that not

18 all cell towers are created equally?

19 A. Yes.

20 Q. Some send out stronger signals, correct, than others?

21 A. Yes.

22 Q. Which, by definition, some send out weaker signals

23 than others, correct?

24 A. Yes.

25 Q. Now, on a given tower there may be several antennas

1084

1  or antennae, correct?

2  A.    Yes.

3  Q.    And is there a reason why there are several on a

4  tower?

5  A.    Yes.

6  Q.    And is it because the tower may service different

7  carriers, such as AT&T, Verizon and T-Mobile?

8  A.    Yes.

9  Q.    Now, does the angle of the antennas affect reception

10  or transmission?

11  A.    I can't answer the question.

12  Q.    If you can explain it.

13  A.    So when we design the site, we determine what the

14  angle should be.  When you say affect, it's designed that

15  way so it's not like it fluctuates.  That angle is not

16  going to fluctuate.

17           (Continued on next page.)

18

19

20

21

22

23

24

25

1    CROSS-EXAMINATION  (Continued)

2    BY MR. LATO:

3    Q    So in designing the tower, we're looking for the

4    optimum angle, correct?

5    A    We down tilt the antenna.

6    Q    Say that again?

7    A    We down tilt the antenna to make sure it only covers

8    a specific area.

9              THE COURT:  We'll take a recess at this time.

10             Members of the jury, we'll take a 15 minute

11   recess.

12             Please don't discuss the case and keep an open

13   mind.

14             Please recess yourselves.

15             (A recess was taken.)

16             (After recess the following occurred.)

17             THE COURT:  You may proceed, Mr. Lato.

18   BY MR. LATO:

19   Q    With respect to signal strength.  At any given moment

20   in time does phone call traffic, can that affect the

21   signal strength?

22   A    Oh, yes.

23   Q    And does data traffic, also affect the signal

24   strength?

25   A    Technically, but the answer would be no unless I can

1   clarify.

2   Q    Go ahead.

3   A    So the signal strength for a telephone call could be

4   affected by telephone traffic.  But smart phones use data

5   strength video streaming.  That's a separate network on

6   the same cell phone tower.  That would not affect it.  So

7   an e-mail or a video stream wouldn't affect phone traffic.

8   Q    What about text messages.  Would that affect the

9   traffic?

10  A    Phone traffic you're saying?

11  Q    Yes.

12  A    No.

13  Q    Now I'm going to turn to the signal strength of the

14  phone itself as opposed to the closest tower.

15          Can the wattage output of a particular hand-held

16  cell phone, does that affect say broadband capability?

17  A    Broadband?

18  Q    Well, does it affect its ability to send and receive

19  calls, how much wattage that phone outputs at a given

20  moment?

21  A    So can I clarify?

22  Q    Yes, please.

23  A    There is a maximum.  So yes, it could vary between a

24  minimum and a maximum.

25  Q    Now what about the generation of a particular phone.

1   In other words, will a newer phone, say a newer iPhone,

2   will that basically have better reception or greater

3   signal strength than say a much older phone?

4   A    Potentially, yes.

5   Q    In other words, is it fair to say that the technology

6   inside a phone is becoming basically more advanced as time

7   goes on?

8   A    Yes.

9   Q    There may not be much difference between an iPhone 5

10  and a 5s, but by the time you get to iPhone 8 it will

11  probably be a lot more advanced than the 5, correct?

12  A    Yes.

13  Q    So in other words, for the most part, newer phones

14  send out stronger signals than older phones on average?

15  A    No.

16  Q    Now do environmental factors affect all reception?

17  A    Yes.

18  Q    Now is one of the factors, or is a factor the weather

19  at a given moment in time?

20  A    Again, if I can clarify I can answer.  If not, I

21  can't.

22  Q    Well hold on, not this time.

23       Can the weather affect the cell phone reception

24  or signal strength?

25  A    I have to say generally, no.

1088

1  Q    Now in an electrical storm, does lightning create

2  radio waves?

3  A    No.

4  Q    Can lightning or a thunder storm interfere with

5  reception?

6  A    Generally, no.

7  Q    Well you're saying generally, no.  By default does

8  that mean sometimes, yes?

9  A    I can't think of a practical application.

10 Q    Well what about topography?

11 A    Yes.

12 Q    Now is it a fair statement that topography is the

13 arrangement of the surface of the earth, the ground and

14 the buildings, correct?

15 A    Yes.

16 Q    Can topography affect signal strength at any given

17 moment in time?

18 A    Absolutely, yes.

19 Q    Now let me just look for an exhibit.  Skip that, your

20 Honor.

21       Now what about the location of a phone, for

22 instance a signal strength, can that be affected by where

23 the phone is in you such as inside a building or outside,

24 say in the parking lot?

25 A    Yes.

1  Q    And is that because that the building itself, the

2  exterior of the building and the walls of this room can

3  affect signal strength?

4  A    Yes.

5  Q    And is it also a fair statement that the substance

6  that is used to create the inner and outer walls of this

7  court house can affect signal strength, correct?

8  A    Yes.

9  Q    In other words, certain materials are more permeable

10 than others, correct?

11 A    Yes.

12 Q    So is it a fair statement that for instance in this

13 building, reception could be worse or non-existent inside

14 an elevator?

15 A    For this building?

16 Q    Yes.

17 A    No.

18 Q    Well, can radio waves penetrate stainless steel

19 doors?

20 A    Not the doors, but it could penetrate through in

21 other ways.

22 Q    All right, but is it a fair statement that radio

23 waves cannot penetrate stainless steel?

24 A    Yes.

25 Q    Just like x-rays cannot penetrate lead, correct?

1    A    Yes.

2    Q    Now can radio waves penetrate concrete?

3    A    They can.

4    Q    Okay.  Does it depend on the thickness of the

5    concrete?

6    A    Yes.

7    Q    And does it also depend on the density of the

8    concrete?

9    A    Yes.

10    Q    So is it fair to say that if on a staircase in this

11    courthouse there is a lot of steel and a lot of thick

12    concrete, a person may not be able to get reception?

13    A    I'm going to say, no.  I can clarify, but I have to

14    say, no.

15    Q    You want to clarify?

16    A    Yes.  This building?

17    Q    No, do you want to?

18    A    Yes.

19    Q    Go ahead.

20    A    There is an in-building system in this building, and

21    so that's why most of these answers are --

22    Q    I'm sorry what is in this?

23    A    An in-building system.

24    Q    Now, in this building?

25         THE COURT:  What is that?

1091

1        THE WITNESS:  In-building?

2        THE COURT:  You may proceed.

3    BY MR. LATO:

4    Q    Now is there a reason why there is an in-building

5    system in this building?

6    A    It's to provide coverage in the building, yes.

7    Q    In other words, but for that in-building system,

8    there might not be coverage inside this building, correct?

9    A    Correct.

10   Q    Do you know whether in the period 2011 to 2014 there

11   was in-building coverage in the Suffolk County jails?

12   A    No.

13   Q    You don't know or you do know?

14   A    I don't know.

15   Q    So do you know whether there's a Suffolk County Jail

16   in Riverhead?

17   A    Yes.

18   Q    So do you have any idea whether there is an

19   in-building system there?

20   A    No.

21   Q    Do you have any idea whether there is an in-building

22   system in the Yaphank jail?

23   A    I would -- again, if I can clarify?

24   Q    No, not this time.

25   A    No.

1  Q    Now does it matter whether a person or a phone is on

2  the surface of the earth or higher up in terms of

3  reception or signal strength?

4  A    Yes.

5  Q    Now does reception increase or decrease as the cell

6  phone itself increases in altitude?

7  A    I can't answer that question.

8  Q    Well if a person were or the phone is on the ground

9  or in a person's head, say six feet above the ground, is

10 reception better or worse at six feet than it is on the

11 ground?

12 A    Again, it's -- there is a variance in the answer.  I

13 guess the answer would be, no.  That is a very short

14 distance.

15 Q    Well let's make it 50 feet above the ground, the cell

16 phone.  Now is that significant?

17 A    It's a significant height, yes.

18 Q    And would the signal be stronger or weaker at 50 feet

19 than it would be on the ground?

20 A    I can't answer that question.

21 Q    You can't answer it yes or no, or you can't answer it

22 at all?

23 A    I can't answer it yes or no.

24 Q    Can you explain?

25 A    It depends on where the cell phone tower is.

1  Q    And if the cell phone tower is several miles away, is

2  it fair to say that the higher the phone the chances are

3  better for reception?

4  A    Yes.

5  Q    So is it a fair statement that if the cell phone

6  tower is several miles away, and that phone is in say a

7  hot air balloon at a thousand feet, is that better or

8  worse reception?

9  A    Worse.

10 Q    Because it is now too high?

11 A    And the signal quality is also affected.

12 Q    Now is it a fair statement that in Manhattan the cell

13 phone carrier density is many times greater than it is in

14 Suffolk County?

15 A    Yes.

16 Q    And is it a fair statement that in Manhattan for

17 instance you could have one tower covering just one

18 building?

19 A    Yes.

20 Q    And in fact you could have one tower covering only

21 certain floors in that one building?

22 A    Yes.  And unless it has an in-building system.

23 Q    Now how many years have you been an expert in this

24 area?

25 A    So I'm working in engineering since 1999.  So this

1  would be my 17th year.

2  Q    In your 17 years have you spoken to other experts?

3  A    Yes.

4  Q    And is it fair to say that not all experts agree with

5  using historical cell site data to locate where someone

6  is?

7  A    Do you mean the ones I have spoken to?

8  Q    Yes.

9  A    We all agree.

10  Q    Well, have you read articles, you know scholarly

11  pieces by other people in this field, critical of using

12  historical cell site data to identify where someone is?

13  A    I can't answer it with a yes or no.

14  Q    Have you read any articles discussing the use of

15  historical cell site data?

16  A    Yes.

17  Q    In any of those articles, were they critical of using

18  historical cell site data?

19  A    Yes.

20  Q    Now is it fair to say that DNA fingerprinting, that

21  is accurate, correct?

22  A    Yes.

23  Q    Is it fair to say that using historical cell site

24  data to locate a person is still in its relative infancy

25  compared to say DNA or fingerprinting?

1  A    No.

2  Q    Well, how long have cell phones been around?

3  A    Since the 80s, since the 80s.

4  Q    DNA has been around a lot longer than that?

5  A    Well, I can't answer with yes or no.

6  Q    Are you familiar with an organization called Cherry

7  Biometrics?

8  A    No.

9  Q    Well before testifying here today, did the government

10 tell you that the defense is going to call an expert?

11 A    Yes.

12 Q    And were you informed that that expert's opinion is

13 going to differ from yours?

14 A    Yes.

15 Q    So, are you familiar with some of the cases, you know

16 Court cases that have been litigated over the years where

17 historical cell site data was used?

18 A    Other than mine?

19 Q    Yes.

20 A    No.

21 Q    So you have never heard of cell phone data being used

22 in any case other than the ones you testified or were

23 involved in?

24 A    Can I clarify?

25 Q    Yes, sure, go ahead.

1    A    You asked me if I knew anything about those other

2    cases.  I don't.  But the assumption is, yes, there are

3    other experts who have testified on other cases.

4    Q    Now are you aware that not only do some experts

5    disagree, but some federal judges have disagreed with the

6    use of cell site historical data in terms of pinpointing

7    where someone is?

8              MR. TIERNEY:  Objection, your Honor.

9              THE COURT:  Sustained.

10   BY MR. LATO:

11   Q    Have you read anything over the years, or other

12   opinions where the science of using historical cell site

13   data to locate somebody has been called into question?

14   A    I can't answer yes or no.

15   Q    So you can't answer yes or no whether there's a

16   disagreement in this field about the use of historical

17   cell site data to identify where someone is?

18   A    I can't unless I can clarify it.

19   Q    No.

20             My question is this.  Is there a disagreement

21   among experts about the accuracy and the use of this cell

22   site data to identify where someone is at any given moment

23   in time?  Just whether there is a disagreement, not your

24   opinion.

25   A    Again, I can't answer the question.

1  Q    If a person, say such as, such as myself, and my cell

2  phone is on.  Before I make a call my cell phone is

3  communicating with a tower, correct?

4  A    Yes.  Yes.  Well, I'm sorry, did you say before you

5  turn the phone on?

6  Q    No, the phone is on before I place the call.

7  A    Yes, that's correct.

8  Q    Now, when I actually dial a number and hit send, is

9  the first thing that happens, is that my phone or the

10  signal connects to a mobile switching center?

11  A    No.

12  Q    What is the first thing that happens?

13  A    It connects to the cell phone tower.

14  Q    And what is the next thing that happens?

15  A    The cell phone tower communicates with the cell

16  phone.

17  Q    Well, how does my phone know which tower to use at a

18  given moment in time since it doesn't think?

19  A    Again, I can't answer that unless I can clarify.

20  Q    Well, I asked how, so that you can.

21  A    So the phone does think.  And in the case of the

22  Verizon phone the receiver is actually looking for a

23  number of sites in the area.

24  Q    Well, is it fair to say that the phone will pick out

25  the clearest signal as opposed to actually thinking like

1098

1   you and I are doing right now?

2   A    No.

3   Q    The phone is not picking out the clearest signal, is

4   that what you're saying?

5   A    I'm not saying that.  Can I clarify?

6   Q    No.

7   A    Okay.

8   Q    If at a given moment in time a phone is being used to

9   make a call, is the phone going to pick the nearest tower

10  or the clearest tower?

11  A    Again, I can't answer yes or no to that question.

12  Q    So is it your testimony that when a call is made,

13  that this thinking phone will actually select a tower

14  where there is an inferior signal over one that has a

15  superior signal?

16  A    Yes.

17  Q    Now is that a smart phone or a stupid phone that

18  picks the inferior signal?

19          MR. TIERNEY:  Objection.

20          I'm sorry, your Honor.  Objection.

21          THE COURT:  Sustained.

22  BY MR. LATO:

23  Q    If the phone thinks, is there a reason why it would

24  pick an inferior signal?

25  A    Yes.

1   Q    Now does the range of a tower depend on its wattage,

2   the amount of power that tower has?

3   A    Yes, generally speaking.

4   Q    And does it also depend on the aim of its antennas?

5   A    Yes.

6   Q    And the angle of the antennas, correct?

7   A    Yes.

8   Q    And if some kids are up on the roof turning those

9   antennas, that will affect reception, right?

10  A    Yes.

11  Q    Does the time of day, some times of the day affect

12  cell phone reception?

13  A    No.

14  Q    Well say in Manhattan, seven, eight in the morning

15  when people are turning their cell phones on.  Is there a

16  lot of traffic going on?

17  A    Yes.

18  Q    Immediately when that phone is turned on?

19  A    Yes.

20  Q    So is it your testimony that whether ten thousand

21  people are near a cell tower or one hundred thousand, it

22  will have no affect on the clarity of the signal?

23  A    Again, it's not a yes or no answer.  I can't answer.

24  Q    Even though two persons are standing in the same

25  place to make a call and it hits different cell towers,

1    correct?

2    A    Yes.

3    Q    Now you remember preparing a map that includes

4    pictures of water?

5    A    Yes.

6    Q    And you also prepared a chart using water, correct?

7    A    Yes.

8    Q    Are there any cell towers in the Long Island Sound?

9    A    No.

10   Q    And if a person is on a ferry between Connecticut and

11   the North Fork of Long Island, will that person have

12   reception the entire way?

13   A    Again, can I clarify?

14   Q    No.

15   A    Okay.

16   Q    Yes or no, or you don't know?

17   A    I don't know.

18   Q    Do you know what the distance is say from Orient

19   Point to Bridgeport, Connecticut?

20   A    Approximately.

21   Q    Sure.

22   A    I would say 50 miles.

23   Q    Have you ever taken a ferry over the sound?

24   A    Never over the sound.

25   Q    Now does the water itself, the Long Island Sound,

1   affect cell phone reception?

2   A    Yes.

3   Q    And is that because radio frequencies are either

4   absorbed or deflected by the water, or reflected?

5   A    They're reflected by the water, yes.

6   Q    And is it fair to say that water is not the only

7   thing that can cause radio waves to reflect, correct?

8   A    Yes.

9   Q    Now when say NASA is communicating with a probe, is

10  that by radio waves?

11  A    Yes.

12  Q    Now is it a fair statement that those radio waives

13  can be affected by factors such as gravitation of large

14  objects, correct?

15  A    I couldn't answer that question.

16  Q    Well, is it fair to say that a radio waive is a form

17  of electromagnetic radiation?

18  A    Yes.

19  Q    And is it fair to say that just like visible light is

20  a form of electromagnetic radiation, correct?

21  A    Yes.

22  Q    And in fact in terms of frequency and wavelength, all

23  right, is it fair to say that there is an inverse

24  proportion between frequency and wavelength, right?

25  A    Yes.

1    Q    In other words, the greater the frequency the shorter

2    the wave length?

3    A    Yes.

4    Q    Now in terms of electromagnetic radiation, the

5    highest frequency and the shortest wavelength are gamma

6    rays, correct?

7    A    I would have to check.  I think.

8    Q    Do does that sound about right, gamma rays at the

9    top?

10    A    It could be, yes.

11    Q    Now in the middle, is visible light, correct, before

12    we get to radio waves?

13    A    Again, I need to talk to somebody.  I don't want to

14    talk about something I haven't worked with.  I can't

15    answer the question.

16    Q    Well radio waves are invisible to the naked eye

17    correct?

18    A    Yes.

19    Q    And is it fair to say that radio waves compared to

20    say visible light have a lower frequency but a higher

21    wavelength?

22    A    So -- could you repeat the question?  Again I can't

23    answer the question.

24    Q    Compared to visible light, such as red, orange,

25    yellow, invisible spectrum; radio waves have a lower

1    frequency but a higher wavelength?

2    A    I can't answer the question.

3    Q    Because you don't know the answer?

4    A    I don't.  Honestly.

5    Q    Now one of the reasons why radio waves can say travel

6    long distances or reflect off the water is because they

7    have long wavelengths, correct?

8    A    The wavelength, yes.

9    Q    And do you know how long the wavelength is of a radio

10   wave?

11   A    If you look at the frequency, yes.

12   Q    Say that again, sir?

13   A    As I mentioned before, it's dependent on the

14   frequency.  So, yes.

15   Q    Now do you k now the speed at which radio waves

16   travel?

17   A    Yes.

18   Q    Is it a fair to say that in a vacuum they travel at

19   the speed of light?

20   A    Yes.

21   Q    Like all forms of electromagnetic radiation, correct?

22   A    Yes.

23   Q    But in a medium, meaning in the water, they're

24   slower, correct?

25   A    A fraction I would say, yes.

1   Q    And if a radio wave is traveling through a concrete

2   block, it is no longer traveling at the speed of light,

3   it's slower, right?

4   A    Yes.

5   Q    Now is it fair to say that different frequencies of

6   radio waves have different propagation characteristics?

7   A    Yes.

8   Q    Is it a fair statement that the longer waves, those

9   of longer wavelength can detract around obstacles and

10  mountains, and follow the contour of the earth?

11  A    Some, yes.

12  Q    Now is it fair to say that sometimes the shorter

13  waves will reflect off the ionosphere?

14  A    Yes.

15  Q    And the really short waves have a tough time

16  basically doing what the longer waves do, correct?

17  A    Yes.

18  Q    Now a remote control on say a television, does that

19  use a radio wave, an RF?

20  A    It's usually infrared.

21  Q    And what about the pointer that you were using.  Is

22  that infrared?

23  A    It's, it should be laser, actually.

24  Q    Now does that laser have a shorter or longer

25  wavelength than say a radio wave?

1105

1  A    I would say -- I would be guessing, actually.  I

2  don't know.

3  Q    But that laser has a limited line of sight, correct?

4  A    It can travel far.

5  Q    But if there is an obstacle in its way, it will not

6  penetrate that obstacle, correct?

7  A    That's correct, yes.

8  Q    Whereas a radio wave of long wavelength can bend

9  around it, correct?

10 A    Again, I can't answer that question.

11 Q    Now in Long Island, did you help design some of the

12 towers?

13 A    Yes.

14 Q    Did you design every tower?

15 A    No.

16 Q    Do you know what the range is of every tower in

17 Suffolk County?

18 A    No.

19 Q    Do you know what the maximum range is of say the

20 towers when they're 20 miles of the Riverhead jail?

21 A    No, I don't.

22 Q    Now are you familiar with the acronym SINR, S-I-N-R?

23 A    Yes.

24 Q    And is it a fair statement that SINR, the acronym,

25 refers to the strength of signal divided by interference

1    and noise?

2    A    I can't answer the question unless I can clarify.

3    Q    No thanks.

4    A    Okay.

5    Q    Now in terms of signal clarity, is one of the

6    concerns with getting a clear signal, interference?

7    A    Yes.

8    Q    Is also one of the concerns noise?

9    A    Yes.

10   Q    Now do you know what noise is?

11   A    Yes.

12   Q    And is it a fair statement that noise is, let me put

13   it this way, a random fluctuation in an electrical signal?

14   A    Yes.

15   Q    Now interference or electromagnetic interference, do

16   you know what that is?

17   A    Yes.

18   Q    Now in the radio frequency spectrum, is it a

19   disturbance generated by an external source that affects

20   an electrical circuit?

21   A    Yes.

22   Q    Now is it a fair statement that even if there is a

23   strong signal from a tower, the signal can be degraded if

24   there is a lot of noise and interference?

25   A    Yes.

1  Q    And in fact, interference can be so strong that it

2  can cause a circuit to stop functioning?

3  A    Yes.

4  Q    Now in a data path as opposed to a call path, can

5  interference range from increasing the error rate to a

6  total loss of data?

7  A    Yes.

8  Q    Now is it a fair statement that some of the following

9  things can cause interference.  I'm going to go through

10  them one at a time.

11          Can one cell phone interfere with another cell

12  phone?

13  A    It's not a black and white answer.  I can't answer.

14  Q    Can a radio interfere with a cell phone?

15  A    Yes.

16  Q    And in fact on an airplane, is it a fair statement

17  that people with cell phones have to put their phones on

18  airplane mode?

19  A    Yes.

20  Q    And is there a reason for that?

21  A    Potential for interference.

22  Q    And this is what I would like you to explain.  Please

23  tell the jury what interference can occur if people do not

24  put their phones off on the airplane?

25  A    So it's really an abundance of caution.  So the

1  interference could interfere with the, with the plane's

2  communication.

3  Q    The navigation system of the plain?

4  A    Yes.  So there is a concern about that.

5  Q    Now can for instance an automobile ignition system

6  interfere with a cell phone?

7  A    No.

8  Q    What about thunderstorms?

9  A    No.

10  Q    What about the sun itself, either the intensity or

11  the gravitational effect of the sun?

12  A    Yes.

13  Q    And is it a fair statement that electromagnetism is

14  only one of the four fundamental forces, correct, gravity

15  being one of the others?

16  A    I can't answer that question.

17  Q    So answer me the next two questions.  Are you aware

18  of the two fundamental forces are the strong nuclear force

19  and a weak force?

20  A    Yes, I don't know.

21  Q    And so do you know one way or another whether the

22  strong force or the weak force can interfere with a cell

23  phone reception?

24        MR. TIERNEY:  I'm just going to object.

25        THE COURT:  Sustained.

1109

1  BY MR. LATO:

2  Q    Now you mentioned that you design cell towers,

3  correct?

4  A    Yes.

5  Q    Do you also did design computer networks?

6  A    For my other work, yes.

7  Q    When you say your other work, what other work?

8  A    I work for Einstein.

9  Q    Well with respect to cell phone routing and so forth,

10  do you design the standard equipment that is near a cell

11  tower, or at a cell tower?

12  A    No.

13  Q    So is it a fair statement your expertise is designing

14  a tower as opposed to the computer, the hardware at the

15  base of the cell tower?

16  A    No.

17  Q    You design the software do you?

18  A    No.

19  Q    Now the data that you review to make your maps, is it

20  a fair statement that that data is stored in a computer as

21  opposed to on a tower's antenna?

22  A    Yes.

23  Q    Now the main carriers, at least in Long Island are,

24  correct me if I'm wrong, AT&T, Verizon, Sprint, and

25  T-mobile?

1   A    Yes.

2   Q    They went out?

3   A    Not any more.

4   Q    Is that Nextel?

5   A    No, MetroPCS merged.

6   Q    So the carriers own towers?

7   A    Yes.

8   Q    For instance Verizon owns towers, correct?

9   A    Yes.

10  Q    AT and T owns towers, correct?

11  A    Yes.

12  Q    And are towers sometimes owned by entities other than

13  the carriers?

14  A    Yes.

15  Q    Now is it a fair statement that the carriers will

16  still use those towers even though they don't own them?

17  A    Yes.

18  Q    And is it a fair statement that the owner of those

19  towers charges, say Verizon, AT&T for the use of their

20  towers?

21  A    Yes.

22  Q    In other words, the carriers rent space on the towers

23  for want of a better term, right?

24  A    Yes.

25  Q    Now when a company like Verizon is renting space, the

1   carrier has to determine whether they want to pay the

2   amount that the owner of the tower is charging, correct?

3   A   Yes.

4   Q   Now that is sometimes referred to as a tariff?

5   A   I have never heard it, but it could be.

6   Q   Now is it a fair statement that if I, for instance

7   have a Verizon phone and I make a call to other than a

8   Verizon tower, and Verizon doesn't want to pay for that

9   tower at the moment, my phone will pick a different tower?

10  A   Could you repeat the question?

11  Q   I'll try.

12          Is it a fair statement that if I place a call

13  and the nearest tower for distance is one that Verizon

14  doesn't want to rent space from because it's too much, my

15  phone will pick up a more distant tower?

16  A   It's not a yes or no.

17  Q   Now when a person makes a call and is traveling, is

18  it a fair statement that to prevent loss, or to try to

19  prevent a call from being dropped, the towers will hand

20  off one to the other?

21  A   Yes.

22  Q   And in fact is that the term that is used in the

23  industry, a handoff, just like football?

24  A   Yes.

25  Q   Now during a phone call if a person doesn't move can

1    there also be a handoff?

2    A    Yes.

3    Q    For instance if I am in a parking lot with

4    Mr. Wexler, and he made a phone call, we have already

5    established we could connect to different towers even

6    though we're standing next to each other, right?

7    A    Yes.

8    Q    And during that phone, call even though neither of us

9    is moving, there could be handoffs to other towers?

10   A    Yes.

11   Q    Now when a person is traveling, say on the Long

12   Island Rail Road, will there be a handoff depending upon

13   the distance from one tower to another?

14   A    You could assume, yes.

15   Q    Now could it be that if a person is traveling, say

16   east to west toward New York, toward New York City, that

17   the person might move, say one mile and immediately go to

18   a tower ten miles away?

19   A    I would say, no.

20   Q    Now do you recall testifying that it was possible

21   that the phone in this case that you looked at was being

22   used on a golf course, correct?

23   A    Yes.

24              (Continued on the following page.)

25

1113

1  CROSS-EXAMINATION (Continued)

2  BY MR. LATO:

3  Q.   And is it a fair statement that anything consistent

4  with the laws of physics is possible?

5  A.   Yes.

6  Q.   So do I understand from your testimony it is possible

7  that he wasn't on a golf course?

8  A.   Yes, you could assume that.

9  Q.   So in other words, your testimony does not put that

10 phone actually on the golf course; just it could be on the

11 golf course.  Correct?

12 A.   Correct.  Yes.

13 Q.   Now, are you familiar with how close the Gull Haven

14 Golf Course is to this courthouse?

15 A.   Approximate.

16 Q.   Go ahead.

17 A.   Probably about 10 miles?

18 Q.   Really.

19 A.   Actually, you know, I don't want to guess.

20 Q.   Well, we have a map.  We don't have to.

21          81B.

22 A.   Yes.  Less than that.

23 Q.   And in fact on this map we can actually see where the

24 courthouse is because it says so.

25 A.   Yes.

1    Q.    Do you see it?

2    A.    Yes.  So the tower is all the way south, basically,

3    so it is probably closer to a mile.

4    Q.    Now, do you know where the state courthouse is in

5    relation to this courthouse and Gull Haven?

6    A.    No, I don't know where the state courthouse is.

7    Q.    Actually, just north of this courthouse do you see a

8    road that says Courthouse Drive?

9          Look at the document in front of you, and see if

10   you can see Courthouse Drive.

11   A.    What --

12   Q.    81B.

13   A.    Can you tell me what the page is, actually?

14         Here it is.  Yes.

15         I see -- oh.  Courthouse Drive.  Yes.  I see it.

16   Yes.

17   Q.    And that Courthouse Drive is north of this

18   courthouse, or between us and Gull Haven.  Correct?

19   A.    Yes.

20   Q.    Do you know if that courthouse-drive is in fact where

21   the state courthouse is?

22   A.    I mean, you are saying that.  I don't know that.

23   Q.    Okay.  Fair enough.  You don't know.

24         Now, do you remember testifying that the cell

25   phone you looked at in this case was used to make calls in

1115

1   Brooklyn?

2   A.   Yes.

3   Q.   As you sit here, do you have any idea who it was who

4   made the calls?

5   A.   No.

6   Q.   Do you know for what purpose those calls were made?

7   A.   No.

8   Q.   Do you know whether there are any golf courses in

9   Brooklyn?

10  A.   No.

11  Q.   You do know, however, whether there are courts in

12  Brooklyn.  Correct?

13  A.   Yes.

14  Q.   Now, do you know whether there are any funeral homes

15  in Brooklyn?

16  A.   I assume, yes.

17  Q.   Do you know whether, for instance, there are family

18  members of Suffolk County correction officers who live in

19  Brooklyn?

20        One way or the other, do you know?

21  A.   I don't know.

22  Q.   Now, do you recall testifying earlier that it was

23  possible that the cell phone in this case was used inside

24  the diner?

25  A.   Yes.

1116

1  Q.   Is it also possible that it was used outside the

2  diner?

3  A.   Yes.

4  Q.   Is it also possible that it was used inside a car

5  driving past the diner?

6  A.   Yes.

7  Q.   Is it also possible it was used a mile away from the

8  diner?

9  A.   Yes.

10  Q.   In other words a lot of things are possible with

11  respect to the use of a cell phone.  Correct?

12  A.   Yes.

13          MR. LATO:  One moment please.

14          Nothing further.

15

16  REDIRECT EXAMINATION

17  BY MR. TIERNEY:

18  Q.   During cross-examination you were asked whether or

19  not a cell phone connects with a cell tower every seven

20  seconds.

21  A.   Yes.

22  Q.   And you indicated that it wasn't the case.  Why is

23  that?

24  A.   So the phone does communicate to the tower

25  periodically, but if it was every seven seconds it would

1  drain the battery power.  So there is a parameter in the

2  software that we set so as to, in essence, maximize the

3  battery power.

4  Q.   Now, do you remember you were asked questions on

5  cross-examination with regard to Mr. Wexler and Mr. Lato

6  being in the parking lot and each of their phones hitting

7  off a different cell tower?

8  A.   Yes.

9  Q.   Are you familiar with something known as the neighbor

10 list?

11 A.   Yes.

12 Q.   What is the neighbor list?

13 A.   So in most technologies we create what's called a

14 handover list.  Neighbor list.  And so we specify for a

15 specific area, we can go to a map, which towers in that

16 area the phone should look at.

17       So it looks for signal strength, signal power.

18 That phone also looks at the neighbor list and the sites

19 that are in that neighbor list.  And that's how it selects

20 the site to serve on.

21       There's other things as well.

22 Q.   Now with regard to the neighbor list, the cells on

23 the neighbor list, where are they in proximity to one

24 another?

25 A.   So generally speaking, when we design a site, we

1  form, depending upon the area, a one mile radius, two-mile

2  radius, and include the sites around that cell phone tower

3  that are within that.

4        Once we turn the site on air, the software and

5  the statistics really tell us this one is not a good

6  neighbor, this one is not a good neighbor, and so we take

7  off some of the neighbors from the handover list so that

8  your phone wouldn't consider that cell phone tower to hand

9  over to.

10  Q.   And so with regard to the neighbor list, there is not

11  a cell site in Islip and a cell site in Queens on the same

12  neighbor list.  Is that correct?

13  A.   No.  No.

14  Q.   And you were asked questions on cross-examination

15  with regard to electrical fluctuations and electrical

16  power.

17  A.   Yes.

18  Q.   What is a feature with regard to the electrical power

19  and cell towers?

20  A.   As far as electrical power to the cell phone sites,

21  usually they are either up or down.  In other words, you

22  lose power and it is not working.  If it is up, it is

23  working.

24        The trend in the industry, and Verizon's one of

25  the leading contributors, or they have been at this point,

1  is to have backup generators so that if the power does go

2  down you have a backup generator that kicks in with power

3  to keep that site up and running.

4         The FCC mandated some of this after the

5  hurricanes down in Florida.

6  Q.   And you also discussed, as a cell site designer and

7  optimization engineer, you want to down-tilt the antennas

8  on a cell tower.

9         Why is that?

10  A.   Generally, to contain the coverage.

11         Again, as I mentioned before, when we design, we

12  only want to cover a certain area so by down-tilting it we

13  contain it to that area.  By containing it in that area,

14  it prevents busy calls.  So if a site covers too large of

15  an area, it starts blocking because it is covering too

16  far.

17         The second reason ss to prevent noise on the

18  neighboring sites, especially if they not on that neighbor

19  list that I mentioned.

20  Q.   So you want to keep the antennas.  You don't want

21  them going off in the distance, you want to keep them

22  confined to a certain area.  Correct?

23  A.   As much as possible.  If you notice some of that, if

24  you look at this one, you have got two -- it is not up

25  there, there are two towers.  Generally speaking, our

1　coverage area we would want to be somewhere in between, so

2　we would down-tilt to generally try to limit the coverage

3　to half the distance.  Generally speaking.

4　Q.　And along those lines.  When you talked about, out in

5　Montauk and Amagansett?

6　A.　Amagansett.  Yes.

7　Q.　And if there was, theoretically speaking, ten miles

8　between two cell towers, how would you optimize those two

9　sites?

10　A.　So again, you want to minimize the overlap, but

11　because you only have two towers, your optimal signal, you

12　try to have around that half-point distance, generally

13　speaking.

14　　　You do want a little bit of overlap, so there is

15　a little bit of an overlap.  But you certainly don't want

16　it to reach that other area because, again, even though

17　there is not as -- the populations aren't as big,

18　especially at the Montauk site.

19　　　In the summer, when I worked for Sprint picked

20　up a lot of summer coverage and so it starts shrinking, as

21　I had mentioned before, the coverage.

22　Q.　And you were asked questions on cross-examination

23　with regard to carriers, the same carriers using the same

24　towers and a multitude of antennas on the cell towers.

25　A.　Yes.

1  Q.  How does that affect cell coverage?

2  A.  So two things.  I mean, there are some cases where

3  there is interference, that was mentioned, between the

4  antennas, so the antennas have to be separated.

5       The bigger challenge now is, everybody's

6  familiar with 4G or LTE.  Those are two separate networks.

7       So I think I mentioned before, your phone call

8  is on the Legacy for Verizon's CDMA system.  This was, and

9  I'm talking about the time frames that we are interested

10  in.  And then your data usage would be on the LTE network.

11       Those are two separate antennas.  They operate

12  on two separate frequencies, so in the future it will be

13  one network but we are not there yet, so your phone calls

14  are on another network.

15       Verizon started, they call it voice-over-LTE,

16  recently.  So it is starting to change right about now.

17  Q.  And you were asked a question with regard to the

18  antenna being on the World Trade Center.

19       The antennas on the World Trade Center, does

20  that have anything to do with cell calls?

21  A.  No.  Those are broadcast, I believe it is referred

22  to.  So they were radio and television, because radio and

23  television you really only receive so you can try to

24  maximize the coverage for radio and television -- well,

25  the old television.  Now it is all cable but.

1 Q. Now, you were also asked questions on

2 cross-examination with regard to the number of cell towers

3 and how it is increasing.

4 A. Yes.

5 Q. Is that the case?

6 A. So as you can appreciate, and especially we referred

7 to areas like Manhattan, even out here on the Island, I

8 just want to specify that it is a combination of towers

9 and other technologies.

10        For the future we will have what are called

11 small cells. These are mounted on lamp posts, light

12 posts, telephone polls. We also have what are known as

13 outdoor distributed antenna system. Those aren't cell

14 phone towers. They are designed to cover specific areas.

15        For instance, Verizon has one. I think that is

16 on 25A, 106-107. That is another one of those high-end

17 areas real estate-wise. We couldn't build a lot of

18 towers, none of the carriers could. So you don't build a

19 tower, you build a series of antenna system.

20        So there are other technologies where in the

21 future you are not necessarily just building cell phone

22 towers.

23 Q. And you were asked questions with regard to the

24 science of using historical cell site data to pinpoint

25 someone's location.

1          Can you do that?

2    A.    No.

3    Q.    What can you use historical cell site information

4    for?

5    A.    We can use it to generally, number one, we do know

6    the towers that we are serving, especially particularly as

7    I mentioned with the call detail records.  So we

8    absolutely know the cell phone tower that served the phone

9    and we know that it is in that general vicinity.

10         And because of your design, you can generally

11   tell how far away it might be serving.  That and the fact

12   that, we mentioned, neighbor lists before.

13   Q.    You were also asked questions with regard to a cell

14   phone and whether it would pick an inferior cell tower

15   signal?

16   A.    Yes.

17   Q.    And you said there are instances where it would?

18   A.    Yes.  It is not a black-and-white answer.  So when we

19   say inferior, in CDMA, which is the technology Verizon

20   uses, the signal-to-noise ratio is called the EC/IO.

21         CDMA technology has what is called a pilot.

22   That signal is pretty much, you know, waiving to everyone

23   in the area:  Hey, this is a cell phone circuit out there.

24   So we look at the pilot power.  And then there is users in

25   the area, which increase the noise a little bit.

1     But CDMA is much more resilient to noise in

2   general.  So you could have a site that is further away,

3   less power, with good signal strength.  You could have a

4   site that is closer with lower signal quality.

5     But the phone, as I mentioned before, is looking

6   at all the neighbors on the neighbor list, and if there is

7   a problem with capacity, there is too much traffic on that

8   other site, it might select another site.  That would be

9   considered more inferior but it is got to be good enough

10  to serve that phone.

11  Q.   You were also asked questions with regard to, I

12  believe it was referred to as SINR.

13     Is that a term used in the cell phone industry?

14  A.   Yes.  So just to clarify.

15     So SNR is generally used in the radio industry,

16  signal-to-noise ratio.  SINR is associated with different

17  technologies like WIMAX.  They don't necessarily mean the

18  same thing.

19     And I just explained to you that for CDMA, the

20  equivalent of SNR is what I called EC/IO.  So they are

21  similar but they are different, and it is really dependent

22  on the technology.

23  Q.   You were asked questions with regard to one of the

24  golf courses and possibilities.

25  A.   Yes.

1125

1  Q.  Just looking at Exhibit 82B.  If a cell phone fires

2  off of cell site 245, is it possible that phone call was

3  made out in Riverhead?

4  A.  I would say no.

5  Q.  Why is that?

6  A.  So 245 is right here.

7      There's too many sites over here.

8      I would limit the handover of the neighbor list

9  to sites that were right around here.  I would never put a

10  site over here.  The quality wouldn't be good.  It would

11  affect performance.

12     Sp again, the neighbor list limits the general

13  area of towers that you can hand over to or also select.

14  Call selection, selection is when the phone has not placed

15  a call.  It is similar to handovers.  The same things is

16  happening.  You are looking at the neighbor list to see

17  which site you can select.  So selection and handover,

18  both processes are used in neighbor lists.

19  Q.  And you were also asked on cross-examination about a

20  lot of factors that could theoretically affect cell phone

21  signals.

22  A.  Yes.

23  Q.  And what if anything do those theoretical

24  considerations or factors, how does that affect your job

25  as an optimization engineer and cell site designer?

1    A.    So the biggest concern we have in terms of

2    optimization and signal quality is not what we call the

3    thermal noise or cellular electrical noise.  It is noise

4    from other users in the area that elevates a little bit

5    for CDMA.

6              The issue about atmospheric conditions, rain

7    will effect propagation but it will only affect it for

8    certain frequencies.

9              So to give you an example.  We do microwave.

10   That is a way of communicating from an area, from the

11   tower, basically, to another area.  Maybe even a switch.

12             Because of the frequencies that we use for

13   microwave, 2.4 gigahertz or 5.8 gigahertz, we have to

14   design it for a higher power.

15             But microwave has to be line-of-site.  The

16   impact for a CDMA network is more pronounced for rain only

17   for the 1900 frequencies.  Really there is no affect in

18   the 800 frequencies.  And since Verizon uses a number of

19   frequencies, that is why I can't answer it black and

20   white.  It really depends upon the frequencies that you

21   are using.

22             MR. TIERNEY:  Thank you.  I have no further

23   questions.

24             MR. LATO:  Nothing.

25             Thank you, your Honor.

1    THE COURT:  You may step down.

2    (The witness was excused.)

3    THE COURT:  We are going to recess now until

4    tomorrow, which is Thursday, March 24, at 9:30.  I know

5    that everybody will be here at 9:30.

6    In the meantime I continue to urge that you not

7    to discuss this case either among yourselves or with

8    anyone else.  Maybe you are saying I don't want to discuss

9    this case.  But keep an open mind.  Come to no

10    conclusions.

11    Don't ask any aid from anybody.  Don't look up

12    the internet.  Don't look up the dictionary.  Do they

13    still use dictionaries?  Do they still use encyclopedias?

14    Maybe not.  In my day we did use them, and I still use

15    them.

16    Keep an open mind.  Come to no conclusions.

17    Forget about the case.

18    Don't read Newsday, a very fine newspaper but

19    they are going to have an article about this case

20    probably.  You don't need anyone to tell you what you are

21    hearing and seeing.

22    So keep an open mind.  Don't look for any

23    outside influences.

24    We will see you tomorrow morning at 9:30.  Have

25    a nice evening.

1    (The following ensued in the absence of the

2    jury.)

3    THE COURT:  How many more witnesses for the

4    government?

5    MS. MIRABILE:  Two more witnesses and a

6    stipulation.

7    THE COURT:  Okay.

8    (There was a pause in the proceedings.)

9    THE COURT:  Counsel, my courtroom deputy tells

10   me that the jurors are all asking questions how long is

11   this going to be?  How many more witnesses?  How long is

12   the case going to be?  They are all making noises.

13   I am not going to tell them anything until the

14   government rests.  Then we will see what we will tell them

15   at that point.  I don't ask the defense what they are

16   going to do ahead of time.  So we will see.

17   But know that the jurors are raising questions

18   now about the duration of the case.

19   By the way, they were told by the Magistrate

20   Judge in jury selection three weeks.  That is not what we

21   asked her to say but she said three weeks.  And they think

22   thy are in their second week now.  So a word to the wise.

23   Have a good night.

24   (Proceedings adjourned at 4:30 pm.)

25

1    **I N D E X**

2    **JOHN ROCHE**                                    911
     CROSS-EXAMINATION                                 912
3    BY MR. LATO

4    **MICHAEL NEWMAN**
     DIRECT EXAMINATION                                915
5    BY MS. MIRABILE
     CROSS-EXAMINATION                                 923
6    BY MR. WEXLER
     REDIRECT EXAMINATION                              927
7    BY MS. MIRABILE

8    **EVERETT OLIVER**                                928
     DIRECT EXAMINATION                                929
9    BY MS. MIRABILE
     CROSS-EXAMINATION                                 936
10   BY MR. WEXLER
     REDIRECT EXAMINATION                              940
11   BY MS. MIRABILE
     RECROSS-EXAMINATION                               941
12   BY MR. WEXLER
     REDIRECT EXAMINATION                              942
13   BY MS. MIRABILE

14   **MICHELLE MAHLER**
     DIRECT EXAMINATION                                943
15   BY MR. TIERNEY
     CROSS-EXAMINATION                                 950
16   BY MR. WEXLER
     REDIRECT EXAMINATION                              955
17   BY MR. TIERNEY

18   **FRANK PROFETA**
     DIRECT EXAMINATION                                956
19   BY MR. TIERNEY
     CROSS-EXAMINATION                                 963
20   BY MR. WEXLER
     REDIRECT EXAMINATION                              964
21   BY MR. TIERNEY

22

23

24

25

**ROBERT KANAS**
DIRECT EXAMINATION                          965
BY MR. TIERNEY
CROSS-EXAMINATION                           974
BY MR. WEXLER
REDIRECT EXAMINATION                        990
BY MR. TIERNEY
RECROSS-EXAMINATION                         993
BY MR. WEXLER

**EDUARDO ORELLANO**
DIRECT EXAMINATION                          995
BY MR. TIERNEY
EDUARDO ORELLANO                            1029
CROSS-EXAMINATION                           1065
BY MR. LATO
REDIRECT EXAMINATION                        1116
BY MR. TIERNEY

## E X H I B I T S

Government Exhibits 1081, 1091, 1118, and      961
1119 in evidence
Government Exhibit 77, 78, 79, 80, 81 A, 82    1015
A, 83, 84, 90, 91, 92, 93, 94, 82 B, 95 A and
95 B in evidence.
Government Exhibit 81B in evidence             1041