UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                                                                                     15-CR-91 (ADS)

EDWARD M. WALSH JR.,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


# EDWARD M. WALSH JR.'S NEW-TRIAL MOTION BASED ON THE GOVERNMENT'S SUPPRESSION OF EXCULPATORY EVIDENCE

Leonard Lato, Esq.
200 Motor Parkway, Suite C-17
Hauppauge, NY 11788
Telephone:  (631) 655-5008
Fax:  (631) 300-4380
Email:  leonardlato@yahoo.com

William D. Wexler, Esq.
816 Deer Park Avenue
North Babylon, NY 11703
Telephone:  (631) 422-2900
Fax:  (631) 422-0987
Email:  wexlaw@optonline.net

## TABLE OF CONTENTS

| | |
|---|---:|
| Preliminary Statement | 1 |
| Relevant History | 1 |
|     Walsh's *Brady* and *Giglio* Demands | 2 |
|     Vincent DeMarco — The Government's Principal Trial Witness | 5 |
|     The Government's Belated *Brady* and *Giglio* Disclosures | 6 |
| Argument | 14 |
| Conclusion | 16 |

## PRELIMINARY STATEMENT

Some 54 years ago, the Supreme Court held, "[T]he suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Thirteen years later, the Supreme Court expanded the prosecution's *Brady* obligation to include "evidence . . . so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce . . . even if no request is made." *United States v. Augurs*, 427 U.S. 97, 107 (1976). "[E]vidence favorable to an accused" includes material that an accused could use to undermine the credibility of a prosecution witness. *Giglio v. United States*, 405 U.S. 150, 154-55 (1972). Thus, "Impeachment evidence, . . . as well as exculpatory evidence, falls within the *Brady* rule." *United States v. Bagley*, 473 U.S. 667, 676 (1985).

The government violated its *Brady* obligation by concealing evidence showing that Edward M. Walsh Jr. had worked more hours than the government claimed that he had worked and by suppressing evidence that Walsh could have used to impeach the government's principal trial witness, Vincent DeMarco.

## RELEVANT HISTORY

On March 31, 2016, a jury convicted Walsh of unlawfully receiving wages for hours that he did not work, in violation of 18 U.S.C. §§ 661(a)(1)(A) and 1343.

(*See* ECF No. 86; PSR ¶¶ 1-2.)  On June 20, 2017, the Court sentenced Walsh principally to 24 months' imprisonment and ordered Walsh to surrender for service of sentence on August 22, 2017.  (*See* ECF No. 126.)  Walsh has filed a notice of appeal.  (*See* ECF No. 130.)

**Walsh's *Brady* and *Giglio* Demands**

In a pretrial letter to the government, Walsh wrote, "Pursuant to *Brady v. Maryland* and its progeny, and Rule 16 of the Federal Rules of Criminal Procedure, I request that the Government promptly complete its constitutional and statutory duties to disclose."  (ECF No. 65.)  Although not required to do so, Walsh provided specifics:

> [T]he defense has interviewed several present and former [sheriff's office] employees.  Each one has informed the defense, in substance, that Walsh went to work and did his job, and that they so told the FBI.  The government has failed to disclose to the defense the names of those persons and the substance of their statements.  The defense can only guess if there are yet other such persons whom the FBI or government attorneys have interviewed. . . . [P]lease provide me with the names of *all* persons who have provided exculpatory information to the FBI or to the government attorneys.  Please also provide the substance of what they said.

(*Id.* at 1.)

At the status conference that took place the day after Walsh served his pretrial *Brady* letter, the Court ordered the government to fulfill its *Brady* obligations.  After the conference, Walsh served on the government another *Brady*

2

letter, which stated:

> Consistent with the ruling that Judge Spatt gave at today's conference, please promptly fulfill the government's constitutional duty to disclose.
>
> As . . . stated at the conference and in my March 13 letter, the defense has interviewed several present and former [sheriff's office] employees who have informed the defense, in substance, that Walsh went to work and did his job, and that they so told the FBI. *It is irrelevant whether the FBI agent or agents who conducted the interviews took notes or prepared FBI 302 reports of the interviews. Unlike the government's 3500 duty to disclose, the Brady duty to disclose does not depend on whether discoverable information exists in written form.*

(ECF No. 67, at 1) (emphasis added). *See United States* v. *Rodriguez,* 496 F.3d 221, 226 (2d Cir. 2007) ("The obligation to disclose information covered by the *Brady* and *Giglio* rules exists without regard to whether that information has been recorded in tangible form.")

The government did not comply with Walsh's *Brady* and *Giglio* demands, and one of Walsh's defense attorneys so complained during the trial:

> In a letter dated March 13 I asked the government to comply with both its statutory, or Rule 16, obligations to disclose and also its constitutional or *Brady* obligations to disclose.
>
> On March 14 we were in court and I informed the court that several defense witnesses have informed . . . the defense . . . that they were interviewed by the FBI some weeks ago, that they told the FBI in fact that Ed Walsh did go to work and did do his job, and that but for

3

> luck and having found these people we never would have known that.
>
> Given it is the government's theory that Mr. Walsh played golf and went gambling and rarely went to work, it is . . . *Brady* material when witnesses come forward and say he did go to work and [that] we so told the FBI.
>
> . . . .
>
> And I explained that, unlike 3500 material, *Brady* material does not have to be written. So it is not matter whether the government lawyers or whether . . . case agent Ken [H]osey took notes [or] reduced anything to writing.

(Trial Tr. 615-16.)

The government responded:

> We have interviewed people and they have said that at times they saw him working but they were — that he has done his job at times and that at other times they were unaware of what he was doing. And most people were unaware of what he was doing at all times in the day, which you would expect.
>
> . . . .
>
> I don't think that constitutes *Brady*, your Honor, because we are not saying that he never went to work. That is not the government's theory of the case.

(Trial Tr. 617.)

The government's "theory" was a revision of the theory that it had advanced in its opposition to Walsh's pretrial motions: "The defendant was, arguably, as close to a ghost or 'no-show' employee as one can get." (ECF No. 39, at 15.)

4

Walsh's *Brady* demand was not limited to the specific holding in *Brady*. Walsh requested information discoverable under "*Brady* . . . and its progeny." (ECF No. 65, at 1.)  In light of the trial testimony of DeMarco and FBI Special Agent Kenneth Hosey, the "progeny" request was significant.  At trial, the government offered no evidence to corroborate DeMarco's description of Walsh's duties and responsibilities, either as "aide to the sheriff" or as "liaison to outside agencies."  Unlike every other position in the sheriff's department, there was no written description of the aide's or the liaison's duties and responsibilities.  (*See* Trial Tr. 575-76, 581-82.)  As for Hosey, he had spoken with DeMarco some 40 to 50 times, but never took one note or filed one report memorializing the substance of any of those conversations.  (*See* Trial Tr. 1309-11.)  Thus, the defense could only speculate whether DeMarco's account changed with the passage of time.

**Vincent DeMarco — The Government's Principal Trial Witness**

DeMarco was *the* pivotal government witness, his direct testimony spanning 77 pages.  (*See* Trial Tr. 484-561.)  He testified that voters elected him Suffolk County Sheriff in 2005, that he immediately "designated Ed Walsh as a sheriff's aid[e]" and that, "about a month" after taking office, he elevated Walsh to the position of "liaison to outside agencies."   (Trial Tr. 496, 502-03, 508-10.) DeMarco denied, however, that he supervised Walsh, testifying instead that Walsh reported to "Warden [Charles] Ewald and Undersheriff [John] Meyerricks." (Trial

5

Tr. 515.) But even though the government interviewed Ewald and Meyerricks (Trial Tr. 1312, 1315-17), neither individual was a government witness at trial. That left DeMarco as the only witness who testified about Walsh's duties and responsibilities. (*See* Trial Tr. 510-19, 540, 557-61.)

Because the government refused to make disclosures with respect to Ewald and Meyerricks, the defense could only speculate whether they were interviewed and, if so, what they said in those interviews.

**The Government's Belated *Brady* and *Giglio* Disclosures**

After the trial and prior to the June 1, 2017, *Fatico* hearing, the government finally disclosed information that it had received from Ewald (but not from Meyerricks). According to Hosey,[1] on the following dates, Ewald informed the government of the following:

- November 13, 2014, some 16 months before trial — "Walsh generally reported directly to the Sheriff or Undersheriff Meyerricks rather than Ewald. . . . Walsh and Ewald did not have a lot of interaction." (Ex. 1-1, 1-3.)

- February 25, 2015 — some 13 months before trial — "Walsh was not in Ewald's chain of command." (Ex. 1-11.)

The government violated its *Giglio* obligation. Ewald told the government that he had little interaction with Walsh. Ewald also told the government that Walsh reported directly to DeMarco or to Meyerricks. This contradicted

---

[1] Hosey took notes of his interviews with Ewald and, based on those notes, prepared reports of the interviews. (*See* Ex. 1-1 to 1-12.)

6

DeMarco's trial testimony: DeMarco denied that he had supervised Walsh and, erecting a barrier to insulate himself, testified that he knew nothing of Walsh's coming and goings and that Walsh reported to Ewald and to Meyerricks.

DeMarco's denial was critical to his credibility and to the government's case. If DeMarco admitted that he, and only he, supervised Walsh and that he saw, spoke with and otherwise interacted with Walsh in Riverhead on a daily basis, the jury would have concluded that DeMarco had approved of, or at least had acquiesced in, Walsh's schedule.

That DeMarco may have lied in his 40-50 pretrial, "unmemorialized" contacts with the government and that he was engaging in an ignorance charade at trial should not have surprised the government's two trial prosecutors. Each participated in the first Ewald interview, and one participated in a portion of the second Ewald interview. (*See* Ex. 1-1, 1-11.)

After receiving the government's belated *Giglio* disclosure, and one day before the *Fatico* hearing, Walsh attorney William Wexler "had a telephone conversation with . . . Ewald," who by then had retired from the sheriff's office. (Ex. 2-1.) DeMarco was still the sheriff, but he, too, was on the way out: 23 days before Wexler spoke with Ewald, DeMarco announced that he would not seek re-election. *See* David M. Schwartz, *Vincent DeMarco Won't Seek a 4th Term as Suffolk Sheriff*, Newsday Online (updated May 8, 2017, 9:14 p.m.).

7

According to Mr. Wexler:

> 3. During my conversation with Ewald, he advised me that . . . DeMarco . . . was aware of Mr. Walsh's work schedule and that the sheriff was generally aware of when Mr. Walsh arrived and left the Suffolk County Correctional Facility.
>
> 4. Ewald also told me that Mr. Walsh answered directly to Sheriff DeMarco and that Mr. Walsh did not report either to Ewald or to any of the deputy wardens. Ewald further stated that he "could make no decisions" regarding the work performed by Mr. Walsh, as Mr. Walsh answered directly to the sheriff.
>
> 5. Ewald added that he often signed Mr. Walsh's timesheets and would not have signed them if he thought they were inaccurate.
>
> 6. Ewald continued that although he no longer personally feared retribution from DeMarco, Ewald had a son who was in the process of becoming employed by the Suffolk County Sheriff's Office and worried that if he became involved in this case, something could happen to his son's chances of employment.
>
> 7. Several times during our conversation, Ewald told me that DeMarco was "evil" and was capable of taking action against Ewald's son.

(Ex. 2-1 to 2-2, ¶¶ 3-7.)

Ewald's assertion that DeMarco was aware of Walsh's work schedule contradicted DeMarco's testimony that DeMarco first became aware of "a Walsh work-hours" issue "[o]n February 27, 2014," some nine years after DeMarco had become sheriff. (*See* Trial Tr. 544, 546.) Ewald's contention that Walsh answered

8

and reported directly to DeMarco contradicted DeMarco's testimony that Walsh reported to Ewald and to Meyerricks. Ewald's acknowledgment that he often signed Walsh's time sheets and that he believed the time sheets to be accurate contradicted the government's theory that Walsh covertly inflated the number of hours that he had worked. Ewald's characterization of DeMarco as "evil" and someone who posed a potential threat to the employment future of Ewald's son is evidence of DeMarco's motive to implicate Walsh and to threaten those who supported Walsh. Indeed, it came out at trial that DeMarco directed a subordinate, Brian Baisley, to dissuade witnesses from testifying on Walsh's behalf. On cross-examination of DeMarco, the following occurred:

> Q. . . . [The defense served trial] subpoenas . . . on various Sheriff employees. You are aware, as being the Suffolk County Sheriff, and your days as a Deputy Sheriff serving process, that a subpoena is not a defense subpoena or government subpoena, it is a subpoena from the United States District Court, correct?
>
> A. Correct.
>
> . . . .
>
> Q. Did you ever tell Lieutenant Baisley that . . . defense witnesses would not been paid?
>
> . . . .
>
> A. No.

(Trial Tr. 563-66.)

9

DeMarco may have been lying. John Santocroce and Richard Clark received subpoenas from the defense and met with Baisley. The defense called Baisley as a witness to demonstrate DeMarco's attempt to intimidate Santocroce and Clark. The following are excerpts from Baisley's testimony:

> Q. Did you instruct . . . Mr. [Santoc]roce and Mr. Clark, that if they testified for the defense, they would not be paid for the day?
>
> A. Yes.
>
> Q. Did you tell them that this directive was coming directly from Vincent DeMarco?
>
> . . . .
>
> A. . . . I'm going to say yes.
>
> Q. "Yes," as to what, sir?
>
> A. Yes, the directive came from Sheriff DeMarco.
>
> . . . .
>
> Q. Did he tell you to tell anything to people who have been subpoenaed by the defense?
>
> A. He told me that anyone who was coming to testify, not for the government, would not be paid because we don't pay people to testify for criminal defendants.

(Trial Tr. 1399-1400.)

Baisley, relaying the sheriff's decree to Santocroce and Clark, made it clear that those who help the sheriff get paid and that those who help Walsh or any other

10

criminal defendant do not. Ewald therefore had good reason to fear that, if he came forward, DeMarco would hurt Ewald and threaten the future of Ewald's son.

Ewald is not the only person who knew of exculpatory information that the government suppressed. Daniel Papele was the warden of the Yaphank facility — Ewald was the warden of the Riverhead facility — and Hosey and members of the U.S. Attorney's Office interviewed Papele before Walsh's trial. (Ex. 3, at 1 ¶ 3.) According to paragraph 4 of Papele's affidavit, Papele told the government:

> c. Lieutenant Walsh . . . did what Sheriff DeMarco asked him to do. [Walsh] did not answer to me, nor to my understanding[] did he answer to Undersheriff Meyerricks or Warden Charles Ewald.
>
> d. I was the Warden at the Yaphank facility and reported there daily during calendar years 2012 and 2013. Additionally, for most of 2011, I was assigned to the Yaphank transition team . . . . My office was next to the office assigned to the Sheriff. During 2011, 2012 and 2013, Sheriff DeMarco was rarely present at the Yaphank facility[,] and when he did appear he would stay one or two hours at most.
>
> e. . . . [If a]ny emergency situation . . . arose, regardless of the hour, the standing instructions were to call Lieutenant Walsh for him to address the emergency with the Sheriff.
>
> f. . . . I attended numerous Memorial Day Sheriff's Department Services and have seen Lieutenant Walsh and Sheriff DeMarco standing together with other dignitaries during events.

(Ex. 3-1 to 3-2, ¶ 4c-f.)

The information that Papele told the government was consistent with what Ewald told the government. Papele's information also contradicted much of what DeMarco said during the trial. For instance, Papele's recollection of seeing Walsh and DeMarco standing next to each other at numerous events contradicts DeMarco's trial testimony that Walsh's duties did not require Walsh's presence outside the Riverhead or Yaphank jails. (*See* Trial Tr. 515-17, 522-23.). Papele's assertion that DeMarco was rarely present at the Yaphank facility between 2011 and 2013 contradicted DeMarco's testimony that "[i]n 2011[ he] moved [his] office to the Enforcement Building in Yaphank," and that at "the end of 2012 or 2013[ he] moved [his] office into the new administrative building at the new jail in Yaphank." (Trial Tr. 526.)

Papele was a defense witness at Walsh's trial and testified to some of what is contained in his affidavit. (Trial Tr. 1752-54, 1758-60.) A notable exception is what appears in paragraph 4(f) of his affidavit — Papele having observed "Walsh and . . . DeMarco standing together with other dignitaries during events." This contradicted DeMarco's trial testimony that Walsh had no permission to attend such events. Had it known of the above prior to trial, the defense could have explored the matter prior to calling Papele as a defense witness and elicited details from Papele when he testified.

There is more evidence of *Brady* suppression. Shortly before the trial,

12

Michael Murnane retired from the sheriff's office with the rank of deputy warden. (*See* Ex. 4 at 1, ¶ 1; Trial Tr. 1589.) According to Murnane, "In 2014, [he] was interviewed by several agents of the [FBI] and attorneys from the United States Attorney's Office" and, during that interview, said this:

> a. That [he] played golf with Sheriff Vincent DeMarco . . . , Lieutenant Walsh and Undersheriff Caracappa during the work week. When [he] told the agents this, [he] remember[s] them putting down their pens that they had been taking notes with and not being interested about Sheriff DeMarco on the golf course with Lieutenant Walsh.
>
> b. Lieutenant Walsh was the liaison to Sheriff DeMarco and strictly answered to the Sheriff. . . . Lieutenant Walsh did not answer to Warden Charles Ewald.

(Ex. 4, at 1-2, ¶ 3.)

Although Murnane testified to much of the above when called as a defense witness at trial (*see* Trial Tr. 1592-93, 1600, 1628), the government committed a *Brady* violation by concealing it.

The *Brady* violation may be continuing. The government still has not revealed the content of its interview or interviews with Meyerricks, and it is reasonable to believe that the information that Meyerricks gave to the government is similar to the information that Ewald gave to the government.

13

## ARGUMENT

"*Brady* information must be disclosed . . . in a manner that gives the defendant a reasonable opportunity either to use the evidence in the trial or to use the information to obtain evidence for use in the trial." *United States v. Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007). "Similarly, disclosures must be sufficiently specific and complete to be useful." *Id.* The Court need not decide whether the government's "non-disclosure[s] w[ere] a deliberate tactical concealment, or resulted from the mismanagement of information, or from sloppy thinking about the evidentiary significance of the material." *Leka v. Portuondo,* 257 F.3d 89, 103 (2d Cir. 2001). This is what matters here — evidence that should have been disclosed was not disclosed, and Walsh was prejudiced as a result.

"Prejudice" does not require Walsh to show that he probably would have been acquitted had he been provided the information contained in the suppressed interviews. Walsh is entitled to a new trial if disclosure would have created a "significant possibility" of acquittal. *Strickler v. Greene*, 527 U.S. 263, 301 (1999). *See also Kyles* v. *Whitley,* 514 U.S. 419, 435 (1995) (concluding that a *Brady* violation occurs when suppressed, "favorable evidence could reasonably [have been used to] put the whole case in such a different light as to undermine confidence in the verdict").

If Ewald had testified and had the jury credited his testimony, there is a

significant possibility that the jury would have rejected DeMarco's testimony and, with that rejection, the government's entire case. *See United States v. Kohring*, 637 F.3d 895, 902-03, 913 (9th Cir. 2011) (vacating conviction where suppressed *Brady* evidence "sp[oke] to the acts that the jury might have relied on in reaching its verdicts" and otherwise "would have been highly probative of [the prosecution witness's] 'character for truthfulness'") (quoting Fed. R. Evid. 608(b)); *Leka v. Portuondo*, 257 F.3d at 92-93, 104-07 (finding *Brady* violation where off-duty police officer's undisclosed observations contradicted testimony of other eyewitnesses); *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) (observing that "[i]nformation coming within the scope of [*Brady*] includes . . . evidence that is useful for impeachment, *i.e.*, having the potential to alter the jury's assessment of the credibility of a significant prosecution witness").

  If Ewald had testified, it is actually *more* than "significantly possible" that the jury would have credited his testimony and rejected DeMarco's testimony and the government's case. DeMarco was an elected official concerned with his public image and who threatened prospective defense witnesses and created a climate of fear that spread to Ewald, his subordinate. Moreover, whereas Hosey took notes and wrote reports of his handful of conversations with Ewald and Meyerricks, Hosey inexplicably failed to take a single note or to write one report of any of his 40-50 conversations with DeMarco.

15

It was only after the trial and just before the *Fatico* hearing that the defense began to learn of Ewald's exculpatory information. If the government, in its response to this motion, contends that the defense's knowledge of Ewald's existence relieved the government of its *Brady* and *Giglio* obligations, that contention would be meritless. *See United States v. Payne,* 63 F.3d 1200, 1208-09 (2d Cir. 1995) (finding "suppress[ion] within the meaning of *Brady*" where the defense was aware of prosecution witness's identity but was unaware of essential facts that would have led to evidence that could have used to impeach the witness); *see also Brady*, 373 U.S. at 84, 86 (holding that Maryland violated Brady's due-process rights at Brady's capital murder trial where the prosecution withheld a statement in which Brady's accomplice "admitted [having done] the actual homicide"); *United States v. Orena*,145 F.3d 551, 557 n.4 (2d Cir. 1988) (explaining that the defense's awareness of "Scarpa's informant status" did not relieve the government of its *Brady* obligation to disclose "the specific information exchanged between Scarpa and the FBI").

## CONCLUSION

Walsh is entitled to a new trial based upon the government's failure to turn over exculpatory evidence pursuant to *Brady* and its progeny. At a minimum, Walsh is entitled to an evidentiary hearing and to the testimony of Ewald and Meyerricks. In advance of that hearing, Walsh is also entitled to the information

16

that Meyerricks provided to the government, information that the government still has withheld from the defense.

Dated:     Hauppauge, New York
           August 16, 2017

                                        Respectfully,

                                        *Leonard Lato*
                                        Leonard Lato

                                        *William D. Wexler*
                                        William D. Wexler

ec:    AUSAs Catherine M. Mirabile & AUSA Raymond A. Tierney