

*U.S. Department of Justice*

*United States Attorney*
*Eastern District of New York*

RAT:CMM
F. #2014R01331

*610 Federal Plaza*
*Central Islip, New York 11722*

August 23, 2017

By Hand and ECF

The Honorable Arthur D. Spatt
United States District Judge
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

      Re:    United States v. Walsh
                Docket No. 15-CR-91 (ADS)

Dear Judge Spatt:

      As the Court is aware, on August 16, 2017, the defendant in the above-referenced action filed a motion for a new trial based on the government's alleged suppression of exculpatory evidence ("Def. Motion"). On August 18, 2017, the government opposed the defendant's motion ("Govt Op."). On August 21, 2017, the defendant submitted a reply to the government's opposition ("Def. Reply"). The government submits the within letter as a sur-reply to the defendant's August 21 reply.

      In the defendant's reply, he claims that the government's opposition "implicitly concedes that the 'evidence at issue' is 'exculpatory and impeaching.'" See Def. Reply at 1. To the extent the government's position was unclear in its August 18, 2017 opposition, the government submits that the "evidence at issue" – that is, the alleged statements by Ewald, Papele and Murnane – is neither exculpatory nor impeaching and, to the extent that such information is impeaching, than such impeachment is duplicative and of a collateral nature and, thus, immaterial. See e.g., Govt Op. at 34 (with respect to the Ewald Statements, "the defendant's arguments that the Ewald Statements constitutes Brady material flies well short of the mark given the evidence in the case and, even if deemed exculpatory, these statements are not material, disclosure by the government would not have resulted in a different result[,] and the defense otherwise had access to the allegedly suppressed information."); id. at 38 (with respect to the Papele Statements, "issues regarding shift changes and the layout of the offices at the SCSO were extensively discussed at the trial"); id. at 38 (with respect to the Murnane Statements, "[e]ven if such a disclosure was timely made to the government, it is collateral to the issue of the defendant's guilt, would not

constitute Brady and, in any event, the defendant did get the opportunity to cross DeMarco and elicit the fact that he did play golf during the work week").

As discussed in detail in the government's opposition, the identity of the defendant's immediate supervisor, the location of the defendant's office at the Riverhead facility and its proximity to other offices at that facility, the fact that Sheriff DeMarco played golf with the defendant on one occasion on a workday, or that Ewald now opines that DeMarco is "evil" are not exculpatory. None of these things evidence that the defendant actually worked the hours that he claimed and was paid for, particularly when voluminous records introduced at trial indicate that the defendant was actually golfing, shopping, banking, sitting at home, or at Connecticut casinos or political party events.

In their motion and reply, the defendant essentially argues that Ewald's Statements are exculpatory because Ewald believed that the defendant's time sheets were accurate and so the time sheets must be accurate. See Def. Motion at 9; Def. Reply at 2-3. Such reasoning is misplaced and utterly ignores Ewald's actual statements to the government. As noted in the FBI Special Agent Hosey's 302 of Ewald's November 13, 2014 meeting with the government, Ewald acknowledged that there were days when he did not see the defendant after lunch and other days he did not see the defendant at all. Ewald admitted that, while he was responsible for signing the defendant's time sheets, he relied on the defendant regarding its accuracy. See 3500-KH-28 at 1-2 (attached as Exhibit 1 to the defendant's motion). Indeed, when asked if he could verify the defendant worked a full shift each day, Ewald stated "I can't say." Id. at 3. Such statements by Ewald are not exculpatory or impeaching.

Further, while the defense claims that Ewald told defense counsel over a year and a half after the conclusion of the trial that the defendant reported solely to Sheriff DeMarco, this is not what Ewald informed the government prior to trial. See Govt Op. at 36 ("[t]he government can categorically state that Ewald made no such similar statements to . . . the government . . . prior to the trial . . ."). Thus, to the extent this information is even true, the government could not have turned it over to the defense prior to trial as it was not in possession of such information.

In any event, Ewald did not state that the defendant was solely supervised by Sheriff Demarco. As noted in the FBI 302, Ewald stated that the defendant reported to either Sheriff DeMarco **or** Undersheriff Meyerricks and that the defendant essentially responded to complaints assigned to him by Meyerricks. See 3500-KH-28 at 1. Ewald also admitted that the defendant would call him (Ewald) if there was a suicide or an officer injured at the facility. Id. Contrary to the defendant's assertions, Ewald's statements to the government prior to trial are consistent with DeMarco's testimony. At trial, DeMarco testified that the defendant was supervised by Meyerricks or Ewald. (See Trial Transcript ("T") at 507, 515). Specifically, DeMarco stated that "[t]he defendant was to keep his finger on the pulse of the Internal Security Unit and the Gang Intelligence Unit and let Warden Ewald and Undersheriff Meyerricks know immediately if drugs came into the facility, if weapons were found, and if he happened to be off duty, if there was an inmate death, they may commit

suicide, or natural causes it was all hands on deck - - . . . If there was an inmate death, by suicide or natural causes, it was usually all hands on deck . . . ." (T. 512-13). Thus, Ewald's statements to the government prior to trial that the defendant was supervised by Meyerricks, that the defendant reported occurrences such as an inmate death to Ewald, and that Ewald was the supervisory personnel responsible for signing the defendant's time sheets are consistent with DeMarco's statements. Ewald's statements to the government prior to trial are not exculpatory and, thus, the government was not required to disclose them to the defense.

   To the extent that Ewald stated that DeMarco had some supervisory responsibility over the defendant (as one could argue DeMarco had over every employee of the Suffolk County Sheriff's Office), as noted in the government's opposition, the jury heard from repeated witnesses during the trial that it was their understanding that the defendant reported to DeMarco; these witnesses included Anthony Dolan, Vito D'Agnello, Daniel Papele, Michael Murnane and Christopher Lambert. See Govt Op. at 34-35 (citing T. 1142, 1505, 1527, 1612-25 and 1752). Thus, this information is duplicative of impeachment already used by the defendant at trial and, nevertheless, is of a collateral issue, because, as noted above and in the government's opposition, the identity of the defendant's immediate supervisor is immaterial to the question of whether or not the defendant actually worked the hours that he claimed and was paid for.

   Further, in his reply, the defendant, once again, fails to comprehend the significance of the Collective Bargaining Agreement. See Def. Reply at 3. Contrary to the defendant's claims, Sheriff DeMarco did not have the authority to waive the workday or work week requirements for Correction Officers, including the defendant. While there were some things that DeMarco could do (like assigning employees to positions outside the seniority lists), DeMarco could not absolve any Correction Officer of the hourly job requirements. See Govt Op. at 10-13 (Section on the Collective Bargaining Agreement).

   Moreover, whether or not Ewald claimed that the defendant attended a budget meeting with DeMarco is irrelevant, as such information does not explain the defendant's presence on the golf course, at a casino, or in Manhattan at a political party event and any impeachment of DeMarco on this issue is of minimal value and cumulative of the extensive cross-examination of DeMarco at trial. As set discussed in the government's opposition, such a statement is not material and disclosure by the government would not have resulted in different result.

   Lastly, with respect to the defendant's claim that DeMarco is "evil" and attempted to intimidate witnesses, it is clear from both the FBI 302s and the Wexler Affirmation that Ewald never told the government that DeMarco was "evil" or that he feared retribution from DeMarco. Indeed, the FBI 302s arguably indicate that, if anything, it was the defendant who attempted to intimidate Ewald, not DeMarco. In any event, the defendant repeatedly mischaracterizes DeMarco's testimony at trial. As this Court found in its November 7, 2016 Order denying the defendant's motion for a new trial:

> [T]he Defendant has misconstrued the evidence presented against him at trial. Sheriff DeMarco testified that he had a conversation with Lieutenant Baisley about defense subpoenas and that no witnesses for the government or defense would be paid until they had an opinion from the Suffolk County Attorney as to whether the CBA permitted it.

See Memorandum of Decision & Order, dated November 7, 2016 (citing Tr. At 565-66).

The defendant's claims that the statements by Ewald, Papele and Murnane are exculpatory and/or impeaching are untrue. Even if, however, the defendant's claims were true, these purported "violations" do not create a serious danger that a miscarriage of justice has occurred – that is, that an innocent person has been convicted – and therefore a new trial should not be granted. See United States v. Sanchez, 969 F.2d 1049, 1414 (2d Cir. 1992) (quoting United States v. Reed, 875 F.2d 107, 114 (7th Cir. 1989)).

The "evidence at issue" is immaterial to the defendant's guilt, despite the defendant's allegations that these purported statements are so material that it would likely lead to an acquittal. These statements do not suggest that the defendant actually worked the hours he claimed to have worked and was paid for, and they do nothing to counter the substantial evidence corroborating the defendant's guilt. The defendant's guilt was well established at trial. In sum, no rational juror could find that these statements undermine the defendant's rightful conviction for his clear theft of funds and wire fraud and, thus, no new trial should be granted, and there is no need for the Court to hold a hearing on the matter.

    Respectfully submitted,

    BRIDGET M. ROHDE
    Acting United States Attorney

By:    /s/
    Raymond A. Tierney
    Catherine M. Mirabile
    Assistant U.S. Attorneys
    (631) 715-7849/7850

cc:   William Wexler, Esq.
      Leonard Lato, Esq.