FILED
CLERK
3:00 pm, Aug 29, 2017
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------X
UNITED STATES OF AMERICA

     -against-       MEMORANDUM OF
                DECISION & ORDER
EDWARD M. WALSH, JR.,      15-cr-91 (ADS)

     Defendant.
----------------------------------------------------------X

**APPEARANCES:**

**United States Attorney's Office, Eastern District of New York**
610 Federal Plaza
Central Islip, NY 11722
  By: Raymond A. Tierney, Assistant U.S. Attorney
     Catherine Mary Mirabile, Assistant U.S. Attorney

**Leonard Lato, Esq.**
*Co-Counsel for the Defendant*
200 Motor Parkway, Suite C-17
Hauppauge, NY 11788

**William D. Wexler, Esq.**
*Co-Counsel for the Defendant*
816 Deer Park Avenue
North Babylon, NY 11703

**SPATT, District Judge**:

  On March 31, 2016, after a jury trial, the Defendant Edward M. Walsh, Jr. (the "Defendant") was convicted of two felony counts, the same counts for which he had been indicted by a grand jury on March 6, 2015. On June 20, 2017, the Defendant was principally sentenced to twenty-four months incarceration on each count, to run concurrently; three years supervised release; and restitution and forfeiture in the amounts of $245,811.27.

  Presently before the Court is a motion by the Defendant for a new trial pursuant to Federal Rule of Criminal Procedure ("FED. R. CRIM. P." or "Rule") 33 based on the Government's alleged

1

*Brady* and *Giglio* violations. For the following reasons, the Defendant's motion is denied in its entirety.

## I. BACKGROUND

For purposes of these motions, familiarity with the underlying trial record, which spans more than two thousand (2,000) transcribed pages, is presumed. The Court's discussion of the evidence adduced at the trial will be limited to the specific challenges presently raised by the Defendant. In this regard, references to the trial transcript are denoted as "Tr."

## II. DISCUSSION

### A. The Relevant Legal Standards

Rule 33 states that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." FED. R. CRIM. P. 33(a). This rule, "by its terms gives the trial court 'broad discretion . . . to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice.'" *United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir. 2001) (quoting *United States v. Sanchez,* 969 F.2d 1409, 1413 (2d Cir. 1992)); *see also United States v. Landau*, 155 F.3d 93, 104 (2d Cir. 1998) ("A district court should grant a new trial if it is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." (internal quotation marks and citation omitted)).

*Brady* requires the Government to disclose material evidence which is favorable to a criminal defendant. *United States v. Rivas,* 377 F.3d 195, 199 (2d Cir. 2004). Evidence is favorable if it is either exculpatory or impeaching, *Strickler v. Greene,* 527 U.S. 263, 281–82, 119 S. Ct. 1936, 1948, 144 L. Ed. 2d 286 (1999), and it is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been

different[,]" *Youngblood v. West Virginia,* 547 U.S. 867, 870, 126 S. Ct. 2188, 2190, 165 L. Ed. 2d 269 (2006) (internal citations and quotation marks omitted).

There are three components to a *Brady* violation that a defendant must establish: " (1) that the evidence at issue is 'favorable to the accused, either because it is exculpatory, or because it is impeaching'; (2) the 'evidence must have been suppressed by the State, either willfully or inadvertently'; and (3) 'prejudice must have ensued.'" *United States v. Paulino*, 445 F.3d 211, 224 (2d Cir. 2006) (quoting *Strickler,* 527 U.S. 263, 281–82,); *see also United States v. Jackson*, 345 F.3d 59, 71 (2d Cir. 2003); *see generally United States v. Coppa*, 267 F.3d 132, 139 (2d Cir. 2001)).

The third component is also known as the materiality component. The "touchstone of materiality is a 'reasonable probability' of a different result." *Kyles v. Whitley,* 514 U.S. 419, 434, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995). "This is not a test for sufficiency of evidence; the defendant must show that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Jackson*, 345 F.3d at 73–74. A court must consider "the cumulative effect of suppression" in light of the evidence as a whole, *Kyles,* 514 U.S. at 436-37, 115 S. Ct. 1555, and conduct its "own independent examination of the record in determining whether the suppressed evidence is material." *United States v. Orena*, 145 F.3d 551, 558 (2d Cir.1998).

A defendant "seeking a new trial on the basis of an alleged *Brady* violation bears the burden of demonstrating both that the Government suppressed exculpatory information and that this information was material." *United States v. Brunshtein*, 344 F.3d 91, 101 (2d Cir. 2003) (citing *United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir. 1995)).

**B. The Defendant's Bases For a New Trial**

The Defendant contends that he is entitled to a new trial because the Government concealed certain evidence—namely, that he worked more hours than the Government alleged, and by suppressing material from three witnesses that the defense could have used to impeach Sheriff Vincent DeMarco ("DeMarco").

**1. Allegedly Previously Undisclosed Evidence from Charles Ewald**

Charles Ewald ("Ewald"), who worked as the warden at the Riverhead facility, was not called as a witness by the Government or the defense at trial.

Prior to the June 1, 2017 *Fatico* hearing, the Government disclosed to the defense that Ewald had told the Government that "[the Defendant] generally reported directly to the Sheriff or Undersheriff Meyerricks rather than Ewald. . . . Walsh and Ewald did not have a lot of interaction." (Def.'s Ex. 1-1 (ECF No. 138-1).

The Defendant also submitted an affidavit from one of his attorneys. In that affidavit, counsel for the Defendant averred that Ewald informed him that "DeMarco . . . was aware of [the Defendant's] work schedule and that the sheriff was generally aware of when [the Defendant] arrived and left the Suffolk County Correctional Facility[,]" (Def.'s Ex. 2 ¶ 3); that the Defendant answered directly to DeMarco and not to any of the deputy wardens; and Ewald signed the Defendant's time sheets and would not have signed them if he thought they were inaccurate. (*Id.* ¶¶ 4–5). Ewald reportedly further stated that although he did not fear personal retribution from DeMarco any longer, Ewald's son was in the process of gaining employment with the Suffolk County Sheriff's Office and was worried that his son's employment prospects might be affected if Ewald became involved in the case.

## 2. Allegedly Previously Undisclosed Evidence from Daniel Papele

The Defendant also submitted an affidavit from Daniel Papele, who testified as a witness for the Defendant at trial. Papele stated that he told the Government that:

> c. [The Defendant . . . did what Sheriff DeMarco asked him to do. He did not answer to me, nor to my understanding, did he answer to Undersheriff Meyericks or Warden Charles Ewald.
> . . .
> d. During 2011, 2012, and 2013, Sheriff DeMarco was rarely present at the Yaphank facility and when he did appear he would stay one or two hours at most.
> . . .
> f. I attended numerous Memorial Day Sheriff's Department [s]ervices and have seen Lieutenant Walsh and Sheriff DeMarco standing together with other dignitaries during the events.

(Def.'s Ex. 3 ¶¶ 4c–4f). While the Defendant admits that Papele testified "to some of what is contained in his affidavit," (Def.'s Mem of Law at 12), the Defendant was unaware that Papele had seen the Defendant with DeMarco at events outside of the Suffolk County Sherriff's Office's (the "SCSO") facilities.

## 3. Allegedly Previously Undisclosed Evidence from Michael Murnane

The Defendant also submitted an affidavit from Michael Murnane ("Murnane"), who worked as captain investigator in charge of the internal security division, the gang intelligence unit, the K-9 unit, and the sheriff's emergency response team. Murnane also testified at the trial as a witness for the defense.

In his affidavit, Murnane stated that, in 2014, he told the Government:

> a. That I played golf with Sheriff Vincent DeMarco . . . , Lieutenant Walsh and Undersheriff Caracappa during the work week. When I told the agents this, I remember them putting down their pens that they had been taking notes with an not being interested about Sheriff DeMarco on the golf course with Lieutenant Walsh.
> b. Lieutenant Walsh was the liaison to Sheriff DeMarco and strictly answered to the Sheriff. . . . Lieutenant Walsh did not answer to Warden Charles Ewald.

(Def.'s Ex. 4 ¶ 3a–3b).

The Defendant concedes that Murnane testified at trial to "much of the above," (Def.'s Mem. of Law at 13), but contends that the Government nevertheless committed a *Brady* violation by concealing the information.

## C. The Government's Response

The Government argues that the Defendant is unable to prove that any of the above statements produce a reasonable probability of a different result. While the Government contends that the Court need not reach the factual issues of whether it had actual or constructive knowledge of the above statements, *see United States v. Gambino*, 59 F.3d 353, 366 (2d Cir. 1995) (stating that the court "need not decide whether [the evidence] was suppressed" because it found that the evidence did not meet the requirements of materiality), it disputes that the Government had knowledge of many of the above statements. Namely, the Government contends that Ewald's statements contained in defense counsel's affidavit cannot be imputed to the Government, and that Ewald did not make such statements to the Government. As to Papele and Murnane, the Government points out that those individuals met with defense counsel and testified at trial for the Defendant; their affidavits contradict parts of their trial testimony; and the statements in their affidavits cannot be imputed to the Government. Finally, the Government argues that the Defendant knows who supervised him, and to whom he reported, so that information could inherently not be suppressed.

## D. Application to the Facts

Although the Government's memorandum addresses each of the above witnesses individually, the Court must consider the allegedly suppressed evidence as a whole. *See Kyles*, 514 U.S. at 421 ("[t]he established rule that the state's obligation under *Brady v. Maryland,* 373

U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), to disclose evidence favorable to the defense, turns on the cumulative effect of all such evidence suppressed by the government . . . .").

The allegedly suppressed evidence appears to contradict DeMarco's testimony at trial that the Defendant did not report to him, but instead reported to Ewald and Meyerricks. DeMarco also testified that the Defendant's everyday duties did not require him to be outside of the jails in Riverhead or Yaphank (collectively, the "jails"); and that he could only recall two instances when he assigned tasks to the Defendant that brought him outside of the jails.

However, the Defendant clearly fails to prove or establish that the allegedly suppressed evidence produces a reasonable probability of a different result.

First, the information contained in the allegedly suppressed evidence was introduced at trial. Other witnesses testified that the Defendant reported directly to DeMarco; that the Defendant played golf during the day with DeMarco; and that the Defendant was seen at public functions with DeMarco. Anthony Dolan, who had worked as a sheriff's aide to DeMarco, testified that "[w]hatever the sheriff wanted, [the Defendant] got it for him." (*Id.* at 1143). Vito Dagnello, who worked as a corrections officer, testified that the Defendant did "[e]xactly whatever the sheriff told him to do," and that the Defendant reported directly to DeMarco. (*Id.* at 1498). Anthony Polistana, another corrections officer, testified that the Defendant did whatever DeMarco asked him to, including attending wakes on behalf of the SCSO. (*Id.* at 1525, 1519). Murnane testified the Defendant reported directly to the sheriff. (*Id.* at 1592). Specifically, Murnane stated, "[w]hat [the Defendant] did, he worked for the sheriff. He didn't work for me. He worked for the sheriff. His comings and goings were his comings and goings with the sheriff; had nothing to do with us." (*Id.* at 1600).

Murnane also testified that the Defendant golfed in the middle of the day, and that the Defendant represented the SCSO at wakes and funerals. (*Id.* at 1600, 1604). Papele testified that the Defendant was "the eyes and ears of the sheriff. He worked only for the sheriff." (*Id.* at 1752). "[H]e basically did whatever the sheriff asked him to do. (*Id.* at 1753). DeMarco even testified that there was no written description for aide to the sheriff, because the job responsibilities are whatever the sheriff wanted the aide to do. (*Id.* at 577).

Therefore, the allegedly suppressed evidence, if introduced at the trial, would have been duplicative of other evidence actually introduced at trial, and cumulative. In the Court's view, there cannot be a reasonable probability of a different result where the impeaching evidence was introduced at the trial.

The Court notes that at the trial, DeMarco's credibility was attacked based on his statement that he did not supervise the Defendant, as well as on several other grounds. Despite the fact that DeMarco testified that he did not know where the Defendant was at all times, he admitted that he spoke with the Defendant on the phone thousands of times, and at all hours of the day, during the Defendant's tenure as a liaison. While DeMarco denied that the Defendant was his right hand man, several witnesses testified that he did occupy that role. DeMarco testified that he never told Lieutenant Baisley that witnesses who testified for the Defendant would not be paid by the County. However, Baisley testified that DeMarco said "that anyone who was coming to testify, not for the government, would not be paid because we don't pay people to testify for criminal defendants." (*Id.* at 1401). The Defendant argued in a previous motion for a new trial that this amounted to perjury on DeMarco's part. (*See generally* ECF No. 91). Also, although DeMarco testified at the trial that he received the democratic endorsement in 2009 without the Defendant's help, the Democratic chair said that was not true, and that the Democratic Party endorsed DeMarco because

of a deal brokered with the Defendant. (Tr. at 857). Defense counsel also repeatedly pointed out that the Defendant helped DeMarco get the conservative party line; that DeMarco elevated the Defendant immediately upon taking office; and that DeMarco never chastised the Defendant. Defense counsel believed that DeMarco's credibility was so affected by all of this testimony that they argued in summation that the jury should disregard his testimony.

Where, as here, a witness' credibility has already been damaged and the allegedly suppressed evidence would only arguably further erode that credibility, materiality cannot be shown. *United States v. Rowland*, 826 F.3d 100, 113 (2d Cir. 2016) ("[W]here the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material." (quoting *United States v. Avellino*, 136 F.3d 249, 257 (2d Cir. 1998))); *United States v. Spinelli,* 551 F.3d 159, 165 (2d Cir. 2008) (holding that a new trial is not required where "information withheld is merely cumulative of equally impeaching evidence introduced at trial, so that it would not have materially increased the jury's likelihood of discrediting the witness"); *Tankleff v. Senkowski,* 135 F.3d 235, 251 (2d Cir. 1998) ("When a witness's credibility has already been substantially called into question in the same respects by other evidence, additional impeachment evidence will generally be immaterial and will not provide the basis for a *Brady* claim."); *Avellino*, 136 F.3d at 257 (collecting cases).

While "evidence whose function is impeachment may be considered to be material where the witness in question supplied the only evidence linking the defendant to the crime," *Avellino*, 136 F.3d at 256–57 (citing *Giglio v. United States*, 405 U.S. 150, 154–55, 92 S. Ct. 763, 766, 31 L. Ed. 2d 104 (1972) (finding that the case had to be remanded for a new trial where government's

9

case depended "almost entirely" on a witness as to whom impeaching evidence was not disclosed)), DeMarco was not the only piece of evidence connecting the Defendant to the crimes with which he was charged. Although it is true that DeMarco appears to have been the only witness who testified that the Defendant had to be at the jails, many witnesses testified that every SCSO employee was bound by the collective bargaining agreement (the "CBA"), and that County employees could not get paid for gambling, golfing, or engaging in political activities as the Defendant did. Nearly every SCSO employee who testified at trial acknowledged the hourly requirements of the CBA. Dagnello testified that the sheriff could not remove the Defendant from the requirements of the CBA. (Tr. at 1500). Murnane testified similarly that the rules of the CBA applied equally to each SCSO officer, including the Defendant. (*Id.* at 1618). Polistana, Papele, and Doherty all testified that although no one had told them, they knew that they could not get paid by the County for playing golf, gambling at the casino, or doing political party work. (*Id.* at 1522, 1764, 1790–91).

As this Court stated in a prior decision, there was substantial evidence showing that the Defendant spent a great deal of his working hours engaged in those activities. The Government introduced attendance and payroll records, time sheets, overtime slips, receipts, cell phone records, credit card records, bank records, business records, and photographs. The evidence showed that the Defendant played more than one hundred and sixty total rounds of golf at Hampton Hills Golf and Country Club (*Id.* at 126–32, 139–99, 1456–87, 1990; Gov't Ex. 20–25); that he also golfed at the Sebonack Golf Club and Timber Point Golf Course (Tr. at 214–29, 251–58; Gov't Ex. 26–27); that he gambled at Foxwoods on several dates (Tr. at 259–72, 426–54; Gov't Ex. 43, 48, 49, 86); that he went to the bank and shopped (Tr. at 272–91, 316–50; Gov't Ex. 30B–E, 31A–C, 32A–B, 33A–C, 34A–C, 35A–C, 36-38, 40A, 45, 55); and that he worked on behalf of the Suffolk

County Conservative Party (the "SCCP"). (Tr. at 292–311, 388–423; Govt Ex. 33B). These "extracurricular activities" amounted to hundreds of hours where the Defendant was paid while not working for the SCSO. None of the above mentioned evidence was introduced by DeMarco.

It is well-settled that "[w]here substantial evidence of guilt entirely unrelated to the withheld impeachment evidence exists, it will be more difficult to argue that there is a reasonable probability that the withheld evidence, if disclosed, would have resulted in a different verdict." *Orena*, 145 F.3d at 558 (internal citations omitted)); *see also Payne,* 63 F.3d at 1210 ("[A] new trial is generally not required when the testimony of the witness [as to whom impeachment evidence has been withheld] is 'corroborated by other testimony.'" (quoting *United States v. Petrillo,* 821 F.2d 85, 89 (2d Cir. 1987))); *Avellino*, 136 F.3d at 256–57 ("Undisclosed impeachment evidence is not material in the *Brady* sense when, although 'possibly useful to the defense,' it is 'not likely to have changed the verdict.'" (quoting *Giglio,* 405 U.S. at 154)).

Even assuming that Ewald could testify to DeMarco's state of mind—that DeMarco "was aware of [the Defendant's] work schedule and that the sheriff was generally aware of when [the Defendant] arrived and left the Suffolk County Correctional Facility," (Def.'s Ex. 2 ¶ 3), there was a mountain of evidence that demonstrated that the Defendant was bound to the CBA, and could not be paid for the activities in which he repeatedly engaged. Nothing in the allegedly suppressed evidence stands for the proposition that the Defendant was exempt from the CBA requirements that he work a seven-and-a-half-hour work day and a thirty-seven-and-a-half-hour work week, or that he deserved credit for golfing, gambling, or politicking. Said differently, the allegedly suppressed evidence does not discredit the multiple other witnesses who said that the Defendant had to comply with the CBA requirements, and that no one could be paid for engaging in the extracurricular activities in which the Defendant took part while "working." Therefore, because

there was substantial evidence of the Defendant's guilt totally unrelated to DeMarco's testimony, the Defendant cannot sustain his burden of demonstrating materiality.

Finally, the Defendant knew before the trial who supervised him, as well as whether DeMarco was aware of his comings and goings. The Second Circuit has explicitly stated that "*Brady* cannot be violated if the defendant[] had actual knowledge of the relevant information . . . ." *United States v. Zagari*, 111 F.3d 307, 320 (2d Cir. 1997); *see also Lewis v. Conn. Comm'r of Corr.,* 790 F.3d 109, 121 (2d Cir. 2015) ("[E]vidence is not suppressed for *Brady* purposes if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence." (alterations and internal quotation marks omitted)).

Similarly, as the Defendant admits, Murnane testified to all of what was contained in his affidavit, and Papele testified to much of what was in his affidavit. There cannot be a *Brady* violation where the Defendant already possessed the information, was able to use it at trial, and did use it. *See, e.g., Coppa,* 267 F.3d at 144 ("[A]s long as a defendant possesses *Brady* evidence in time for its effective use, the government has not deprived the defendant of due process of law simply because it did not produce the evidence sooner."). While the Defendant contends that there was nevertheless a *Brady* violation because Papele did not testify that he "observed Walsh and DeMarco standing together with other dignitaries during events," (Def.'s Mem. of Law at 12 (internal alterations and citations omitted)), the Court disagrees. As stated above, evidence was adduced at the trial, including from DeMarco himself, that DeMarco and Walsh were sometimes seen together during events. Papele's affidavit does not state that the Defendant was authorized to attend political functions on County time—only that the Defendant appeared at functions with

12

DeMarco. This evidence would have been duplicative and cumulative, and the issue was totally collateral and of limited relevance.

Therefore, the Court finds that the allegedly suppressed evidence clearly does not create a reasonable probability of a different result in this case. As the Defendant cannot demonstrate that he was prejudiced, the Court need not address whether the evidence was in fact suppressed by the Government. *See Gambino*, 59 F.3d at 366 (stating that the court "need not decide whether [the evidence] was suppressed" because it found that the evidence did not meet the requirements of materiality).

### III.  CONCLUSION

Accordingly, for the reasons stated above, the Defendant's motion for a new trial pursuant to Rule 33 is denied.

The Defendant is directed to surrender on October 17, 2017. This date of surrender is final.

It is **SO ORDERED:**

Dated: Central Islip, New York
August 29, 2017

        */s/ Arthur D. Spatt*
ARTHUR D. SPATT
United States District Judge